IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: REMBRANDT TECHNOLOGIES, LP PATENT LITIGATION, | MDL Docket No. 07-md-1848 (GMS) |

| | |
|---|---|
| MOTOROLA, INC., CISCO SYSTEMS, INC., SCIENTIFIC-ATLANTA, INC., ARRIS GROUP, INC., THOMSON, INC., AMBIT MICROSYSTEMS, INC., and NETGEAR, INC., | C.A. No. 07-752 (GMS) |
| Plaintiffs, | |
| v. | |
| REMBRANDT TECHNOLOGIES, LP, | |
| Defendant. | |

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP, and REMBRANDT TECHNOLOGIES, LLC d/b/a REMSTREAM, | |
| Counter-Plaintiffs, | |
| v. | |
| MOTOROLA, INC., CISCO SYSTEMS, INC., SCIENTIFIC-ATLANTA, INC., ARRIS GROUP, INC., THOMSON, INC., AMBIT MICROSYSTEMS, INC., NETGEAR, INC., TIME WARNER CABLE, INC., TIME WARNER CABLE, LLC, TIME WARNER NEW YORK CABLE, LLC, TIME WARNER ENTERTAINMENT COMPANY, LP, COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, INC., CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS OPERATING, LLC, COXCOM, INC., COX COMMUNICATIONS, INC., COX ENTERPRISES, INC., CSC HOLDINGS, | **JURY TRIAL DEMANDED** |

INC., CABLEVISION SYSTEMS               )
CORPORATION, ADELPHIA                   )
COMMUNICATIONS CORPORATION,             )
CENTURY-TCI CALIFORNIA                  )
COMMUNICATIONS, LP, CENTURY-TCI         )
HOLDINGS, LLC, COMCAST OF               )
FLORIDA/PENNSYLVANIA, LP (f/k/a         )
PARNASSOS, LP), COMCAST OF              )
PENNSYLVANIA II, LP (f/k/a CENTURY-     )
TCI CALIFORNIA, LP), PARNASSOS          )
COMMUNICATIONS, LP, ADELPHIA            )
CONSOLIDATION, LLC, PARNASSOS           )
HOLDINGS, LLC, and WESTERN NY           )
CABLEVISION, LP,                        )
                                        )
          Counter-Defendants.           )
                                        )
                                        )
_____   )
                                        )
COMCAST CORPORATION, COMCAST            )
CABLE COMMUNICATIONS, LLC,              )
CENTURY-TCI CALIFORNIA                  )
COMMUNICATIONS, LP, COMCAST OF          )
FLORIDA/PENNSYLVANIA, LP,               )
COMCAST OF PENNSYLVANIA II, LP,         )   **JURY TRIAL DEMANDED**
PARNASSOS COMMUNICATIONS, LP, and       )
COMCAST CABLE COMMUNICATIONS,           )
INC.,                                   )
                                        )
          Counter-Counterclaimants,     )
                                        )
     v.                                 )
                                        )
REMBRANDT TECHNOLOGIES, LP; and         )
REMBRANDT TECHNOLOGIES, LLC,            )
d/b/a REMSTREAM,                        )
                                        )
          Counter-Counter-Defendants.   )
                                        )
                                        )
                                        )
_____   )

## REPLY OF COMCAST COUNTER-DEFENDANTS TO COUNTERCLAIMS OF REMBRANDT TECHNOLOGIES, LP AND REMBRANDT TECHNOLOGIES, LLC, d/b/a REMSTREAM; AND COUNTER-COUNTERCLAIM OF CERTAIN COMCAST COUNTER-DEFENDANTS AND COMCAST CABLE COMMUNICATIONS HOLDINGS, INC.

COUNTER-DEFENDANTS Comcast Corporation; Comcast Cable Communications,

LLC; Century-TCI California Communications, LP; Century-TCI Holdings, LLC; Comcast of

Florida/Pennsylvania, LP; Comcast of Pennsylvania II, LP; Parnassos Communications, LP; Parnassos Holdings, LLC; and Western NY Cablevision, LP (collectively the "Comcast Counter-Defendants") REPLY to the COUNTERCLAIMS of Counter-Plaintiffs Rembrandt Technologies, LP and Rembrandt Technologies, LLC d/b/a Remstream (collectively "Rembrandt") as follows:

Except as expressly admitted herein, the Comcast Counter-Defendants deny each and every allegation in the Counterclaims of Rembrandt.

**THE PARTIES**

1.      The Comcast Counter-Defendants admit the allegations in this paragraph on information and belief.

2.      On information and belief, the Comcast Counter-Defendants admit that Rembrandt Technologies, LLC is organized under the laws of the state of Delaware with its headquarters at 410 City Avenue, Suite 900, Bala Cynwyd, Pennsylvania.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remainder of allegations in this paragraph, and on that basis denies those allegations.

3.      The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

4.      The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

5.      The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

6.      The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

7.      The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

8.      The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

9.      The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

10.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

11.     The Comcast Counter-Defendants admit that one or more of them purchases equipment, including cable modems, from one or more Plaintiff/Counter-Defendants for utilization in cable networks, and that one or more of the Comcast Counter-Defendants provide high-speed Internet and other services to customers utilizing equipment purhased from one or more Plaintiff/Counter-Defendants.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph as directed to the Comcast Counter-Defendants.  Further, the Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph as directed to the non-Comcast MSO Counter-Defendants, and on that basis deny those allegations.

12.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

13.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

14.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

15.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

16.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

17.     Admited that Comcast Corporation is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

18.     Admitted that Comcast Cable Communications, LLC is a limited liability company organized under the laws of the state of Delaware with a principal place of business in Philadelphia, Pennsylvania, and that its registered agent for service of process in Delaware is Comcast Capital Corporation, Wilmington, Delaware.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

19.     Admitted that Comcast Cable Communications, LLC, through one or more subsidiaries, provides cable television and high-speed Internet and other services to customers in one or more of the United States, and conducts and transacts business in Delaware.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

20.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

21.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

22.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

23.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

24.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

25.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

26.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

27.     On information and belief, admitted that in June 2002, Adelphia Communications Corporation ("ACC") filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York.  The Comcast Counter-Defendants

lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

28.     Admitted that Century-TCI California Communications, LP is a limited partnership organized under the laws of the state of Delaware, and that its registered agent for service of process in Delaware is Comcast Capital Corporation, Wilmington, Delaware.  On information and belief, admitted that in June 2002, Century-TCI California Communications, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York.  Denied that Century-TCI California Communications, LP is an affiliate of ACC, that "Century-TCI California Communications, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG)" and that Century-TCI California Communications, LP is a party to or involved in bankruptcy proceedings.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

29.     Admitted that Century-TCI Holdings, LLC is a limited liability company organized under the laws of the state of Delaware, and that its registered agent for service of process in Delaware is Comcast Capital Corporation, Wilmington, Delaware.  On information and belief, admitted that in June 2002, Century-TCI California Communications, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York.  Denied that Century-TCI Holdings, LLC is an affiliate of ACC, that "Century-TCI Holdings, LLC's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG)" and that Century-TCI California Communications, LP or Century-TCI Holdings, LLC is a party to or involved in bankruptcy proceedings.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of remaining the allegations in this paragraph, and on that basis deny those allegations.

30.     Admitted that Comcast of Florida/Pennsylvania, LP, f/k/a Parnassos, LP, is a

limited partnership organized under the laws of the state of Delaware, that Parnossos, LP was an affiliate of ACC at a point in time, and that Comcast of Florida/Pennsylvania, LP's registered agent for service of process in Delaware is Comcast Capital Corporation, Wilmington, Delaware. On information and belief, admitted that in June 2002, Parnossos, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Denied that Parnossos, LP is an affiliate of ACC, that Comcast of Florida/Pennsylvania, LP is an affiliate of ACC, that "Parnossos, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG)" and that Parnossos, LP or Comcast of Florida/Pennsylvania, LP is a party to or involved in bankruptcy proceedings. The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

31.    Admitted that Comcast of Pennsylvania II, LP, f/k/a Century-TCI California, LP, is a limited partnership organized under the laws of the state of Delaware, that Parnossos, LP was an affiliate of ACC at a point in time, and that Comcast of Pennsylvania II, LP's registered agent for service of process in Delaware is Comcast Capital Corporation, Wilmington, Delaware. On information and belief, admitted that in June 2002, Century-TCI California, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Denied that Century-TCI California, LP or Comcast of Pennsylvania II, LP is an affiliate of ACC, that "Century-TCI California, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG)" and that Century-TCI California, LP or Comcast of Pennsylvania II, LP is a party to or involved in bankruptcy proceedings. The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

32.    Admitted that Parnassos Communications, LP is a limited partnership organized under the laws of the state of Delaware, and that its registered agent for service of process in

Delaware is Comcast Capital Corporation, Wilmington, Delaware. On information and belief, admitted that in June 2002, Parnassos Communications, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Denied that Parnassos Communications, LP is an affiliate of ACC, that "Parnassos Communications, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG)" and that Parnassos Communications, LP is a party to or involved in bankruptcy proceedings. The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

33.    The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

34.    Admitted that Parnassos Holdings, LLC is a limited liability company organized under the laws of the state of Delaware, and that its registered agent for service of process in Delaware is Comcast Capital Corporation, Wilmington, Delaware. On information and belief, admitted that in June 2002, Parnassos Holdings, LLC filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Denied that Parnassos Holdings, LLC is an affiliate of ACC, that "Parnassos Holdings, LLC's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG)" and that Parnassos Holdings, LLC is a party to or involved in bankruptcy proceedings. The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

35.    Admitted that Western NY Cablevision, LP is a limited partnership organized under the laws of the state of Delaware, and that its registered agent for service of process in Delaware is Comcast Capital Corporation, Wilmington, Delaware. On information and belief, admitted that in June 2002, Western NY Cablevision, LP filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York.

Denied that Western NY Cablevision, LP is an affiliate of ACC, that "Western NY Cablevision, LP's bankruptcy proceedings are jointly administered with *In re Adelphia Communications Corporation*, Case No. 02-41729 (REG)" and that Western NY Cablevision, LP is a party to or involved in bankruptcy proceedings. The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

36.     Denied that Rembrandt commenced an adversary proceeding against the "ACC-Affiliated Counter-Defendants" as defined, and that Rembrandt filed an administrative proof of claim against the "ACC-Affiliated Counter-Defendants" as defined. The Comcast Counter-Defendants either lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations, or the remaining allegations are legal assertions that require no response.

## JURISDICTION AND VENUE

37.     The Comcast Counter-Defendants admit that Rembrandt asserts that this is an action for patent infringement, arising under the patent laws of the United States, 35 U.S.C. § 1. *et seq*.

38.     Admitted.

39.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

40.     The Comcast Counter-Defendants admit that one or more of them have availed themselves of this Court's jurisdiction, and that one or more of them are Delaware entities. The Comcast Counter-Defendants deny the remaining allegations in this paragraph.

41.     Admitted.

## COUNT I -- U.S. Patent No. 4,937,819

42.     This paragraph does not require a response.

43.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

44.     Admitted that the issue date listed on the '819 patent is June 26, 1990.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

45.     Admitted that one or more of the Comcast Counter-Defendants have purchased equipment from one or more Plaintiff/Counter-Defendants for utilization in cable networks in one or more of the United States.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

46.     Denied.

47.     Denied.

48.     Denied.

### COUNT II -- U.S. Patent No. 5,008,903

49.     This paragraph does not require a response.

50.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

51.     Admitted that the issue date listed on the '903 patent is April 16, 1991.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

52.     Admitted that one or more of the Comcast Counter-Defendants have purchased equipment from one or more Plaintiff/Counter-Defendants for utilization in cable networks in one or more of the United States.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

53.     Denied.

54.     Denied.

55.     Denied.

## COUNT III -- U.S. Patent No. 5,701,761

56.     This paragraph does not require a response.

57.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

58.     Admitted that the issue date listed on the '761 patent is January 20, 1998.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

59.     Admitted that one or more of the Comcast Counter-Defendants have purchased equipment from one or more Plaintiff/Counter-Defendants for utilization in cable networks in one or more of the United States.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

60.     The Comcast Counter-Defendants lack sufficient knowledge to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny those allegations.

61.     Denied.

62.     Denied.

63.     Denied.

## COUNT IV -- U.S. Patent No. 5,719,858

64.     This paragraph does not require a response.

65.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

66.     Admitted that the issue date listed on the '858 patent is February 17, 1998.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

67.     Admitted that one or more of the Comcast Counter-Defendants have purchased equipment from one or more Plaintiff/Counter-Defendants for utilization in cable networks in one or more of the United States.  The Comcast Counter-Defendants lack sufficient information

to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

68.    Denied.

69.    Denied.

70.    Denied.

**COUNT V -- U.S. Patent No. 5,778,234**

71.    This paragraph does not require a response.

72.    The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

73.    Admitted that the issue date listed on the '234 patent is July 7, 1998.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

74.    Admitted that one or more of the Comcast Counter-Defendants have purchased equipment from one or more Plaintiff/Counter-Defendants for utilization in cable networks in one or more of the United States.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

75.    The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny those allegations.

76.    Denied.

77.    Denied.

78.    Denied.

**COUNT VI -- U.S. Patent No. 5,852,631**

79.    This paragraph does not require a response.

80.    The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

81.    Admitted that the issue date listed on the '631 patent is December 22, 1998. Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

82.    Admitted that one or more of the Comcast Counter-Defendants have purchased equipment from one or more Plaintiff/Counter-Defendants for utilization in cable networks in one or more of the United States.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

83.    Denied.

84.    Denied.

85.    Denied.

## COUNT VII -- U.S. Patent No. 6,131,159

86.    This paragraph does not require a response.

87.    The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

88.    Admitted that the issue date listed on the '159 patent is October 10, 2000.  Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

89.    Admitted that one or more of the Comcast Counter-Defendants have purchased equipment from one or more Plaintiff/Counter-Defendants for utilization in cable networks in one or more of the United States.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

90.    The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny those allegations.

91.    Denied.

25

92.     Denied.

93.     Denied.

## COUNT VIII -- U.S. Patent No. 6,950,444

94.     This paragraph does not require a response.

95.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny those allegations.

96.     Admitted that the issue date listed on the '444 patent is September 27, 2005. Except as expressly so admitted, the Comcast Counter-Defendants deny the remaining allegations in this paragraph.

97.     Admitted that one or more of the Comcast Counter-Defendants have purchased equipment from one or more Plaintiff/Counter-Defendants for utilization in cable networks in one or more of the United States.  The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis deny those allegations.

98.     The Comcast Counter-Defendants lack sufficient information to form a belief as to the truth of the allegations contained in this paragraph, and on that basis deny those allegations.

99.     Denied.

100.     Denied.

101.     Denied.

## PRAYER FOR RELIEF

WHEREFORE, the Comcast Counter-Defendants request that Rembrandt take nothing by its Counterclaims and that the relief requested in Rembrandt's Prayer for Relief be denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE:  Failure to State a Claim (Counts I-VIII)

1.     Counts I-VIII of Rembrandt's Counterclaims fail to state a claim upon which relief can be granted.

2.      The Comcast Counter-Defendants have not infringed any claim of any of the '819, '903, '761, '858, '234, '631, '159, and '444 patents ("the asserted patents").

3.      The Comcast Counter-Defendants have not caused, with knowledge, specific intent, or otherwise, equipment suppliers, service providers, and/or any others to infringe any claim of the asserted patents.

4.      Rembrandt has not been damaged in any amount, manner, or at all by reason of any act alleged against the Comcast Counter-Defendants, and therefore the relief Rembrandt prays for cannot be granted.

5.      Rembrandt is not entitled to permanent injunctive relief.

### SECOND AFFIRMATIVE DEFENSE:  Invalidity

6.      On information and belief, each of the asserted patents is invalid at least for failure to satisfy one or more of the conditions of Title 35 United States Code, including without limitation, Sections 101, 102, 103, and 112 thereof.

### THIRD AFFIRMATIVE DEFENSE:  Misuse

7.      On information and belief, Rembrandt has misused the asserted patents by bringing and maintaining its claims of patent infringement against the Comcast Counter-Defendants in bad faith and without probable cause when it knew or should have known that it had no valid claim of patent infringement against the Comcast Counter-Defendants, and by purporting to enforce the asserted patents and demand royalties and other damages with respect to products not covered by the asserted patents.

### FOURTH AFFIRMATIVE DEFENSE:  Laches

8.      Rembrandt's claims are barred, in whole or in part, by the doctrine of laches.

9.      More specifically, and without limiting the generality of the foregoing paragraph, Rembrandt has accused devices that practice one of more of the DOCSIS standards of infringing the asserted patents.

10.      The Comcast Counter-Defendants and/or their predecessors in interest have used products or services that comply with one or more of the DOCSIS standards since no later than

May 1998.  Rembrandt and/or its predecessors in interest knew or reasonably should have known that the Comcast Counter-Defendants and/or their predecessors in interest had used such products or services at that time and since.  However, neither Rembrandt nor its predecessors in interest asserted the '819, '858, and '631 patents against the Comcast Counter-Defendants or any of their predecessors in interest until September 2005, and neither Rembrandt nor its predecessors in interest asserted the '903, '761, '234, '159, and '444 patents against the Comcast Counter-Defendants or any of their predecessors in interest until November 2006.  Rembrandt's and its predecessors in interest's delay is unreasonable and inexcusable, and has caused the Comcast Counter-Defendants material evidentiary and/or economic prejudice.  Rembrandt's claims are accordingly barred by the doctrine of laches.

### FIFTH AFFIRMATIVE DEFENSE: Estoppel

11.    Rembrandt's claims for relief are barred in whole or in part by the equitable doctrines of waiver and/or estoppel.

### SIXTH AFFIRMATIVE DEFENSE:  Rembrandt is Not Entitled to Damages

12.    Rembrandt is not entitled to alleged damages due to its failure to plead and, on information and belief, its inability to prove compliance with the provisions of 35 U.S.C. § 287 on patent marking and pre-suit notice.  Additionally, the limitations period further bars past damages claims.

### SEVENTH AFFIRMATIVE DEFENSE: Remstream Lacks Standing

13.    Rembrandt Technologies, LLC d/b/a Remstream, lacks standing to bring the instant counterclaims because Rembrandt has failed to allege that all substantial rights, including the right to enforce the patents, have been granted to Rembrandt Technologies, LLC d/b/a Remstream.

### EIGHTH AFFIRMATIVE DEFENSE: License

14.    Rembrandt's claims for relief are barred in whole or in part by express or implied license.

## COUNTER-COUNTERCLAIMS

Comcast Cable Communications Holdings, Inc. and Counter-Defendants Comcast Corporation; Comcast Cable Communications, LLC; Century-TCI California Communications, LP; Comcast of Florida/Pennsylvania, LP; Comcast of Pennsylvania II, LP; and Parnassos Communications, LP (collectively the "Comcast Counter-Counterclaimants") assert the following Counter-Counterclaims against Defendant/Counter-Plaintiff-Rembrandt Technologies, LP and Counter-Plaintiff Rembrandt Technologies, LLC d/b/a Remstream (collectively, "Rembrandt").

### PARTIES

1.     Comcast Corporation is a corporation organized under the laws of the Commonwealth of Pennsylvania, having its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania.

2.     Comcast Cable Communications, LLC is a limited liability company organized under the laws of the state of Delaware, having its principal place of business at One Comcast Center, Philadelphia, Pennsylvania, 19103.

3.     Century-TCI California Communications, LP is a limited partnership organized under the laws of the state of Delaware, having its principal place of business at One Comcast Center, Philadelphia, Pennsylvania, 19103.

4.     Comcast of Florida/Pennsylvania, LP, f/k/a Parnassos, LP, is a limited partnership organized under the laws of the state of Delaware, having its principal place of business at One Comcast Center, Philadelphia, Pennsylvania, 19103.

5.     Comcast of Pennsylvania II, LP, f/k/a Century-TCI California, LP is a limited partnership organized under the laws of the state of Delaware, having its principal place of business at One Comcast Center, Philadelphia, Pennsylvania, 19103.

6.     Parnassos Communications, LP is a limited partnership organized under the laws of the state of Delaware, having its principal place of business at One Comcast Center, Philadelphia, Pennsylvania, 19103.

7.     Comcast Cable Communications Holdings, Inc. is a corporation organized under the laws of the state of Delaware, having its principal place of business at One Comcast Center, Philadelphia, Pennsylvania, 19103.  Joinder of Comcast Cable Communications Holdings Inc., as a counter-counterclaimant is proper under Federal Rules of Civil Procedure 13(h) and 19.

8.     On information and belief, Rembrandt Technologies, LP is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 900, Bala Cynwyd, Pennsylvania.

9.     On information and belief, Rembrandt Technologies, LLC d/b/a Remstream is a limited liability corporation organized under the laws of Delaware with its headquarters at 401 City Avenue, Suite 900, Bala Cynwyd, Pennsylvania.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the Counter-Counterclaims under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and federal question jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Patent Laws in Title 35 of the United States Code.

11.     This Court has personal jurisdiction over Rembrandt Technologies, LP and Rembrandt Technologies, LLC d/b/a Remstream, because they have submitted to the jurisdiction of this Court, regularly conduct business in Delaware, and have other sufficient contacts with Delaware.  In addition, Rembrandt Technologies, LLC d/b/a Remstream is a Delaware entity.

12.     Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400.

## FACTS

13.     On information and belief, Rembrandt claims to own all rights, title, and interest in and to the '819, '903, '761, '858, '234, '631, '159, and '444 patents.  In addition, Rembrandt claims to own all rights, title and interest in and to United States Patent No. 5,243,627 ("the '627 patent"), entitled "Signal Point Interleaving Technique" ("the '627 patent"), issued on September 7, 1993. (Ex. A hereto)

14.     Rembrandt has accused one or more of the Comcast Counter-Counterclaimants

and one or more of the Comcast Counter-Defendants' parents, subsidiaries or affiliates, including

the parent of and subsidiaries of Comcast Cable Communications Holdings, Inc., of infringing

the '819, '903, '761, '858, '234, '631, '159, '444, and '627 patents ("Rembrandt's asserted

patents").

15.     An actual case or controversy exists between the Comcast Counter-

Counterclaimants and Rembrandt as to the infringement, validity, and enforceability of

Rembrandt's asserted patents.

**FIRST CLAIM FOR RELIEF: Declaratory Judgment of Non-Infringement, Invalidity,
and Non-Infringement of the '819 Patent**

16.     The Comcast Counter-Counterclaimants reallege and incorporate by reference

Paragraphs 1 through 15 above, and all responses set forth above by the Comcast Counter-

Defendants in their Reply to Rembrandt's Counterclaims and Affirmative Defenses.

17.     The Comcast Counter-Counterclaimants, and their parents, subsidiaries or

affiliates, have not infringed and are not now infringing the '819 patent.

18.     The Comcast Counter-Counterclaimants, and their parents, subsidiaries or

affiliates have not caused others to infringe, and are not now causing others to infringe, the '819

patent.

19.     The '819 patent is invalid under, without limitation, 35 U.S.C. §§ 101-103, 112.

20.     Rembrandt has committed patent misuse by accusing the Comcast Counter-

Counterclaimants, and their parents, subsidiaries or affiliates, of infringing the '819 patent with

knowledge that the '819 patent is invalid and/or not infringed.

21.     The Comcast Counter-Counterclaimants are entitled to a declaratory judgment

that neither they, nor their parents, subsidiaries or affiliates have infringed, nor are infringing, the

'819 patent, and that the '819 patent is invalid and unenforceable.

22.     This Counter-Counterclaim is exceptional under 35 U.S.C. § 285, and the

Comcast Counter-Claimants are entitled to an award of their reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF: Declaratory Judgment of Non-Infringement, Invalidity and Non-Infringement of the '903 Patent**

23.     The Comcast Counter-Counterclaimants reallege and incorporate by reference Paragraphs 1 through 22 above, and all responses set forth above by the Comcast Counter-Defendants in their Reply to Rembrandt's Counterclaims and Affirmative Defenses.

24.     The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, have not infringed and are not now infringing the '903 patent.

25.     The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates have not caused others to infringe, and are not now causing others to infringe, the '903 patent.

26.     The '903 patent is invalid under, without limitation, 35 U.S.C. §§ 101-103, 112.

27.     Rembrandt has committed patent misuse by accusing the Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, of infringing the '903 patent with knowledge that the '903 patent is invalid and/or not infringed.

28.     The Comcast Counter-Counterclaimants are entitled to a declaratory judgment that neither they, nor their parents, subsidiaries or affiliates have infringed, nor are infringing, the '903 patent, and that the '903 patent is invalid and unenforceable.

29.     This Counter-Counterclaim is exceptional under 35 U.S.C. § 285, and the Comcast Counter-Claimants are entitled to an award of their reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF: Declaratory Judgment of Non-Infringement, Invalidity, and Non-Infringement of the '761 Patent**

30.     The Comcast Counter-Counterclaimants reallege and incorporate by reference Paragraphs 1 through 29 above, and all responses set forth above by the Comcast Counter-Defendants in their Reply to Rembrandt's Counterclaims and Affirmative Defenses.

31.     The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, have not infringed and are not now infringing the '761 patent.

32.     The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates have not caused others to infringe, and are not now causing others to infringe, the '761

patent.

33.    The '761 patent is invalid under, without limitation, 35 U.S.C. §§ 101-103, 112.

34.    Rembrandt has committed patent misuse by accusing the Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, of infringing the '761 patent with knowledge that the '761 patent is invalid and/or not infringed.

35.    The Comcast Counter-Counterclaimants are entitled to a declaratory judgment that neither they, nor their parents, subsidiaries or affiliates have infringed, nor are infringing, the '761 patent, and that the '761 patent is invalid and unenforceable.

36.    This Counter-Counterclaim is exceptional under 35 U.S.C. § 285, and the Comcast Counter-Claimants are entitled to an award of their reasonable attorneys' fees.

**FOURTH CLAIM FOR RELIEF: Declaratory Judgment of Non-Infringement, Invalidity, and Non-Infringement of the '858 Patent**

37.    The Comcast Counter-Counterclaimants reallege and incorporate by reference Paragraphs 1 through 36 above, and all responses set forth above by the Comcast Counter-Defendants in their Reply to Rembrandt's Counterclaims and Affirmative Defenses.

38.    The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, have not infringed and are not now infringing the '858 patent.

39.    The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates have not caused others to infringe, and are not now causing others to infringe, the '858 patent.

40.    The '858 patent is invalid under, without limitation, 35 U.S.C. §§ 101-103, 112.

41.    Rembrandt has committed patent misuse by accusing the Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, of infringing the '858 patent with knowledge that the '858 patent is invalid and/or not infringed.

42.    The Comcast Counter-Counterclaimants are entitled to a declaratory judgment that neither they, nor their parents, subsidiaries or affiliates have infringed, nor are infringing, the '858 patent, and that the '858 patent is invalid and unenforceable.

43.     This Counter-Counterclaim is exceptional under 35 U.S.C. § 285, and the Comcast Counter-Claimants are entitled to an award of their reasonable attorneys' fees.

**FIFTH CLAIM FOR RELIEF: Declaratory Judgment of Non-Infringement, Invalidity, and Non-Infringement of the '234 Patent**

44.     The Comcast Counter-Counterclaimants reallege and incorporate by reference Paragraphs 1 through 43 above, and all responses set forth above by the Comcast Counter-Defendants in their Reply to Rembrandt's Counterclaims and Affirmative Defenses.

45.     The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, have not infringed and are not now infringing the '234 patent.

46.     The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates have not caused others to infringe, and are not now causing others to infringe, the '234 patent.

47.     The '234 patent is invalid under, without limitation, 35 U.S.C. §§ 101-103, 112.

48.     Rembrandt has committed patent misuse by accusing the Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, of infringing the '234 patent with knowledge that the '234 patent is invalid and/or not infringed.

49.     The Comcast Counter-Counterclaimants are entitled to a declaratory judgment that neither they, nor their parents, subsidiaries or affiliates have infringed, nor are infringing, the '234 patent, and that the '234 patent is invalid and unenforceable.

50.     This Counter-Counterclaim is exceptional under 35 U.S.C. § 285, and the Comcast Counter-Claimants are entitled to an award of their reasonable attorneys' fees.

**SIXTH CLAIM FOR RELIEF: Declaratory Judgment of Non-Infringement, Invalidity, and Non-Infringement of the '631 Patent**

51.     The Comcast Counter-Counterclaimants reallege and incorporate by reference Paragraphs 1 through 50 above, and all responses set forth above by the Comcast Counter-Defendants in their Reply to Rembrandt's Counterclaims and Affirmative Defenses.

52.     The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, have not infringed and are not now infringing the '631 patent.

53.    The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates have not caused others to infringe, and are not now causing others to infringe, the '631 patent.

54.    The '631 patent is invalid under, without limitation, 35 U.S.C. §§ 101-103, 112.

55.    Rembrandt has committed patent misuse by accusing the Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, of infringing the '631 patent with knowledge that the '631 patent is invalid and/or not infringed.

56.    The Comcast Counter-Counterclaimants are entitled to a declaratory judgment that neither they, nor their parents, subsidiaries or affiliates have infringed, nor are infringing, the '631 patent, and that the '631 patent is invalid and unenforceable.

57.    This Counter-Counterclaim is exceptional under 35 U.S.C. § 285, and the Comcast Counter-Claimants are entitled to an award of their reasonable attorneys' fees.

**SEVENTH CLAIM FOR RELIEF: Declaratory Judgment of Non-Infringement, Invalidity, and Non-Infringement of the '159 Patent**

58.    The Comcast Counter-Counterclaimants reallege and incorporate by reference Paragraphs 1 through 57 above, and all responses set forth above by the Comcast Counter-Defendants in their Reply to Rembrandt's Counterclaims and Affirmative Defenses.

59.    The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, have not infringed and are not now infringing the '159 patent.

60.    The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates have not caused others to infringe, and are not now causing others to infringe, the '159 patent.

61.    The '159 patent is invalid under, without limitation, 35 U.S.C. §§ 101-103, 112.

62.    Rembrandt has committed patent misuse by accusing the Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, of infringing the '159 patent with knowledge that the '159 patent is invalid and/or not infringed.

63.    The Comcast Counter-Counterclaimants are entitled to a declaratory judgment

that neither they, nor their parents, subsidiaries or affiliates have infringed, nor are infringing, the '159 patent, and that the '159 patent is invalid and unenforceable.

64.    This Counter-Counterclaim is exceptional under 35 U.S.C. § 285, and the Comcast Counter-Claimants are entitled to an award of their reasonable attorneys' fees.

**EIGHTH CLAIM FOR RELIEF: Declaratory Judgment of Non-Infringement, Invalidity, and Non-Infringement of the '444 Patent**

65.    The Comcast Counter-Counterclaimants reallege and incorporate by reference Paragraphs 1 through 64 above, and all responses set forth above by the Comcast Counter-Defendants in their Reply to Rembrandt's Counterclaims and Affirmative Defenses.

66.    The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, have not infringed and are not now infringing the '444 patent.

67.    The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates have not caused others to infringe, and are not now causing others to infringe, the '444 patent.

68.    The '444 patent is invalid under, without limitation, 35 U.S.C. §§ 101-103, 112.

69.    Rembrandt has committed patent misuse by accusing the Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, of infringing the '444 patent with knowledge that the '444 patent is invalid and/or not infringed.

70.    The Comcast Counter-Counterclaimants are entitled to a declaratory judgment that neither they, nor their parents, subsidiaries or affiliates have infringed, nor are infringing, the '444 patent, and that the '444 patent is invalid and unenforceable.

71.    This Counter-Counterclaim is exceptional under 35 U.S.C. § 285, and the Comcast Counter-Claimants are entitled to an award of their reasonable attorneys' fees.

**NINTH CLAIM FOR RELIEF: Declaratory Judgment of Non-Infringement, Invalidity, and Non-Infringement of the '627 Patent**

72.    The Comcast Counter-Counterclaimants reallege and incorporate by reference Paragraphs 1 through 71 above, and all responses set forth above by the Comcast Counter-Defendants in their Reply to Rembrandt's Counterclaims and Affirmative Defenses.

73.    The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates, have not infringed and are not now infringing the '627 patent.

74.    The Comcast Counter-Counterclaimants, and their parents, subsidiaries or affiliates have not caused others to infringe, and are not now causing others to infringe, the '627 patent.

75.    The '627 patent is invalid under, without limitation, 35 U.S.C. §§ 101-103, 112.

76.    Any attempt by Rembrandt to assert the claims of the '627 patent against the Comcast Counter-Counterclaimants, their parents, subsidiaries or affiliates, is barred by the doctrine of laches.  Rembrandt has accused devices that practice the Advanced Television Systems Committee ("ATSC") standard of infringing the '627 patent.  However, the Comcast Counter-Counterclaimants, their parents, subsidiaries or affiliates and/or each of the foregoing's predecessors in interest, have used products or services that comply with the ATSC standard since no later than February 2001.  Rembrandt and/or its predecessors in interest knew or reasonably should have known that the Comcast Counter-Counterclaimants, their parents, subsidiaries or affiliates, and/or each of the foregoing's predecessors in interest had used such products or services at that time and since.  However, Rembrandt failed to assert the '627 patent against the Comcast Counter-Counterclaimants until September 2005.  Rembrandt's delay is unreasonable and inexcusable, and has caused the Comcast Counter-Counterclaimants material evidentiary and/or economic prejudice.  Rembrandt's claims under the '627 patent are accordingly barred by laches.

77.    Rembrandt has committed patent misuse by accusing the Comcast Counter-Counterclaimants, or their parents, subsidiaries or affiliates, of infringing the '627 patent with knowledge that the '627 patent is invalid and/or not infringed.

78.    More specifically, and without limiting the generality of the foregoing paragraph, when the '627 patent issued in 1993, it was assigned to AT&T Bell Laboratories, a subsidiary or affiliate of AT&T Corporation ("AT&T").  Also in 1993, AT&T and several other companies and institutions joined together to form the HDTV Grand Alliance, whose mission was to

develop a standard for the transmission of digital television. The Grand Alliance coordinated with the ATSC, a standards-setting organization, to create a standard for high-definition television broadcasting. The FCC ultimately adopted the major components of the ATSC standard. In adopting the ATSC standard, the FCC expressly premised its order upon, among other things, the Grand Alliance members' agreement to make any of their relevant patents available either free of charge or on a reasonable, nondiscriminatory basis. AT&T, as a member of the Grand Alliance, was bound by this agreement, and expressly committed to make licenses to any patents that it deemed essential to practicing that standard available under reasonable terms and conditions on a non-discriminatory, non-exclusive basis.

79.    When Paradyne Corporation was spun off from AT&T, it took any rights that it may have had to the '627 patent subject to AT&T's commitment to license that patent on reasonable and nondiscriminatory terms. When Rembrandt purchased the '627 patent from Paradyne, it similarly took any rights to that patent subject to the agreement that AT&T had made to license the patent on reasonable terms and on a non-discriminatory basis.

80.    Rembrandt has actual knowledge of AT&T's commitment with respect to the '627 patent. Yet in asserting that Comcast infringes the '627 patent by allegedly practicing the ATSC standard, Rembrandt has failed to honor AT&T's commitment to license that patent at reasonable and nondiscriminatory rates; instead, Rembrandt seeks exorbitant and oppressive royalty rates, and an injunction. Rembrandt's conduct constitutes patent misuse.

81.    The '627 patent is also unenforceable because it was obtained through inequitable conduct. More specifically, William Betts (a named inventor on the '627 patent) committed fraud on the U.S. Patent and Trademark Office ("PTO") when prosecuting the '627 patent. Mr. Betts's fraud on the PTO renders the '627 patent unenforceable.

82.    As described in more detail below, while prosecuting the '627 patent, Mr. Betts knew of multiple prior art references material to the patentability of the claims in the '627 patent. But Mr. Betts failed to disclose those items of prior art and in so doing violated his duty of candor to the PTO. Moreover, Comcast is informed and believes that Mr. Betts failed to disclose

these references with an intent to deceive the PTO.

83.     Mr. Betts is a named inventor on United States Patent No. 4,677,626 ("the '626 patent"), entitled "Self-Synchronizing Interleaver for Trellis Encoder Used in Wireline Modems." That patent issued on June 30, 1987, and is therefore prior art to the '627 patent. The '626 patent constitutes material prior art to the '627 patent, such that a reasonable patent examiner would have been substantially likely to consider it important in deciding whether to allow any claims in the application for the '627 patent to issue. Mr. Betts indisputably knew of the '626 patent and its materiality, as he was a named inventor on that prior-art patent. His failure to disclose the '626 patent violated his duty of candor to the PTO and constituted inequitable conduct, thus rendering the '627 patent unenforceable.

84.     United States Patent No. 5,052,000 ("the '000 patent"), entitled "Technique for Improving the Operation of Decision Feedback Equalizers in Communications Systems Using Error Correction," issued on September 24, 1991 to Wang et al. based on an application filed on June 9, 1989. It is therefore prior art to the '627 patent. The '000 patent constitutes material prior art to the '627 patent, such that a reasonable patent examiner would have been likely to consider it important in deciding whether to allow any claims in the application for the '627 patent to issue. On information and belief, Mr. Betts knew of the invention of the '000 patent and its materiality, as he was a colleague of Wang's in the AT&T family of companies, and received a paper co-authored by Wang that described the invention of the prior-art '000 patent. Mr. Betts's failure to disclose the '000 patent to the PTO violated his duty of candor to the PTO and constituted inequitable conduct, thus rendering the '627 patent unenforceable.

85.     The Comcast Counter-Counterclaimants are entitled to a declaratory judgment that neither they, nor their parents, subsidiaries or affiliates have infringed, nor are infringing the '627 patent, and that the '627 patent is invalid and unenforceable.

86.     This Counter-Counterclaim is exceptional under 35 U.S.C. § 285, and the Comcast Counter-Counterclaimants are entitled to an award of its reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), the Comcast Counter-Defendants and the Comcast Counter-Counterclaimants demand a trial by jury of all issues so triable in this action, including, without limitation, those issues raised in the Counterclaims, Reply, Affirmative Defenses, and Counter-Counterclaims.

## PRAYER FOR RELIEF

WHEREFORE, the Comcast Counter-Defendants and Comcast Counter-Counterclaimants pray for judgment against Rembrandt Technologies, LP and Rembrandt Technologies, LLC d/b/a Remstream (collectively "Rembrandt") as follows:

A.    For dismissal of Rembrandt's Counterclaims in their entirety, with prejudice, and that the relief requested be denied;

B.    For a judgment declaring that no claim of the '819, '903, '761, '858, '234, '631, '159, '444, or '627  patents (collectively "the patents-in-suit") has been infringed willfully, deliberately, or otherwise by the Comcast Counter-Defendants, the Comcast Counter-Counterclaimants, and/or the Comcast Counter-Defendants' or the Comcast Counterclaimants' parents, subsidiaries and/or affiliates;

C.    For a judgment declaring that each and every claim of the patents-in-suit is invalid;

D.    For an award of the Comcast Counter-Defendants' and Comcast Counterclaimants' reasonable attorneys' fees under 35 U.S.C. § 285; and

G.    For such other and further relief as the Court may deem just and fair.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs Louden (#2881)*
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
klouden@mnat.com
Attorneys for COMCAST CORP.;
COMCAST CABLE COMMUNICATIONS,
LLC;
CENTURY-TCI CALIFORNIA
COMMUNICATIONS, LP;
CENTURY-TCI HOLDINGS, LLC
COMCAST OF FLORIDA /
PENNSYLVANIA, LP;
COMCAST OF PENNSYLVANIA II, LP;
PARNASSOS COMMUNICATIONS, LP;
PARNASSOS HOLDINGS, LLC;
WESTERN NY CABLEVISION LP; AND
COMCAST CABLE COMMUNICATIONS
HOLDINGS, INC.

OF COUNSEL:

Robert A. Van Nest
Brian L. Ferrall
Daralyn J. Durie
Leo L. Lam
Matthew M. Werdegar
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA  94111
(415) 391-5400

February 7, 2008
1486155

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 7, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

I further certify that I caused to be served copies of the foregoing document on February 7, 2008 upon the following in the manner indicated:

### <u>VIA EMAIL</u>

Collins J. Seitz, Jr., Esquire
Francis DiGiovanni, Esquire
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
cseitz@cblh.com
fdigiovanni@cblh.com

John W. Shaw, Esquire
YOUNG CONAWAY STARGATT & TAYLOR LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
jshaw@ycst.com

David S. Benyacar, Esquire
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
dbenyacar@kayescholer.com

John M. DesMarais, Esquire
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
jdesmarais@kirkland.com

Eric R. Lamison, Esquire
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
elamison@kirkland.com

*Karen Jacobs Louden (#2881)*
Karen Jacobs Louden (#2881)

# EXHIBIT A

US005243627A

# United States Patent [19]

## Betts et al.

[11]  Patent Number: 5,243,627

[45]  Date of Patent: Sep. 7, 1993

[54] SIGNAL POINT INTERLEAVING TECHNIQUE

[75] Inventors: William L. Betts, St. Petersburg; Edward S. Zuranski, Largo, both of Fla.

[73] Assignee: AT&T Bell Laboratories, Murray Hill, N.J.

[21] Appl. No.: 748,594

[22] Filed: Aug. 22, 1991

[51] Int. Cl.5 .............................................. H04L 5/12
[52] U.S. Cl. ...................................... 375/39; 375/60; 375/99; 371/43
[58] Field of Search ........................ 375/39, 58, 60, 99; 371/43, 37.5, 2.1, 45; 341/81

[56]             References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,988,677 | 10/1976 | Fletcher et al. | 371/45 X |
| 4,677,624 | 6/1987 | Betts et al. | 375/39 |
| 4,945,549 | 7/1990 | Simon et al. | 375/53 |
| 5,029,185 | 7/1991 | Wei | 375/39 X |

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—Tesfaldet Bocure
*Attorney, Agent, or Firm*—Ronald D. Slusky; Gerard A. deBlasi

[57]               ABSTRACT

Viterbi decoder performance in a data communication system using 2N-dimensional channel symbols N>1 can be further enhanced by an interleaving technique which uses a distributed trellis encoder in combination with a signal point interleaver.

24 Claims, 4 Drawing Sheets







*FIG. 1*

PRIOR ART



*FIG. 2*



FIG. 3



*FIG. 4*

*FIG. 5*

| | | 4D SYMBOL | | 4D SYMBOL | | 4D SYMBOL | | 4D SYMBOL | | 4D SYMBOL | | 4D SYMBOL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | NOT INTERLEAVED ONE TRELLIS STAGE | $X_0^\alpha$ | $X_1^\alpha$ | $X_2^\alpha$ | $X_3^\alpha$ | $X_4^\alpha$ | $X_5^\alpha$ | $X_6^\alpha$ | $X_7^\alpha$ | $X_8^\alpha$ | $X_9^\alpha$ | $X_{10}^\alpha$ | ... |
| II | NOT INTERLEAVED THREE TRELLIS STAGES | $X_0^\alpha$ | $X_1^\alpha$ | $X_2^\beta$ | $X_3^\beta$ | $X_4^\gamma$ | $X_5^\gamma$ | $X_6^\alpha$ | $X_7^\alpha$ | $X_8^\beta$ | $X_9^\beta$ | $X_{10}^\gamma$ | ... |
| III | INTERLEAVED ONE TRELLIS STAGE | $X_0^\alpha$ | $X_{-1}^\alpha$ | $X_2^\alpha$ | $X_1^\alpha$ | $X_4^\alpha$ | $X_3^\alpha$ | $X_6^\alpha$ | $X_5^\alpha$ | $X_8^\alpha$ | $X_7^\alpha$ | $X_{10}^\alpha$ | ... |
| IV | INTERLEAVED TWO TRELLIS STAGES | $X_0^\alpha$ | $X_{-1}^\beta$ | $X_2^\beta$ | $X_1^\alpha$ | $X_4^\alpha$ | $X_3^\beta$ | $X_6^\beta$ | $X_5^\alpha$ | $X_8^\alpha$ | $X_7^\beta$ | $X_{10}^\beta$ | ... |
| V | INTERLEAVED THREE TRELLIS STAGES | $X_0^\alpha$ | $X_{-1}^\gamma$ | $X_2^\beta$ | $X_1^\alpha$ | $X_4^\gamma$ | $X_3^\beta$ | $X_6^\alpha$ | $X_5^\gamma$ | $X_8^\beta$ | $X_7^\alpha$ | $X_{10}^\gamma$ | ... |

*FIG. 6*



*FIG. 7*



5,243,627

1

# SIGNAL POINT INTERLEAVING TECHNIQUE

## BACKGROUND OF THE INVENTION

The present invention relates to the transmission of digital data over band-limited channels.

Over the years, the requirements of modern-day digital data transmission over band-limited channels—such as voiceband telephone channels—have resulted in a push for higher and higher bit rates. This push has led to the development and introduction of such innovations as adaptive equalization, multi-dimensional signal constellations, echo cancellation (for two-wire applications), and trellis coding. Today, the data rates achieved using these and other techniques are beginning to approach the theoretical limits of the channel.

It has been found that various channel impairments, whose effects on the achievable bit rate were relatively minor compared to, say, additive white Gaussian noise and linear distortion, have now become of greater concern. These include such impairments as nonlinear distortion and residual (i.e., uncompensated-for) phase jitter. Such impairments are particularly irksome in systems which use trellis coding. Indeed, it has been found that the theoretical improvement in Gaussian noise immunity promised by at least some trellis codes is not realized in real-world applications where these impairments are manifest. The principal reason this is so appears to be that the noise components introduced into the received signal samples are such as to worsen the effectiveness of the Viterbi decoder used in the receiver to recover the transmitted data.

U.S. Pat. No. 4,677,625, issued Jun. 30, 1987 to Betts et al, teaches a method and arrangement in which, through the use of a distributed trellis encoder/Viterbi decoder, the effects of many of these impairments can be reduced. The invention in the Betts et al patent recognizes that a part of the reason that the performance of the Viterbi decoder is degraded by these impairments is the fact that the noise components of channel symbols which closely follow one another in the transmission channel are highly correlated for many types of impairments. And it is that correlation which worsens the effect that these impairments have on the Viterbi decoder. Among the impairments whose noise is correlated in this way are impulse noise, phase "hits" and gain "hits." All of these typically extend over a number of adjacent channel symbols in the channel, and thus all result in channel symbol noise components which are highly correlated. The well-known noise enhancement characteristics of linear equalizers also induce correlated noise in adjacent channel symbols, as does uncompensated-for phase jitter. Also, the occurrence of one of the relatively high power points of the signal constellation can, in pulse code modulation (PCM) systems, for example, give rise to noise on adjacent channel symbols which, again, is correlated.

The Betts et al patent addresses this issue by distributing the outgoing data to a plurality of trellis encoders in round-robin fashion and interleaving the trellis encoder outputs on the transmission channel. In the receiver, the stream of received interleaved channel symbols is correspondingly distributed to a plurality of trellis decoders. Since the successive pairs of channel symbols applied to a particular trellis decoder are separated from one another as they traverse the channel, the correlation of the noise components of these channel symbol

2

pairs is reduced from what it would have otherwise been.

## SUMMARY OF THE INVENTION

In accordance with the present invention, it has been realized that the Viterbi decoder performance in a data communication system using 2N-dimensional channel symbols can be further enhanced by an interleaving technique which uses, in combination, a) the aforementioned distributed trellis encoder/Viterbi decoder technique and b) a signal point interleaving technique which causes the constituent signal points of the channel symbols to be non-adjacent as they traverse the channel.

In preferred embodiments of the invention, the interleaving is carried out in such a way that every $N^{th}$ signal point in the signal point stream traversing the channel is the $N^{th}$ signal point of a respective one of the channel symbols. This criterion enhances the accuracy with which the phase tracking loop in the receiver performs its function.

Also in preferred embodiments, we have found that the use of three parallel trellis encoders in conjunction with a signal point interleaving regime in which the signal points of each channel symbol are separated from one another by three signaling intervals (bauds) provides an optimum or near-optimum tradeoff between signal point/channel symbol separation and the decoding delay that is caused by the interleaving.

## BRIEF DESCRIPTION OF THE DRAWING

In the drawing,

FIG. 1 is a block diagram of the transmitter section of a prior art modem;

FIG. 2 is shows a signal constellation used by the transmitter of FIG. 1;

FIG. 3 is a block diagram of the transmitter section of a modem employing four-dimensional channel symbols and embodying the principles of the invention;

FIG. 4 is a block diagram of the receiver section of a modem embodying the principles of the invention which processes the received four-dimensional channel symbols generated by the transmitter of FIG. 3;

FIG. 5 is a signal point timing/sequencing chart helpful in explaining the principles of the present invention;

FIG. 6 is a signal point interleaver which can be used in the transmitter of FIG. 3 to interleave the signal points of eight-dimensional channel symbols; and

FIG. 7 is a signal point deinterleaver which can be used in the receiver of FIG. 4 to deinterleave the signal points of eight-dimensional channel symbols.

## DETAILED DESCRIPTION

FIG. 1 depicts the transmitter section of a prior art modem employing a 2N-dimensional signaling scheme, $N \geq 1$. The modem receives input information in the form of a serial bit stream from data terminal equipment (DTE) 111—illustratively a host computer. That bit stream is then scrambled, or randomized, by randomizer 113 whose output bits are provided in serial form to serial-to-parallel (S/P) converter 115.

Serial-to-parallel converter 115, in turn, provides, during each of a succession of symbol intervals (comprised of N baud intervals), some predetermined number of parallel bits on lead 109 and some number of parallel bits on lead 108. (It will be appreciated that whenever bits are provided in parallel in the modem, separate leads are required to carry each of the bits.) The bits on lead 109 are applied to trellis encoder 119α,

5,243,627

| 3 | 4 |

and are referred to as the "trellis bits." The bits on lead 108 are applied to modulus converter 116, and are referred to as the "uncoded bits."

To better understand how trellis encoder $119\alpha$ and modulus converter 116 work, reference is made to FIG. 2, which shows the two-dimensional signal constellation that forms the basis of the 2N-dimensional signaling scheme illustratively used by the modem. This constellation is comprised of 32 signal points, which are divided into four subsets, A through D, each comprised of eight signal points. The eight points of subset A are explicitly labeled as $A_0$ through $A_7$. It may be noted that subsets C, B and D can be arrived at by clockwise rotation of subset A by 90, 180 and 270 degrees, respectively. (Conventional differential encoding circuitry within trellis encoder $119\alpha$ exploits this symmetry.) For reference, a single signal point of each of those subsets is also shown on FIG. 2.

Consider, first, the case of N=1, i.e., a two-dimensional signaling scheme. In this case, one trellis bit on lead 109 would be expanded to two bits by trellis encoder $119\alpha$ on lead 121. The four possible values of those three bits 00, 01, 10, and 11 identify subsets A, B, C and D, respectively. The successive 2-bit words on lead 121 are represented as $a_n$, n=0,1,2. . . , where n is an index that advances at the baud rate. At the same time, three parallel bits would be provided on lead 108. These are converted by modulus converter 116 into an index having a value within the range (decimal) 0 to 7. The index value, represented in binary form on lead 117, selects a particular signal point from the subset identified on lead 121. Thus if lead 121 carries the two bits 00 while lead 117 carries the three bits 001, then signal point $A_1$ of the FIG. 2 constellation has been selected. The words on leads 117 and 121 are applied to QAM encoder 124 which generates, on lead 125, values representing the I (in-phase) and Q (quadrature-phase) components of signal point $A_1$. The signal point generated on lead 125 in the $n^{th}$ baud interval is denoted $X_n\alpha$, which is passed on to modulator 128 to generate a passband line signal which is applied to the communication channel. The superscript, $\alpha$, indicates that the trellis encoder that was used to identify the subset for any particular signal point was trellis encoder $119\alpha$. That is, of course, a trivial notation as far as FIG. 1 goes inasmuch as trellis encoder $119\alpha$ is the only trellis encoder in the modem. However, it is useful to introduce this notation because more than one trellis encoder stage is used in preferred embodiments of modems incorporating the principles of the present invention as shown in later FIGS.

In the case of N>1, the operation is similar. Now, however, the words on lead 109 are used by trellis encoder $119\alpha$ to sequentially identify on lead 121N subsets, while the words on lead 108 are used to generate N corresponding index values on lead 117. The N signal points identified in this way are the component signal points of a 2N-dimensional channel symbol, the first such symbol being comprised of the signal points $X_0\alpha$, . . . $X_{(N-1)}\alpha$. For example, a modem in which the transmitter of FIG. 1 could be used may be a 14,400 bit per second modem using four-dimensional coding (i.e., N=2) and a baud rate of 3200. In this case, nine bits from S/P converter 115 are used for each four-dimensional symbol. Specifically, three parallel bits on lead 109 are expanded into four bits on lead 121 to identify a pair of subsets while six bits on lead 108 are used to select particular signal points from those two subsets.

Those two signal points are thereupon communicated over the channel by QAM encoder 124 and modulator 128 as described above.

Note that, implementationally, the 2N-dimensional channel symbol is generated by having the trellis encoder identify, interdependently, N subsets of the two-dimensional constellation of FIG. 2, then select a two-dimensional signal point from each of the subsets thus identified. The concatenation of the two two-dimensional signal points thus selected is the desired 2N-dimensional channel symbol. This process, however, can be understood as involving the direct selection of a 2N-dimensional channel symbol. Viewed in this context, the set of all possible combinations of N of the two-dimensional subsets identified by N successive trellis encoder outputs can be understood to be a set of 2N-dimensional subsets of a 2N-dimensional constellation, the latter being comprised of all possible combinations of N of the signal points of the two-dimensional constellation. A succession of N outputs from the trellis encoder identifies a particular one of the 2N-dimensional subsets and a succession of N outputs from the modulus converter selects a particular 2N-dimensional signal point from the identified 2N-dimensional subset.

Modulus converter 116 is illustratively of the type disclosed in co-pending, commonly-assigned U.S. patent application Ser. No. 588,658 filed Sep. 26, 1990 and allowed on May 21, 1991, hereby incorporated by reference. Modulus converter 116 provides the modem with the ability to support data transmission at various different bit rates. Assume, for example, that the rate at which bits are provided by DTE 111 decreases. The serial-to-parallel converter will continue to provide its outputs on leads 108 and 109 at the same baud rate as before. However, the upper limit of the range of index values that are provided by modulus converter 116 on lead 117 will be reduced, so that, effectively, each of the four subsets A through D, instead of having eight signal points, will have some smaller number. Conversely if the rate at which bits are provided by DTE 111 should increase over that originally assumed, the upper limit of the range of index values, and thus the number of parallel bits, that appear on lead 117 will be increased beyond eight and the constellation itself will be expanded to accommodate the larger number of signal points thus being selected. As an alternative to using a modulus converter, fractional bit rates can be supported using, for example, the technique disclosed in L. Wei, "Trellis-Coded Modulation with Multidimensional Constellations," *IEEE Trans. on Communication Theory*, Vol. IT-33, No. 4, July 1987, pp. 483–501.

Turning now to FIG. 3, the transmitter portion of a modem embodying the principles of the invention is shown. This embodiment illustratively uses the aforementioned four-dimensional, i.e., N=2, signaling scheme. Many of the components are similar to those shown in FIG. 1. Thus, in particular, the transmitter of FIG. 3—which receives its input information in the form of a stream of input bits from DTE 311—includes randomizer 313, which supplies its output, on lead 314, to S/P converter 315. The latter outputs uncoded bits to modulus converter 316. The transmitter further includes four-dimensional QAM encoder 324 and modulator 328. The trellis bits, on lead 309, are provided not to a standard single trellis encoder, but to a distributed trellis encoder comprised of three trellis encoder stages: trellis encoder stage $319\alpha$, trellis encoder stage $319\beta$, and trellis encoder stage $319\gamma$.

5

Such a distributed trellis encoder, which is described in the aforementioned Betts et al patent, generates a plurality of streams of trellis encoded channel symbols in response to respective portions of the input information. Specifically, a three-bit word on lead 309 is supplied to trellis encoder stage 319$\alpha$. The next three-bit word on lead 309 is supplied to trellis encoder stage 319$\beta$. The next three-bit word is supplied to trellis encoder stage 319$\gamma$, and then back to trellis encoder stage 319$\alpha$. This distribution of the trellis bits to the various trellis encoder stages is performed by switching circuit 331 operating under the control of symbol clock 325. The initial data word outputs of the trellis encoders are subset identifiers $\alpha_0$ and $\alpha_1$ for encoder stage 319$\alpha$, $\beta_2$ and $\beta_3$ for encoder stage 319$\beta$, and $\gamma_4$ and $\gamma_5$ for encoder stage 319$\gamma$, followed by $\alpha_6$ and $\alpha_7$ for encoder stage 319$\alpha$, and so forth. These are supplied to four-dimensional QAM encoder 324 by switching circuit 337—also operating under the control of symbol clock 325—on lead 338 through a one-symbol delay 364 and lead 363, in order to compensate for a one-symbol delay caused by modulus converter 316. Thus, the order of subset identifiers on lead 338 is $\alpha_0$, $\alpha_1$, $\beta_2$, $\beta_3$, $\gamma_4$, $\gamma_5$, $\alpha_6$ . . . . Using the notation introduced above, then, the output of encoder 324 on lead 325 is the stream of signal points $X_0{}^\alpha$, $X_1{}^\alpha$, $X_2{}^\beta$, $X_3{}^\beta$, $X_4{}^\gamma$, $X_5{}^\gamma$, $X_6{}^\alpha$ . . . , which is comprised of three interleaved streams of trellis encoded channel symbols, these streams being $X_0{}^\alpha$, $X_1{}^\alpha$, $X_6{}^\alpha$, $X_7{}^\alpha$, $X_{12}{}^\alpha$ . . . ; $X_2{}^\beta$, $X_3{}^\beta$, $X_8{}^\beta$, $X_9{}^\beta$, $X_{14}{}^\beta$ . . . ; and $X_4{}^\gamma$, $X_5{}^\gamma$, $X_{10}{}^\gamma$, $X_{11}{}^\gamma$, $X_{16}{}^\gamma$ . . . . These, in turn, are supplied, in accordance with the invention, to signal point interleaver 341 which applies alternate ones of the signal points applied thereto to lead 3412—which signal points appear immediately at the interleaver output on lead 342—and to one-symbol ($Z^{-1}$) delay element 3411, which appear on lead 342 after being delayed therein by one symbol interval. The resulting interleaved stream of trellis encoded signal points is $X_0{}^\alpha$, $X_{-1}{}^\gamma$, $X_2{}^\beta$, $X_1{}^\alpha$, $X_4{}^\gamma$, $X_3{}^\beta$, $X_6{}^\alpha$, $X_5{}^\gamma$, $X_8{}^\beta$, $X_7{}^\alpha$, $X_{10}{}^\gamma$, $X_9{}^\beta$ . . . (the signal point $X_{-1}{}^\gamma$ being, of course, the signal point applied to interleaver 341 just ahead of signal point $X_0{}^\alpha$).

A discussion and explanation of how the interleaving just described is advantageous is set forth hereinbelow. In order to fully set the stage for that explanation, however, it will be first useful to consider the receiver section of a modem which receives the interleaved signal point stream.

Thus referring to FIG. 4, the line signal transmitted by the transmitter of FIG. 3 is received from the channel and applied to demodulator/equalizer 455 which, in conventional fashion—including an input from phase tracking loop 457—generates a stream of outputs on lead 456 representing the demodulator/equalizer's best approximation of the values of the I and Q components of the signal points of the transmitted interleaved signal point stream. These outputs are referred to herein as the "received signal points." (Due to distortion and other channel impairments that the demodulator/equalizer is not able to compensate for, the I and Q components of the received signal points, instead of having exact integer values, can have any value. Thus a transmitted signal point having coordinates (3, −5) may be output by the demodulator/equalizer as the received signal point (2.945, −5.001).) The stream of received signal points on lead 456 is denoted $\overline{X}_0{}^\alpha$, $\overline{X}_{-1}{}^\gamma$, $\overline{X}_2{}^\beta$, $\overline{X}_1{}^\alpha$, $\overline{X}_4{}^\gamma$, $\overline{X}_3{}^\beta$, $\overline{X}_6{}^\alpha$, $\overline{X}_5{}^\gamma$, $\overline{X}_8{}^\beta$, $\overline{X}_7{}^\alpha$, $\overline{X}_{10}{}^\gamma$, $\overline{X}_9{}^\beta$ . . . .

The successive received signal points are deinterleaved in signal point deinterleaver 441, which provides

6

the opposite function to interleaver 341 in the transmitter. The output of deinterleaver 441 on lead 442 is thus $\overline{X}_0{}^\alpha$, $\overline{X}_1{}^\alpha$, $\overline{X}_2{}^\beta$, $\overline{X}_3{}^\beta$, $\overline{X}_4{}^\gamma$, $\overline{X}_5{}^\gamma$, $\overline{X}_6{}^\alpha$, . . . , etc. (Although not explicitly shown in the drawing, the same well-known techniques used in modems of this general kind to identify within the stream of received signal points the boundaries between successive symbols is used to synchronize the operation of signal point deinterleaver 441 to ensure that received signal points $\overline{X}_0{}^\alpha$, $\overline{X}_2{}^\beta$, $\overline{X}_4{}^\gamma$ . . . are applied to delay element 4411 while received signal points $\overline{X}_1{}^\alpha$, $\overline{X}_3{}^\beta$, $\overline{X}_5{}^\gamma$ . . . are applied to lead 4412.)

The received signal points on lead 442 are then distributed by switching circuit 431 under the control of symbol clock 425 to a distributed Viterbi decoder comprised of 4D Viterbi decoder stages 419$\alpha$, 419$\beta$ and 419$\gamma$. Specifically, received signal points $\overline{X}_0{}^\alpha$ and $\overline{X}_1{}^\alpha$ are applied to decoder stage 419$\alpha$; received signal points $\overline{X}_2{}^\beta$ and $\overline{X}_3{}^\beta$ are applied to decoder stage 419$\beta$; and received signal points $\overline{X}_4{}^\gamma$ and $\overline{X}_5{}^\gamma$ are applied to decoder stage 419$\gamma$. The outputs of the three decoder stages are then combined into a serial stream on lead 438 by switching circuit 437, also operating under the control of symbol clock 425. Those outputs, representing decisions as to the values of the transmitted signal points, are denoted $\overline{X}_0$, $\overline{X}_1$, $\overline{X}_2$, $\overline{X}_3$, $\overline{X}_4$, $\overline{X}_5$, $\overline{X}_6$ . . . , the $\alpha$, $\beta$ and $\gamma$ superscripts no longer being needed.

In conventional fashion, the bits that represent each of the decisions on lead 438 can be divided into bits that represent a) the trellis bits that appeared on transmitter lead 309 and b) the trellis bits that appeared on transmitter lead 317. Those two groups of bits are provided in the receiver on leads 461 and 462, respectively. The latter group of bits are deconverted by modulus deconverter 416 (also disclosed in the aforementioned '658 patent application) back to uncoded bit values on lead 414. The operation of the modulus deconverter imparts a one-symbol delay to the bits on lead 414. Accordingly, the bits on lead 461 are caused to be delayed by one symbol by delay element 464. The resulting combined bits on lead 415 thus represent the stream of bits that appeared at the output of randomizer 313 in the transmitter. These are derandomized in the receiver by derandomizer 413 and the resulting derandomized bit stream is applied to DTE 411 which may be, for example, a computer terminal.

Referring to FIG. 5, one can see the improvement that is achieved by the present invention.

Line I shows the stream of output signal points generated and launched into the channel using one stage of trellis encoding and no signal point interleaving. This is, of course, the prior art arrangement shown in FIG. 1. Line II shows the effect of providing a three-stage distributed trellis encoder but still no signal point interleaving. This is the arrangement shown in the aforementioned Betts et al patent. Note that the signal points of each channel symbol operated on by a particular trellis encoder stage are adjacent in the output signal point stream. For example, the second signal point of the symbol $X_0{}^\alpha$—namely signal point $X_1{}^\alpha$—is separated by five baud intervals from the first (closer) signal point of the symbol $X_6{}^\alpha$—namely signal point $X_6{}^\alpha$. As noted earlier, such separation is advantageous because the channel symbols which are processed one after the other in a particular Viterbi decoder stage have noise components which are not highly correlated.

Note, however, that the individual signal points of each channel symbol, e.g., $X_0{}^\alpha$ and $X_1{}^\alpha$, are adjacent to

5,243,627

7

one another as they pass through the channel; and since all the signal points of a channel symbol must be processed serially in the same Viterbi decoder stage, this means that the Viterbi decoder must process adjacent signal points that have highly correlated noise components.

It is to this end that signal point interleaver 341 is included within the transmitter in accordance with the invention. Firstly, it may be noted from Line III that using the signal point interleaver without the distributed trellis encoder—an arrangement not depicted in the drawing—will, advantageously, cause the signal points from the same channel symbol to be non-adjacent. Moreover, there is further advantage in that a pair of channel symbols processed serially by Viterbi decoder stage $419\alpha$ traverses the channel separated by five baud intervals rather than three, thereby providing greater decorrelation of the noise components thereof. Compare, for example, the span of baud intervals occupied by signal points $X_0^\alpha$ and $X_1^\alpha$, $X_2^\alpha$ and $X_3^\alpha$ in Line I and the span of baud intervals occupied by the same signal points in Line III. Disadvantageously, however, the use of a single trellis encoding stage brings back the problem that the distributed trellis encoder solves, as described above. Thus, for example, although signal points $X_0^\alpha$ and $X_1^\alpha$, which are from the same channel symbol, are separated from one another when traversing the channel, we find that, disadvantageously, signal points $X_2^\alpha$ and $X_1^\alpha$, which are signal points from two different channel symbols which will be processed serially by the Viterbi decoder, traverse the channel adjacent to one another.

Line IV shows that using the signal point interleaver with a two-stage trellis encoder—also an arrangement not depicted in the drawing—provides some improvement. Firstly, it may be noted that, as in Line III, signal points from the same channel symbol remain separated by three baud intervals. Additionally, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of signal points $X_0^\alpha$ and $X_1^\alpha$, $X_4^\alpha$ and $X_5^\alpha$—are still non-adjacent and, indeed, are now separated by seven baud intervals, which is even greater than the separation of five baud intervals provided in Line III. Moreover, certain signal points that traverse the channel adjacent to one another and which are from channel symbols which would have been decoded sequentially in the one-trellis-encoding-stage case are, in the two-trellis-encoding-stage case of Line IV, processed by different Viterbi decoding stages. Signal points $X_2^\beta$ and $X_1^\alpha$ are such a pair of signal points. Note, however, that, disadvantageously, signal points $X_1^\alpha$ and $X_4^\alpha$ traverse the channel serially, and are from channel symbols which are serially processed by the "$\alpha$" Viterbi decoder stage.

Referring, however, to Line V, which depicts the stream of signal points output by the transmitter of FIG. 3, it will be seen that, in accordance with the invention, there is still a non-adjacency—indeed, a separation of at least three baud intervals—between a) the signal points which belong to any particular channel symbol (and which, therefore, are processed serially by a particular Viterbi decoder stage) and b) the signal points which belong to channel symbols which are processed serially by a Viterbi decoder stage. Thus, for example, signal points $X_1^\alpha$ and $X_4^\gamma$ are now processed by different Viterbi decoder stages. Moreover, pairs of channel symbols processed sequentially by a given Viterbi decoder stage—such as the channel symbols comprised of

8

signal points $X_0^\alpha$ and $X_1^\alpha$, $X_6^\alpha$ and $X_7^\alpha$—are now separated by none baud intervals.

Using more than three trellis encoder stages in the distributed trellis encoder and/or a signal point interleaver that separates signal points from the same channel symbol by more than three baud intervals would provide even greater separation and could, therefore, potentially provide even greater improvement in Viterbi decoding. However, such improvement comes at a price—that price being increased decoding delay——particularly as the number of trellis encoders is increased beyond three. An engineering trade-off can be made, as suits any particular application.

Moreover, it is desirable for the signal point interleaver to provide a sequence in which every $N^{th}$ signal point in the interleaved signal point stream is the $N^{th}$ signal point of a channel symbol. (The reason this is desirable is described in detail hereinbelow.) In the case of an N=2, four-dimensional signaling scheme, this means that every second, that is "every other," signal point in the interleaved stream is the second signal point of the channel symbol from which it comes. In the case of an N=4, eight-dimensional signaling scheme, this means that every fourth signal point in the interleaved stream is the fourth signal point of the channel symbol from which it comes. Indeed, this criterion is in fact satisfied in the embodiment of FIG. 3. Note that each one of signal points $X_0^\alpha$, $X_2^\beta$, $X_4^\gamma$, $X_6^\alpha$, . . . , which appear as every other signal point in the interleaved stream, is the second signal point of one of the four-dimensional channel symbols. Note that not all rearrangements of the signal points will, in fact, satisfy this criterion, such as, if the two signal points of a channel symbol are separated by two, rather than three, baud intervals.

Satisfying the above criterion is advantageous because it enhances the accuracy with which phase tracking loop 457 performs its function. This is so because the arrival of an $N^{th}$ signal point of a given symbol means that all the signal points comprising that channel symbol have arrived. This, in turn, makes it possible to form a decision as to the identity of that channel symbol by using the minimum accumulated path metric in the Viterbi decoder stages. (Those decisions are fed back to the tracking loop by decoder stages $419\alpha$, $419\beta$ $419\gamma$ on leads 494, 495 and 496, respectively, via switching circuit 456.) Without having received all of the signal points of a channel symbol, one cannot take advantage of the accumulated path metric information but, rather, must rely on the so-called raw sliced values, which is less accurate. By having every $N^{th}$ signal point in the interleaved stream be the $N^{th}$ signal point of a channel symbol, we are guaranteed that the time between adjacent such path metric "decisions" supplied to the phase tracking loop is, advantageously, never more than N baud intervals.

The foregoing merely illustrates the principles of the invention. Thus although the illustrative embodiment utilizes a four-dimensional signaling scheme, the invention can be used with signaling schemes of any dimensionality. In the general, 2N-dimensional, case each stage of the distributed trellis encoder would provide N two-dimensional subset identifiers to switching circuit 337 before the latter moves on to the next stage. And, of course, each stage of the distributed Viterbi decoder would receive N successive received signal points. The distributed trellis encoder and distributed Viterbi decoder can, however, continue to include three trellis

5,243,627

9

encoders and still maintain, independent of the value of N, a separation of three baud intervals in the channel between signal points that are from channel symbols that are adjacent in the trellis encoder. If a greater separation of such signal points is desired, more stages can be added to the distributed trellis encoder/Viterbi decoder, just as was noted above for the four-dimensional case. However, when dealing with 2N-dimensional signaling where N>2, it is necessary to add additional delay elements to the signal point interleaver/deinterleaver in order to maintain a three-baud-interval separation among the signal points from any given channel symbol.

Consider, for example, the case of N=4, i.e., an eight-dimensional case. Looking again at FIG. 3, the three (8D) stages of the distributed trellis encoder would generate the three streams of subset identifiers $\alpha_0 \alpha_1 \alpha_2 \alpha_3 \alpha_{12} \ldots$, $\beta_4 \beta_5 \beta_6 \beta_7 \beta_{16} \ldots$, and $\gamma_8 \gamma_9 \gamma_{10} \gamma_{11} \gamma_{20} \ldots$, respectively. This would lead to the following stream of signal points of eight-dimensional trellis encoded channel symbols at the output of the QAM encoder on lead 325: $X_0{}^\alpha X_1{}^\alpha X_2{}^\alpha X_3{}^\alpha X_4{}^\beta X_5{}^\beta X_6{}^\beta X_7{}^\beta X_8{}^\gamma X_9{}^\gamma X_{10}{}^\gamma X_{11}{}^\gamma X_{12}{}^\alpha \ldots$. Signal point interleaving could be carried out by substituting signal point interleaver 641 of FIG. 6 for interleaver 341. Interleaver 641, in addition to direct connection 6414, includes one-, two-, and three-symbol delay elements 6413, 6412 and 6411, respectively.

The signal points on lead 325, after passing through interleaver 641, would appear on lead 342 in the following order: $X_0{}^\alpha X_{-3}{}^\gamma X_{-6}{}^\beta X_{-9}{}^\alpha X_4{}^\beta X_1{}^\alpha X_{-2}{}^\gamma X_{-5}{}^\beta X_8{}^\gamma X_5{}^\beta X_2{}^\alpha X_{-1}{}^\gamma X_{12}{}^\alpha X_9{}^\gamma X_6{}^\beta X_3{}^\alpha X_{16}{}^\beta X_{13}{}^\alpha X_{10}{}^\gamma X_7{}^\beta \ldots$ where signal points with negative subscripts are, of course, signal points that arrived before signal point $X_0{}^\alpha$ and were already stored in the delay elements 6411, 6412 and 6413. Examination of this signal point stream will reveal that there is either a three- or five-baud separation between signal points of channel symbols that are processed sequentially by the same trellis encoder stage, e.g., $X_3{}^\alpha$ and $X_{12}{}^\alpha$; that adjacent signal points of any one channel symbol, e.g., $X_0{}^\alpha$ and $X_1{}^\alpha$, are separated by five baud intervals; and that the four signal points comprising any particular one channel symbol are separated by fifteen baud intervals.

FIG. 7 shows the structure of a deinterleaver 741 that could be used in the receiver of FIG. 4 in place of deinterleaver 441 in order to restore the signal points of the eight-dimensional channel symbols to their original order. This structure, which is the inverse of interleaver 641, includes delay stages 7411, 7412 and 7413, as well as direct connection 7414.

It will be appreciated that, although various components of the modem transmitter and receiver are disclosed herein for pedagogic clarity as discrete functional elements and indeed—in the case of the various switching circuits—as mechanical elements, those skilled in the art will recognize that the function of any one or more of those elements could be implemented with any appropriate available technology, including one or more appropriately programmed processors, digital signal processing (DSP) chips, etc. For example, multiple trellis encoders and decoders can be realized using a single program routine which, through the mechanism of indirect addressing of multiple arrays within memory, serves to provide the function of each of the multiple devices.

It will thus be appreciated that those skilled in the art will be able to devise numerous arrangements which,

10

although not explicitly shown or described herein, embody the principles of the invention and are within its spirit and scope.

We claim:

1. Apparatus for forming a stream of trellis encoded signal points in response to input information, said apparatus comprising

means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and

means for interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points.

2. The apparatus of claim 1 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

3. The apparatus of claim 1 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

4. The apparatus of claim 2 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

5. A modem comprising

means for receiving a stream of input bits,

means for dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,

means for independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,

means for selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and

means for generating a stream of output signal points, said signal point stream being comprised of the signal points of the selected channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol stream, are separated in said output stream by at least one other signal point.

6. The apparatus of claim 5 wherein said trellis encoding means includes a plurality of trellis encoder stage

11

means for trellis encoding respective ones of said streams of trellis bits.

7. The apparatus of claim 5 wherein said means for selecting includes means for modulus converting said stream of uncoded bits.

8. The apparatus of claim 5 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said means for generating causes every $N^{th}$ signal point in said stream of output signal points to be the $N^{th}$ signal point of a respective one of said channel symbols.

9. Receiver apparatus for recovering information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by transmitter apparatus which generates said signal points by generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and by interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,

said receiver apparatus comprising
means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and
a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

10. The apparatus of claim 9 further comprising
a phase tracking loop, and
means for adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

11. A method for forming a stream of trellis encoded signal points in response to input information, said method comprising the steps of
generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points, and
interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points.

12. The method of claim 11 wherein said generating step generates three of said streams of trellis encoded channel symbols, and wherein said interleaving step causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

13. The method of claim 11 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said interleaving step causes every $N^{th}$ signal point in said interleaved signal point stream to be

12

the $N^{th}$ signal point of a respective one of said channel symbols.

14. The method of claim 12 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said interleaving step causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

15. A method for use in a modem, said method comprising the steps of
receiving a stream of input bits,
dividing said stream of input bits into a stream of uncoded bits and a plurality of streams of trellis bits,
independently trellis encoding each of said plurality of streams of trellis bits to generate respective streams of data words each identifying one of a plurality of predetermined subsets of the channel symbols of a predetermined 2N-dimensional constellation, N being an integer greater than unity, each of said channel symbols being comprised of a plurality of signal points,
selecting an individual channel symbol from each identified subset in response to said stream of uncoded bits to form a stream of channel symbols, and
generating a stream of output signal points, said signal point stream being comprised of the signal points of the selected channel symbols, the signal points of said signal point stream being sequenced in such a way that signal points that are either a) part of the same channel symbol, or b) part of channel symbols that are adjacent to one another in said channel symbol stream, are separated in said output stream by at least one other signal point.

16. The method of claim 15 wherein in said trellis encoding step a plurality of trellis encoder stages trellis encode respective ones of said streams of trellis bits.

17. The method of claim 15 wherein said selecting step includes the step of modulus converting said stream of uncoded bits.

18. The method of claim 15 wherein said channel symbols are 2N-dimensional channel symbols, N>1, and wherein said generating step causes every $N^{th}$ signal point in said stream of output signal points to be the $N^{th}$ signal point of a respective one of said channel symbols.

19. A method for use in a receiver to recover information from a received stream of trellis encoded signal points, said signal points having been transmitted to said receiver apparatus by a method which includes the steps of
generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said information, each of said channel symbols being comprised of a plurality of signal points, and
interleaving the signal points of said generated channel symbols to form said stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,
said method comprising the steps of
deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and

5,243,627

**13**

using a distributed Viterbi decoder to recover said information from the deinterleaved signal points.

20. The method of claim 19 wherein said receiver includes a phase tracking loop and wherein said method comprises the further step of adapting the operation of said phase tracking loop in response to minimum accumulated path metrics in said distributed Viterbi decoder.

21. Data communication apparatus comprising
means for receiving input information,
means for generating a plurality of streams of trellis encoded channel symbols in response to respective portions of said input information, each of said channel symbols being comprised of a plurality of signal points,
means for interleaving the signal points of said generated channel symbols to form a stream of trellis encoded signal points, said interleaving being carried out in such a way that the signal points of each channel symbol are non-adjacent in said stream of trellis encoded signal points and such that the signal points of adjacent symbols in any one of said channel symbol streams are non-adjacent in said stream of trellis encoded signal points,
means for applying the stream of trellis encoded signal points to a transmission channel,

**14**

means for receiving the stream of trellis encoded signal points from the channel,
means for deinterleaving the interleaved signal points to recover said plurality of streams of trellis encoded channel symbols, and
a distributed Viterbi decoder for recovering said information from the deinterleaved signal points.

22. The apparatus of claim 21 wherein said means for generating generates three of said streams of trellis encoded channel symbols, and wherein said means for interleaving causes there to be interleaved between each of the signal points of each channel symbol at least two signal points from other channel symbols of said streams of trellis encoded channel symbols.

23. The apparatus of claim 21 wherein said channel symbols are 2N-dimensional channel symbols, $N > 1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

24. The apparatus of claim 22 wherein said channel symbols are 2N-dimensional channel symbols, $N > 1$, and wherein said means for interleaving causes every $N^{th}$ signal point in said interleaved signal point stream to be the $N^{th}$ signal point of a respective one of said channel symbols.

* * * * *

5

10

15

20

25

30

35

40

45

50

55

60

65