# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: REMBRANDT TECHNOLOGIES, LP PATENT LITIGATION | ) ) ) ) MDL Docket No. 07-md-1848 (GMS) ) |
| MOTOROLA, INC., CISCO SYSTEMS, INC., SCIENTIFIC-ATLANTA, INC., ARRIS GROUP, INC., THOMSON, INC., AMBIT MICROSYSTEMS, INC., and NETGEAR, INC., | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| REMBRANDT TECHNOLOGIES, LP, | ) Civil Action No. 07-752-GMS ) ) |
| Defendant. | ) **JURY TRIAL DEMANDED** ) |
| REMBRANDT TECHNOLOGIES, LP, and REMBRANDT TECHNOLOGIES, LLC d/b/a REMSTREAM, | ) ) ) ) ) |
| Counter-Plaintiffs, Counterclaim Defendants, | ) ) ) |
| v. | ) Civil Action No. 07-752-GMS ) |
| MOTOROLA, INC., CISCO SYSTEMS, INC., SCIENTIFIC-ATLANTA, INC., ARRIS GROUP, INC., THOMSON, INC., AMBIT MICROSYSTEMS, INC., NETGEAR, INC., | ) ) ) **JURY TRIAL DEMANDED** ) ) |
| Counter-Defendants, | ) ) |
| and | ) ) |
| TIME WARNER CABLE, INC., TIME WARNER CABLE LLC, TIME WARNER NEW YORK CABLE LLC, TIME WARNER ENTERTAINMENT COMPANY, LP, COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC, CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS OPERATING, LLC, COXCOM, INC., COX COMMUNICATIONS, | ) ) ) ) ) ) ) ) ) ) ) |

Original Filing Date: May 2, 2008
Redacted Filing Date: May 7, 2008

INC., COX ENTERPRISES, INC., CSC
HOLDINGS, INC., CABLEVISION SYSTEMS
CORPORATION, ADELPHIA
COMMUNICATIONS CORPORATION,
CENTURY-TCI CALIFORNIA
COMMUNICATIONS, LP, CENTURY-TCI
HOLDINGS, LLC, COMCAST OF
FLORIDA/PENNSYLVANIA, L.P. (f/k/a
PARNASSOS, LP), COMCAST OF
PENNSYLVANIA II, L.P. (f/k/a CENTURY-TCI
CALIFORNIA, L.P.), PARNASSOS
COMMUNICATIONS, LP, ADELPHIA
CONSOLIDATION, LLC, PARNASSOS
HOLDINGS, LLC, and WESTERN NY
CABLEVISION, LP,

       Counter-Defendants, Counterclaim
       Plaintiffs,

       and

TIME WARNER ENTERTAINMENT-
ADVANCE/NEWHOUSE
PARTNERSHIP,

       Counterclaim Plaintiff.

---

REMBRANDT TECHNOLOGIES, LP, and
REMBRANDT TECHNOLOGIES, LLC d/b/a
REMSTREAM,

       Counter Counterclaim-Plaintiffs,

       v.

TIME WARNER ENTERTAINMENT-
ADVANCE/NEWHOUSE
PARTNERSHIP, and
COMCAST CABLE COMMUNICATION
HOLDINGS, INC.

       Counter Counterclaim-Defendants.

---

## TWC'S REPLY TO REMBRANDT TECHNOLOGIES, LP'S, AND REMBRANDT TECHNOLOGIES, LLC'S COUNTERCLAIM FOR PATENT INFRINGEMENT AND COUNTER-COUNTERCLAIMS AGAINST THE TWC COUNTERCLAIMANTS FOR PATENT INFRINGEMENT

Counter Counterclaim-Defendant Time Warner Entertainment-Advance/Newhouse

2

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

Partnership ("TWEAN") and Counter-Defendants Time Warner Cable Inc., Time Warner Cable LLC, Time Warner New York Cable LLC (properly known as Time Warner NY Cable LLC) and Time Warner Entertainment Company, L.P. (collectively "TWC"), by its undersigned counsel, pursuant to stipulation entered by this Court, respond to the allegations asserted in Rembrandt Technologies, LP's, and Rembrandt Technologies, LLC's (collectively "Rembrandt") Counterclaim for Patent Infringement and Rembrandt Technologies, LP's, and Rembrandt Technologies, LLC's Counter-Counterclaims Against the TWC Counterclaimants for Patent Infringement (the "Counterclaim") as follows:

1.    TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 1 of the Counterclaim, and on that basis denies those allegations.

2.    TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 2 of the Counterclaim, and on that basis denies those allegations.

3.    TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 3 of the Counterclaim, and on that basis denies those allegations.

4.    TWC admits the allegations of paragraph 4 of the Counterclaim that Time Warner Entertainment-Advanced/Newhouse Partnership is a New York partnership having its corporate headquarters at One Time Warner Center, New York, New York.

5.    TWC admits the allegations of paragraph 5 of the Counterclaim that Time Warner Cable Inc. is a Delaware corporation having its corporate headquarters at One Time Warner Center, New York, New York 10019.

6.    TWC admits the allegations of paragraph 6 of the Counterclaim that Time Warner Cable LLC is a Delaware limited liability company having its corporate headquarters at One Time Warner Center, New York, New York 10019.

7.    TWC admits the allegations of paragraph 7 of the Counterclaim that Time Warner

NY Cable LLC is a Delaware limited liability company having its corporate headquarters at One Time Warner Center, New York, New York 10019.

8.    TWC admits the allegations of paragraph 8 of the Counterclaim that Time Warner Entertainment Company, L.P. is a Delaware limited partnership having its corporate headquarters at One Time Warner Center, New York, New York 10019.

9.    This paragraph does not require a response.

10.    Paragraph 10 of the Counterclaim sets forth legal conclusions for which no response is required. To the extent paragraph 10 contains factual allegations to which a response is required, those allegations are denied.

11.    TWC admits that this Court has personal jurisdiction over TWC. TWC denies the remaining allegations of paragraph 11 of the Counterclaim. TWC is not infringing, and has not in the past infringed, any of the patents identified in the Counterclaim.

12.    Paragraph 12 of the Counterclaim sets forth legal conclusions for which no response is required. To the extent paragraph 12 contains factual allegations to which a response is required, those allegations are denied.

## COUNT I

13.    TWC restates and realleges its responses to paragraphs 1-12 of the Counterclaim and incorporates them herein by reference.

14.    TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 14 of the Counterclaim, and on that basis denies those allegations.

15.    TWC admits that U.S. Patent No. 4,937,819 (the "'819 patent") was issued by the United States Patent and Trademark Office ("the PTO") on June 26, 1990. TWC denies the remaining allegations made in paragraph 15 of the Counterclaim.

16.    TWEAN denies the allegations of paragraph 16 of the Counterclaim. TWEAN does not infringe and has not infringed the '819 patent in this district or anywhere else within the United States.

17.    TWEAN denies the allegations of paragraph 17 of the Counterclaim. TWEAN

does not infringe the '819 patent, and therefore will not "continue to infringe" the '819 patent.

## COUNT II

18.     TWC restates and realleges its responses to paragraphs 1-17 of the Counterclaim and incorporates them herein by reference.

19.     TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 19 of the Counterclaim, and on that basis denies those allegations.

20.     TWC admits that U.S. Patent No. 5,008,903 (the "'903 patent") was issued by the PTO on April 16, 1991.  TWC denies the remaining allegations made in paragraph 20 of the Counterclaim.

21.     TWEAN denies the allegations of paragraph 21 of the Counterclaim.  TWEAN does not infringe and has not infringed the '903 patent in this district or anywhere else within the United States.

22.     TWEAN denies the allegations of paragraph 22 of the Counterclaim.  TWEAN does not infringe the '903 patent, and therefore will not "continue to infringe" the '903 patent.

## COUNT III

23.     TWC restates and realleges its responses to paragraphs 1-22 of the Counterclaim and incorporates them herein by reference.

24.     TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 24 of the Counterclaim, and on that basis denies those allegations.

25.     TWC admits that U.S. Patent No. 5,710,761 (the "'761 patent," which is incorrectly identified as Patent No. 5,701,761 in paragraph 24 of the Counterclaim) was issued by the PTO on January 20, 1998.  TWC denies the remaining allegations made in paragraph 25 of the Counterclaim.

26.     TWEAN denies the allegations of paragraph 26 of the Counterclaim.  TWEAN does not infringe and has not infringed the '761 patent in this district or anywhere else within the United States.

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

27.    TWEAN denies the allegations of paragraph 27 of the Counterclaim.  TWEAN does not infringe the '761 patent, and therefore will not "continue to infringe" the '761 patent.

### COUNT IV

28.    TWC restates and realleges its responses to paragraphs 1-27 of the Counterclaim and incorporates them herein by reference.

29.    TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 29 of the Counterclaim, and on that basis denies those allegations.

30.    TWC admits that U.S. Patent No. 5,719,858 (the "'858 patent") was issued by the PTO on February 17, 1998.  TWC denies the remaining allegations made in paragraph 30 of the Counterclaim.

31.    TWEAN denies the allegations of paragraph 31 of the Counterclaim.  TWEAN does not infringe and has not infringed the '858 patent in this district or anywhere else within the United States.

32.    TWEAN denies the allegations of paragraph 32 of the Counterclaim.  TWEAN does not infringe the '858 patent, and therefore will not "continue to infringe" the '858 patent.

### COUNT V

33.    TWC restates and realleges its responses to paragraphs 1-32 of the Counterclaim and incorporates them herein by reference.

34.    TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 34 of the Counterclaim, and on that basis denies those allegations.

35.    TWC admits that U.S. Patent No. 5,778,234 (the "'234 patent") was issued by the PTO on July 7, 1998.  TWC denies the remaining allegations made in paragraph 35 of the Counterclaim.

36.    TWEAN denies the allegations of paragraph 36 of the Counterclaim.  TWEAN does not infringe and has not infringed the '234 patent in this district or anywhere else within the United States.

37.    TWEAN denies the allegations of paragraph 37 of the Counterclaim.  TWEAN does not infringe the '234 patent, and therefore will not "continue to infringe" the '234 patent.

## COUNT VI

38.    TWC restates and realleges its responses to paragraphs 1-37 of the Counterclaim and incorporates them herein by reference.

39.    TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 39 of the Counterclaim, and on that basis denies those allegations.

40.    TWC admits that U.S. Patent No. 5,852,631 (the "'631 patent") was issued by the PTO on December 22, 1998.  TWC denies the remaining allegations made in paragraph 40 of the Counterclaim.

41.    TWEAN denies the allegations of paragraph 41 of the Counterclaim.  TWEAN does not infringe and has not infringed the '631 patent in this district or anywhere else within the United States.

42.    TWEAN denies the allegations of paragraph 42 of the Counterclaim.  TWEAN does not infringe the '631 patent, and therefore will not "continue to infringe" the '631 patent.

## COUNT VII

43.    TWC restates and realleges its responses to paragraphs 1-42 of the Counterclaim and incorporates them herein by reference.

44.    TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 44 of the Counterclaim, and on that basis denies those allegations.

45.    TWC admits that U.S. Patent No. 6,131,159 (the "'159 patent") was issued by the PTO on October 10, 2000.  TWC denies the remaining allegations made in paragraph 45 of the Counterclaim.

46.    TWEAN denies the allegations of paragraph 46 of the Counterclaim.  TWEAN does not infringe and has not infringed the '159 patent in this district or anywhere else within the United States.

47.     TWEAN denies the allegations of paragraph 47 of the Counterclaim. TWEAN does not infringe the '159 patent, and therefore will not "continue to infringe" the '159 patent.

## COUNT VIII

48.     TWC restates and realleges its responses to paragraphs 1-47 of the Counterclaim and incorporates them herein by reference.

49.     TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 49 of the Counterclaim, and on that basis denies those allegations.

50.     TWC admits that U.S. Patent No. 6,950,444 (the "'444" patent) was issued by the PTO on September 27, 2005. TWC denies the remaining allegations made in paragraph 50 of the Counterclaim.

51.     TWEAN denies the allegations of paragraph 51 of the Counterclaim. TWEAN does not infringe and has not infringed the '444 patent in this district or anywhere else within the United States.

52.     TWEAN denies the allegations of paragraph 52 of the Counterclaim. TWEAN does not infringe the '444 patent, and therefore will not "continue to infringe" the '444 patent.

## COUNT IX

53.     TWC restates and realleges its responses to paragraphs 1-52 of the Counterclaim and incorporates them herein by reference.

54.     TWC lacks knowledge or information sufficient to form a belief as to the truth of the allegations made in paragraph 54 of the Counterclaim, and on that basis denies those allegations.

55.     TWC admits that U.S. Patent No. 5,243,627 (the "'627" patent) was issued by the PTO on September 7, 1993. TWC denies the remaining allegations made in paragraph 55 of the Counterclaim.

56.     TWC admits that through one or more of its subsidiaries, affiliates, partners or other related parties, TWC operates cable television systems in various locations throughout the United States. TWC denies the remaining allegations made in paragraph 56 of the Counterclaim.

57.    TWC denies the allegations of paragraph 57 of the Counterclaim. TWC does not infringe and has not infringed the '627 patent in this district or anywhere else within the United States.

58.    TWC denies the allegations of paragraph 58 of the Counterclaim. TWC does not infringe the '627 patent, and therefore will not "continue to infringe" the '627 patent.

### PRAYER FOR RELIEF

TWC denies that Rembrandt is entitled to the relief requested in its prayer, and to the extent that Rembrandt's prayer for relief contains factual allegations, those allegations are denied.

### AFFIRMATIVE AND OTHER DEFENSES

TWC sets forth the following affirmative and other defenses responsive to First Amended Reply of Rembrandt Technologies, LP and Rembrandt Technologies, LLC d/b/a Remstream to Counterclaims of Time Warner Cable Inc., Time Warner Cable LLC, Time Warner New York Cable LLC and Time Warner Entertainment Company, L.P. and Counter-Counterclaims and all other Rembrandt pleadings against TWC in this action. TWC does not intend hereby to assume the burden of proof with respect to those matters as to which, pursuant to law, Rembrandt bears the burden.

### FIRST AFFIRMATIVE DEFENSE

59.    Each of the claims of the '819, '903, '761, '858, '234, '631, '159, '444 and '627 patents is invalid for failure to satisfy the provisions of one or more of sections 101, 102, 103, and/or 112 of Title 35 of the United States Code.

### SECOND AFFIRMATIVE DEFENSE

60.    TWC does not manufacture, use, offer for sale, sell, or import into the United States any product or method that infringes any claim of the '819, '903, '761, '858, '234, '631, '159, '444 or '627 patents and it has not done so in the past. TWC also does not contribute to or induce infringement of the '819, '903, '761, '858, '234, '631, '159, '444 or '627 patents and it has not done so in the past. TWC does not infringe, and has not in the past infringed, either

9

directly or indirectly, the '819, '903, '761, '858, '234, '631, '159, '444 or '627 patents.

### THIRD AFFIRMATIVE DEFENSE

61.    The claims of the '761, '631, '234, '159, '858, '444 and '627 patents are unenforceable due to the inequitable conduct of one or more named inventors and/or others having substantive involvement in the prosecution of the foregoing patents. These individuals, subject to the duty of candor under 37 C.F.R. § 1.56, committed inequitable conduct by engaging in a pattern and practice of withholding or misstating material information with intent to deceive the United States Patent & Trademark Office. The particulars of this inequitable conduct are pled in Counterclaimants' THIRD COUNTERCLAIM and FOURTH COUNTERCLAIM, incorporated herein by reference.

### FOURTH AFFIRMATIVE DEFENSE

62.    The '819, '903, '761, '858, '234, '631, '159, '444, or '627 patents are unenforceable due to patent misuse.

### FIFTH AFFIRMATIVE DEFENSE

63.    Rembrandt's claims are barred by the doctrine of estoppel.

### SIXTH AFFIRMATIVE DEFENSE

64.    Rembrandt's claims are barred by the doctrine of laches.

### SEVENTH AFFIRMATIVE DEFENSE

65.    Rembrandt's claims are barred by unclean hands.

### EIGHTH AFFIRMATIVE DEFENSE

66.    Rembrandt's claims are barred by license.

### COUNTERCLAIMS

### PARTIES

1.    Counterclaimant Time Warner Cable Inc. is a Delaware corporation having its corporate headquarters at One Time Warner Center, New York, New York 10019.

2.    Counterclaimant Time Warner Cable LLC is a Delaware limited liability company having its corporate headquarters at One Time Warner Center, New York, New York 10019.

3.    Counterclaimant Time Warner NY Cable LLC is a Delaware limited liability company having its corporate headquarters at One Time Warner Center, New York, New York 10019.

4.    Counterclaimant Time Warner Entertainment Company, L.P. is a Delaware limited partnership having its corporate headquarters at One Time Warner Center, New York, New York 10019.

5.    Counterclaimant Time Warner Entertainment-Advance/Newhouse Partnership is a New York partnership having its corporate headquarters at One Time Warner Center, New York, New York 10019.

6.    Counterclaim Defendant Rembrandt Technologies, LP purports to be a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 900, Bala Cynwyd, PA 19004.

7.    Counterclaim Defendant Rembrandt Technologies, LLC, d/b/a Remstream, purports to be a Delaware LLC with it headquarters at 401 City Avenue, Suite 900, Bala Cynwyd, PA 19004.

## JURISDICTION AND VENUE

8.    These counterclaims seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338 and 1367.

9.    This Court has supplemental jurisdiction over the state law claims asserted in this action under 28 U.S.C. § 1367.  The federal and state law claims asserted in this action arise from a common nucleus of operative facts.

10.    Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400.

11.    A justiciable controversy exists between Time Warner Cable Inc., Time Warner Cable LLC, Time Warner NY Cable LLC, Time Warner Entertainment Company, L.P., and Time Warner Entertainment-Advance/Newhouse Partnership ("Counterclaimants" or "TWC Counterclaimants") and Counterclaim Defendants with respect to the invalidity and non-infringement of the claims of U.S. Patent Nos. 4,937,819 (the "'819 patent"), 5,008,903 (the

"'903 patent"), 5,710,761 (the "'761 patent"), 5,719,858 (the "'858 patent"), 5,778,234 (the "'234 patent"), 5,852,631 (the "'631 patent"), 6,131,159 (the "'159 patent"), 6,950,444 (the "'444 patent"), and 5,243,627 (the "'627 patent").

## FACTS

12.     On information and belief, Rembrandt claims to own all rights, title, and interest in and to the '819, '903, '761, '858, '234, '631, '159, '444 and '627 patents. ("Rembrandt's asserted patents").

13.     Rembrandt has accused one or more of the Counterclaimants of infringing Rembrandt's asserted patents.

## FIRST COUNTERCLAIM

## THE PATENTS-IN-SUIT ARE INVALID

14.     Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-11 of these Counterclaims as if fully set forth herein.

15.     Each of the claims of the '819, '903, '761, '858, '234, '631, '159, '444 and '627 patents is invalid for failure to satisfy the provisions of one or more of sections 101, 102, 103, and/or 112 of Title 35 of the United States Code.

## SECOND COUNTERCLAIM

## COUNTERCLAIMANTS DO NOT INFRINGE THE PATENTS-IN-SUIT

16.     Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-13 of these Counterclaims as if fully set forth herein.

17.     Counterclaimants do not manufacture, use, offer for sale, sell, or import into the United States any product or method that infringes any claim of the '819, '903, '761, '858, '234, '631, '159, '444, or '627 patents and Counterclaimants have not done so in the past. Counterclaimants also do not contribute to or induce infringement of the '819, '903, '761, '858, '234, '631, '159, '444, or '627 patents and Counterclaimants have not done so in the past. Counterclaimants do not infringe, and have not in the past infringed, either directly or indirectly, the '819, '903, '761, '858, '234, '631, '159, '444, or '627 patents.

### THIRD COUNTERCLAIM

### INEQUITABLE CONDUCT IN CONNECTION WITH PROSECUTION OF THE '761, '631, '234, '159, '858, AND '444 PATENTS

18.    Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-17 of these Counterclaims as if fully set forth herein.

19.    Individuals subject to the duty of candor under 37 C.F.R. § 1.56 ("Applicants"), including named inventors in the applications referenced below and employees with substantive involvement in the filing and/or prosecution of patent applications for Paradyne entities, engaged in inequitable conduct by engaging in a pattern and practice of withholding or misstating material information with intent to deceive the United States Patent and Trademark Office ("the PTO") in connection with patent prosecution of the '761, '631, '234, '159, '858, and '444 patents, including withholding or misstating material information with the intent to deceive in view of the claim constructions that Rembrandt seeks in this litigation. On information and belief, a reasonable opportunity for discovery will show that Applicants failed to disclose their own previously issued patents that comprised material prior art, failed to disclose material information regarding their own co-pending applications for patents, failed to disclose prior art that was known to them through the prosecution of their own patents and applications, and failed to disclose their own systems that were on-sale prior to the relevant critical dates. In addition to nondisclosure, Applicants in the prosecution chain of the '159 and '234 patents provided affirmative misstatements as set forth below. Accordingly, Applicants engaged in an overall pattern and practice of repeatedly and continuously failing to disclose to the PTO material information of which Applicants were indisputably aware. The permeation and continuation of this misconduct throughout prosecution of multiple patent applications confirms that Applicants acted with deceptive intent rendering the patents unenforceable. Further, the doctrine of infectious unenforceability renders related patents unenforceable.

13

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

20.     More specifically, during prosecution of the '761 patent, Applicants engaged in inequitable conduct before the PTO, rendering the '761 patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)     By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)     Notwithstanding these clear obligations, during prosecution, Applicants were aware of and failed to disclose, without limitation, co-pending application 08/780,762 ("the '762 application," now the '631 patent, which is commonly asserted in this action along with the '761 patent). The Applicants for the '761 patent failed to identify the '762 application or its claims to the examiner in the

14

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

prosecution of the '761 patent. The '762 application was never disclosed on any IDS that was submitted in the '761 patent or otherwise made of record in the '761 patent. Information relating to the '762 application and its claims was material to patentability. One or more Applicants were aware of the '762 application. Robert Scott is the sole named inventor on both the '761 and '631 patents. Robert Scott was aware of the co-pendency of his applications. In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '761 patent and were aware of the '762 application. Material information relating to the '762 application was withheld with intent to deceive the PTO as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)    Further, Applicants failed to disclose in prosecution of the '761 patent, the prior art of record from the '762 application, as well as the prior art of record from Application Nos. 08/781,787, now issued as 5,751,796 ("Rapid Startup Protocol For Communication Between a Plurality of Modems"), to Scott and Zuranski, 08/781,067, now issued as 5,796,808 ("System and Method for Automatically Selecting the Mode of Communication between a Plurality of Modems"), to Scott and Lastinger Jr., 08/457,881, now issued as 5,793,809 ("Transparent Technique for Mu-Law Modems to Detect an All-Digital Circuit Connection"), to Holmquist, 08/912,126, now issued as 6,081,556 ("Transparent Technique for Mu-Law Modems to Detect an All-Digital Circuit Connection"), to Holmquist, and 08/978,536, now issued as 5,349,635 ("Half-Duplex or Full-Duplex Automode Operation for use in Data Communications Equipment"), to Scott (the "'761 Co-Pending Applications"). One or more Applicants were aware of the '761

Co-Pending Applications. Four of the '761 Co-Pending Applications include Robert Scott as a named inventor, and in the case of the '761 and '631 patents, he is the sole named inventor on both. Robert Scott was aware of the co-pendency of his applications. In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '761 patent and were aware of the '761 Co-Pending Applications.

(iv)     The prior art of record from the '761 Co-Pending Applications that Applicants failed to disclose, includes without limitation U.S. Patent Nos. 4,905,282 ("Feature Negotiation Protocol and Dynamically Adjustable Retraining Sequence for a High Speed Half Duplex Modem"), to McGlynn and Nash ("McGlynn"), 5,528,679 ("Automatic Detection of Digital Call Paths in a Telephone System"), to Taarud ("Taarud"), 4,680,773 ("Data Telecommunications System"), to Amundson ("Amundson"), and 4,782,498 ("Modem with Improved Handshaking Capability"), to Copeland, III ("Copeland") (the "'761 Co-Pending Art"). The '761 Co-Pending Art was material to the patentability of the '761 patent. Applicants for the '761 patent failed to identify any of '761 Co-Pending Art to the examiner in the prosecution of the '761 patent. Applicants were aware of the '761 Co-Pending Art. Robert Scott is the same and only named inventor on both the '631 and the '761 patents. Further, McGlynn was cited by the Examiner of the '631 patent in a Detailed Office Action and accompanying Notice of References Cited mailed on 9/12/97. The Applicants attempted to distinguish McGlynn in a First Response with Amendments on October 23, 1997. Notwithstanding the October 23, 1997 response, the PTO issued a Detailed Action rejecting the claims in the '631 patent based upon McGlynn in an office action dated November 18,

16

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

1997, while the application for the '761 patent remained co-pending, and
Applicants nevertheless failed to disclose McGlynn in prosecution of the '761
patent. Further, Applicants for the '761 patent failed to disclose in prosecuting the
'761 patent the office actions and responses from the co-pending '631 patent. In
addition, on information and belief, a reasonable opportunity for discovery will
show that Paradyne personnel substantively involved in the filing or prosecution
of the '761 patent were aware of the '761 Co-Pending Art, as well as U.S. Patent
Nos. 5,600,712 ("Enabling Technique for Quickly Establishing High Speed PSTN
Connections In Telecommuting Applications"), to Hanson, 5,577,105
("Telephone Call Routing and Switching Techniques for Data Communications"),
to Baum, and 5,127,041 ("System and Method for Interfacing Computers to
Diverse Telephone Networks"), to O'Sullivan. The undisclosed information
described herein was material to patentability of the '761 patent and was withheld
with intent to deceive the PTO, as is particularly shown by the continuing pattern
and practice of nondisclosure referenced in this Counterclaim.

21.     Additional instances of misconduct occurred in prosecution of the '631 patent,
where Applicants engaged in inequitable conduct before the PTO rendering the patent
unenforceable by withholding and failing to disclose material information with intent to deceive
including the following acts:

(i)     By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the
attention of the examiner, or other Office official involved with the examination
of a particular application, information within their knowledge as to other co-
pending United States applications which are 'material to patentability' of the
application in question." The MPEP cites to caselaw providing that "[W]e think
that it is unfair to the busy examiner, no matter how diligent and well informed he

17

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)    Notwithstanding these clear obligations, during prosecution, Applicants repeatedly failed to disclose information within their knowledge as to co-pending applications of which they were aware, including without limitation co-pending application 08/458,048 (now the '761 patent, which is now commonly asserted here along with the '631 patent), as well as Application Nos. 08/781,787, now issued as U.S. Patent No. 5,751,796 ("Rapid Startup Protocol For Communication Between a Plurality of Modems") to Scott and Zuranski, and 08/780,238, now issued as U.S. Patent No. 5,787,363 ("System and Method for Connect Message Synchronization of Modems in a Cellular Data Gateway"), to Scott and Lastinger Jr. (the "'631 Co-Pending Applications"). Applicants for the '631 patent failed to identify any of these co-pending applications or their claims to the examiner in the prosecution of the '631 patent. These applications are never disclosed on an IDS that was submitted in the '631 patent or otherwise made of record in the '631 patent. One or more Applicants were aware of the '631 Co-Pending Applications

during prosecution of the '631 patent. All three of the '631 Co-Pending Applications include Robert Scott as a named inventor and two of the '631 Co-Pending Applications claim priority to the same provisional applications for which priority is claimed by the '631 patent. In addition, on information and belief a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '631 patent and were aware of the '631 Co-Pending Applications. The information relating to the '631 Co-Pending Applications was material to the patentability of the '631 Patent and was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)    Further, Applicants failed to disclose in prosecution of the '631 patent, the prior art of record from the '631 Co-Pending Applications, including without limitation U.S. Patent Nos. 5,550,881 ("Automatic Modulation Mode Selecting Unit and Method for Modems"), to Sridhar and Sheer ("Sridhar"), and 5,528,679 ("Automatic Detection of Digital Call Paths in a Telephone System"), to Taarud ("Taarud") (the "'631 Co-Pending Art"). The Applicants did not disclose the '631 Co-Pending Art during prosecution of the '631 patent. Applicants were aware of the '631 Co-Pending Art during prosecution of the '631 patent. Robert Scott is the same and only named inventor on both the '631 and the '761 patents. Further, Sridhar was cited by the Examiner of the '761 patent and used for claim rejections in a Detailed Office Action and accompanying Notice of References Cited dated December 26, 1996. The '631 and '761 patent were co-pending on December 26, 1996, and the '631 patent did not issue until December 22, 1998. While the '631 patent remained co-pending, Applicants attempted to distinguish Sridhar in a Response and Amendment transmitted March 31, 1997. Applicants for the '631

19

patent failed to disclose in prosecuting the '631 patent, the December 26, 1996 office action and the March 31, 1997 response from the co-pending '761 patent or the prior art of record referenced in those communications. In addition, on information and belief a reasonable opportunity for discovery will show that Paradyne personnel substantively involved in the filing or prosecution of the '631 patent were aware of the '631 Co-Pending Art, as well as U.S. Patent Nos. 5,600,712 ("Enabling Technique for Quickly Establishing High Speed PSTN Connections In Telecommuting Applications"), to Hanson, 5,577,105 ("Telephone Call Routing and Switching Techniques for Data Communications"), to Baum, 5,127,041 ("System and Method for Interfacing Computers to Diverse Telephone Networks"), to O'Sullivan, 4,680,773 ("Data Telecommunications System"), to Amundson ("Amundson"), and 4,782,498 ("Modem with Improved Handshaking Capability"), to Copeland, III ("Copeland"). The '631 Co-Pending Art and information described in this paragraph was material to patentability of the '631 patent. The '631 Co-Pending Art and information described in this paragraph was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim. In addition, on information and belief, a reasonable opportunity for discovery will show that Robert Scott was improperly listed as sole inventor of the '631 patent with deceptive intent to defraud the PTO into issuing the patent over the '761 patent.

22.    Additional instances of misconduct occurred in prosecution of the '444 patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

(i)    By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)    On information and belief, a reasonable opportunity for discovery will show that one or more Applicants were aware of U.S. Patent No. 3,978,407 ("Fast Start-Up Adaptive Equalizer Communication System Using Two Data Transmission Rates"), to Forney and Hart. Applicants failed to disclose this patent to the PTO in prosecution of the '444 patent. This reference was material to patentability of the '444 patent. On information and belief, a reasonable opportunity for discovery will show that Applicants knew of and withheld this reference with intent to

deceive the PTO, as is particularly shown by the continuing pattern and practice
of nondisclosure referenced in this Counterclaim.

(iii)    In addition, on information and belief a reasonable opportunity for discovery will
show that Paradyne offered for sale MVL technology more than one year before
applying for the '444 patent, that was material to the '444 patent, but failed to
disclose those sales as prior art to the PTO. The withheld information was
material to patentability and, on information and belief a reasonable opportunity
for discovery will show that this information was withheld with intent to deceive
the PTO, as is particularly shown by the continuing pattern and practice of
nondisclosure referenced in this Counterclaim.

23.    Additional instances of misconduct occurred during the prosecution of the '159
patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent
unenforceable by omitting and misstating material information with intent to deceive including
the following acts:

(i)    In prosecution of the '159 patent, the PTO repeatedly rejected pending claims due
to prior art, including without limitation references to Lang and Mori. In response
to these and other rejections, Applicants represented that claims required and that
they had invented a system that included a "displacement multibit memory
address." However, Applicants lacked support for the invention as represented to
the PTO. Applicants misstated and omitted this material information with intent
to deceive the PTO into issuing the claims. These material misstatements and
omissions were made with intent to deceive, as further confirmed by the pattern
and practice of inequitable conduct alleged throughout this Counterclaim.
Further, the '234 patent is a divisional of the '159 patent, refers back to acts

occurring in prosecution of the '159 patent, and is infected by the unenforceability associated with the '159 patent.

(ii)  In addition, on information and belief, a reasonable opportunity for discovery will show that the Applicants offered the invention on-sale or placed it in public use more than one year before the application date, and applicants withheld this information which was material to patentability with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

24.  Additional instances of misconduct occurred in prosecution of the '858 patent, Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)  By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question."  The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent."  The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to

the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)    On information and belief, Applicants failed to disclose in prosecution of the '858 patent, the material prior art of record from Application No. 08/607,912, now issued as U.S. Patent No. 5,754,799 ("System and Method for Bus Contention Resolution"), to Hiles, including without limitation U.S. Patent Nos. 4,608,700 ("Serial Multi-Drop Data Link"), to Kirtley, Sterling, and Williams, and 5,398,243 ("Arbitration Method and Bus for Serial Data Transmission"), to Aguilhon, Doucet, and Karcher (the "'858 Co-Pending Art"). The Applicants did not disclose the '858 Co-Pending Art during prosecution of the '858 patent. On information and belief, a reasonable opportunity for discovery will show that one or more Applicants were aware of the '858 Co-Pending Art during prosecution of the '858 patent. This undisclosed information was material to patentability of the '858 patent. On information and belief, a reasonable opportunity for discovery will show this information was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)    In addition, one or more Applicants were aware of U.S. Patent No. 4,797,815 ("Interleaved Synchronous Bus Access Protocol for a Shared Memory Multi-Processor System"), to Moore (the same inventor as the '858), and, on information and belief, a reasonable opportunity for discovery will show one or more Applicants were aware of U.S. Patent Nos. 3,997,896 ("Data Processing System Providing Split Bus Cycle Operation"), to Cassarino, Jr., Bekampis, Conway, and

24

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

Lemay, 4,181,974 ("System Providing Multiple Outstanding Information Requests"), to Lemay and Curley, and 4,669,056 ("Data Processing System with a Plurality of Processors Accessing a Common Bus to Interleaved Storage"), to Waldecker and Wright. Applicants failed to disclose these patents to the PTO in prosecution of the '858 patent. These references were material to patentability of the '858 patent and on information and belief a reasonable opportunity for discovery will show that Applicants knew of and withheld them with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

## FOURTH COUNTERCLAIM

### INEQUITABLE CONDUCT IN CONNECTION WITH PROSECUTION OF THE '627 PATENT

25.    Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-24 of these Counterclaims as if fully set forth herein.

26.    The claims of the '627 patent are unenforceable due to the inequitable conduct of one or more of the named inventors and/or others having substantive involvement in prosecuting the '627 patent application. These individuals include, but are not limited to, William L. Betts, Edward S. Zuranski, Ronald D. Slusky and Gerard A. deBlasi ("'627 Procurement Team").

### Misrepresentation Of Prior Art

27.    On information and belief, the '627 Procurement Team made false material statements to the United States Patent and Trademark Office ("the PTO") with the intent to deceive the PTO during the prosecution of the patent application which led to the issuance of the '627 patent (Ser. No. 748,594, hereinafter "'627 patent application").

28.    In particular, during the prosecution of the '627 patent application, one of the prosecuting attorneys, Gerard A. deBlasi, represented to the PTO that "[t]he Prior Art, as described in Applicants' patent application, does not teach independently trellis encoding a

25

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

plurality of streams of trellis bits" and that "[t]he Prior Art clearly does not include a plurality of

trellis encoders to independently encode a plurality of streams of trellis bits as in Applicants'

invention." (12/24/92 Amendment filed in '627 patent application, at 5, 6).

29.    The Prior Art described by the applicants in the '627 patent application included

United States Patent No. 4,677,625 (the "'625 patent"). The '625 patent discloses a plurality of

trellis encoders to independently encode a plurality of streams of trellis bits, contrary to Mr.

deBlasi's statements to the PTO.

30.    Mr. deBlasi's false statements were material because they were made to overcome

prior art asserted by the PTO in rejecting pending claims. Consequently, Mr. deBlasi's

statements are material.

31.    On information and belief, Mr. deBlasi made false material statements to the PTO

during the prosecution of the '627 patent application.

32.    On information and belief, these false material statements were made with intent

to deceive the PTO.

33.    These false material statements constitute a breach of the '627 Procurement

Team's duty of candor and good faith owed to the PTO. Consequently, this misconduct bars the

enforcement of the '627 patent.

### Intentional Withholding Of Material Prior Art References

34.    On information and belief, the '627 Procurement Team intentionally withheld

material information with the intent to deceive the PTO during the prosecution of the '627 patent

application.

35.    In particular, the '627 Procurement Team failed to disclose United States Patent

No. 4,641,327 ("the '327 patent"), United States Patent No. 5,052,000 ("the '000 patent"),

United States Patent Application No. 363,793 ("the '793 application"), United States Patent No.

5,056,112 ("the '112 patent"), United States Patent Application No. 457,438 ("the '438

application"), United States Patent No. 5,105,442 ("the '442 patent"), United States Patent Application No. 611,200 ("the '200 application"), United States Patent No. 5,214,656 ("the '656 patent") and United States Patent Application No. 627,156 ("the '156 application") to the PTO.

36.    On information and belief, the '627 Procurement Team failed to disclose the '327 patent to the PTO. The '327 patent is entitled "Frame Synchronization in Trellis-Coded Communication Systems," and was issued to Lee-Fang Wei on February 3, 1987.

37.    On information and belief, one or more members of the '627 Procurement Team were aware of the '327 patent prior to issuance of the '627 patent.

38.    On information and belief, the '627 Procurement Team withheld the '327 patent with intent to deceive the PTO.

39.    On information and belief, one or more members of the '627 Procurement Team were aware that the '327 patent contained material information including, but not limited to the following:

    (i)    "Another general feature of the invention is an interleaver that changes the original sequence of signal points to a revised sequence for transmission and a deinterleaver that changes the received sequence of signal points in a manner that will restore the original sequence . . . ." ('327 Col. 1:51-56; see also 2:18-20.)

    (ii)    "The communication system is a trellis-coded modulation system. Each signal point is two-dimensional. The two-dimensional points are grouped into multi-dimensional points." ('327 Col. 1:59-62.)

    (iii)    "[E]ncoders and grouping device 18 deliver to interleaver 19, N pairs of in-phase and quadrature coordinates in series, one pair in each signaling interval, each pair corresponding to a point in a two-dimensional (2D) signal constellation. Interleaver 19 reorders the coordinate pairs . . . ." ('327 Col. 2:68-3:5.)

40.    Because, on information and belief, one or more members of the '627

27

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

Procurement Team intentionally withheld the '327 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

41.    On information and belief, the '627 Procurement Team failed to disclose the '000 patent to the PTO. The '000 patent is entitled "Technique for Improving the Operation of Decision Feedback Equalizers in Communications Systems Utilizing Error Correction," and was issued to Jin-Der Wang and Jean-Jacques Werner on September 24, 1991. The '627 Procurement Team also failed to disclose the existence of the '793 application to the PTO. The '793 application was filed on June 9, 1989, and eventually issued as the '000 patent.

42.    On information and belief, one or more members of the '627 Procurement Team were aware of the '793 application and the '000 patent prior to issuance of the '627 patent.

43.    On information and belief, the '627 Procurement Team withheld the '793 application and the '000 patent with intent to deceive the PTO.

44.    On information and belief, one or more members of the '627 Procurement Team were aware that the '793 application and the '000 patent contained material information including, but not limited to the following:

(i)    "The use of plural coders provide interleaving of the transmitted symbols and, accordingly, each decoder is operative upon every Mth symbol, where M is the number of encoders or decoders. If M is properly chosen, the probability of noise impairing the recovery of two successive symbols by any decoder is reduced." ('000 Col. 2:20-24.)

(ii)    "Illustratively, encoders 206-$i$ may each be a convolutional encoder of the type that is used in a standard trellis encoder. Switch 207 takes the outputs of encoders 206-$i$, preferably in a cyclic fashion, and feeds them to symbol mapping apparatus 208 which generates two-dimensional symbols . . . ." ('000 Col. 4:36-42; see also 8:1-4.)

28

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

(iii)   "[W]hile the present invention has been described in reference to particular two-dimensional signal constellations, the invention is also applicable to other two-dimensional signal constellations.  Indeed, the present invention is applicable to signal constellations having other than two dimensions." ('000 Col. 7:60-65.)

45.     Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '793 application and/or the '000 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

46.     On information and belief, the '627 Procurement Team failed to disclose the '112 patent to the PTO.  The '112 patent is entitled "Interleaving in Coded Modulation for Mobile Radio," and was issued to Lee-Fang Wei on October 8, 1991.  The '627 Procurement Team also failed to disclose the existence of the '438 application to the PTO.  The '438 application was filed on December 27, 1989, and eventually issued as the '112 patent.

47.     On information and belief, one or more members of the '627 Procurement Team were aware of the '438 application and the '112 patent prior to issuance of the '627 patent.

48.     On information and belief, the '627 Procurement Team withheld the '438 application and the '112 patent with intent to deceive the PTO.

49.     On information and belief, one or more members of the '627 Procurement Team were aware that the '438 application and the '112 patent contained material information including, but not limited to the following:

(i)   "Interleavers used in fading channel applications can be matched to a particular trellis or block code being used. . . . Matching both the interleaver and the code increases the separation between interdependent signal points and provides an improvement in error performance." ('112 Abstract.)

(ii)   "As an illustration, assume that N is equal to four (an eight-dimensional code) so that four interdependent signal points would be produced for each codeword

every four signalling intervals." ('112 Col. 4:39-43.)

(iii)    "In accordance with the invention, FIG. 14 illustrates the operation of the interleaver on the illustrative trellis code (with two-fold time diversity between successive signal points) of FIG. 10." ('112 Col. 10:14-17.)

50.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '438 application and/or the '112 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

51.    On information and belief, the '627 Procurement Team failed to disclose the '442 patent to the PTO. The '442 patent is entitled "Coded Modulation with Unequal Error Protection," and was issued to Lee-Fang Wei on April 14, 1992. The '627 Procurement Team also failed to disclose the existence of the '200 application to the PTO. The '200 application was filed on November 7, 1990, and eventually issued as the '442 patent.

52.    On information and belief, one or more members of the '627 Procurement Team were aware of the '200 application and the '442 patent prior to issuance of the '627 patent.

53.    On information and belief, the '627 Procurement Team withheld the '200 application and the '442 patent with intent to deceive the PTO.

54.    On information and belief, one or more members of the '627 Procurement Team were aware that the '200 application and the '442 patent contained material information including, but not limited to the following:

(i)    "In accordance with the invention, as described more fully hereinbelow, the respective groups of bits on leads 112 and 113 are extended to channel encoders-- illustratively trellis encoders--114 and 115 which generate, for each symbol interval, respective expanded groups of the expanded r and p bits on leads 121 and 122, where r>m and p>k." ('442 Col. 4:30-36; see also 9:3-4; 12:33-36.)

(ii)    "Decoding in the case where multi-dimensional symbols are used--such as the

four-dimensional examples described below--is carried out in a similar manner, as will be appreciated by those skilled in the art." ('442 Col. 8:27-30; see also 8:49-9:11.)

(iii)    "A further protection against impulse noise for the most important bits in coded modulation schemes based on constellations of the type of FIG. 8 can be achieved by rearranging the bits that are output by channel encoder 114 so that bits that are generated in proximity to one another by the encoder are separated from one another as much as possible, given that the system delay constraints are met. To this end, channel encoder 114 may include a bit interleaver, which performs such rearrangement, as shown in FIG. 15." ('442 Col. 9:40-49.)

55.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '200 application and/or the '442 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

56.    On information and belief, the '627 Procurement Team failed to disclose the '656 patent to the PTO. The '656 patent is entitled "Multiplexed Coded Modulation With Unequal Error Protection," and was issued to Hong Y. Chung, Jin-Der Wang and Lee-Fang Wei on May 25, 1993. The '627 Procurement Team also failed to disclose the existence of the '156 application to the PTO. The '156 application was filed on December 13, 1990, and eventually issued as the '656 patent.

57.    On information and belief, one or more members of the '627 Procurement Team were aware of the '156 application and the '656 patent prior to issuance of the '627 patent.

58.    On information and belief, the '627 Procurement Team withheld the '156 application and the '656 patent with intent to deceive the PTO.

59.    On information and belief, one or more members of the '627 Procurement Team were aware that the '156 application and the '656 patent contained material information

including, but not limited to the following:

    (i)    "Specifically, and in accordance with the present invention, unequal error protection is provided for a signal comprised of a plurality of classes of information by a) separately coding each one of the plurality of classes of information using a different coded modulation scheme and b) multiplexing the plurality of coded outputs for transmission." ('656 Col. 2:10-17.)

    (ii)    "Each class of information is then separately coded by a different, and conventional, coded modulation scheme, e.g., a 4D 8-state trellis code and a uniformly-spaced QAM signal constellation." ('656 Col. 2:21-24; see also 5:55-61; 6:26-52.)

    (iii)    "Also, the coded modulation scheme for each class of information can be enhanced using interleaving techniques, or more complex coded modulation schemes, to protect against other forms of noise, e.g., to protect against 'colored' noise." ('656 Col. 7:26-30.)

60.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '156 application and/or the '656 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

61.    On information and belief, one or more members of the '627 Procurement Team made false material statements to the PTO and withheld several material patents and/or patent applications from the PTO during the prosecution of the '627 patent. This behavior demonstrates a pattern of bad faith and intent to deceive the PTO. Consequently, for the reasons stated above, the '627 Procurement Team breached their duty of candor and good faith owed to the PTO and this breach bars the enforcement of the '627 patent.

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

## FIFTH COUNTERCLAIM

## BREACH OF CONTRACT AND SPECIFIC PERFORMANCE RE ATSC

### Creation of the ATSC Standard

62.    Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-61 of these Counterclaims as if fully set forth herein.

63.    The American Television Systems Committee ("ATSC") is a private standard setting organization ("SSO") organized according to the policies of the American National Standards Institute.  Following a multi-year competitive bidding process for the technology that would become the standard for terrestrial digital television broadcasting, the ATSC published the ATSC A-53 Digital Television Standard ("ATSC standard") on or about September 16, 1995.

64.    As a condition for participating in the ATSC's standard development, American Telephone and Telegraph Company ("AT&T")—the original owner of the '627 patent during the ATSC standard setting process—was required to agree, and did agree, to abide by the ATSC Patent Policy that required all ATSC participants to license any proprietary technology essential for ATSC compliance either without compensation or on fair, reasonable, and non-discriminatory ("FRAND") terms.  On or about January 12, 1995, AT&T promised that it would license its patents, to the extent they are essential to implementation of the ATSC standard, under reasonable terms and conditions on a non-discriminatory, non-exclusive basis.

65.    Besides the technology that Rembrandt currently alleges infringes the '627 patent, at all relevant times multiple other alternative and then-competing technologies were available to the ATSC for incorporation into the standard.  Had the ATSC known that any ATSC signatory or its successor would repudiate its FRAND obligations and assert that the '627 patent covers all or part of the standard, the ATSC would have adopted one of the then-competing technologies.

66.    On or about December 24, 1996, the Federal Communication Commission ("FCC") adopted the ATSC standard as the mandatory standard for terrestrial digital television

broadcasting in the United States. In adopting the ATSC standard, the FCC explicitly conditioned its adoption on all ATSC participants, including AT&T, agreeing to license essential proprietary technology on FRAND terms.

67.    If the FCC had known that an ATSC signatory or its successor would repudiate its FRAND obligations, and would assert that its patent(s) were essential to the ATSC standard, then the FCC would have adopted one of the competing standards.

68.    Both ATSC and the FCC relied on AT&T's and others' FRAND commitments in adopting the ATSC standard not only as a voluntary industry standard, but also a government mandated standard. As the only technology accepted by the FCC for broadcasting terrestrial digital television in the United States, the Counterclaimants and their content providers must implement and follow the standard by at least no later than the upcoming deadline set by Congress for transition to a digital television format. The Counterclaimants have already invested a significant amount of time, energy and money into implementing the ATSC standard.

69.    Congress has established February 17, 2009 as the deadline for the final transition from an analog to a digital system for terrestrial broadcast television in accordance with the ATSC standard. The Counterclaimants will be required to comply with the ATSC standard if they wish to provide their subscribers with any content from terrestrial broadcast television at all in the United States.

### Rembrandt's Repudiation Of Its FRAND Commitment To ATSC

70.    AT&T owned the '627 patent at the time the ATSC promulgated the ATSC standard, and before the FCC adopted that standard as a government-mandated standard. After the FCC adopted the ATSC standard, in or around December 2004, Rembrandt acquired the '627 patent from Paradyne Networks, Inc. ("Paradyne"), a former subsidiary or affiliate of AT&T, successor-in-interest to AT&T with respect to the rights and obligations associated with the '627 patent, and now a wholly owned subsidiary of Zhone Technologies ("Zhone"). Paradyne

obtained its ownership rights to the '627 patent from AT&T. AT&T and its successors-in-interest to the '627 patent were and are bound by the FRAND licensing commitment that AT&T made to the ATSC. As a successor-in-interest to the '627 patent, Rembrandt also is bound by that FRAND licensing commitment to the extent that the patent covers technologies necessary to implement or comply with the ATSC standard.

71.    Rembrandt claims that the '627 patent is "essential" to the ATSC standard. But Rembrandt has disavowed, reneged on, and repudiated the FRAND licensing commitment that its predecessors-in-interest made to ATSC and by which its predecessors-in-interest were bound.

72.    AT&T, as a predecessor-in-interest to the '627 patent, never claimed that the '627 patent was essential to the ATSC standard. And through its acts and omissions, AT&T implicitly denied the '627 patent applied to the ATSC standard.

73.    Rembrandt sued the Counterclaimants and other MSOs without first providing any prior notice of the '627 patent and without offering any license, let alone a license on FRAND terms. After Rembrandt sued the Counterclaimants and other MSOs, Rembrandt demanded exorbitant royalties from the Counterclaimants and others that far exceeded any royalty based on FRAND. These demands directly harm the Counterclaimants and the MSOs and threaten the benefits that inure to all those who use the ATSC standard.

74.    After acquiring the '627 patent, Rembrandt intentionally repudiated any FRAND commitment with respect to the allegedly essential '627 patent.

75.    Rembrandt acquired the '627 patent with the specific intent to repudiate, in bad faith, its FRAND obligations and to obtain exorbitant royalties far in excess of FRAND.

76.    Rembrandt has expressly denied having any FRAND obligations.

77.    Rembrandt seeks non-FRAND term royalties from the Counterclaimants, who must according to Rembrandt's allegations pay an exorbitant royalty far in excess of FRAND for practicing the mandated ATSC standard, or cease receiving terrestrial digital broadcast television

signals in the United States.

78.    Rembrandt's acquisition of the '627 patent has now subjected the Counterclaimants to Rembrandt's patent infringement suit, whereas AT&T could not and would not have asserted such suit. Because AT&T implicitly denied application of the '627 patent to ATSC standard, and because they could not charge greater than FRAND terms in any event, Rembrandt has harmed the Counterclaimants in a way its predecessors could not and would not have done.

79.    As set forth above, Rembrandt took title to the '627 Patent subject to AT&T's FRAND commitment, and is therefore required to license it in good faith and to grant FRAND license terms to any user of the ATSC standard, including the Counterclaimants and its equipment suppliers.

80.    Alternatively, the Counterclaimants are intended third-party beneficiaries of AT&T's contract with the ATSC in that the ATSC and those who participated in the ATSC standard setting process (including AT&T) intended all manufacturers of ATSC-compliant equipment to have available to them FRAND licensing terms, which would inure to the benefit of purchasers of such ATSC-compliant equipment, including MSOs such as the Counterclaimants. The Counterclaimants have standing to enforce AT&T's promise to grant FRAND licenses against AT&T's successor-in-interest, Rembrandt.

81.    Rembrandt has breached its obligations by refusing to offer a license in good faith and by failing to license on FRAND terms.

82.    As a result of Rembrandt's breaches, the Counterclaimants have been irreparably injured or threatened with irreparable injury.

83.    As a result of the Counterclaimants' injuries, the Counterclaimants seek specific performance of Rembrandt's contractual obligations to offer licenses in good faith and on FRAND terms.

84.    The Counterclaimants have no adequate remedy at law.

85.    In addition to an order requiring Rembrandt to specifically perform its contractual obligations, the Counterclaimants also seek damages for the injuries they have incurred and continue to incur, in an amount to be proven at trial.

## SIXTH COUNTERCLAIM

### DECLARATORY JUDGMENT OF CONTRACTUAL RIGHTS AND LIABILITIES RE ATSC

86.    Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-85 of these Counterclaims as if fully set forth herein.

87.    An actual controversy exists between the Counterclaimants and Rembrandt regarding the Counterclaimants right to license the '627 Patent on FRAND terms.

88.    The Counterclaimants are entitled to a declaratory judgment that:  (i) The Counterclaimants are entitled to license the '627 Patent on FRAND terms; (ii) Rembrandt's refusal to provide FRAND licenses, despite its obligation to do so, is a breach of contract; (iii) the Counterclaimants are third-party beneficiaries that have been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to enforce those obligations and to recover damages due to said breach of contract; and/or (iv)  the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology covered by the '627 patent, if essential to the ATSC standard as Rembrandt contends, on FRAND terms.

## SEVENTH COUNTERCLAIM

## DECLARATORY JUDGMENT OF CONTRACTUAL
## RIGHTS AND LIABILITIES RE DOCSIS

### Creation of the DOCSIS Specification

89.    Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-88 of these Counterclaims as if fully set forth herein.

90.    Beginning in the mid-1990s, work began to develop a technical specification for the delivery of high-speed data over cable television networks.  In 1997, The first version of Data Over Cable Services Interface Specifications (DOCSIS) was released by CableLabs.

91.    The goal in the development of DOCSIS was to specify interface requirements so that cable operators and their subscribers would be able to purchase affordable, interchangeable, highly functional cable modems and other equipment from multiple suppliers.  To ensure that customers who purchased cable modems would receive products that were fully compatible with the DOCSIS standard, CableLabs established a certification program to identify DOCSIS-compliant manufacturers.  Certified equipment could then be used in cable systems supporting DOCSIS, and cable operators could then ensure that the equipment used on their network is DOCSIS certified.

92.    On information and belief, both during and after the DOCSIS standardization process, and prior to filing lawsuits against the Counterclaimants and other MSOs, neither Rembrandt nor its Paradyne predecessors-in interest informed CableLabs or cable equipment vendors that they had intellectual property they believed read on or covered the DOCSIS standard.

93.    To facilitate efficient licensing of patented technology essential to implement the original DOCSIS specification and subsequent versions, CableLabs developed a patent pool for such intellectual property.  CableLabs announced the DOCSIS patent pool in July 1998. Companies contributing technology essential to the DOCSIS standardization effort signed an

38

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

agreement, entitled, "Data Over Cable Service Interface Specifications License Agreement."

94.     DOCSIS patent pool members contribute a non-exclusive, royalty-free license to any intellectual property rights they have that are essential to comply with the DOCSIS specifications. In exchange for this grant to the patent pool, DOCSIS pool members receive non-exclusive, royalty-free licenses to the patent pool intellectual property to the extent it is essential to comply with the DOCSIS specification.

95.     Rembrandt and Remstream contend that they have not signed, nor are bound by, the DOCSIS License Agreement.

### Rembrandt's Breach Of The DOCSIS Licensing Agreement

96.     Rembrandt is a non-practicing entity ("NPE")—*viz.*, a company that invests in patents but does not intend to practice them. According to its website, "Rembrandt invests its capital to acquire patents to pursue infringement."

97.     Rembrandt acquired the patents-in-suit with the intent to assert them against, among others, MSOs that use DOCSIS compliant equipment. Rembrandt contends that its patents are essential to compliance with the DOCSIS specification.

98.     As part of Rembrandt's scheme to assert the patents-in-suit, on information and belief, Rembrandt endeavored to become a supposed market participant or direct competitor of the MSOs and/or DOCSIS-compliant equipment manufacturers for the sole purpose of seeking injunctive relief and or lost profits in its infringement suits.



TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

Redacted Document – Publicly Filed



TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS



105.    Remstream—either alone or through partnerships with███████and others—

lacks the capacity to meet U.S. demand for DOCSIS-compliant cable modems.  Rembrandt's

efforts to establish its entity Remstream as the sole supplier of cable modems is not being done

for any legitimate business purposes but rather to conjure up an advantage in litigation.

106.    Upon information and belief, Rembrandt has also reached an agreement with

█████████████████, a cable systems provider to further its scheme of attempting to

further its litigation aims, not any legitimate business purpose.  On information and belief, this

scheme is intended to support Rembrandt's false claim that it is a practicing entity that has

suffered damages as a purported competitor in the cable systems market.

107.    An actual case or controversy exists between the Counterclaimants and

Rembrandt as to infringement, validity, and enforceability of Rembrandt's asserted patents.

108.    The Counterclaimants are intended third-party beneficiaries of the DOCSIS

License Agreement entered into by various signatories, including but not limited to Turbocomm.

Those who participated in the DOCSIS standard-setting process, and in particular the signatories

to the DOCSIS License Agreement, intended all manufacturers and providers of DOCSIS-

compliant equipment and services to have available to them such royalty-free licenses to patent

claims deemed essential for compliance with DOCSIS, subject to the terms of the DOCSIS

License Agreement, which would inure to the benefit of purchasers and operators of such

DOCSIS-compliant equipment, including MSOs such as the Counterclaimants.  The

Counterclaimants have standing to enforce each DOCSIS License Agreement's signatory's promise to grant royalty-free licenses under the DOCSIS License Agreement.

109.    As set forth above, ███████ signed and was bound by the terms of the DOCSIS License Agreement. Under those terms, ███████ and any of its affiliates agreed to grant a nontransferable, worldwide, nonexclusive, and royalty-free license to any of its patent claims deemed essential for DOCSIS compliance to CableLabs, which in turn sublicensed such rights to all other signatories to the DOCSIS License Agreement. ███████ in turn conferred all of the benefits it enjoyed under the DOCSIS License Agreement to Rembrandt d/b/a Remstream.

110.    As alleged above, Rembrandt assisted ███████ in obtaining CableLabs certification for modems that Rembrandt intended to resell. Rembrandt did so for the specific purpose of partnering with ███████ to enjoy ███████ rights under the DOCSIS License Agreement while attempting to avoid its corresponding obligation to grant a royalty free license under its own patents. Rembrandt's engaged in this scheme to portray itself misleadingly as a true practicing entity in the cable modem business, solely for the purposes of seeking lost profits and/or injunctive relief from the Counterclaimants, among others.

111.    Rembrandt has, or had a relationship, both business and legal, with ███████ such that they effectively acted as, partners, joint venturers, alter egos of each other, and/or agent and principal. Alternatively, Rembrandt adopted, confirmed and ratified ███████ entering into the DOCSIS License Agreement when it entered into its business relationship with ███████

112.    As a result, Rembrandt has been and continues to be bound by ███████ obligations under the DOCSIS License Agreement. Rembrandt has breached its obligations by refusing to offer in good faith a royalty-free license, as provided for under the DOCSIS License Agreement, to the patents it alleges are essential for DOCSIS compliance while simultaneously

42

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

assuming ▇▇▇▇▇▇▇ rights under the DOCSIS License Agreement to royalty-free licenses to others' patents essential for compliance with the standard for purposes of portraying itself as a business competitor.

113.    As a result of Rembrandt's breaches, the Counterclaimants have been irreparably injured or threatened with irreparable injury. As a result of the Counterclaimants' injuries, the Counterclaimants seek specific performance of Rembrandt's contractual obligations to offer royalty-free licenses in good faith under the DOCSIS License Agreement.

114.    The Counterclaimants have no adequate remedy at law. In addition to an order requiring Rembrandt to specifically perform its contractual obligations, the Counterclaimants also seek damages for the injuries they have incurred and continue to incur, in an amount to be proven at trial.

### EIGHTH COUNTERCLAIM

### DECLARATORY JUDGMENT OF CONTRACTUAL RIGHTS AND LIABILITIES RE DOCSIS

115.    Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-114 of these Counterclaims as if fully set forth herein.

116.    An actual controversy exists between the Counterclaimants and Rembrandt regarding the Counterclaimants right to obtain royalty-free licenses to patent claims Rembrandt asserts are essential for compliance with DOCSIS under the DOCSIS License Agreement.

117.    For the reasons set forth above, the Counterclaimants are entitled to a declaratory judgment that: (i) The Counterclaimants are entitled to a royalty-free licenses to patent claims deemed essential for compliance with DOCSIS under the DOCSIS License Agreement; (ii) Rembrandt's refusal to provide royalty-free licenses, despite its obligation to do so, is a breach of contract; (iii) the Counterclaimants are third-party beneficiaries that have been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to enforce those obligations and to recover damages due to said breach of contract; (iv) the Counterclaimants'

customers have a right to use the technology licensed pursuant to the DOCSIS License Agreement by virtue of their relationship with the Counterclaimants; and/or (v) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology, which as Rembrandt contends, is essential for compliance with the DOCSIS standard.

## NINTH COUNTERCLAIM

### UNFAIR BUSINESS PRACTICES, CAL. BUS. & PROF. CODE §17200 RE ATSC

118.    Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-117 of these Counterclaims as if fully set forth herein.

119.    As alleged more fully above, Rembrandt has engaged in unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code §17200.  These practices have occurred, at least in part, in California, and/or have affected California residents and consumers, or threaten to do so.

120.    Rembrandt has engaged in unfair business practices by, among other things, refusing to abide by its obligations as successor in interest to AT&T's commitment to offer FRAND licensing terms to any intellectual property that is asserted to be essential to the practice of the ATSC standard.

121.    Rembrandt has engaged in unlawful business practices by, among other things, failing to abide by the Dec. 24, 1996 FCC Fourth Report and Order that the ATSC format was adopted conditioned upon the participants' agreement to license any technology asserted to be relevant on FRAND terms.

122.    The Counterclaimants have suffered actual injury, and are threatened with further actual injury unless enjoined, as a result of the unfair, deceptive and unlawful business practices of Rembrandt described above.

44

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

## TENTH COUNTERCLAIM

## UNFAIR BUSINESS PRACTICES, CAL. BUS. & PROF. CODE §17200 RE DOCSIS

123.    Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-122 of these Counterclaims as if fully set forth herein.

124.    As alleged more fully above, Rembrandt has engaged in unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code §17200.  These practices have occurred, at least in part, in California, and/or have affected California residents and consumers, or threaten to do so.

125.    Several of Rembrandt's illegal, unfair, and fraudulent acts have harmed and threaten to further harm California customers, consumers, and competition within California, including by increasing the prices California consumers pay for cable modems or decreasing the supply of cable modems, or threatening the same.

126.    Rembrandt has engaged in unfair business practices by, among other things, refusing to abide by its obligations under the DOCSIS License Agreement to offer royalty-free licenses any intellectual property that is asserted to be essential to the practice of the DOCSIS standard, while at the same time purporting to be a bona fide participant in the business of providing cable modems licensed under the DOCSIS License Agreement.

127.    Rembrandt has engaged in unlawful business practices by, among other things, failing to abide by its obligation to license any technology asserted to be essential to compliance with the DOCSIS standard.

128.    Rembrandt has engaged in deceptive business practices by representing, or threatening to represent, itself as a purported bona fide cable modem provider when in fact its involvement in the cable modem business is for the purpose of generating evidence for this litigation. Rembrandt has also engaged in deceptive business practices by representing, or threatening to represent, itself as a purported bona fide cable modem provider when in fact the

true participant in the cable modem business is ███████████████████████

████████

129.    The Counterclaimants have suffered actual injury, and are threatened with further actual injury unless enjoined, as a result of the unfair, deceptive and unlawful business practices of Rembrandt described above.

## ELEVENTH COUNTERCLAIM

### THE PATENTS-IN-SUIT ARE UNENFORCEABLE - PATENT MISUSE

130.    Counterclaimants hereby repeat and reiterate the allegations made in paragraphs 1-129 of these Counterclaims as if fully set forth herein.

131.    The '819, '903, '761, '858, '234, '631, '159, '444, or '627 patents are unenforceable due to patent misuse.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), the Counterclaimants demand a trial by jury of all issues so triable in this action, including, without limitation, those issues raised in the Reply, Affirmative Defenses and Counter-Counterclaims.

## PRAYER FOR RELIEF

WHEREFORE, TWC prays that:

a)  The Court dismiss all of Rembrandt's claims against TWC with prejudice;

b)  The Court declare invalid each of the claims of the '819, '903, '761, '858, '234, '631, '159, '444 and '627 patents;

c)  The Court declare that TWC does not manufacture, use, offer for sale, sell, or import into the United States any product or method that infringes any of the claims of the '819, '903, '761, '858, '234, '631, '159, '444 or '627 patents and has not done so in the past, and that TWC therefore and otherwise does not directly infringe the '819, '903, '761, '858, '234, '631, '159, '444 or '627 patents and has not done so in the past;

d)  The Court declare that TWC does not contribute to or induce infringement of the

46

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

'819, '903, '761, '858, '234, '631, '159, '444 or '627 patents and TWC has not done so in the past, and that TWC therefore and otherwise does not indirectly infringe the '819, '903, '761, '858, '234, '631, '159, '444 or '627 patents and has not done so in the past;

e)  The Court declare that the '819, '903, '761, '858, '234, '631, '159, '444 or '627 patents are unenforceable due to patent misuse;

f)  The Court declare that the Counterclaimants have no adequate remedy at law.

g)  The Court order Rembrandt to specifically perform its contractual obligation to license the '627 patent on FRAND terms;

h)  The Court order Rembrandt to specifically perform its contractual obligation to grant a royalty-free license on technology essential for compliance with the DOCSIS standard:

i)  The Court declare that: (i) The Counterclaimants are entitled to license the '627 Patent on FRAND terms; (ii) Rembrandt's refusal to provide FRAND licenses, despite its obligation to do so, is a breach of contract; (iii) the Counterclaimants are third-party beneficiaries that have been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to enforce those obligations and to recover damages due to said breach of contract; (iv) the Counterclaimants customers have a right to use the technology licensed pursuant to the FRAND terms by virtue of their relationship with the Counterclaimants; and/or (v) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has failed to license the technology on FRAND terms.

j)  The Court declare that: (i) The Counterclaimants are entitled to a royalty-free licenses to patent claims deemed essential for compliance with DOCSIS under the DLA; (ii) Rembrandt's refusal to provide royalty-free licenses, despite its obligation to do so, is a breach of contract; (iii) the Counterclaimants are third-party beneficiaries that have been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to enforce those obligations and to recover damages due to said breach of

contract; (iv) the Counterclaimants' customers have a right to use the technology
licensed pursuant to the DLA by virtue of their relationship with the Counterclaimants;
and/or (v) the claims of various patents allegedly owned by Rembrandt are
unenforceable because Rembrandt has repudiated its obligation to and failed to
license the technology, which as Rembrandt contends, is essential for compliance with
the DOCSIS standard.

k) The Court award damages to the Counterclaimants on the breach of contracts claim in
an amount to be determined at trial.

l) The Court award restitution to the Counterclaimants on the unfair business practices
claims, in an amount to be determined at trial.

m) The Court grant a preliminary and permanent injunction prohibiting any and all of
Rembrandt's ongoing acts of unfair business practices.

n) TWC be awarded its costs, its attorneys fees pursuant to 35 U.S.C. § 285, and interest
as allowed by law; and

o) TWC be awarded such other and further relief as this Court deems is just and proper.


Respectfully submitted,


By:    ___/s/ Daniel L. Reinser_____
David S. Benyacar
Daniel L. Reisner
**Kaye Scholer LLP**
425 Park Avenue
New York, NY 10022-3598
(212) 836-8000

*Attorneys for Time Warner Cable Inc.,*
*Time Warner Cable LLC, Time Warner NY*
*Cable LLC, Time Warner Entertainment*
*Company, L.P., and Time Warner*
*Entertainment-Advance/Newhouse*
*Partnership*

Dated: May 2, 2008

TWC'S REPLY TO REMBRANDT'S COUNTERCLAIM AND COUNTER-
COUNTERCLAIMS FOR PATENT INFRINGEMENT
MDL Docket No. 07-md-1848 (GMS); Civil Action No. 07-752-GMS

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2008, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF.

I further certify that I caused to be served copies of the foregoing document on

May 2, 2008 upon the following in the manner indicated:

### VIA HAND DELIVERY and EMAIL

Collins J. Seitz, Jr., Esquire
Francis DiGiovanni, Esquire
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19801
cseitz@cblh.com
fdigiovanni@cblh.com

John W. Shaw, Esquire
YOUNG CONAWAY STARGATT & TAYLOR LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com

### VIA EMAIL

David S. Benyacar, Esquire
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022
dbenyacar@kayescholer.com

John M. DesMarais, Esquire
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611
Jdesmarais@kirkland.com

Eric R. Lamison, Esquire
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
elamison@kirkland.com

Edward R. Reines, Esquire
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
edward.reines@weil.com

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

I further certify that I caused to be served copies of the foregoing document on May 7, 2008 upon the following in the manner indicated:

## VIA ELECTRONIC MAIL

Collins J. Seitz, Jr., Esquire
Francis DiGiovanni, Esquire
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19801
cseitz@cblh.com
fdigiovanni@cblh.com

John W. Shaw, Esquire
YOUNG CONAWAY STARGATT & TAYLOR LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
jshaw@ycst.com

David S. Benyacar, Esquire
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022
dbenyacar@kayescholer.com

John M. DesMarais, Esquire
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611
jdesmarais@kirkland.com

Eric R. Lamison, Esquire
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
elamison@kirkland.com

Edward R. Reines, Esquire
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
edward.reines@weil.com

*/s/ Jack B. Blumenfeld*

---

Jack B. Blumenfeld (#1014)