# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In Re: | ) | |
| REMBRANDT TECHNOLOGIES, LP PATENT | ) | MDL Docket No. 07-md-1848 (GMS) |
| LITIGATION | ) | |
|  | ) | |
|  | ) | |
| MOTOROLA, INC., CISCO SYSTEMS, INC., | ) | |
| SCIENTIFIC-ATLANTA, INC., ARRIS GROUP, | ) | |
| INC., THOMSON, INC., AMBIT | ) | |
| MICROSYSTEMS, INC., and NETGEAR, INC., | ) | |
|  | ) | |
| Plaintiffs, | ) | Civil Action No. 07-752-GMS |
|  | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
|  | ) | |
| REMBRANDT TECHNOLOGIES, LP, | ) | |
|  | ) | |
| Defendant. | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
| REMBRANDT TECHNOLOGIES, LP, and | ) | |
| REMBRANDT TECHNOLOGIES, LLC d/b/a | ) | |
| REMSTREAM, | ) | |
|  | ) | |
| Counter-Plaintiffs, | ) | Civil Action No. 07-752-GMS |
|  | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
|  | ) | |
| MOTOROLA, INC., CISCO SYSTEMS, INC., | ) | |
| SCIENTIFIC-ATLANTA, INC., ARRIS GROUP, | ) | ██**PUBLIC VERSION** |
| INC., THOMSON, INC., AMBIT | ) | |
| MICROSYSTEMS, INC., and NETGEAR, INC., | ) | Original Filing Date: May 2, 2008 |
| TIME WARNER CABLE, INC., TIME | ) | Redacted Filing Date: May 8, 2008 |
| WARNER CABLE LLC, TIME WARNER NEW | ) | |
| YORK CABLE LLC, TIME WARNER | ) | |
| ENTERTAINMENT COMPANY, LP, | ) | |
| COMCAST CORPORATION, COMCAST | ) | |
| CABLE COMMUNICATIONS, LLC, CHARTER | ) | |
| COMMUNICATIONS, INC., CHARTER | ) | |
| COMMUNICATIONS OPERATING, LLC, | ) | |
| COXCOM, INC., COX COMMUNICATIONS, | ) | |
| INC., COX ENTERPRISES, INC., | ) | |

CSC HOLDINGS, INC., CABLEVISION           )
SYSTEMS CORPORATION, ADELPHIA             )
COMMUNICATIONS CORPORATION,               )
CENTURY-TCI CALIFORNIA                    )
COMMUNICATIONS, LP, CENTURY-TCI           )
HOLDINGS, LLC, COMCAST OF                 )
FLORIDA/PENNSYLVIANIA, L.P. (f/k/a        )
PARNASSOS, LP), COMCAST OF                )
PENNSYLVANIA II, L.P. (f/k/a CENTURY-TCI  )
CALIFORNIA, L.P.), PARNASSOS              )
COMMUNICATIONS, LP, ADELPHIA              )
CONSOLIDATION, LLC, PARNASSOS             )
HOLDINGS, LLC, and WESTERN NY             )
CABLEVISION, LP,                          )
                                          )
        Counter-Defendants.            )
                                          )

## CHARTER COMMUNICATIONS, INC.'S AND CHARTER COMMUNICATIONS OPERATING, LLC'S ANSWER AND COUNTERCLAIMS TO REMBRANDT TECHNOLOGIES, LP'S COUNTER-COUNTERCLAIM

Charter Communications, Inc. and Charter Communications Operating LLC (collectively "Charter") answer Rembrandt Technologies, LP's ("Rembrandt") Counter-Counterclaim as follows:

### The Parties

1.      Upon information and belief, Charter admits that Rembrandt is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 900, Bala Cynwyd, PA 19004.

2.      Charter admits the allegations of paragraph 2.

3.      Charter admits the allegations of paragraph 3.

### Jurisdiction and Venue

4.      Charter admits that this action invokes the United States patent laws.

5.      Charter admits that this Court has subject matter jurisdiction over patent law claims.

6.    Charter admits that this Court has personal jurisdiction over Charter Communications, Inc. and Charter Communications Operating, LLC because they have filed Counterclaims in this action and are Delaware entities. Charter denies the remaining allegations of paragraph 6.

7.    Charter admits the allegations of paragraph 7 for purposes of this litigation only.

### Count I – Infringement of U.S. Patent No. 5,243,627

8.    Charter restates and incorporates by reference its responses to the allegations of paragraphs 1-7.

9.    Charter admits that a copy of U.S. Patent No. 5,243,627 ("the '627 patent") entitled "Signal Point Interleaving Technique" was attached as Exhibit A to Charter's Counterclaim filed February 7, 2008. Charter lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 9 and demands strict proof thereof.

10.    Charter admits that the United States Patent and Trademark Office ("the PTO") issued the '627 patent on September 7, 1993. Charter lacks knowledge or information sufficient to form a belief as to the truth of whether the '627 patent was "duly and legally issued" because these terms are not defined.

11.    Charter admits the allegations of paragraph 11.

12.    Charter denies the allegations of paragraph 12.

13.    Charter denies the allegations of paragraph 13.

### AFFIRMATIVE DEFENSES

Charter asserts the following defenses. Charter reserves the right to assert additional defenses as further information is obtained.

1.    Charter has not infringed and does not infringe, directly or indirectly, any valid and enforceable claim of the '627, '761, '858, '819, '234, '631, '159, '903 or '444 patents.

2.    The claims of the '627, '761, '858, '819, '234, '631, '159, '903 and '444 patents are invalid for failure to satisfy one or more of the requirements of Sections 101, 102, 103 and 112 of Title 35 of the United States Code.

3.    Rembrandt's claims under the '627, '761, '858, '819, '234, '631, '159, '903 and '444 patents are barred, in whole or in part, by the doctrines of laches or estoppel.

4.    Rembrandt's claims under the '627, '761, '858, '819, '234, '631, '159, '903 and '444 patents are barred, in whole or in part, by the doctrine of patent misuse.

5.    The '627, '761, '858, '234, '631, '159, and '444 patents are unenforceable due to the inequitable conduct of one or more named inventors and/or others having substantive involvement in the prosecution of the foregoing patents.  These individuals, subject to the duty of candor under 37 C.F.R. § 1.56, committed inequitable conduct by engaging in a pattern and practice of withholding or misstating material information with intent to deceive the United States Patent & Trademark Office.  The particulars of this inequitable conduct are pled in Charter's Counterclaims below, incorporated herein by reference.

6.    Rembrandt's claims under the '627, '761, '858, '819, '234, '631, '159, '903 and '444 patents are barred, in whole or in part, by the doctrine of unclean hands.

7.    Rembrandt's claims under the '627, '761, '858, '819, '234, '631, '159, '903 and '444 patents are barred, in whole or in part, by express or implied license.

## ADDITIONAL COUNTERCLAIMS[1]

Charter Communications, Inc. and Charter Communications Operating LLC (collectively "Charter") for its Counterclaims against Rembrandt Technologies, LP ("Rembrandt") and Rembrandt Technologies, LLC ("Remstream") states as follows:

### Parties

1.      Charter Communications, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscourt Drive, Suite 100, St. Louis, MO 63131.

2.      Charter Communications Operating, LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscourt Drive, Suite 100, St. Louis, MO 63131.

3.      Upon information and belief, Rembrandt Technologies, LP is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 900, Bala Cynwyd, PA 19004.

4.      Upon information and belief, Rembrandt Technologies, LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business at 401 City Avenue, Suite 900, Bala Cynwyd, PA 19004.

### Jurisdiction and Venue

5.      These Counterclaims arise under the United States patent laws and the declaratory judgment statute.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1338(a),

---

[1] These counterclaims are in addition to those contained in Charter Communication, Inc. and Charter Communications Operation, LLC's Answer to Rembrandt Technologies, LP's and Rembrandt Technologies, LLC's Counterclaim (Dkt. 75), filed February 7, 2008.

1367, 2201 and 2202. The federal and state law claims asserted in this action arise from a common nucleus of operative facts.

6. This Court has personal jurisdiction over Rembrandt and Remstream because they have submitted to the jurisdiction of this Court by filing their Counterclaim for Patent Infringement in the instant action.

7. Venue in this District is proper under 28 U.S.C. § 1391 and 1400.

## Factual Background

8. Rembrandt and Remstream have accused Charter of infringing U.S. Patent Nos. 5,710,761 ("the '761 patent"), 5,778,234 ("the '234 patent"), 6,131,159 ("the '159 patent"), and 6,950,444 ("the '444 patent") directly and/or indirectly.

9. Rembrandt has accused Charter of infringing U.S. Patent Nos. 4,937,819 ("the '819 patent"), 5,008,903 ("the '903 patent"), 5,719,858 ("the '858 patent"), 5,852,631 ("the '631 patent"), and 5,243,627 ("the '627 patent") directly and/or indirectly.

10. The '819, '903, '761, '858, '234, '631, '159, '444, and '627 patents are invalid, and have not been and are not infringed by Charter, either directly or indirectly.

11. The '761, '858, '234, '631, '159, '444, and '627 patents are unenforceable due to inequitable conduct.

12. Consequently, there is an actual case or controversy between the parties over the infringement, validity, and/or enforceability of the '819, '903, '761, '858, '234, '631, '159, '444, and '627 patents.

**Count I – Inequitable Conduct Regarding Prosecution
of the '761, '858, '234, '631, '159, and '444 Patents**

13.     Charter restates and incorporates by reference its allegations in paragraphs 1-12 of its Counterclaims.

14.     The '761, '858, '234, '631, '159, and '444 patents are unenforceable due to the inequitable conduct of one or more named inventors and/or others having substantive involvement in the prosecution of the foregoing patents.

15.     Individuals subject to the duty of candor under 37 C.F.R. § 1.56 ("Applicants"), including named inventors in the applications referenced below and employees with substantive involvement in the filing and/or prosecution of patent applications for Paradyne entities, engaged in inequitable conduct by engaging in a pattern and practice of withholding or misstating material information with intent to deceive the United States Patent and Trademark Office ("the PTO") in connection with patent prosecution of the '761, '631, '234, '159, '858, and '444 patents, including withholding or misstating material information with the intent to deceive in view of the claim constructions that Rembrandt seeks in this litigation.  On information and belief, a reasonable opportunity for discovery will show that Applicants failed to disclose their own previously issued patents that comprised material prior art, failed to disclose material information regarding their own co-pending applications for patents, failed to disclose prior art that was known to them through the prosecution of their own patents and applications, and failed to disclose their own systems that were on-sale prior to the relevant critical dates.  In addition to nondisclosure, Applicants in the prosecution chain of the '159 and '234 patents provided affirmative misstatements as set forth below.  Accordingly, Applicants engaged in an overall pattern and practice of repeatedly and continuously failing to disclose to the PTO material information of which Applicants were indisputably aware.  The permeation and continuation of

this misconduct throughout prosecution of multiple patent applications confirms that Applicants acted with deceptive intent rendering the patents unenforceable. Further, the doctrine of infectious unenforceability renders related patents unenforceable.

16.    More specifically, during prosecution of the '761 patent, Applicants engaged in inequitable conduct before the PTO, rendering the '761 patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)    By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)    Notwithstanding these clear obligations, during prosecution, Applicants were aware of and failed to disclose, without limitation, co-pending application 08/780,762 ("the '762 application," now the '631 patent, which is commonly asserted in this action along with the '761 patent). The Applicants for the '761 patent failed to identify the '762 application or its claims to the examiner in the prosecution of the '761 patent. The '762 application was never disclosed on any IDS that was submitted in the '761 patent or otherwise made of record in the '761 patent. Information relating to the '762 application and its claims was material to patentability. One or more Applicants were aware of the '762 application. Robert Scott is the sole named inventor on both the '761 and '631 patents. Robert Scott was aware of the co-pendency of his applications. In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '761 patent and were aware of the '762 application. Material information relating to the '762 application was withheld with intent to deceive the PTO as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)   Further, Applicants failed to disclose in prosecution of the '761 patent, the prior art of record from the '762 application, as well as the prior art of record from Application Nos. 08/781,787, now issued as 5,751,796 ("Rapid Startup Protocol For Communication Between a Plurality of Modems"), to Scott and Zuranski, 08/781,067, now issued as 5,796,808 ("System and Method for Automatically Selecting the Mode of Communication between a Plurality of Modems"), to Scott and Lastinger Jr., 08/457,881, now issued as 5,793,809 ("Transparent Technique

for Mu-Law Modems to Detect an All-Digital Circuit Connection"), to

Holmquist, 08/912,126, now issued as 6,081,556 ("Transparent Technique for

Mu-Law Modems to Detect an All-Digital Circuit Connection"), to Holmquist,

and 08/978,536, now issued as 5,349,635 ("Half-Duplex or Full-Duplex

Automode Operation for use in Data Communications Equipment"), to Scott (the

"'761 Co-Pending Applications").  One or more Applicants were aware of the '761

Co-Pending Applications.  Two of the '761 Co-Pending Applications include

Robert Scott as a named inventor, and in the case of the '761 and '631 patents, he

is the sole named inventor on both.  Robert Scott was aware of the co-pendency of

his applications.  In addition, on information and belief, a reasonable opportunity

for discovery will show that Paradyne personnel were substantively involved in

the filing or prosecution of the '761 patent and were aware of the '761 Co-Pending

Applications.

(iv)    The prior art of record from the '761 Co-Pending Applications that Applicants

failed to disclose, includes without limitation U.S. Patent Nos. 4,905,282

("Feature Negotiation Protocol and Dynamically Adjustable Retraining Sequence

for a High Speed Half Duplex Modem"), to McGlynn and Nash ("McGlynn"),

5,528,679 ("Automatic Detection of Digital Call Paths in a Telephone System"),

to Taarud ("Taarud"), 4,680,773 ("Data Telecommunications System"), to

Amundson ("Amundson"), and 4,782,498 ("Modem with Improved Handshaking

Capability"), to Copeland, III ("Copeland") (the "'761 Co-Pending Art").  The

'761 Co-Pending Art was material to the patentability of the '761 patent.

Applicants for the '761 patent failed to identify any of '761 Co-Pending Art to the

examiner in the prosecution of the '761 patent.  Applicants were aware of the '761

Co-Pending Art. Robert Scott is the same and only named inventor on both the '631 and the '761 patents. Further, McGlynn was cited by the Examiner of the '631 patent in a Detailed Office Action and accompanying Notice of References Cited mailed on 9/12/97. The Applicants attempted to distinguish McGlynn in a First Response with Amendments on October 23, 1997. Notwithstanding the October 23, 1997 response, the PTO issued a Detailed Action rejecting the claims in the '631 patent based upon McGlynn in an office action dated November 18, 1997, while the application for the '761 patent remained co-pending, and Applicants nevertheless failed to disclose McGlynn in prosecution of the '761 patent. Further, Applicants for the '761 patent failed to disclose in prosecuting the '761 patent the office actions and responses from the co-pending '631 patent. In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel substantively involved in the filing or prosecution of the '761 patent were aware of the '761 Co-Pending Art, as well as U.S. Patent Nos. 5,600,712 ("Enabling Technique for Quickly Establishing High Speed PSTN Connections In Telecommuting Applications"), to Hanson, 5,577,105 ("Telephone Call Routing and Switching Techniques for Data Communications"), to Baum, and 5,127,041 ("System and Method for Interfacing Computers to Diverse Telephone Networks"), to O'Sullivan. The undisclosed information described herein was material to patentability of the '761 patent and was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

17.    Additional instances of misconduct occurred in prosecution of the '631 patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent

unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)      By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question."  The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent."  The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications.  Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)     Notwithstanding these clear obligations, during prosecution, Applicants repeatedly failed to disclose information within their knowledge as to co-pending applications of which they were aware, including without limitation co-pending application 08/458,048 (now the '761 patent, which is now commonly asserted

here along with the '631 patent), as well as Application Nos. 08/781,787, now

issued as U.S. Patent No. 5,751,796 ("Rapid Startup Protocol For Communication

Between a Plurality of Modems") to Scott and Zuranski, and 08/780,238, now

issued as U.S. Patent No. 5,787,363 ("System and Method for Connect Message

Synchronization of Modems in a Cellular Data Gateway"), to Scott and Lastinger

Jr. (the "'631 Co-Pending Applications"). Applicants for the '631 patent failed to

identify any of these co-pending applications or their claims to the examiner in

the prosecution of the '631 patent. These applications are never disclosed on an

IDS that was submitted in the '631 patent or otherwise made of record in the '631

patent. One or more Applicants were aware of the '631 Co-Pending Applications

during prosecution of the '631 patent. All of the '631 Co-Pending Applications

include Robert Scott as a named inventor and two claim priority to the same

provisional applications for which priority is claimed by the '631 patent. In the

case of the '761 and '631 patents, he is the sole named inventor on both. In

addition, on information and belief a reasonable opportunity for discovery will

show that Paradyne personnel were substantively involved in the filing or

prosecution of the '631 patent and were aware of the '631 Co-Pending

Applications. The information relating to the '631 Co-Pending Applications was

material to the patentability of the '631 Patent and was withheld with intent to

deceive the PTO, as is particularly shown by the continuing pattern and practice

of nondisclosure referenced in this Counterclaim.

(iii)   Further, Applicants failed to disclose in prosecution of the '631 patent, the prior

art of record from the '631 Co-Pending Applications, including without limitation

U.S. Patent Nos. 5,550,881 ("Automatic Modulation Mode Selecting Unit and

Method for Modems"), to Sridhar and Sheer ("Sridhar"), and 5,528,679

("Automatic Detection of Digital Call Paths in a Telephone System"), to Taarud

("Taarud") (the "'631 Co-Pending Art"). The Applicants did not disclose the '631

Co-Pending Art during prosecution of the '631 patent. Applicants were aware of

the '631 Co-Pending Art during prosecution of the '631 patent. Robert Scott is the

same and only named inventor on both the '631 and the '761 patents. Further,

Sridhar was cited by the Examiner of the '761 patent and used for claim rejections

in a Detailed Office Action and accompanying Notice of References Cited dated

December 26, 1996. The '631 and '761 patent were co-pending on December 26,

1996, and the '631 patent did not issue until December 22, 1998. While the '631

patent remained co-pending, Applicants attempted to distinguish Sridhar in a

Response and Amendment transmitted March 31, 1997. Applicants for the '631

patent failed to disclose in prosecuting the '631 patent, the December 26, 1996

office action and the March 31, 1997 response from the co-pending '761 patent or

the prior art of record referenced in those communications. In addition, on

information and belief a reasonable opportunity for discovery will show that

Paradyne personnel substantively involved in the filing or prosecution of the '631

patent were aware of the '631 Co-Pending Art, as well as U.S. Patent Nos.

5,600,712 ("Enabling Technique for Quickly Establishing High Speed PSTN

Connections In Telecommuting Applications"), to Hanson, 5,577,105

("Telephone Call Routing and Switching Techniques for Data Communications"),

to Baum, 5,127,041 ("System and Method for Interfacing Computers to Diverse

Telephone Networks"), to O'Sullivan, 4,680,773 ("Data Telecommunications

System"), to Amundson ("Amundson"), and 4,782,498 ("Modem with Improved

Handshaking Capability"), to Copeland, III ("Copeland"). The '631 Co-Pending Art and information described in this paragraph was material to patentability of the '631 patent. The '631 Co-Pending Art and information described in this paragraph was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim. In addition, on information and belief, a reasonable opportunity for discovery will show that Robert Scott was improperly listed as sole inventor of the '631 patent with deceptive intent to defraud the PTO into issuing the patent over the '761 patent.

18.    Additional instances of misconduct occurred in prosecution of the '444 patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)    By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material

information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)  On information and belief, a reasonable opportunity for discovery will show that one or more Applicants was aware of U.S. Patent No. 3,978,407 ("Fast Start-Up Adaptive Equalizer Communication System Using Two Data Transmission Rates"), to Forney and Hart. Applicants failed to disclose this patent to the PTO in prosecution of the '444 patent. This reference was material to patentability of the '444 patent. On information and belief, a reasonable opportunity for discovery will show that Applicants knew of and withheld this reference with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)  In addition, on information and belief a reasonable opportunity for discovery will show that Paradyne offered for sale MVL technology more than one year before applying for the '444 patent, that was material to the '444 patent, but failed to disclose those sales as prior art to the PTO. The withheld information was material to patentability and, on information and belief a reasonable opportunity for discovery will show that this information was withheld with intent to deceive

the PTO, as is particularly shown by the continuing pattern and practice of
nondisclosure referenced in this Counterclaim.

19.     Additional instances of misconduct occurred during the prosecution of the '159
patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent
unenforceable by omitting and misstating material information with intent to deceive including
the following acts:

(i)     In prosecution of the '159 patent, the PTO repeatedly rejected pending claims due
        to prior art, including without limitation references to Lang and Mori.  In response
        to these and other rejections, Applicants represented that claims required and that
        they had invented a system that included a "displacement multibit memory
        address." However, Applicants lacked support for the invention as represented to
        the PTO.  Applicants misstated and omitted this material information with intent
        to deceive the PTO into issuing the claims.  These material misstatements and
        omissions were made with intent to deceive, as further confirmed by the pattern
        and practice of inequitable conduct alleged throughout this Counterclaim.
        Further, the '234 patent is a divisional of the '159 patent, refers back to acts
        occurring in prosecution of the '159 patent, and is infected by the unenforceabilty
        associated with the '159 patent.

(ii)    In addition, on information and belief, a reasonable opportunity for discovery will
        show that the Applicants offered the invention on-sale or placed it in public use
        more than one year before the application date, and applicants withheld this
        information which was material to patentability with intent to deceive the PTO, as

is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

20.     Additional instances of misconduct occurred in prosecution of the '858 patent, Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)     By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that " [W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

18

(ii)     Notwithstanding these clear obligations, Applicants failed to disclose in prosecution of the '858 patent, the material prior art of record from Application No. 08/607,912, now issued as U.S. Patent No. 5,754,799 ("System and Method for Bus Contention Resolution"), to Hiles, including without limitation U.S. Patent Nos. 4,608,700 ("Serial Multi-Drop Data Link"), to Kirtley, Sterling, and Williams, and 5,398,243 ("Arbitration Method and Bus for Serial Data Transmission"), to Aguilhon, Doucet, and Karcher (the "'858 Co-Pending Art"). The Applicants did not disclose the '858 Co-Pending Art during prosecution of the '858 patent. On information and belief, a reasonable opportunity for discovery will show that one or more Applicants was aware of the '858 Co-Pending Art during prosecution of the '858 patent. This undisclosed information was material to patentability of the '858 patent. On information and belief, a reasonable opportunity for discovery will show this information was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)     In addition, one or more Applicants was aware of U.S. Patent No. 4,797,815 ("Interleaved Synchronous Bus Access Protocol for a Shared Memory Multi-Processor System"), to Moore (the same inventor as the '858), and, on information and belief, a reasonable opportunity for discovery will show one or more Applicants was aware of U.S. Patent Nos. 3,997,896 ("Data Processing System Providing Split Bus Cycle Operation"), to Cassarino, Jr., Bekampis, Conway, and Lemay, 4,181,974 ("System Providing Multiple Outstanding Information Requests"), to Lemay and Curley, and 4,669,056 ("Data Processing System with a Plurality of Processors Accessing a Common Bus to Interleaved Storage"), to

Waldecker and Wright. Applicants failed to disclose these patents to the PTO in prosecution of the '858 patent. These references were material to patentability of the '858 patent and on information and belief a reasonable opportunity for discovery will show that Applicants knew of and withheld them with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

**Count II – Inequitable Conduct Regarding Prosecution of the '627 Patent**

21.     Charter restates and incorporates by reference its allegations in paragraphs 1-12 of its Counterclaims.

22.     The claims of the '627 patent are unenforceable due to the inequitable conduct of one or more of the named inventors and/or others having substantive involvement in prosecuting the '627 patent application. These individuals include, but are not limited to, William L. Betts, Edward S. Zuranski, Ronald D. Slusky and Gerard A. deBlasi ("'627 Procurement Team").

<u>Misrepresentation Of Prior Art</u>

23.     On information and belief, the '627 Procurement Team made false material statements to the United States Patent and Trademark Office ("the PTO") with the intent to deceive the PTO during the prosecution of the patent application which led to the issuance of the'627 patent (Ser. No. 748,594, hereinafter "'627 patent application").

24.     In particular, during the prosecution of the '627 patent application, one of the prosecuting attorneys, Gerard A. deBlasi, represented to the PTO that "[t]he Prior Art, as described in Applicants' patent application, does not teach independently trellis encoding a plurality of streams of trellis bits" and that "[t]he Prior Art clearly does not include a plurality of

trellis encoders to independently encode a plurality of streams of trellis bits as in Applicants' invention." (12/24/92 Amendment filed in '627 patent application, at 5, 6).

25.     The Prior Art described by the applicants in the '627 patent application included United States Patent No. 4,677,625 (the "'625 patent"). The '625 patent discloses a plurality of trellis encoders to independently encode a plurality of streams of trellis bits, contrary to Mr. deBlasi's statements to the PTO.

26.     Mr. deBlasi's false statements were material because they were made to overcome prior art asserted by the PTO in rejecting pending claims. Consequently, Mr. deBlasi's statements are material.

27.     On information and belief, Mr. deBlasi made false material statements to the PTO during the prosecution of the '627 patent application.

28.     On information and belief, these false material statements were made with intent to deceive the PTO.

29.     These false material statements constitute a breach of the '627 Procurement Team's duty of candor and good faith owed to the PTO. Consequently, this misconduct bars the enforcement of the '627 patent.

<u>Intentional Withholding Of Material Prior Art References</u>

30.     On information and belief, the '627 Procurement Team intentionally withheld material information with the intent to deceive the PTO during the prosecution of the '627 patent application.

31.    In particular, the '627 Procurement Team failed to disclose United States Patent No. 4,641,327 ("the '327 patent"), United States Patent No. 5,052,000 ("the '000 patent"), United States Patent Application No. 363,793 ("the '793 application"), United States Patent No. 5,056,112 ("the '112 patent"), United States Patent Application No. 457,438 ("the '438 application"), United States Patent No. 5,105,442 ("the '442 patent"), United States Patent Application No. 611,200 ("the '200 application"), United States Patent No. 5,214,656 ("the '656 patent") and United States Patent Application No. 627,156 ("the '156 application") to the PTO.

32.    On information and belief, the '627 Procurement Team failed to disclose the '327 patent to the PTO.  The '327 patent is entitled "Frame Synchronization in Trellis-Coded Communication Systems," and was issued to Lee-Fang Wei on February 3, 1987.

33.    On information and belief, one or more members of the '627 Procurement Team were aware of the '327 patent prior to issuance of the '627 patent.

34.    On information and belief, the '627 Procurement Team withheld the '327 patent with intent to deceive the PTO.

35.    On information and belief, one or more members of the '627 Procurement Team were aware that the '327 patent contained material information including, but not limited to the following:

    (i)    "Another general feature of the invention is an interleaver that changes the original sequence of signal points to a revised sequence for transmission and a deinterleaver that changes the received sequence of signal points in a manner that will restore the original sequence . . . ."  ('327 Col. 1:51-56; see also 2:18-20.)

    (ii)    "The communication system is a trellis-coded modulation system.  Each signal point is two-dimensional.  The two-dimensional points are grouped into multi-dimensional points."  ('327 Col. 1:59-62.)

(iii)    "[E]ncoders and grouping device 18 deliver to interleaver 19, N pairs of in-phase and quadrature coordinates in series, one pair in each signaling interval, each pair corresponding to a point in a two-dimensional (2D) signal constellation. Interleaver 19 reorders the coordinate pairs . . . ." ('327 Col. 2:68-3:5.)

36.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '327 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

37.    On information and belief, the '627 Procurement Team failed to disclose the '000 patent to the PTO. The '000 patent is entitled "Technique for Improving the Operation of Decision Feedback Equalizers in Communications Systems Utilizing Error Correction," and was issued to Jin-Der Wang and Jean-Jacques Werner on September 24, 1991. The '627 Procurement Team also failed to disclose the existence of the '793 application to the PTO. The '793 application was filed on June 9, 1989, and eventually issued as the '000 patent.

38.    On information and belief, one or more members of the '627 Procurement Team were aware of the '793 application and the '000 patent prior to issuance of the '627 patent.

39.    On information and belief, the '627 Procurement Team withheld the '793 application and the '000 patent with intent to deceive the PTO.

40.    On information and belief, one or more members of the '627 Procurement Team were aware that the '793 application and the '000 patent contained material information including, but not limited to the following:

(i)    "The use of plural coders provide interleaving of the transmitted symbols and, accordingly, each decoder is operative upon every Mth symbol, where M is the number of encoders or decoders. If M is properly chosen, the probability of noise impairing the recovery of two successive symbols by any decoder is reduced." ('000 Col. 2:20-24.)

23

(ii)     "Illustratively, encoders 206-i may each be a convolutional encoder of the type that is used in a standard trellis encoder.  Switch 207 takes the outputs of encoders 206-i, preferably in a cyclic fashion, and feeds them to symbol mapping apparatus 208 which generates two-dimensional symbols . . . ."  ('000 Col. 4:36-42; see also 8:1-4.)

(iii)     "[W]hile the present invention has been described in reference to particular two-dimensional signal constellations, the invention is also applicable to other two-dimensional signal constellations.  Indeed, the present invention is applicable to signal constellations having other than two dimensions."  ('000 Col. 7:60-65.)

41.     Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '793 application and/or the '000 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

42.     On information and belief, the '627 Procurement Team failed to disclose the '112 patent to the PTO.  The '112 patent is entitled "Interleaving in Coded Modulation for Mobile Radio," and was issued to Lee-Fang Wei on October 8, 1991.  The '627 Procurement Team also failed to disclose the existence of the '438 application to the PTO.  The '438 application was filed on December 27, 1989, and eventually issued as the '112 patent.

43.     On information and belief, one or more members of the '627 Procurement Team were aware of the '438 application and the '112 patent prior to issuance of the '627 patent.

44.     On information and belief, the '627 Procurement Team withheld the '438 application and the '112 patent with intent to deceive the PTO.

45.     On information and belief, one or more members of the '627 Procurement Team were aware that the '438 application and the '112 patent contained material information including, but not limited to the following:

(i)     "Interleavers used in fading channel applications can be matched to a particular trellis or block code being used. . . . Matching both the

24

interleaver and the code increases the separation between interdependent signal points and provides an improvement in error performance." ('112 Abstract.)

(ii)    "As an illustration, assume that N is equal to four (an eight-dimensional code) so that four interdependent signal points would be produced for each codeword every four signalling intervals." ('112 Col. 4:39-43.)

(iii)   "In accordance with the invention, FIG. 14 illustrates the operation of the interleaver on the illustrative trellis code (with two-fold time diversity between successive signal points) of FIG. 10." ('112 Col. 10:14-17.)

46.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '438 application and/or the '112 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

47.    On information and belief, the '627 Procurement Team failed to disclose the '442 patent to the PTO. The '442 patent is entitled "Coded Modulation with Unequal Error Protection," and was issued to Lee-Fang Wei on April 14, 1992. The '627 Procurement Team also failed to disclose the existence of the '200 application to the PTO. The '200 application was filed on November 7, 1990, and eventually issued as the '442 patent.

48.    On information and belief, one or more members of the '627 Procurement Team were aware of the '200 application and the '442 patent prior to issuance of the '627 patent.

49.    On information and belief, the '627 Procurement Team withheld the '200 application and the '442 patent with intent to deceive the PTO.

50.    On information and belief, one or more members of the '627 Procurement Team were aware that the '200 application and the '442 patent contained material information including, but not limited to the following:

(i)    "In accordance with the invention, as described more fully hereinbelow, the respective groups of bits on leads 112 and 113 are extended to channel

encoders--illustratively trellis encoders--114 and 115 which generate, for each symbol interval, respective expanded groups of the expanded r and p bits on leads 121 and 122, where r>m and p>k." ('442 Col. 4:30-36; see also 9:3-4; 12:33-36.)

(ii)    "Decoding in the case where multi-dimensional symbols are used--such as the four-dimensional examples described below--is carried out in a similar manner, as will be appreciated by those skilled in the art." ('442 Col. 8:27-30; see also 8:49-9:11.)

(iii)   "A further protection against impulse noise for the most important bits in coded modulation schemes based on constellations of the type of FIG. 8 can be achieved by rearranging the bits that are output by channel encoder 114 so that bits that are generated in proximity to one another by the encoder are separated from one another as much as possible, given that the system delay constraints are met. To this end, channel encoder 114 may include a bit interleaver, which performs such rearrangement, as shown in FIG. 15." ('442 Col. 9:40-49.)

51.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '200 application and/or the '442 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

52.    On information and belief, the '627 Procurement Team failed to disclose the '656 patent to the PTO. The '656 patent is entitled "Multiplexed Coded Modulation With Unequal Error Protection," and was issued to Hong Y. Chung, Jin-Der Wang and Lee-Fang Wei on May 25, 1993. The '627 Procurement Team also failed to disclose the existence of the '156 application to the PTO. The '156 application was filed on December 13, 1990, and eventually issued as the '656 patent.

53.    On information and belief, one or more members of the '627 Procurement Team were aware of the '156 application and the '656 patent prior to issuance of the '627 patent.

54.    On information and belief, the '627 Procurement Team withheld the '156 application and the '656 patent with intent to deceive the PTO.

55.    On information and belief, one or more members of the '627 Procurement Team were aware that the '156 application and the '656 patent contained material information including, but not limited to the following:

    (i)    "Specifically, and in accordance with the present invention, unequal error protection is provided for a signal comprised of a plurality of classes of information by a) separately coding each one of the plurality of classes of information using a different coded modulation scheme and b) multiplexing the plurality of coded outputs for transmission." ('656 Col. 2:10-17.)

    (ii)    "Each class of information is then separately coded by a different, and conventional, coded modulation scheme, e.g., a 4D 8-state trellis code and a uniformly-spaced QAM signal constellation." ('656 Col. 2:21-24; see also 5:55-61; 6:26-52.)

    (iii)    "Also, the coded modulation scheme for each class of information can be enhanced using interleaving techniques, or more complex coded modulation schemes, to protect against other forms of noise, e.g., to protect against 'colored' noise." ('656 Col. 7:26-30.)

56.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '156 application and/or the '656 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

57.    On information and belief, one or more members of the '627 Procurement Team made false material statements to the PTO and withheld several material patents and/or patent applications from the PTO during the prosecution of the '627 patent. This behavior demonstrates a pattern of bad faith and intent to deceive the PTO. Consequently, for the reasons stated above, the '627 Procurement Team breached their duty of candor and good faith owed to the PTO and this breach bars the enforcement of the '627 patent.

**State Law Claims**

<u>Creation of the ATSC Standard</u>

58.    The American Television Systems Committee ("ATSC") is a private standard setting organization ("SSO") organized according to the policies of the American National Standards Institute. Following a multi-year competitive bidding process for the technology that would become the standard for terrestrial digital television broadcasting, the ATSC published the ATSC A-53 Digital Television Standard ("ATSC standard") on or about September 16, 1995.

59.    As a condition for participating in the ATSC's standard development, American Telephone and Telegraph Company ("AT&T")—the original owner of the '627 patent during the ATSC standard setting process—was required to agree, and did agree, to abide by the ATSC Patent Policy that required all ATSC participants to license any proprietary technology essential for ATSC compliance either without compensation or on fair, reasonable, and non-discriminatory ("FRAND") terms. On or about January 12, 1995, AT&T promised that it would license its patents, to the extent they are essential to implementation of the ATSC standard, under reasonable terms and conditions on a non-discriminatory, non-exclusive basis.

60.    Besides the technology that Rembrandt currently alleges infringes the '627 patent, at all relevant times multiple other alternative and then-competing technologies were available to the ATSC for incorporation into the standard. Had the ATSC known that any ATSC signatory or its successor would repudiate its FRAND obligations and assert that the '627 patent covers all or part of the standard, the ATSC would have adopted one of the then-competing technologies.

61.    On or about December 24, 1996, the Federal Communication Commission ("FCC") adopted the ATSC standard as the mandatory standard for terrestrial digital television broadcasting in the United States. In adopting the ATSC standard, the FCC explicitly

28

conditioned its adoption on all ATSC participants, including AT&T, agreeing to license essential proprietary technology on FRAND terms.

62.    If the FCC had known that an ATSC signatory or its successor would repudiate its FRAND obligations, and would assert that its patent(s) were essential to the ATSC standard, then the FCC would have adopted one of the competing standards.

63.    Both ATSC and the FCC relied on AT&T's and others' FRAND commitments in adopting the ATSC standard not only as a voluntary industry standard, but also a government mandated standard.  As the only technology accepted by the FCC for broadcasting terrestrial digital television in the United States, Charter and its content providers must implement and follow the standard by at least no later than the upcoming deadline set by Congress for transition to a digital television format.  Charter has already invested a significant amount of time, energy and money into implementing the ATSC standard.

64.    Congress has established February 17, 2009 as the deadline for the final transition from an analog to a digital system for terrestrial broadcast television in accordance with the ATSC standard.  Charter will be required to comply with the ATSC standard if they wish to provide their subscribers with any content from terrestrial broadcast television at all in the United States.

### Rembrandt's Repudiation of its FRAND Commitment to ATSC

65.    AT&T owned the '627 patent at the time the ATSC promulgated the ATSC standard, and before the FCC adopted that standard as a government-mandated standard.  After the FCC adopted the ATSC standard, in or around December 2004, Rembrandt acquired the '627 patent from Paradyne Networks, Inc. ("Paradyne"), a former subsidiary or affiliate of AT&T, successor-in-interest to AT&T with respect to the rights and obligations associated with the '627

patent, and now a wholly owned subsidiary of Zhone Technologies ("Zhone"). Paradyne

obtained its ownership rights to the '627 patent from AT&T. AT&T and its successors-in-

interest to the '627 patent were and are bound by the FRAND licensing commitment that AT&T

made to the ATSC. As a successor-in-interest to the '627 patent, Rembrandt also is bound by

that FRAND licensing commitment to the extent that the patent covers technologies necessary to

implement or comply with the ATSC standard.

66.     Rembrandt claims that the '627 patent is "essential" to the ATSC standard. But

Rembrandt has disavowed, reneged on, and repudiated the FRAND licensing commitment that

its predecessors-in-interest made to ATSC and by which its predecessors-in-interest were bound.

67.     AT&T, as a predecessor-in-interest to the '627 patent, never claimed that the '627

patent was essential to the ATSC standard. And through its acts and omissions, AT&T

implicitly denied the '627 patent applied to the ATSC standard.

68.     Rembrandt sued Charter and other MSOs without first providing any prior notice

of the '627 patent and without offering any license, let alone a license on FRAND terms. After

Rembrandt sued Charter and other MSOs, Rembrandt demanded exorbitant royalties from

Charter and others that far exceeded any royalty based on FRAND. These demands directly

harm Charter and the other MSOs and threaten the benefits that inure to all those who use the

ATSC standard.

69.     After acquiring the '627 patent, Rembrandt intentionally repudiated any FRAND

commitment with respect to the allegedly essential '627 patent.

70.     Rembrandt acquired the '627 patent with the specific intent to repudiate, in bad

faith, its FRAND obligations and to obtain exorbitant royalties far in excess of FRAND.

71.    Rembrandt has expressly denied having any FRAND obligations. For example, upon information and belief, it denied owing any such obligation to Harris Corporation, a manufacturer of digital transmission devices, in a complaint it filed in Delaware state court in 2007.

72.    Rembrandt seeks non-FRAND term royalties from Charter, who must according to Rembrandt's allegations pay an exorbitant royalty far in excess of FRAND for practicing the mandated ATSC standard, or cease receiving terrestrial digital broadcast television signals in the United States.

73.    Rembrandt's acquisition of the '627 patent has now subjected Charter to Rembrandt's patent infringement suit, whereas AT&T could not and would not have asserted such suit. Because AT&T implicitly denied application of the '627 patent to the ATSC standard, and because they could not charge greater than FRAND terms in any event, Rembrandt has harmed Charter in a way its predecessors could not and would not have done.

### Creation of the DOCSIS Specification

74.    Beginning in the mid-1990s, work began to develop a technical specification for the delivery of high-speed data over cable television networks. In 1997, The first version of Data Over Cable Services Interface Specifications (DOCSIS) was released by CableLabs.

75.    The goal in the development of DOCSIS was to specify interface requirements so that cable operators and their subscribers would be able to purchase affordable, interchangeable, highly functional cable modems and other equipment from multiple suppliers. To ensure that customers who purchased cable modems would receive products that were fully compatible with the DOCSIS standard, CableLabs established a certification program to identify DOCSIS-compliant manufacturers. Certified equipment could then be used in cable systems supporting

DOCSIS, and cable operators could then ensure that the equipment used on their network is DOCSIS certified.

76.    On information and belief, both during and after the DOCSIS standardization process, and prior to filing lawsuits against Charter and other MSOs, neither Rembrandt nor its Paradyne predecessors-in-interest informed CableLabs or cable equipment vendors that they had intellectual property they believed read on or covered the DOCSIS standard.

77.    To facilitate efficient licensing of patented technology essential to implement the original DOCSIS specification and subsequent versions, CableLabs developed a patent pool for such intellectual property.  CableLabs announced the DOCSIS patent pool in July 1998. Companies contributing technology essential to the DOCSIS standardization effort signed an agreement, entitled, "Data Over Cable Service Interface Specifications License Agreement."

78.    DOCSIS patent pool members contribute a non-exclusive, royalty-free license to any intellectual property rights they have that are essential to comply with the DOCSIS specifications.  In exchange for this grant to the patent pool, DOCSIS pool members receive non-exclusive, royalty-free licenses to the patent pool intellectual property to the extent it is essential to comply with the DOCSIS specification.

79.    Rembrandt and Remstream contend that they have not signed, nor are bound by, the DOCSIS License Agreement.

<u>Rembrandt's Breach of the Docsis Licensing Agreement</u>

80.    Rembrandt is a non-practicing entity ("NPE")—*viz.*, a company that invests in patents but does not intend to practice them.  According to its website, "Rembrandt invests its capital to acquire patents to pursue infringement."

81.    Rembrandt acquired the patents-in-suit with the intent to assert them against, among others, MSOs that use DOCSIS-compliant equipment.  Rembrandt contends that its patents are essential to compliance with the DOCSIS specification.

82.    As part of Rembrandt's scheme to assert the patents-in-suit, on information and belief, Rembrandt endeavored to become a supposed market participant or direct competitor of the MSOs and/or DOCSIS-compliant equipment manufacturers for the sole purpose of seeking injunctive relief and or lost profits in its infringement suits.

89.    Remstream—either alone or through partnerships with [REDACTED] and others—lacks the capacity to meet U.S. demand for DOCSIS-compliant cable modems. Rembrandt's

efforts to establish its entity Remstream as the sole supplier of cable modems is not being done for any legitimate business purposes but rather to conjure up an advantage in litigation.

90.     Upon information and belief, Rembrandt has also reached an agreement with ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ to further its scheme of attempting to further its litigation aims, not any legitimate business purpose. On information and belief, this scheme is intended to support Rembrandt's false claim that it is a practicing entity that has suffered damages as a purported competitor in the cable systems market.

91.     An actual case or controversy exists between the Comcast Counter-Counterclaimants and Rembrandt as to the infringement, validity, and enforceability of Rembrandt's asserted patents.

### Count III – Breach of Contract and Specific Performance re ATSC

92.     Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

93.     As set forth above, Rembrandt took title to the '627 Patent subject to AT&T's FRAND commitment, and is therefore required to license it in good faith and to grant FRAND license terms to any user of the ATSC standard, including Charter and its equipment suppliers.

94.     Alternatively, Charter is an intended third-party beneficiary of AT&T's contract with the ATSC in that the ATSC and those who participated in the ATSC standard setting process (including AT&T) intended all manufacturers of ATSC-compliant equipment to have available to them FRAND licensing terms, which would inure to the benefit of purchasers of such ATSC-compliant equipment, including MSOs such as Charter. Charter has standing to enforce AT&T's promise to grant FRAND licenses against AT&T's successor-in-interest, Rembrandt.

95.     Rembrandt has breached its obligations by refusing to offer a license in good faith and by failing to license on FRAND terms.

96.     As a result of Rembrandt's breaches, Charter has been irreparably injured in its business or property through the loss of customers and potential customers, by the loss of goodwill and product image, by the prospective damage to their business to the extent it relies upon the ATSC standard, and by the continuing threat of patent infringement litigation.

97.     As a result of Charter's injuries, Charter seeks specific performance of Rembrandt's contractual obligations to offer licenses in good faith and on FRAND terms.

98.     Charter has no adequate remedy at law.

99.     In addition to an order requiring Rembrandt to specifically perform its contractual obligations, Charter also seeks damages for the injuries they have incurred and continue to incur, in an amount to be proven at trial.

**Count IV – Declaratory Judgment of Contractual Rights and Liabilities re ATSC**

100.     Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

101.     An actual controversy exists between Charter and Rembrandt regarding Charter's right to license the '627 Patent on FRAND terms.

102.     Charter is entitled to a declaratory judgment that:  (i) Charter is entitled to license the '627 Patent on FRAND terms; (ii) Rembrandt's refusal to provide FRAND licenses, despite its obligation to do so, is a breach of contract; (iii) Charter is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to

enforce those obligations and to recover damages due to said breach of contract; and/or (iv) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology covered by the '627 patent, if essential to the ATSC standard as Rembrandt contends, on FRAND terms.

### Count V – Breach of Contract and Specific Performance re DOCSIS

103.    Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

104.    Charter is an intended third-party beneficiary of the DOCSIS License Agreement entered into by various signatories, including ███████████████████  Those who participated in the DOCSIS standard-setting process, and in particular the signatories to the DOCSIS License Agreement, intended all manufacturers and providers of DOCSIS-compliant equipment and services to have available to them such royalty-free licenses to patent claims deemed essential for compliance with DOCSIS, subject to the terms of the DOCSIS License Agreement, which would inure to the benefit of purchasers and operators of such DOCSIS-compliant equipment, including MSOs such as Charter.  Charter has standing to enforce each DOCSIS License Agreement's signatory's promise to grant royalty-free licenses under the DOCSIS License Agreement.

105.    As set forth above, ███████████ signed and was bound by the terms of the DOCSIS License Agreement.  Under those terms, ███████████ and any of its affiliates agreed to grant a nontransferable, worldwide, nonexclusive, and royalty-free license to any of its patent claims deemed essential for DOCSIS compliance to CableLabs, which in turn sublicensed such rights to all other signatories to the DOCSIS License Agreement.  ███████████████

███████████████████████████████████████████████

██████████ .

106.    As alleged above, Rembrandt assisted ████████████ in obtaining CableLabs certification for modems that Rembrandt intended to resell.  Rembrandt did so for the specific purpose of partnering with ██████████████████████████ rights under the DOCSIS License Agreement while attempting to avoid its corresponding obligation to grant a royalty free license under its own patents.  Rembrandt engaged in this scheme to portray itself misleadingly as a true practicing entity in the cable modem business, solely for the purposes of seeking lost profits and/or injunctive relief from Charter, among others.

107.    Rembrandt has, or had a relationship, both business and legal, with ████████████ such that they effectively acted as, partners, joint venturers, alter egos of each other, and/or agent and principal.  Alternatively, Rembrandt ████████████████████████████████

███████████████████████████████████████████████

██████████ .

108.    As a result, Rembrandt has been and continues to be bound by ████████████ obligations under the DOCSIS License Agreement.  Rembrandt has breached its obligations by refusing to offer in good faith a royalty-free license, as provided for under the DOCSIS License Agreement, to the patents it alleges are essential for DOCSIS compliance while simultaneously assuming ████████████ rights under the DOCSIS License Agreement to royalty-free licenses to others' patents essential for compliance with the standard for purposes of portraying itself as a business competitor.

109.    As a result of Rembrandt's breaches, Charter has been irreparably injured or threatened with irreparable injury.

110.    As a result of Charter's injuries, Charter seeks specific performance of Rembrandt's contractual obligations to offer royalty-free licenses in good faith under the DOCSIS License Agreement.

111.    Charter has no adequate remedy at law.

112.    In addition to an order requiring Rembrandt to specifically perform its contractual obligations, Charter also seeks damages for the injuries is has incurred and continues to incur, in an amount to be proven at trial.

**Count VI – Declaratory Judgment of Contractual Rights and Liabilities re DOCSIS**

113.    Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

114.    An actual controversy exists between Charter and Rembrandt regarding the Charter's right to obtain royalty-free licenses to patent claims Rembrandt asserts are essential for compliance with DOCSIS under the DOCSIS License Agreement.

115.    For the reasons set forth above, Charter is entitled to a declaratory judgment that: (i) Charter is entitled to a royalty-free licenses to patent claims deemed essential for compliance with DOCSIS under the DOCSIS License Agreement; (ii) Rembrandt's refusal to provide royalty-free licenses, despite its obligation to do so, is a breach of contract; (iii) Charter is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and is entitled to enforce those obligations and to recover damages due to said breach of contract; (iv) Charter's customers have a right to use the technology licensed pursuant to the DOCSIS License Agreement by virtue of their relationship with Charter; and/or (v) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its

obligation to and failed to license the technology, which as Rembrandt contends, is essential for compliance with the DOCSIS standard.

### Count VII – Unfair Business Practices, Cal. Bus. & Prof. Code §17200 re ATSC

116.    Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

117.    As alleged more fully above, Rembrandt has engaged in unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code §17200.  These practices have occurred, at least in part, in California, and/or have affected California residents and consumers, or threaten to do so.

118.    Rembrandt has engaged in unfair business practices by, among other things, refusing to abide by its obligations as successor in interest to AT&T's commitment to offer FRAND licensing terms to any intellectual property that is asserted to be essential to the practice of the ATSC standard.

119.    Rembrandt has engaged in unlawful business practices by, among other things, failing to abide by the Dec. 24, 1996 FCC Fourth Report and Order that the ATSC format was adopted conditioned upon the participants' agreement to license any technology asserted to be relevant on FRAND terms.

120.    Charter has suffered actual injury, and is threatened with further actual injury unless Rembrandt is enjoined, as a result of the unfair, deceptive and unlawful business practices of Rembrandt described above.

### Count VIII – Unfair Business Practices, Cal. Bus. & Prof. Code §17200 re DOCSIS

121.    Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

122.    As alleged more fully above, Rembrandt has engaged in unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code §17200.  These practices have occurred, at least in part, in California, and/or have affected California residents and consumers, or threaten to do so.

123.    Several of Rembrandt's illegal, unfair, and fraudulent acts have harmed and threaten to further harm California customers, consumers, and competition within California, including by increasing the prices California consumers pay for cable modems or decreasing the supply of cable modems, or threatening the same.

124.    Rembrandt has engaged in unfair business practices by, among other things, refusing to abide by its obligations under the DOCSIS License Agreement to offer royalty-free licenses any intellectual property that is asserted to be essential to the practice of the DOCSIS standard, while at the same time purporting to be a bona fide participant in the business of providing cable modems licensed under the DOCSIS License Agreement.

125.    Rembrandt has engaged in unlawful business practices by, among other things, failing to abide by its obligation to license any technology asserted to be essential to compliance with the DOCSIS standard.

126.    Rembrandt has engaged in deceptive business practices by representing, or threatening to represent, itself as a purported bona fide cable modem provider when in fact its involvement in the cable modem business is for the purpose of generating evidence for this

litigation. Rembrandt has also engaged in deceptive business practices by representing, or threatening to represent, itself as a purported bona fide cable modem provider when in fact the true participant in the cable modem business is ███████████████████████ ██████████.

     127.    Charter has suffered actual injury, and is threatened with further actual injury unless Rembrandt is enjoined, as a result of the unfair, deceptive and unlawful business practices of Rembrandt described above.

## PRAYER FOR RELIEF

     WHEREFORE, Charter respectfully requests that this Court order judgment in its favor and award it relief including, but not limited to, the following:

    (a)    Dismissal of all of Rembrandt's and Remstream's claims against Charter with prejudice;

    (b)    Entry of judgment declaring that the '761, '858, '234, '631, '159, '444, and '627 patents are unenforceable;

    (c)    Entry of judgment declaring that no claim of the '819, '903, '761, '858, '234, '631, '159, '444, or '627 patents (collectively "the patents-in-suit") has been infringed willfully, deliberately, or otherwise by Charter or Charter's parents, subsidiaries and/or affiliates;

    (d)    For a judgment declaring that each and every claim of the patents-in-suit is invalid;

    (e)    Entry of judgment ordering Rembrandt to specifically perform its contractual obligation to license the '627 patent on FRAND terms;

    (f)    That Charter has no adequate remedy at law;

(g)    Entry of judgment ordering Rembrandt to specifically perform its contractual obligation to grant a royalty-free license on technology essential for compliance with the DOCSIS standard;

(h)    Entry of judgment declaring that: (i) Charter is entitled to license the '627 Patent on FRAND terms; (ii) Rembrandt's refusal to provide FRAND licenses, despite its obligation to do so, is a breach of contract; (iii) Charter is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and is entitled to enforce those obligations and to recover damages due to said breach of contract; (iv) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has failed to license the technology on FRAND terms.

(i)    Entry of judgment declaring that: (i) Charter is entitled to a royalty-free license to patent claims deemed essential for compliance with DOCSIS under the DOCSIS License Agreement; (ii) Rembrandt's refusal to provide royalty-free licenses, despite its obligation to do so, is a breach of contract; (iii) Charter is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and is entitled to enforce those obligations and to recover damages due to said breach of contract; (iv) Charter's customers have a right to use the technology licensed pursuant to the DOCSIS License Agreement by virtue of their relationship with Charter; and/or (v) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology, which as Rembrandt contends, is essential for compliance with the DOCSIS standard.

(j)    Entry of judgment awarding damages to Charter on the breach of contract claims in an amount to be determined at trial.

(k)    Entry of judgment awarding restitution to Charter on the unfair business practices claims in an amount to be determined at trial.

43

(l)    Entry of a preliminary and permanent injunction prohibiting any and all of Rembrandt's ongoing acts of unfair business practices.

(m)    A declaration that this action is an exceptional case under 35 U.S.C. § 285 and an award to Charter of its interest, attorneys' fees, and costs incurred in defending this action; and

(n)    Such other and further relief as this Court may deem just and proper under the circumstances.

Dated: May 2, 2008

/s/ Bradford P. Lyerla
Bradford P. Lyerla, *Attorney in Charge*
Email: blyerla@marshallip.com
Kevin D. Hogg
Email: khogg@marshallip.com
Charles E. Juister
Email: cjuister@marshallip.com
Marshall, Gerstein & Borun LLP
6300 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6357
Tel: (312) 474-6300
Fax: (312) 474-0448

Attorneys for Charter Communications, Inc. and
Charter Communications Operating, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2008, the foregoing was electronically filed with the Clerk of the Court using CM/ECF.

I further certify that on on May 2, 2008, copies of the foregoing document were served upon the following via e-mail:

| | |
|---|---|
| Collins J. Seitz, Jr.<br>Francis DiGiovanni<br>CONNOLLY BOVE LODGE & HUTZ LLP<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE 19801<br>cseitz@cblh.com<br>fdigiovanni@cblh.com | Jack B. Blumenfeld<br>Karen Jacobs Louden<br>MORRIS, NICHOLS, ARSHT & TUNNEL LLP<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, DE 19899-1347<br>jblumenfeld@mnat.com<br>jlouden@mnat.com |
| John W. Shaw<br>YOUNG CONAWAY STARGATT & TAYLOR LLP<br>1000 West Street, 17th Floor<br>P.O. Box 391<br>Wilmington, DE 19899-0391<br>jshaw@ycst.com | John M. DesMarais<br>KIRKLAND & ELLIS LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, NY 10022-4611<br>jdesmarais@kirkland.com |
| David S. Benyacar<br>KAYE SCHOLER LLP<br>425 Park Avenue<br>New York, NY 10022<br>dbenyacar@kayescholer.com | Eric R. Lamison, Esquire<br>KIRKLAND & ELLIS LLP<br>555 California Street<br>San Francisco, CA 94104<br>elamison@kirkland.com |
| Matthew D. Powers<br>Edward R. Reines<br>WEIL GOTSHAL & MANGES LLP<br>201 Redwood Shores Parkway<br>Redwood Shores, CA 94065<br>matthew.powers@weil.com<br>edward.reines@weil.com | |

/s/ Charles E. Juister
Attorney for Charter Communications, Inc. and
Charter Communications Operating, LLC