IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: REMBRANDT TECHNOLOGIES, LP PATENT LITIGATION | ) ) ) | MDL Docket No. 07-md-1848 (GMS) |
| ———————————————————— | ) ) | |
| MOTOROLA, INC., CISCO SYSTEMS, INC., SCIENTIFIC-ATLANTA, INC., ARRIS GROUP, INC., THOMSON, INC., AMBIT MICROSYSTEMS, INC., and NETGEAR, INC.,          Plaintiffs,      v. REMBRANDT TECHNOLOGIES, LP,          Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| ———————————————————— | ) ) | |

REMBRANDT TECHNOLOGIES, LP, and
REMBRANDT TECHNOLOGIES, LLC d/b/a
REMSTREAM,
         Counter-Plaintiffs,
     v.
MOTOROLA, INC., CISCO SYSTEMS, INC.,
SCIENTIFIC-ATLANTA, INC., ARRIS GROUP,
INC., THOMSON, INC., AMBIT MICROSYSTEMS,
INC., NETGEAR, INC., TIME WARNER CABLE,
INC., TIME WARNER CABLE LLC, TIME
WARNER NEW YORK CABLE LLC, TIME
WARNER ENTERTAINMENT COMPANY, LP,
COMCAST CORPORATION, COMCAST CABLE
COMMUNICATIONS, LLC, CHARTER
COMMUNICATIONS, INC., CHARTER
COMMUNICATIONS OPERATING, LLC,
COXCOM, INC., COX COMMUNICATIONS,
INC., COX ENTERPRISES, INC., CSC
HOLDINGS, INC., CABLEVISION SYSTEMS
CORPORATION, ADELPHIA
COMMUNICATIONS CORPORATION,
CENTURY-TCI CALIFORNIA
COMMUNICATIONS, LP, CENTURY-TCI
HOLDINGS, LLC, COMCAST OF
FLORIDA/PENNSYLVANIA, L.P. (f/k/a
PARNASSOS, LP), COMCAST OF
PENNSYLVANIA II, L.P. (f/k/a CENTURY-TCI

Civil Action No. 07-752-GMS
**JURY TRIAL DEMANDED**


REDACTED PUBLIC
VERSION

| | |
|---|---|
| CALIFORNIA, L.P ), PARNASSOS | ) |
| COMMUNICATIONS, LP, ADELPHIA | ) |
| CONSOLIDATION, LLC, PARNASSOS | ) |
| HOLDINGS, LLC, and WESTERN NY | ) |
| CABLEVISION, LP, | ) |
|           Counter-Defendants | ) |

**AMENDED REPLY OF COUNTER-DEFENDANTS CABLEVISION SYSTEMS CORPORATION AND CSC HOLDINGS, INC. TO COUNTERCLAIMS AND COUNTER-COUNTERCLAIMS OF REMBRANDT TECHNOLOGIES, LP AND REMBRANDT TECHNOLOGIES, LLC, d/b/a REMSTREAM; AND COUNTER-COUNTERCLAIMS OF COUNTER-DEFENDANTS CABLEVISION SYSTEMS CORPORATION AND CSC HOLDINGS, INC.**

Counter-Defendants Cablevision Systems Corporation and CSC Holdings, Inc (collectively "Cablevision"), by their attorneys, reply to the Counterclaims of Counter-Plaintiffs Rembrandt Technologies, LP and Rembrandt Technologies, LLC, d/b/a Remstream (collectively "Rembrandt") as follows:

Except as expressly admitted herein, Cablevision denies each and every allegation in Rembrandt's Counterclaims.

### THE PARTIES

1. Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 1, and therefore denies those allegations

2. Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 2, and therefore denies those allegations

3. Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 3, and therefore denies those allegations

4. Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 4, and therefore denies those allegations

2

5       Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 5, and therefore denies those allegations

6.      Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 6, and therefore denies those allegations

7       Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 7, and therefore denies those allegations

8.      Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 8, and therefore denies those allegations

9       Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 9, and therefore denies those allegations

10.     Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 10, and therefore denies those allegations

11.     Cablevision admits that one or more Cablevision Counter-Defendants, either directly, or indirectly through one or more subsidiaries, purchase cable modems from one or more Plaintiffs/Counter-Defendants and sell and/or lease some of that equipment and/or include the equipment in their networks for the provision of high-speed internet and cable broadband services. Except as expressly so admitted, Cablevision denies the remaining allegations in Paragraph 11 as directed to Cablevision  Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 11 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

12.     Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 12, and therefore denies those allegations.

3

13.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 13, and therefore denies those allegations

14     Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 14, and therefore denies those allegations.

15.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 15, and therefore denies those allegations.

16     Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 16, and therefore denies those allegations

17     Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 17, and therefore denies those allegations.

18.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 18, and therefore denies those allegations

19     Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 19, and therefore denies those allegations.

20.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 20, and therefore denies those allegations

21     Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 21, and therefore denies those allegations.

22     Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 22, and therefore denies those allegations

23.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 23, and therefore denies those allegations.

4

24.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 24, and therefore denies those allegations

25.    Admitted.

26.    Admitted.

27.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 27, and therefore denies those allegations.

28    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 28, and therefore denies those allegations

29    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 29, and therefore denies those allegations.

30.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 30, and therefore denies those allegations.

31.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 31, and therefore denies those allegations

32.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 32, and therefore denies those allegations

33    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 33, and therefore denies those allegations

34.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 34, and therefore denies those allegations.

35.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 35, and therefore denies those allegations

5

36.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 36, and therefore denies those allegations.

## JURISDICTION AND VENUE

37.    Cablevision admits that Counter-Plaintiffs purport to bring an action for patent infringement arising under the patent laws of the United States, but Cablevision denies the legal sufficiency of Counter-Plaintiffs' claims and allegations and denies that Counter-Plaintiffs have any viable claim thereunder.

38    Cablevision admits that this Court has subject matter jurisdiction over patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a), but denies the legal sufficiency of Counter-Plaintiffs' claims and allegations.

39.    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 39, and therefore denies those allegations.

40.    Cablevision admits that the Cablevision Counter-Defendants are Delaware entities and that this Court has personal jurisdiction over them, but denies the remaining allegations in paragraph 40 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in paragraph 40 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

41    Cablevision admits that venue is proper in this judicial district, but denies the legal sufficiency of Counter-Plaintiffs' claims and allegations.

## COUNT I

42    Cablevision incorporates its responses to Paragraphs 1-41 as if fully set forth herein.

6

43.    Cablevision admits that U.S. Patent No. 4,937,819 is entitled "Time Orthogonal Multiple Virtual DCE For Use In Analog And Digital Networks," but lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 43, and therefore denies these allegations.

44.    Cablevision admits that the '819 patent on its face indicates that it was issued by the United States Patent and Trademark Office on June 26, 1990, but otherwise denies the allegations of Paragraph 44

45.    Cablevision admits that one or more Cablevision Counter-Defendants, either directly, or indirectly through one or more subsidiaries, purchase cable equipment from one or more Plaintiffs/Counter-Defendants for use in the operation of cable networks, but denies that it sells, leases, and/or uses such equipment "throughout the United States." Cablevision further denies the remaining allegations in Paragraph 45 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 45 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

46.    Cablevision denies the allegations of Paragraph 46 to the extent that they are directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 46 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

47.    Cablevision denies the allegations of Paragraph 47 as directed to Cablevision Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 47 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

7

48    Cablevision denies the allegations of Paragraph 48 as directed to Cablevision Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 48 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

### COUNT II

49    Cablevision incorporates its responses to Paragraphs 1-48 as if fully set forth herein.

50.    Cablevision admits that U.S. Patent No. 5,008,903 is entitled "Adaptive Transmit Pre-Emphasis For Digital Modem Computed From Noise Spectrum," but lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 50, and therefore denies these allegations

51.    Cablevision admits that the '903 patent on its face indicates that it was issued by the United States Patent and Trademark Office on April 16, 1991, but otherwise denies the allegations of Paragraph 51

52    Cablevision admits that one or more Cablevision Counter-Defendants, either directly, or indirectly through one or more subsidiaries, purchase cable equipment from one or more Plaintiffs/Counter-Defendants for use in the operation of cable networks, but denies that it sells, leases, and/or uses such equipment "throughout the United States." Cablevision further denies the remaining allegations in Paragraph 52 as directed to Cablevision Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 52 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

53.    Cablevision denies the allegations of Paragraph 53 to the extent that they are directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth

8

of the allegations in Paragraph 53 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

54.    Cablevision denies the allegations of Paragraph 54 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 54 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

55.    Cablevision denies the allegations of Paragraph 55 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 55 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

COUNT III

56.    Cablevision incorporates its responses to Paragraphs 1-55 as if fully set forth herein.

57.    Cablevision admits that U.S. Patent No. 5,710,761 is entitled "Error Correction Negotiation Based On Modulation," but lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 57, and therefore denies these allegations

58.    Cablevision admits that the '761 patent on its face indicates that it was issued by the United States Patent and Trademark Office on January 20, 1998, but otherwise denies the allegations of Paragraph 58.

59.    Cablevision admits that one or more Cablevision Counter-Defendants, either directly, or indirectly through one or more subsidiaries, purchase cable equipment from one or more Plaintiffs/Counter-Defendants, but denies that it sells and/or leases such equipment "throughout the United States." Cablevision further denies the remaining allegations in

9

Paragraph 59 as directed to Cablevision.   Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 59 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

60.     Cablevision denies the allegations of Paragraph 60 to the extent that they are directed to Cablevision   Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 60 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

61.     Cablevision denies the allegations of Paragraph 61 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 61 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

62.     Cablevision denies the allegations of Paragraph 62 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 62 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

63.     Cablevision denies the allegations of Paragraph 63 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 63 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

## COUNT IV

64.     Cablevision incorporates its responses to Paragraphs 1-63 as if fully set forth herein.

65.    Cablevision admits that U.S. Patent No. 5,719,858 is entitled "Time-Division Multiple-Access Method For Packet Transmission On Shared Synchronous Serial Buses," but lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 65, and therefore denies these allegations.

66.    Cablevision admits that the '858 patent on its face indicates that it was issued by the United States Patent and Trademark Office on February 17, 1998, but otherwise denies the allegations of Paragraph 66.

67    Cablevision admits that one or more Cablevision Counter-Defendants, either directly, or indirectly through one or more subsidiaries, purchase cable equipment from one or more Plaintiffs/Counter-Defendants for use in the operation of cable networks, but denies that it sells, leases, and/or uses such equipment "throughout the United States." Cablevision further denies the remaining allegations in Paragraph 67 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 67 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

68    Cablevision denies the allegations of Paragraph 68 to the extent that they are directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 68 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

69    Cablevision denies the allegations of Paragraph 69 as directed to Cablevision Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 69 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

11

70.    Cablevision denies the allegations of Paragraph 70 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 70 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

## COUNT V

71.    Cablevision incorporates its responses to Paragraphs 1-70 as if fully set forth herein

72.    Cablevision admits that U S Patent No. 5,778,234 is entitled "Method For Downloading Programs," but lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 72, and therefore denies these allegations

73.    Cablevision admits that the '234 patent on its face indicates that it was issued by the United States Patent and Trademark Office on July 7, 1998, but otherwise denies the allegations of Paragraph 73.

74    Cablevision admits that one or more Cablevision Counter-Defendants, either directly, or indirectly through one or more subsidiaries, purchase cable equipment from one or more Plaintiffs/Counter-Defendants, but denies that it sells and/or leases such equipment "throughout the United States." Cablevision further denies the remaining allegations in Paragraph 74 as directed to Cablevision    Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 74 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

75.    Cablevision denies the allegations of Paragraph 75 to the extent that they are directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth

12

of the allegations in Paragraph 75 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

76.    Cablevision denies the allegations of Paragraph 76 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 76 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

77    Cablevision denies the allegations of Paragraph 77 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 77 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

78    Cablevision denies the allegations of Paragraph 78 as directed to Cablevision Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 78 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

## COUNT VI

79.    Cablevision incorporates its responses to Paragraphs 1–78 as if fully set forth herein.

80    Cablevision admits that U S  Patent No  5,852,631 is entitled "System And Method For Establishing Link Layer Parameters Based On Physical Layer Modulation," but lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 80, and therefore denies these allegations

13

81    Cablevision admits that the '631 patent on its face indicates that it was issued by the United States Patent and Trademark Office on December 22, 1998, but otherwise denies the allegations of Paragraph 81.

82    Cablevision admits that one or more Cablevision Counter-Defendants, either directly, or indirectly through one or more subsidiaries, purchase cable equipment from one or more Plaintiffs/Counter-Defendants for use in the operation of cable networks, but denies that it sells, leases, and/or uses such equipment "throughout the United States." Cablevision further denies the remaining allegations in Paragraph 82 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 82 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

83    Cablevision denies the allegations of Paragraph 83 to the extent that they are directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 83 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

84    Cablevision denies the allegations of Paragraph 84 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 84 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

85    Cablevision denies the allegations of Paragraph 85 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 85 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

14

## COUNT VII

86     Cablevision incorporates its responses to Paragraphs 1-85 as if fully set forth herein.

87.    Cablevision admits that U.S. Patent No. 6,131,159 is entitled "System For Downloading Programs," but lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 87, and therefore denies these allegations.

88.    Cablevision admits that the '159 patent on its face indicates that it was issued by the United States Patent and Trademark Office on October 10, 2000, but otherwise denies the allegations of Paragraph 88

89.    Cablevision admits that one or more Cablevision Counter-Defendants, either directly, or indirectly through one or more subsidiaries, purchase cable equipment from one or more Plaintiffs/Counter-Defendants, but denies that it sells and/or leases such equipment "throughout the United States."    Cablevision further denies the remaining allegations in Paragraph 89 as directed to Cablevision.    Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 89 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

90.    Cablevision denies the allegations of Paragraph 90 to the extent that they are directed to Cablevision   Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 90 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

91.    Cablevision denies the allegations of Paragraph 91 as directed to Cablevision Cablevision lacks sufficient information to form a belief as to the truth of the allegations in

Paragraph 91 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

92.    Cablevision denies the allegations of Paragraph 92 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 92 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

93.    Cablevision denies the allegations of Paragraph 93 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 93 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

**COUNT VIII**

94.    Cablevision incorporates its responses to Paragraphs 1-93 as if fully set forth herein.

95.    Cablevision admits that U.S. Patent No. 6,950,444 is entitled "System And Method For A Robust Preamble And Transmission Delimiting In A switched-Carrier Transceiver," but lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 95, and therefore denies these allegations.

96.    Cablevision admits that the '444 patent on its face indicates that it was issued by the United States Patent and Trademark Office on September 27, 2005, but otherwise denies the allegations of Paragraph 96.

97.    Cablevision admits that one or more Cablevision Counter-Defendants, either directly, or indirectly through one or more subsidiaries, purchase cable equipment from one or more Plaintiffs/Counter-Defendants, but denies that it sells and/or leases such equipment

16

"throughout the United States" Cablevision further denies the remaining allegations in Paragraph 97 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 97 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

98.    Cablevision denies the allegations of Paragraph 98 to the extent that they are directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 98 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

99    Cablevision denies the allegations of Paragraph 99 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 99 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

100    Cablevision denies the allegations of Paragraph 100 as directed to Cablevision Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 100 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations.

101    Cablevision denies the allegations of Paragraph 101 as directed to Cablevision. Cablevision lacks sufficient information to form a belief as to the truth of the allegations in Paragraph 101 as directed to the non-Cablevision Counter-Defendants, and on that basis denies those allegations

**DEFENSES**

102    Further replying to Rembrandt's Counterclaims, Cablevision asserts the following defenses:

17

## FIRST DEFENSE

103. Counts I-VIII of Rembrandt's Counterclaims fail to state a claim upon which relief can be granted.

104. Cablevision has not infringed and does not infringe any valid claim of any of the '819, '903, '761, '858, '234, '631, '159, '444, and '627 patents (collectively, "the asserted patents"), either directly or indirectly.

105. Rembrandt has not been damaged in any amount, manner, or at all by reason of any act alleged against Cablevision, and therefore the relief Rembrandt prays for cannot be granted.

106. Rembrandt is not entitled to permanent injunctive relief.

## SECOND DEFENSE

107. Each claim of the asserted patents is invalid at least for failure to satisfy one or more of the requirements of the Patent Act, 35 U.S.C. § 1, *et seq*, including, but not limited to, the conditions of patentability set forth in 35 U.S.C §§ 101, 102, 103, and 112.

## THIRD DEFENSE

108. Prosecution history estoppel applies to preclude Rembrandt from maintaining that any claim of the asserted patents covers any of the accused systems operated by Cablevision

## FOURTH DEFENSE

109. On information and belief, Rembrandt has misused the asserted patents by bringing and maintaining its claims of patent infringement against Cablevision in bad faith and without probable cause when it knew or should have known that it had no valid claim of patent infringement against Cablevision, and by purporting to enforce the asserted patents and demand royalties and other damages with respect to products not covered by the asserted patents

18

RLF1-3279732-1

110.    More specifically, and without limiting the generality of the foregoing paragraph, Rembrandt committed further patent misuse with respect to its assertion of the '627 patent against Cablevision.  When the '627 patent issued in 1993, it was assigned to AT&T Bell Laboratories, a subsidiary or affiliate of AT&T Corporation ("AT&T").  Also in 1993, AT&T and several other companies and institutions joined together to form the HDTV Grand Alliance, whose mission was to develop a standard for the transmission of digital television.  The Grand Alliance coordinated with the Advanced Television Systems Committee ("ATSC"), a standards-setting organization, to create a standard for high-definition television broadcasting.  The FCC ultimately adopted the major components of the ATSC standard.  In adopting the ATSC standard, the FCC expressly premised its order upon, among other things, the Grand Alliance members' agreement to make any of their relevant patents available either free of charge or on fair, reasonable, and nondiscriminatory terms.  AT&T, as a member of the Grand Alliance, was bound by this agreement, and expressly committed to make licenses to any patents essential to practicing that standard available on fair, reasonable and non-discriminatory terms

111.    When Paradyne Corporation was spun off from AT&T, it took any rights that it may have had to the '627 patent subject to AT&T's commitment to license that patent on fair, reasonable and nondiscriminatory terms if essential to the ATSC standard.  When Rembrandt purchased the '627 patent from Paradyne, it similarly took any rights to that patent subject to the agreement that AT&T had made to license the patent on fair, reasonable and non-discriminatory terms if essential to the ATSC standard

19

112    Rembrandt has and had actual knowledge of AT&T's commitment with respect to the '627 patent. Yet in asserting that Cablevision infringed the '627 patent by allegedly practicing the ATSC standard, Rembrandt has failed to honor AT&T's commitment to license that patent on fair, reasonable and nondiscriminatory terms; instead, Rembrandt seeks exorbitant and oppressive royalty rates, and an injunction. Rembrandt's conduct constitutes patent misuse.

113    In addition, and without limiting the foregoing, Rembrandt has knowingly asserted and is asserting U.S. Patents '444, '234, '159, '761, '631, '858, '819 and '903 in a manner that exceeds their scope, all for the purpose of attempting to compete unfairly (in conjunction with various business partners and joint-venturers):

        a.    in the provision of DOCSIS-compliant equipment to cable subscribers; and/or

        b    in the provision of equipment that enjoys the protection of the DOCSIS IPR pool established by CableLabs; and/or

        c    in the provision of high-speed data cable services to cable subscribers.

114    Rembrandt's conduct as to these patents also constitutes patent misuse.

### FIFTH DEFENSE

115.    Rembrandt's claims are barred in whole or in part by the doctrine of laches.

### SIXTH DEFENSE

116.    Rembrandt's claims are barred in whole or in part by the doctrine of estoppel.

### SEVENTH DEFENSE

117    Rembrandt's claims are barred in whole or in part by express or implied license and/or the doctrine of patent exhaustion.

20

## EIGHTH DEFENSE

118    To the extent Rembrandt seeks damages for alleged infringement more than six years prior to the filing of this action, the claims are barred by the statute of limitations pursuant to 35 U.S.C. § 286.

## NINTH DEFENSE

119.    To the extent Rembrandt seeks damages for any alleged infringement prior to its giving actual notice of the patents to Cablevision, its claims are barred pursuant to 35 U.S.C. § 287(a).

## TENTH DEFENSE

120.    Rembrandt's claims are barred in whole or in part by the doctrine of unclean hands.

## ELEVENTH DEFENSE

121    Rembrandt is not entitled to any injunctive relief because any alleged injury to it is not immediate or irreparable, and Rembrandt has an adequate remedy at law for any alleged injury.

## TWELFTH DEFENSE

122    Individuals subject to the duty of candor under 37 C.F.R. § 1.56 ("Applicants"), including named inventors in the applications referenced below and employees with substantive involvement in the filing and/or prosecution of patent applications for Paradyne entities, engaged in inequitable conduct by engaging in a pattern and practice of withholding or misstating material information with intent to deceive the United States Patent and Trademark Office ("the PTO") in connection with patent prosecution of the '761, '631, '234, '159, '858, and '444 patents, including withholding or misstating material information with the intent to deceive in view of the claim

21

constructions that Rembrandt seeks in this litigation  On information and belief, a reasonable opportunity for discovery will show that Applicants failed to disclose their own previously issued patents that comprised material prior art, failed to disclose material information regarding their own co-pending applications for patents, failed to disclose prior art that was known to them through the prosecution of their own patents and applications, and failed to disclose their own systems that were on-sale prior to the relevant critical dates  In addition to nondisclosure, Applicants in the prosecution chain of the '159 and '234 patents provided affirmative misstatements as set forth below.  Accordingly, Applicants engaged in an overall pattern and practice of repeatedly and continuously failing to disclose to the PTO material information of which Applicants were indisputably aware  The permeation and continuation of this misconduct throughout prosecution of multiple patent applications confirms that Applicants acted with deceptive intent rendering the patents unenforceable.  Further, the doctrine of infectious unenforceability renders related patents unenforceable.

123    More specifically, during prosecution of the '761 patent, Applicants engaged in inequitable conduct before the PTO, rendering the '761 patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)    By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he

22

is reviewing a particular application . .    [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications    Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application "

(ii)    Notwithstanding these clear obligations, during prosecution, Applicants were aware of and failed to disclose, without limitation, co-pending application 08/780,762 ("the '762 application," now the '631 patent, which is commonly asserted in this action along with the '761 patent)    The Applicants for the '761 patent failed to identify the '762 application or its claims to the examiner in the prosecution of the '761 patent    The '762 application was never disclosed on any IDS that was submitted in the '761 patent or otherwise made of record in the '761 patent    Information relating to the '762 application and its claims was material to patentability    One or more Applicants were aware of the '762 application    Robert Scott is the sole named inventor on both the '761 and '631 patents    Robert Scott was aware of the co-pendency of his applications    In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '761 patent and

23

were aware of the '762 application. Material information relating to the '762 application was withheld with intent to deceive the PTO as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)   Further, Applicants failed to disclose in prosecution of the '761 patent, the prior art of record from the '762 application, as well as the prior art of record from Application Nos. 08/781,787, now issued as 5,751,796 ("Rapid Startup Protocol For Communication Between a Plurality of Modems"), to Scott and Zuranski, and 08/781,067, now issued as 5,796,808 ("System and Method for Automatically Selecting the Mode of Communication between a Plurality of Modems"), to Scott and Lastinger Jr (the "'761 Co-Pending Applications")  One or more Applicants were aware of the '761 Co-Pending Applications.   The '761 Co-Pending Applications include Robert Scott as a named inventor, and in the case of the '761 and '631 patents, he is the sole named inventor on both  Robert Scott was aware of the co-pendency of his applications.  In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '761 patent and were aware of the '761 Co-Pending Applications.

(iv)   The prior art of record from the '761 Co-Pending Applications that Applicants failed to disclose, includes without limitation U S. Patent Nos. 4,905,282 ("Feature Negotiation Protocol and Dynamically Adjustable Retraining Sequence for a High Speed Half Duplex Modem"), to McGlynn and Nash ("McGlynn"), 5,528,679 ("Automatic Detection of Digital Call Paths in a Telephone System"),

24

to Taarud ("Taarud"), 4,680,773 ("Data Telecommunications System"), to Amundson ("Amundson"), and 4,782,498 ("Modem with Improved Handshaking Capability"), to Copeland, III ("Copeland") (the "'761 Co-Pending Art"). The '761 Co-Pending Art was material to the patentability of the '761 patent. Applicants for the '761 patent failed to identify any of '761 Co-Pending Art to the examiner in the prosecution of the '761 patent. Applicants were aware of the '761 Co-Pending Art. Robert Scott is the same and only named inventor on both the '631 and the '761 patents. Further, McGlynn was cited by the Examiner of the '631 patent in a Detailed Office Action and accompanying Notice of References Cited mailed on 9/12/97. The Applicants attempted to distinguish McGlynn in a First Response with Amendments on October 23, 1997. Notwithstanding the October 23, 1997 response, the PTO issued a Detailed Action rejecting the claims in the '631 patent based upon McGlynn in an office action dated November 18, 1997, while the application for the '761 patent remained co-pending, and Applicants nevertheless failed to disclose McGlynn in prosecution of the '761 patent. Further, Applicants for the '761 patent failed to disclose in prosecuting the '761 patent the office actions and responses from the co-pending '631 patent. In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel substantively involved in the filing or prosecution of the '761 patent were aware of the '761 Co-Pending Art, as well as U.S. Patent Nos 5,600,712 ("Enabling Technique for Quickly Establishing High Speed PSTN Connections In Telecommuting Applications"), to Hanson, 5,577,105 ("Telephone Call Routing and Switching Techniques for Data Communications"), to Baum,

25

and 5,127,041 ("System and Method for Interfacing Computers to Diverse Telephone Networks"), to O'Sullivan. The undisclosed information described herein was material to patentability of the '761 patent and was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim

124. Additional instances of misconduct occurred in prosecution of the '631 patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)    By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art

26

references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application "

(ii)    Notwithstanding these clear obligations, during prosecution, Applicants repeatedly failed to disclose information within their knowledge as to co-pending applications of which they were aware, including without limitation co-pending application 08/458,048 (now the '761 patent, which is now commonly asserted here along with the '631 patent), as well as Application Nos. 08/781,787, now issued as U.S. Patent No. 5,751,796 ("Rapid Startup Protocol For Communication Between a Plurality of Modems") to Scott and Zuranski, 08/781,067, now issued as 5,796,808 ("System and Method for Automatically Selecting the Mode of Communication between a Plurality of Modems"), to Scott and Lastinger Jr., and 08/780,238, now issued as U.S. Patent No. 5,787,363 ("System and Method for Connect Message Synchronization of Modems in a Cellular Data Gateway"), to Scott and Lastinger Jr. (the "'631 Co-Pending Applications")  Applicants for the '631 patent failed to identify any of these co-pending applications or their claims to the examiner in the prosecution of the '631 patent. These applications are never disclosed on an IDS that was submitted in the '631 patent or otherwise made of record in the '631 patent.  One or more Applicants were aware of the '631 Co-Pending Applications during prosecution of the '631 patent  All three of the '631 Co-Pending Applications include Robert Scott as a named inventor and two of the '631 Co-Pending Applications claim priority to the same provisional applications for which priority is claimed by the '631 patent.  In addition, on information and

27

belief a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '631 patent and were aware of the '631 Co-Pending Applications. The information relating to the '631 Co-Pending Applications was material to the patentability of the '631 Patent and was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)    Further, Applicants failed to disclose in prosecution of the '631 patent, the prior art of record from the '631 Co-Pending Applications, including without limitation U.S. Patent Nos 5,550,881 ("Automatic Modulation Mode Selecting Unit and Method for Modems"), to Sridhar and Sheer ("Sridhar"), and 5,528,679 ("Automatic Detection of Digital Call Paths in a Telephone System"), to Taarud ("Taarud") (the "'631 Co-Pending Art"). The Applicants did not disclose the '631 Co-Pending Art during prosecution of the '631 patent. Applicants were aware of the '631 Co-Pending Art during prosecution of the '631 patent Robert Scott is the same and only named inventor on both the '631 and the '761 patents Further, Sridhar was cited by the Examiner of the '761 patent and used for claim rejections in a Detailed Office Action and accompanying Notice of References Cited dated December 26, 1996. The '631 and '761 patent were co-pending on December 26, 1996, and the '631 patent did not issue until December 22, 1998 While the '631 patent remained co-pending, Applicants attempted to distinguish Sridhar in a Response and Amendment transmitted March 31, 1997. Applicants for the '631 patent failed to disclose in prosecuting the '631 patent, the December 26, 1996 office action and the March 31, 1997 response from the co-pending '761 patent or

28

the prior art of record referenced in those communications. In addition, on information and belief a reasonable opportunity for discovery will show that Paradyne personnel substantively involved in the filing or prosecution of the '631 patent were aware of the '631 Co-Pending Art, as well as U S Patent Nos 5,600,712 ("Enabling Technique for Quickly Establishing High Speed PSTN Connections In Telecommuting Applications"), to Hanson, 5,577,105 ("Telephone Call Routing and Switching Techniques for Data Communications"), to Baum, 5,127,041 ("System and Method for Interfacing Computers to Diverse Telephone Networks"), to O'Sullivan, 4,680,773 ("Data Telecommunications System"), to Amundson ("Amundson"), and 4,782,498 ("Modem with Improved Handshaking Capability"), to Copeland, III ("Copeland"). The '631 Co-Pending Art and information described in this paragraph was material to patentability of the '631 patent  The '631 Co-Pending Art and information described in this paragraph was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim In addition, on information and belief, a reasonable opportunity for discovery will show that Robert Scott was improperly listed as sole inventor of the '631 patent with deceptive intent to defraud the PTO into issuing the patent over the '761 patent

125.    Additional instances of misconduct occurred in prosecution of the '444 patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

29

(i)    By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application . . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)    On information and belief, a reasonable opportunity for discovery will show that one or more Applicants were aware of U S Patent No 3,978,407 ("Fast Start-Up Adaptive Equalizer Communication System Using Two Data Transmission Rates"), to Forney and Hart. Applicants failed to disclose this patent to the PTO in prosecution of the '444 patent. This reference was material to patentability of the '444 patent. On information and belief, a reasonable opportunity for discovery

will show that Applicants knew of and withheld this reference with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)   In addition, on information and belief a reasonable opportunity for discovery will show that Paradyne offered for sale MVL technology more than one year before applying for the '444 patent, that was material to the '444 patent, but failed to disclose those sales as prior art to the PTO. The withheld information was material to patentability and, on information and belief a reasonable opportunity for discovery will show that this information was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

126   Additional instances of misconduct occurred during the prosecution of the '159 patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by omitting and misstating material information with intent to deceive including the following acts:

(i)   In prosecution of the '159 patent, the PTO repeatedly rejected pending claims due to prior art, including without limitation references to Lang and Mori. In response to these and other rejections, Applicants represented that claims required and that they had invented a system that included a "displacement multibit memory address." However, Applicants lacked support for the invention as represented to the PTO. Applicants misstated and omitted this material information with intent to deceive the PTO into issuing the claims. These material misstatements and omissions were made with intent to deceive, as further confirmed by the pattern

31

and practice of inequitable conduct alleged throughout this Counterclaim
Further, the '234 patent is a divisional of the '159 patent, refers back to acts
occurring in prosecution of the '159 patent, and is infected by the unenforceability
associated with the '159 patent.

(ii)    In addition, on information and belief, a reasonable opportunity for discovery will
show that the Applicants offered the invention on-sale or placed it in public use
more than one year before the application date, and applicants withheld this
information which was material to patentability with intent to deceive the PTO, as
is particularly shown by the continuing pattern and practice of nondisclosure
referenced in this Counterclaim.

127    Additional instances of misconduct occurred in prosecution of the '858 patent,
Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by
withholding and failing to disclose material information with intent to deceive including the
following acts:

(i)    By way of example, MPEP § 2001 06(b) states that there is "a duty to bring to the
attention of the examiner, or other Office official involved with the examination
of a particular application, information within their knowledge as to other co-
pending United States applications which are 'material to patentability' of the
application in question " The MPEP cites to caselaw providing that "[W]e think
that it is unfair to the busy examiner, no matter how diligent and well informed he
may be, to assume that he retains details of every pending file in his mind when he
is reviewing a particular application        [T]he applicant has the burden of
presenting the examiner with a complete and accurate record to support the

allowance of letters patent " The MPEP provides express examples of material information as to other co-pending applications, stating "[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application "

(ii)    On information and belief, Applicants failed to disclose in prosecution of the '858 patent, the material prior art of record from Application No 08/607,912, now issued as U S. Patent No. 5,754,799 ("System and Method for Bus Contention Resolution"), to Hiles, including without limitation U S. Patent Nos 4,608,700 ("Serial Multi-Drop Data Link"), to Kirtley, Sterling, and Williams, and 5,398,243 ("Arbitration Method and Bus for Serial Data Transmission"), to Aguilhon, Doucet, and Karcher (the "'858 Co-Pending Art"). The Applicants did not disclose the '858 Co-Pending Art during prosecution of the '858 patent On information and belief, a reasonable opportunity for discovery will show that one or more Applicants were aware of the '858 Co-Pending Art during prosecution of the '858 patent This undisclosed information was material to patentability of the '858 patent. On information and belief, a reasonable opportunity for discovery will show this information was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim

33

(iii)    In addition, one or more Applicants were aware of U S Patent No 4,797,815

("Interleaved Synchronous Bus Access Protocol for a Shared Memory Multi-

Processor System"), to Moore (the same inventor as the '858), and, on information

and belief, a reasonable opportunity for discovery will show one or more

Applicants were aware of U.S. Patent Nos. 3,997,896 ("Data Processing System

Providing Split Bus Cycle Operation"), to Cassarino, Jr., Bekampis, Conway, and

Lemay, 4,181,974 ("System Providing Multiple Outstanding Information

Requests"), to Lemay and Curley, and 4,669,056 ("Data Processing System with a

Plurality of Processors Accessing a Common Bus to Interleaved Storage"), to

Waldecker and Wright. Applicants failed to disclose these patents to the PTO in

prosecution of the '858 patent. These references were material to patentability of

the '858 patent and on information and belief a reasonable opportunity for

discovery will show that Applicants knew of and withheld them with intent to

deceive the PTO, as is particularly shown by the continuing pattern and practice of

nondisclosure referenced in this Counterclaim

### THIRTEENTH DEFENSE

128.    The claims of the '627 patent are unenforceable due to the inequitable conduct of

one or more of the named inventors and/or others having substantive involvement in prosecuting

the '627 patent application. These individuals include, but are not limited to, William L. Betts,

Edward S Zuranski, Ronald D Slusky and Gerard A deBlasi ("'627 Procurement Team").

### Misrepresentation Of Prior Art

129     On information and belief, the '627 Procurement Team made false material

statements to the United States Patent and Trademark Office ("the PTO") with the intent

34

to deceive the PTO during the prosecution of the patent application which led to the issuance of the '627 patent (Ser. No. 748,594, hereinafter "'627 patent application")

130.    In particular, during the prosecution of the '627 patent application, one of the prosecuting attorneys, Gerard A. deBlasi, represented to the PTO that "[t]he Prior Art, as described in Applicants' patent application, does not teach independently trellis encoding a plurality of streams of trellis bits" and that "[t]he Prior Art clearly does not include a plurality of trellis encoders to independently encode a plurality of streams of trellis bits as in Applicants' invention." (12/24/92 Amendment filed in '627 patent application, at 5, 6).

131.    The Prior Art described by the applicants in the '627 patent application included United States Patent No. 4,677,625 (the "'625 patent"). The '625 patent discloses a plurality of trellis encoders to independently encode a plurality of streams of trellis bits, contrary to Mr. deBlasi's statements to the PTO.

132.    Mr. deBlasi's false statements were material because they were made to overcome prior art asserted by the PTO in rejecting pending claims. Consequently, Mr. deBlasi's statements are material.

133.    On information and belief, Mr. deBlasi made false material statements to the PTO during the prosecution of the '627 patent application.

134.    On information and belief, these false material statements were made with intent to deceive the PTO.

135.    These false material statements constitute a breach of the '627 Procurement Team's duty of candor and good faith owed to the PTO. Consequently, this misconduct bars the enforcement of the '627 patent.

RLF1-3279732-1

**Intentional Withholding Of Material Prior Art References**

136. On information and belief, the '627 Procurement Team intentionally withheld material information with the intent to deceive the PTO during the prosecution of the '627 patent application

137. In particular, the '627 Procurement Team failed to disclose United States Patent No. 4,641,327 ("the '327 patent"), United States Patent No. 5,052,000 ("the '000 patent"), United States Patent Application No. 363,793 ("the '793 application"), United States Patent No. 5,056,112 ("the '112 patent"), United States Patent Application No. 457,438 ("the '438 application"), United States Patent No. 5,105,442 ("the '442 patent"), United States Patent Application No. 611,200 ("the '200 application"), United States Patent No. 5,214,656 ("the '656 patent") and United States Patent Application No. 627,156 ("the '156 application") to the PTO

138. On information and belief, the '627 Procurement Team failed to disclose the '327 patent to the PTO. The '327 patent is entitled "Frame Synchronization in Trellis-Coded Communication Systems," and was issued to Lee-Fang Wei on February 3, 1987

139. On information and belief, one or more members of the '627 Procurement Team were aware of the '327 patent prior to issuance of the '627 patent.

140. On information and belief, the '627 Procurement Team withheld the '327 patent with intent to deceive the PTO

141. On information and belief, one or more members of the '627 Procurement Team were aware that the '327 patent contained material information including, but not limited to the following:

36

(i)     "Another general feature of the invention is an interleaver that changes the
original sequence of signal points to a revised sequence for transmission
and a deinterleaver that changes the received sequence of signal points in a
manner that will restore the original sequence . . . " ('327 Col. 1:51-56;
see also 2:18-20.)

(ii)    "The communication system is a trellis-coded modulation system. Each
signal point is two-dimensional. The two-dimensional points are grouped
into multi-dimensional points." ('327 Col. 1:59-62.)

(iii)   "[E]ncoders and grouping device 18 deliver to interleaver 19, N pairs of
in-phase and quadrature coordinates in series, one pair in each signaling
interval, each pair corresponding to a point in a two-dimensional (2D)
signal constellation. Interleaver 19 reorders the coordinate pairs . . . "
('327 Col. 2:68-3:5.)

142.    Because, on information and belief, one or more members of the '627
Procurement Team intentionally withheld the '327 patent with the intent to deceive the
PTO, the '627 patent is unenforceable.

143.    On information and belief, the '627 Procurement Team failed to disclose
the '000 patent to the PTO. The '000 patent is entitled "Technique for Improving the
Operation of Decision Feedback Equalizers in Communications Systems Utilizing Error
Correction," and was issued to Jin-Der Wang and Jean-Jacques Werner on September 24,
1991. The '627 Procurement Team also failed to disclose the existence of the '793
application to the PTO. The '793 application was filed on June 9, 1989, and eventually
issued as the '000 patent.

144.    On information and belief, one or more members of the '627 Procurement Team were aware of the '793 application and the '000 patent prior to issuance of the '627 patent.

145.    On information and belief, the '627 Procurement Team withheld the '793 application and the '000 patent with intent to deceive the PTO.

146.    On information and belief, one or more members of the '627 Procurement Team were aware that the '793 application and the '000 patent contained material information including, but not limited to the following:

(i)     "The use of plural coders provide interleaving of the transmitted symbols and, accordingly, each decoder is operative upon every Mth symbol, where M is the number of encoders or decoders.  If M is properly chosen, the probability of noise impairing the recovery of two successive symbols by any decoder is reduced." ('000 Col. 2:20-24 )

(ii)    "Illustratively, encoders 206-i may each be a convolutional encoder of the type that is used in a standard trellis encoder.  Switch 207 takes the outputs of encoders 206-i, preferably in a cyclic fashion, and feeds them to symbol mapping apparatus 208 which generates two-dimensional symbols    ." ('000 Col 4:36-42; see also 8:1-4 )

(iii)   "[W]hile the present invention has been described in reference to particular two-dimensional signal constellations, the invention is also applicable to other two-dimensional signal constellations    Indeed, the present invention is applicable to signal constellations having other than two dimensions." ('000 Col. 7:60-65 )

38

147.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '793 application and/or the '000 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

148    On information and belief, the '627 Procurement Team failed to disclose the '112 patent to the PTO. The '112 patent is entitled "Interleaving in Coded Modulation for Mobile Radio," and was issued to Lee-Fang Wei on October 8, 1991. The '627 Procurement Team also failed to disclose the existence of the '438 application to the PTO. The '438 application was filed on December 27, 1989, and eventually issued as the '112 patent.

149    On information and belief, one or more members of the '627 Procurement Team were aware of the '438 application and the '112 patent prior to issuance of the '627 patent

150.    On information and belief, the '627 Procurement Team withheld the '438 application and the '112 patent with intent to deceive the PTO

151.    On information and belief, one or more members of the '627 Procurement Team were aware that the '438 application and the '112 patent contained material information including, but not limited to the following:

(i)    "Interleavers used in fading channel applications can be matched to a particular trellis or block code being used    .    Matching both the interleaver and the code increases the separation between interdependent signal points and provides an improvement in error performance " ('112 Abstract )

39

(ii)    "As an illustration, assume that N is equal to four (an eight-dimensional code) so that four interdependent signal points would be produced for each codeword every four signaling intervals " ('112 Col. 4:39-43 )

(iii)    "In accordance with the invention, FIG. 14 illustrates the operation of the interleaver on the illustrative trellis code (with two-fold time diversity between successive signal points) of FIG. 10." ('112 Col. 10:14-17 )

152    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '438 application and/or the '112 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

153    On information and belief, the '627 Procurement Team failed to disclose the '442 patent to the PTO. The '442 patent is entitled "Coded Modulation with Unequal Error Protection," and was issued to Lee-Fang Wei on April 14, 1992  The '627 Procurement Team also failed to disclose the existence of the '200 application to the PTO. The '200 application was filed on November 7, 1990, and eventually issued as the '442 patent

154.    On information and belief, one or more members of the '627 Procurement Team were aware of the '200 application and the '442 patent prior to issuance of the '627 patent.

155.    On information and belief, the '627 Procurement Team withheld the '200 application and the '442 patent with intent to deceive the PTO

156.    On information and belief, one or more members of the '627 Procurement Team were aware that the '200 application and the '442 patent contained material information including, but not limited to the following:

40

(i)    "In accordance with the invention, as described more fully herein below, the respective groups of bits on leads 112 and 113 are extended to channel encoders--illustratively trellis encoders--114 and 115 which generate, for each symbol interval, respective expanded groups of the expanded r and p bits on leads 121 and 122, where r>m and p>k." ('442 Col. 4:30-36; see also 9:3-4; 12:33-36.)

(ii)    "Decoding in the case where multi-dimensional symbols are used--such as the four-dimensional examples described below--is carried out in a similar manner, as will be appreciated by those skilled in the art." ('442 Col. 8:27-30; see also 8:49-9:11.)

(iii)    "A further protection against impulse noise for the most important bits in coded modulation schemes based on constellations of the type of FIG. 8 can be achieved by rearranging the bits that are output by channel encoder 114 so that bits that are generated in proximity to one another by the encoder are separated from one another as much as possible, given that the system delay constraints are met. To this end, channel encoder 114 may include a bit interleaver, which performs such rearrangement, as shown in FIG. 15." ('442 Col. 9:40-49.)

157    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '200 application and/or the '442 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

158.    On information and belief, the '627 Procurement Team failed to disclose the '656 patent to the PTO. The '656 patent is entitled "Multiplexed Coded Modulation

41

With Unequal Error Protection," and was issued to Hong Y. Chung, Jin-Der Wang and Lee-Fang Wei on May 25, 1993. The '627 Procurement Team also failed to disclose the existence of the '156 application to the PTO. The '156 application was filed on December 13, 1990, and eventually issued as the '656 patent.

159    On information and belief, one or more members of the '627 Procurement Team were aware of the '156 application and the '656 patent prior to issuance of the '627 patent.

160    On information and belief, the '627 Procurement Team withheld the '156 application and the '656 patent with intent to deceive the PTO.

161    On information and belief, one or more members of the '627 Procurement Team were aware that the '156 application and the '656 patent contained material information including, but not limited to the following:

(i)     "Specifically, and in accordance with the present invention, unequal error protection is provided for a signal comprised of a plurality of classes of information by a) separately coding each one of the plurality of classes of information using a different coded modulation scheme and b) multiplexing the plurality of coded outputs for transmission." ('656 Col. 2:10-17.)

(ii)    "Each class of information is then separately coded by a different, and conventional, coded modulation scheme, e.g., a 4D 8-state trellis code and a uniformly-spaced QAM signal constellation." ('656 Col. 2:21-24; see also 5:55-61; 6:26-52.)

42

(iii)    "Also, the coded modulation scheme for each class of information can be enhanced using interleaving techniques, or more complex coded modulation schemes, to protect against other forms of noise, e g , to protect against 'colored' noise " ('656 Col. 7:26-30 )

162.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '156 application and/or the '656 patent with the intent to deceive the PTO, the '627 patent is unenforceable

163    On information and belief, one or more members of the '627 Procurement Team made false material statements to the PTO and withheld several material patents and/or patent applications from the PTO during the prosecution of the '627 patent. This behavior demonstrates a pattern of bad faith and intent to deceive the PTO. Consequently, for the reasons stated above, the '627 Procurement Team breached their duty of candor and good faith owed to the PTO and this breach bars the enforcement of the '627 patent

## COUNTER-COUNTERCLAIMS

Counter-Defendants Cablevision Systems Corporation and CSC Holdings, Inc (collectively "Cablevision"), by their attorneys, assert the following Counter-Counterclaims against Rembrandt Technologies, LP and Rembrandt Technologies, LLC, d/b/a Remstream (collectively "Rembrandt"):

## PARTIES

164. Cablevision Systems Corporation is a Delaware corporation with its principal place of business at 1111 Stewart Avenue, Bethpage, New York 11714.

165. CSC Holdings, Inc. is a Delaware corporation with its principal place of business at 1111 Stewart Avenue, Bethpage, New York 11714.

166. Upon information and belief, Rembrandt Technologies, LP is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, Pennsylvania 19004

167. Upon information and belief, Rembrandt Technologies, LLC, is a Delaware limited liability company with its principal place of business at 401 City Avenue, Suite 815, Bala Cynwyd, Pennsylvania 19004

### JURISDICTION AND VENUE

168. These Counterclaims arise under federal law, and this Court has jurisdiction pursuant to 28 U S C §§ 1331, 1338, 1367, 2201, and 2202, and the Patent Laws of the United States, 35 U.S.C § 1 *et seq*

169. This Court has supplemental jurisdiction over the state law claims asserted in this action under 28 U S C § 1367. The federal and state law claims asserted in this action arise from a common nucleus of operative facts.

170. This Court has personal jurisdiction over Rembrandt because it has submitted to the jurisdiction of this Court

171. Venue is proper under 28 U S C. § 1391 and 1400(b)

172. Rembrandt has previously asserted in this litigation that Cablevision Systems Corporation and CSC Holdings, Inc infringe U S Patent No 4,937,819, 5,008,903, 5,243,627, 5,719,858, and 5,852,631 Rembrandt's Counterclaims additionally assert that that Cablevision

44

infringes U.S. Patent Nos. 4,937,819, 5,008,903, 5,710,761, 5,719,858, 5,778,234, 5,852,631, 6,131,159, 6,950,444, and 5,243,627 ("the asserted patents")  An actual controversy exists between Rembrandt and Cablevision over the alleged infringement, invalidity, and unenforceability of the asserted patents

## FACTS

### PATENT ISSUES

173.    On information and belief, Rembrandt claims to own all rights, title, and interest in and to the '819, '903, '761, '858, '234, '631, '159, '444 and '627 patents ("Rembrandt's asserted patents").

174    Rembrandt has accused Cablevision of infringing Rembrandt's asserted patents

### CREATION OF THE ATSC STANDARD

175.    The American Television Systems Committee ("ATSC") is a private standard setting organization ("SSO") organized according to the policies of the American National Standards Institute  Following a multi-year competitive bidding process for the technology that would become the standard for terrestrial digital television broadcasting, the ATSC published the ATSC A-53 Digital Television Standard ("ATSC standard") on or about September 16, 1995

176.    As a condition for participating in the ATSC's standard development, American Telephone and Telegraph Company ("AT&T")—the original owner of the '627 patent during the ATSC standard setting process—was required to agree, and did agree, to abide by the ATSC Patent Policy that required all ATSC participants to license any proprietary technology essential for ATSC compliance either without compensation or on fair, reasonable, and non-discriminatory ("FRAND") terms  On or about January 12, 1995, AT&T promised that it would license its

45

patents, to the extent they are essential to implementation of the ATSC standard, under reasonable terms and conditions on a non-discriminatory, non-exclusive basis

177    Besides the technology that Rembrandt currently alleges infringes the '627 patent, at all relevant times multiple other alternative and then-competing technologies were available to the ATSC for incorporation into the standard  Had the ATSC known that any ATSC signatory or its successor would repudiate its FRAND obligations and assert that the '627 patent covers all or part of the standard, the ATSC would have adopted one of the then-competing technologies

178    On or about December 24, 1996, the Federal Communication Commission ("FCC") adopted the ATSC standard as the mandatory standard for terrestrial digital television broadcasting in the United States.  In adopting the ATSC standard, the FCC explicitly conditioned its adoption on all ATSC participants, including AT&T, agreeing to license essential proprietary technology on FRAND terms.

179.    If the FCC had known that an ATSC signatory or its successor would repudiate its FRAND obligations, and would assert that its patent(s) were essential to the ATSC standard, then the FCC would have adopted one of the competing standards.

180    Both ATSC and the FCC relied on AT&T's and others' FRAND commitments in adopting the ATSC standard not only as a voluntary industry standard, but also a government mandated standard.  Because the ATSC standard is the only technology accepted by the FCC for broadcasting terrestrial digital television in the United States, Cablevision and its content providers must implement and follow the standard by at least no later than the upcoming deadline set by Congress for transition to a digital television format.  Cablevision already invested a significant amount of time, energy and money into implementing the ATSC standard.

46

181    Congress has established February 17, 2009 as the deadline for the final transition from an analog to a digital system for terrestrial broadcast television in accordance with the ATSC standard. Cablevision will be required to comply with the ATSC standard if it wishes to provide its subscribers with any content from terrestrial broadcast television at all in the United States.

## REMBRANDT'S REPUDIATION OF ITS FRAND COMMITMENT TO ATSC

182    AT&T owned the '627 patent at the time the ATSC promulgated the ATSC standard, and before the FCC adopted that standard as a government-mandated standard. After the FCC adopted the ATSC standard, in or around December 2004, Rembrandt acquired the '627 patent from Paradyne Networks, Inc. ("Paradyne"), a former subsidiary or affiliate of AT&T, successor-in-interest to AT&T with respect to the rights and obligations associated with the '627 patent, and now a wholly owned subsidiary of Zhone Technologies ("Zhone"). Paradyne obtained its ownership rights to the '627 patent from AT&T. AT&T and its successors-in-interest to the '627 patent were and are bound by the FRAND licensing commitment that AT&T made to the ATSC. As a successor-in-interest to the '627 patent, Rembrandt also is bound by that FRAND licensing commitment to the extent that the patent covers technologies necessary to implement or comply with the ATSC standard.

183.    Rembrandt claims that the '627 patent is "essential" to the ATSC standard. But Rembrandt has disavowed, reneged on, and repudiated the FRAND licensing commitment that its predecessors-in-interest made to ATSC and by which its predecessors-in-interest were bound.

184    AT&T, as a predecessor-in-interest to the '627 patent, never claimed that the '627 patent was essential to the ATSC standard. And through its acts and omissions, AT&T implicitly denied the '627 patent applied to the ATSC standard.

47

185    Rembrandt sued Cablevision and other MSOs without first providing any prior notice of the '627 patent and without offering any license, let alone a license on FRAND terms. After Rembrandt sued Cablevision and other MSOs, Rembrandt demanded exorbitant royalties from Cablevision and others that far exceeded any royalty based on FRAND. These demands directly harm Cablevision and the MSOs and threaten the benefits that inure to all those who use the ATSC standard

186.    After acquiring the '627 patent, Rembrandt intentionally repudiated any FRAND commitment with respect to the allegedly essential '627 patent.

187    Rembrandt acquired the '627 patent with the specific intent to repudiate, in bad faith, its FRAND obligations and to obtain exorbitant royalties far in excess of FRAND.

188    Rembrandt has expressly denied having any FRAND obligations  For example, upon information and belief, it denied owing any such obligation to Harris Corporation, a manufacturer of digital transmission devices, in a complaint it filed in Delaware state court in 2007.

189    Rembrandt seeks non-FRAND term royalties from Cablevision, who must according to Rembrandt's allegations pay an exorbitant royalty far in excess of FRAND for practicing the mandated ATSC standard, or cease receiving terrestrial digital broadcast television signals in the United States.

190    Rembrandt's acquisition of the '627 patent has now subjected Cablevision to Rembrandt's patent infringement suit, whereas AT&T could not and would not have asserted such suit  Because AT&T implicitly denied application of the '627 patent to ATSC standard, and because they could not charge greater than FRAND terms in any event, Rembrandt has harmed Cablevision in a way its predecessors could not and would not have done

48

## CREATION OF THE DOCSIS SPECIFICATION

191.    Beginning in the mid-1990s, work began to develop a technical specification for the delivery of high-speed data over cable television networks. In 1997, the first version of Data Over Cable Services Interface Specifications (DOCSIS) was released by CableLabs.

192    The goal in the development of DOCSIS was to specify interface requirements so that cable operators and their subscribers would be able to purchase affordable, interchangeable, highly functional cable modems and other equipment from multiple suppliers. To ensure that customers who purchased cable modems would receive products that were fully compatible with the DOCSIS standard, CableLabs established a certification program to identify DOCSIS-compliant manufacturers. Certified equipment could then be used in cable systems supporting DOCSIS, and cable operators could then ensure that the equipment used on their network is DOCSIS certified.

193.    On information and belief, both during and after the DOCSIS standardization process, and prior to filing lawsuits against Cablevision and other MSOs, neither Rembrandt nor its Paradyne predecessors-in interest informed CableLabs or cable equipment vendors that they had intellectual property they believed read on or covered the DOCSIS standard

194.    To facilitate efficient licensing of patented technology essential to implement the original DOCSIS specification and subsequent versions, CableLabs developed a patent pool for such intellectual property. CableLabs announced the DOCSIS patent pool in July 1998 Companies contributing technology essential to the DOCSIS standardization effort signed an agreement, entitled, "Data Over Cable Service Interface Specifications License Agreement"

195    DOCSIS patent pool members contribute a non-exclusive, royalty-free license to any intellectual property rights they have that are essential to comply with the DOCSIS

49

specifications. In exchange for this grant to the patent pool, DOCSIS pool members receive non-exclusive, royalty-free licenses to the patent pool intellectual property to the extent it is essential to comply with the DOCSIS specification.

196. Rembrandt and Remstream contend that they have not signed, nor are bound by, the DOCSIS License Agreement.

### REMBRANDT'S BREACH OF THE DOCSIS LICENSING AGREEMENT

197. Rembrandt is a non-practicing entity ("NPE")—viz., a company that invests in patents but does not intend to practice them. According to its website, "Rembrandt invests its capital to acquire patents to pursue infringement."

198. Rembrandt acquired the patents-in-suit with the intent to assert them against, among others, MSOs that use DOCSIS compliant equipment. Rembrandt contends that its patents are essential to compliance with the DOCSIS specification.

199. As part of Rembrandt's scheme to assert the patents-in-suit, on information and belief, Rembrandt endeavored to become a supposed market participant or direct competitor of the MSOs and/or DOCSIS-compliant equipment manufacturers for the sole purpose of seeking injunctive relief and or lost profits in its infringement suits.

200.





205

206    Remstream—either alone or through partnerships with ████████ and others—lacks the capacity to meet U.S. demand for DOCSIS-compliant cable modems. Rembrandt's efforts to establish its entity Remstream as the sole supplier of cable modems is not being done for any legitimate business purposes but rather to conjure up an advantage in litigation.

207.    Upon information and belief, Rembrandt has also reached an agreement with ██████████████████, a cable systems provider, to further its scheme of attempting to further its litigation aims, not any legitimate business purpose. On information and belief, this scheme is intended to support Rembrandt's false claim that it is a practicing entity that has suffered damages as a purported competitor in the cable systems market.

208.    An actual case or controversy exists between Cablevision and Rembrandt as to the infringement, validity, and enforceability of Rembrandt's asserted patents.

### FIRST COUNTER-COUNTERCLAIM

209.    Cablevision incorporates and realleges Paragraphs 1 through 208 as though fully set forth herein.

210.    Cablevision has not infringed and does not directly or indirectly infringe any valid, enforceable claim of any of the asserted patents, either literally or under the doctrine of equivalents.

### SECOND COUNTER-COUNTERCLAIM

211.    Cablevision incorporates and realleges Paragraphs 1 through 210 as though fully set forth herein.

212.    The asserted patents are invalid for failing to satisfy one or more of the requirements of the Patent Act, 35 U.S.C. § 1, *et seq*, including, but not limited to, the conditions of patentability set forth in 35 U.S.C. §§ 101, 102, 103, and 112.

### THIRD COUNTER-COUNTERCLAIM

213.    Cablevision incorporates and realleges Paragraphs 1 through 212 as though fully set forth herein.

214.    The asserted patents are unenforceable in whole or in part as a result of inequitable conduct in their procurement or in the prosecution of related applications, including, but not limited to, failure to adequately disclose, and material misrepresentation of the significance of, relevant material prior art of which Rembrandt was aware to the PTO, and for the reasons set forth above in Cablevision's Twelfth and Thirteenth Defenses. On information and belief, such acts were made with intent to deceive the PTO.

### FOURTH COUNTER-COUNTERCLAIM
### Breach of Contract and Specific Performance re ATSC

215.    Cablevision realleges and incorporates by reference Paragraphs 1 through 214 above, and all responses set forth above by Cablevision in its Reply to Rembrandt's Counterclaims and Affirmative Defenses.

216.    As set forth above, Rembrandt took title to the '627 Patent subject to AT&T's FRAND commitment, and is therefore required to license it in good faith and to grant FRAND license terms to any user of the ATSC standard, including Cablevision and its equipment suppliers.

217.    Alternatively, Cablevision is an intended third-party beneficiary of AT&T's contract with the ATSC in that the ATSC and those who participated in the ATSC standard setting process (including AT&T) intended all manufacturers of ATSC-compliant equipment to have available to them FRAND licensing terms, which would inure to the benefit of purchasers of such ATSC-compliant equipment, including MSOs such as Cablevision. Cablevision has standing to enforce AT&T's promise to grant FRAND licenses against AT&T's successor-in-interest, Rembrandt.

218.    Rembrandt has breached its obligations by refusing to offer a license in good faith and by failing to license on FRAND terms.

219.    As a result of Rembrandt's breaches, Cablevision has been irreparably injured in its business or property through the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective damage to its business to the extent it relies upon the ATSC standard and continuing threat of patent infringement litigation.

220.    As a result of Cablevision's injuries, Cablevision seeks specific performance of Rembrandt's contractual obligations to offer licenses in good faith and on FRAND terms.

221.    Cablevision has no adequate remedy at law.

222.    In addition to an order requiring Rembrandt to specifically perform its contractual obligations, Cablevision also seeks damages for the injuries it has incurred and continues to incur, in an amount to be proven at trial.

## FIFTH COUNTER-COUNTERCLAIM

### Declaration of Contractual Rights and Liabilities re ATSC

223.    Cablevision realleges and incorporates by reference Paragraphs 1 through 222 above, and all responses set forth above by Cablevision in its Reply to Rembrandt's Counterclaims and Affirmative Defenses.

224.    An actual controversy exists between Cablevision and Rembrandt regarding Cablevision's right to license the '627 Patent on FRAND terms

225.    Cablevision is entitled to a declaratory judgment that:  (i) Cablevision is entitled to license the '627 Patent on FRAND terms; (ii) Rembrandt's refusal to provide FRAND licenses, despite its obligation to do so, is a breach of contract; (iii) Cablevision is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to enforce those obligations and to recover damages due to said breach of contract; and/or (iv) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology covered by the '627 patent, if essential to the ATSC standard as Rembrandt contends, on FRAND terms.

## SIXTH COUNTER-COUNTERCLAIM

### Breach of Contract and Specific Performance re DOCSIS

226    Cablevision realleges and incorporates by reference Paragraphs 1 through 225 above, and all responses set forth above Cablevision in its Reply to Rembrandt's Counterclaims and Affirmative Defenses.

227.    Cablevision is an intended third-party beneficiary of the DOCSIS License Agreement entered into by various signatories, including but not limited to Turbocomm.  Those

55

who participated in the DOCSIS standard-setting process, and in particular the signatories to the DOCSIS License Agreement, intended all manufacturers and providers of DOCSIS-compliant equipment and services to have available to them such royalty-free licenses to patent claims deemed essential for compliance with DOCSIS, subject to the terms of the DOCSIS License Agreement, which would inure to the benefit of purchasers and operators of such DOCSIS-compliant equipment, including MSOs such as Cablevision. Cablevision has standing to enforce each DOCSIS License Agreement's signatory's promise to grant royalty-free licenses under the DOCSIS License Agreement.

228.    As set forth above, ████████ signed and was bound by the terms of the DOCSIS License Agreement. Under those terms, ████████ and any of its affiliates agreed to grant a nontransferable, worldwide, nonexclusive, and royalty-free license to any of its patent claims deemed essential for DOCSIS compliance to CableLabs, which in turn sublicensed such rights to all other signatories to the DOCSIS License Agreement. ████████ in turn conferred all of the benefits it enjoyed under the DOCSIS License Agreement to Rembrandt d/b/a Remstream.

229.    As alleged above, Rembrandt assisted ████████ in obtaining CableLabs certification for modems that Rembrandt intended to resell. Rembrandt did so for the specific purpose of partnering with ████████ to enjoy ████████ rights under the DOCSIS License Agreement while attempting to avoid its corresponding obligation to grant a royalty free license under its own patents. Rembrandt engaged in this scheme to portray itself misleadingly as a true practicing entity in the cable modem business, solely for the purposes of seeking lost profits and/or injunctive relief from Cablevision, among others.

230.    Rembrandt has or had a relationship, both business and legal, with ████████ such that they effectively acted as, partners, joint venturers, alter egos of each other, and/or agent and principal. Alternatively, Rembrandt adopted, confirmed and ratified ████████ entering into the DOCSIS License Agreement when it entered into its business relationship with ████████.

231.    As a result, Rembrandt has been and continues to be bound by ████████ obligations under the DOCSIS License Agreement. Rembrandt has breached its obligations by refusing to offer in good faith a royalty-free license, as provided for under the DOCSIS License Agreement, to the patents it alleges are essential for DOCSIS compliance while simultaneously assuming ████████ rights under the DOCSIS License Agreement to royalty-free licenses to others' patents essential for compliance with the standard for purposes of portraying itself as a business competitor.

232.    As a result of Rembrandt's breaches, Cablevision has been irreparably injured or threatened with irreparable injury.

233.    As a result of Cablevision's injuries, Cablevision seeks specific performance of Rembrandt's contractual obligations to offer royalty-free licenses in good faith under the DOCSIS License Agreement.

234.    Cablevision has no adequate remedy at law. In addition to an order requiring Rembrandt to specifically perform its contractual obligations, Cablevision also seeks damages for the injuries they have incurred and continue to incur, in an amount to be proven at trial.

## SEVENTH COUNTER-COUNTERCLAIM

### Declaratory Judgment of Contractual Rights and Liabilities re DOCSIS

57

235.    Cablevision realleges and incorporates by reference Paragraphs 1 through 234 above, and all responses set forth above by Cablevision in its Reply to Rembrandt's Counterclaims and Affirmative Defenses.

236.    An actual controversy exists between Cablevision and Rembrandt regarding Cablevision's right to obtain royalty-free licenses to patent claims Rembrandt asserts are essential for compliance with DOCSIS under the DOCSIS License Agreement.

237.    For the reasons set forth above, Cablevision is entitled to a declaratory judgment that: (i) Cablevision is entitled to a royalty-free licenses to patent claims deemed essential for compliance with DOCSIS under the DOCSIS License Agreement; (ii) Rembrandt's refusal to provide royalty-free licenses, despite its obligation to do so, is a breach of contract; (iii) Cablevision is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to enforce those obligations and to recover damages due to said breach of contract; (iv) Cablevision's customers have a right to use the technology licensed pursuant to the DOCSIS License Agreement by virtue of their relationship with Cablevision; and/or (v) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology, which as Rembrandt contends, is essential for compliance with the DOCSIS standard.

## EIGHTH COUNTER-COUNTERCLAIM

### Unfair Business Practices, Cal. Bus. & Prof. Code §17200 re DOCSIS

238.    Cablevision realleges and incorporates by reference Paragraphs 1 through 237 above, and all responses set forth above by Cablevision in its Reply to Rembrandt's Counterclaims and Affirmative Defenses.

239.    As alleged more fully above, Rembrandt has engaged in unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code §17200. These practices have occurred, at least in part, in California, and/or have affected California residents and consumers, or threaten to do so.

240.    Several of Rembrandt's illegal, unfair, and fraudulent acts have harmed and/or threaten to further harm California customers, consumers, and competition within California, including by increasing the prices California consumers pay for cable modems or decreasing the supply of cable modems, or threatening the same.

241.    Rembrandt has engaged in unfair business practices by, among other things, refusing to abide by its obligations under the DOCSIS License Agreement to offer royalty-free licenses any intellectual property that is asserted to be essential to the practice of the DOCSIS standard, while at the same time purporting to be a bona fide participant in the business of providing cable modems licensed under the DOCSIS License Agreement.

242.    Rembrandt has engaged in unlawful business practices by, among other things, failing to abide by its obligation to license any technology asserted to be essential to compliance with the DOCSIS standard.

243.    Rembrandt has engaged in deceptive business practices by representing, or threatening to represent, itself as a purported bona fide cable modem provider when in fact its involvement in the cable modem business is for the purpose of generating evidence for this litigation.  Rembrandt has also engaged in deceptive business practices by representing, or threatening to represent, itself as a purported bona fide cable modem provider when in fact the true participant in the cable modem business is ███████████████████████████ ████████.

244. Cablevision has suffered actual injury, and is threatened with further actual injury unless Rembrandt is enjoined, as a result of the unfair, deceptive and unlawful business practices of Rembrandt described above.

### DEMAND FOR A JURY TRIAL

Cablevision demands a jury trial, pursuant to Fed. R. Civ. P. 38(b), on all Counter-Counterclaims and as to all issues that may be tried by a jury.

### PRAYER FOR RELIEF

FOR THESE REASONS, Cablevision respectfully requests that this Court enter judgment in its favor and grant the following relief:

A.     An order declaring that Rembrandt, its officers, directors, agents, servants, employees, and attorneys, and those persons in active concert with it, take nothing on the claims asserted in the Counterclaims

B      For dismissal of Rembrandt's Counterclaims in their entirety, with prejudice, and that the relief requested be denied;

C.     A declaration that Cablevision does not infringe any of U.S. Patent Nos. 4,937,819, 5,008,903, 5,243,627, 5,710,761, 5,719,858, 5,778,234, 5,852,631, 6,131,159, and 6,950,444 (collectively, "the asserted patents");

D.     A declaration that the asserted patents are invalid;

E.     For a judgment declaring that the asserted patents are unenforceable;

F      An order declaring that this is an exceptional case and awarding Cablevision its costs, expenses, reasonable attorney fees under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law;

G      That Cablevision has no adequate remedy at law;

60

H.    For an order requiring Rembrandt to specifically perform its contractual obligation to license the '627 patent on FRAND terms;

I.    For an order requiring Rembrandt to specifically perform its contractual obligation to grant a royalty-free license on technology essential for compliance with the DOCSIS standard;

J.    For declarations that: (i) Cablevision is entitled to license the '627 Patent on FRAND terms; (ii) Rembrandt's refusal to provide FRAND licenses, despite its obligation to do so, is a breach of contract; (iii) Cablevision is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to enforce those obligations and to recover damages due to said breach of contract; and/or (iv) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology covered by the '627 patent, if essential to the ATSC standard as Rembrandt contends, on FRAND terms;

K.    For declarations that: (i) Cablevision is entitled to a royalty-free licenses to patent claims deemed essential for compliance with DOCSIS under the DOCSIS License Agreement; (ii) Rembrandt's refusal to provide royalty-free licenses, despite its obligation to do so, is a breach of contract; (iii) Cablevision is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to enforce those obligations and to recover damages due to said breach of contract; (iv) Cablevision's customers have a right to use the

61

technology licensed pursuant to the DOCSIS License Agreement by virtue of their relationship with Cablevision; and/or (v) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology, which as Rembrandt contends, is essential for compliance with the DOCSIS standard;

L.    For an award of damages to Cablevision on the breach of contracts claim in an amount to be determined at trial;

M.    For an award of restitution to Cablevision on the unfair business practices claims, in an amount to be determined at trial;

N.    A preliminary and permanent injunction prohibiting any and all of Rembrandt's ongoing acts of unfair business practices;

O.    Interest, attorneys fees and costs as allowed by law; and

P.    Any such other relief as the Court may deem appropriate and just under the circumstances.

## REPLY OF COUNTER-DEFENDANTS CABLEVISION SYSTEMS CORPORATION AND CSC HOLDINGS, INC. TO COUNTER-PLAINTIFF REMBRANDT'S COUNTER-COUNTERCLAIM

### THE PARTIES

1    Cablevision lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 1 of Counter-Plaintiff's Counter-Counterclaims, and therefore denies those allegations.

2.    Admits.

3.    Admits.

62

4   Cablevision admits that Counter-Plaintiffs purport to bring an action for patent infringement arising under the patent laws of the United States, but Cablevision denies the legal sufficiency of Counter-Plaintiffs' claims and allegations and denies that Counter-Plaintiffs have any viable claim thereunder.

5.   Cablevision admits that this Court has subject matter jurisdiction over patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a), but denies the legal sufficiency of Counter-Plaintiffs' claims and allegations

6   Cablevision admits that the Cablevision Counter-Defendants are Delaware entities and that this Court has personal jurisdiction over them, but denies the remaining allegations in paragraph 6 as directed to Cablevision.

7.   Cablevision admits that venue is proper in this judicial district, but denies the legal sufficiency of Counter-Plaintiffs' claims and allegations

**COUNT I**

8   Cablevision incorporates its responses to Paragraphs 1-7 as if fully set forth herein.

9.   Cablevision admits that U.S. Patent No. 5,243,627 is entitled "Signal Point Interleaving Technique" but lacks knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 9, and therefore denies these allegations

10   Cablevision admits that the '627 patent on its face indicates that it was issued by the United States Patent and Trademark Office on September 7, 1993, but otherwise denies the allegations of Paragraph 10.

11   Cablevision admits that Cablevision operates cable systems in Connecticut, New York, and New Jersey, but otherwise denies the allegations of Paragraph 11

63

12     Cablevision denies the allegations of Paragraph 12

13     Cablevision denies the allegations of Paragraph 13


                                        _Kelly E Farnan_
                                        Frederick L Cottrell, III (#2555)
                                        cottrell@rlf.com
                                        Kelly E Farnan (#4395)
                                        farnan@rlf.com
OF COUNSEL:                             Richards, Layton & Finger, P A.
                                        One Rodney Square
Josh A Krevitt                          920 North King Street
Charles J. Boudreau                     Wilmington, Delaware 19801
GIBSON, DUNN & CRUTCHER LLP             (302) 651-7700
200 Park Avenue, 47th Floor
New York, New York 10166-0193
(212) 351-4000                          *Attorneys for Counter-Defendants Cablevision*
                                        *Systems Corporation and CSC Holdings, Inc*
David Segal
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, California 92612-4412
(949) 451-3800

Amanda J Tessar
GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO 80202-2642
(303) 298-5700

Dated:  May 2, 2008

RLF1-3279732-1