Redacted Document – Publicly Filed

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: REMBRANDT TECHNOLOGIES, LP PATENT LITIGATION | ) ) ) MDL Docket No. 07-md-1848 (GMS) |

| | |
|---|---|
| MOTOROLA, INC., CISCO SYSTEMS, INC., SCIENTIFIC-ATLANTA, INC., ARRIS GROUP, INC., THOMSON, INC., AMBIT MICROSYSTTEMS, INC., and NETGEAR, INC., | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| REMBRANDT TECHNOLOGIES, LP, | ) ) ) |
| Defendant. | ) ) ) ) |

| | |
|---|---|
| REMBRANDT TECHNOLOGIES, LP and REMBRANDT TECHNOLOGIES, LLC d/b/a REMSTREAM, | ) ) ) ) ) |
| Counter-Plaintiffs, | ) ) ) |
| v. | ) ) C.A. NO. 07-752 (GMS) JURY TRIAL DEMANDED |
| MOTOROLA, INC., CISCO SYSTEMS, INC., SCIENTIFIC-ATLANTA, INC., ARRIS GROUP, INC., THOMSON, INC., AMBIT MICROSYSTEMS, INC., NETGEAR, INC., TIME WARNER CABLE, INC., TIME WARNER CABLE LLC, TIME WARNER NEW YORK CABLE LLC, TIME WARNER ENTERTAINMENT COMPANY, LP, COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC, CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONSOPERATING, LLC, COXCOM, INC., COX COMMUNICATIONS, INC., COX | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Redacted Document – Publicly Filed

ENTERPRISES, INC., CSC HOLDINGS,      )
INC., CABLEVISION SYSTEMS             )
CORPORATION, ADELPHIA                 )
COMMUNICATIONS CORPORATION,           )
CENTURY-TCI CALIFORNIA                )
COMMUNICATIONS, LP, CENTURY-TCI       )
HOLDINGS, LLC, COMCAST OF             )
FLORIDA/PENNSYLVANIA, L.P.            )
f/k/a PARNASSOS, LP), COMCAST OF      )
PENNSYLVANIA II, L.P. (f/k/a CENTURY- )
TCI CALIFORNIA, L.P.), PARNASSOS      )
COMMUNICATIONS, LP, ADELPHIA          )
CONSOLIDATION, LLC, PARNASSOS         )
HOLDINGS, LLC, and WESTERN NY         )
CABLEVISION, LP,                      )
                                      )
            Counter-Defendants.       )
                                      )
_____   )

## REMBRANDT TECHNOLOGIES LP AND REMBRANDT TECHNOLOGIES, LLC d/b/a REMSTREAM'S REPLY TO CHARTER COMMUNICATIONS, INC. AND CHARTER COMMUNICATIONS OPERATING LLC'S ADDITIONAL COUNTERCLAIMS

Rembrandt Technologies, LP ("Rembrandt") and Rembrandt Technologies, LLC d/b/a Remstream ("Remstream"), by their undersigned attorneys, respectfully submit this Reply to the Additional Counterclaims of Charter Communications, Inc. and Charter Communications Operating LLC (collectively "Charter") as follows:

### Parties

1.      Charter Communications, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscourt Drive, Suite 100, St. Louis, MO 63131.

<u>Answer</u>:  Upon information and belief, Rembrandt and Remstream admit that Charter Communications, Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscourt Drive, Suite 100, St. Louis, MO 63131.

2.      Charter Communications Operating, LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscourt Drive, Suite 100, St. Louis, MO 63131.

Redacted Document – Publicly Filed

Answer:  Upon information and belief, Rembrandt and Remstream admit that Charter Communications Operating, LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business at 12405 Powerscourt Drive, Suite 100, St. Louis, MO 63131.

3.    Upon information and belief, Rembrandt Technologies, LP is a limited partnership organized under the laws of the state of New Jersey with its principal place of business at 401 City Avenue, Suite 900, Bala Cynwyd, PA 19004.

Answer: Admitted.

4.    Upon information and belief, Rembrandt Technologies, LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business at 401 City Avenue, Suite 900, Bala Cynwyd, PA 19004.

Answer: Admitted.

## Jurisdiction and Venue

5.    These Counterclaims arise under the United States patent laws and the declaratory judgment statute.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a), 1367, 2201 and 2202. The federal and state law claims asserted in this action arise from a common nucleus of operative facts.

Answer:  Rembrandt and Remstream admit that Charter Counter-Defendants purport to bring a declaratory judgment of patent noninfringement and invalidity of nine United States patents under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and the patent laws of the United States, 35 U.S.C. § 100 *et seq.*, and state law claims but deny that the federal and state law claims asserted in this action arise from a common nucleus of operative facts and deny that Charter Counter-Defendants are entitled to their requested relief.

6.    This Court has personal jurisdiction over Rembrandt and Remstream because they have submitted to the jurisdiction of this Court by filing their Counterclaim for Patent Infringement in the instant action.

Answer:    Admitted that this Court has personal jurisdiction over Rembrandt and Remstream for purposes of this litigation only.

7.    Venue in this District is proper under 28 U.S.C. § 1391 and 1400.

Redacted Document – Publicly Filed

Answer:  Rembrandt and Remstream do not contest that venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b), but deny that Charter Counter-Defendants are entitled to their requested relief.

## Factual Background

8.    Rembrandt and Remstream have accused Charter of infringing U.S. Patent Nos. 5,710,761 ("the '761 patent"), 5,778,234 ("the '234 patent"), 6,131,159 ("the '159 patent"), and 6,950,444 ("the '444 patent") directly and/or indirectly.

Answer:  Admitted.

9.    Rembrandt has accused Charter of infringing U.S. Patent Nos. 4,937,819 ("the '819 patent"), 5,008,903 ("the '903 patent"), 5,719,858 ("the '858 patent"), 5,852,631 ("the '631 patent"), and 5,243,627 ("the '627 patent") directly and/or indirectly.

Answer:  Admitted.

10.    The '819, '903, '761, '858, '234, '631, '159, '444, and '627 patents are invalid, and have not been and are not infringed by Charter, either directly or indirectly.

Answer:  Denied.

11.    The '761, '858, '234, '631, '159,444, and '627 patents are unenforceable due to inequitable conduct.

Answer:  Denied.

12.    Consequently, there is an actual case or controversy between the parties over the infringement, validity, and/or enforceability of the '819, '903, '761, '858, '234, '631, '159, '444, and '627 patents.

Answer:  Admitted that there is an actual case or controversy, but denied insofar as the word "consequently" implies that any previous paragraphs of the Additional Counterclaims are incorporated by reference.

Redacted Document – Publicly Filed

### Count I — Inequitable Conduct Regarding Prosecution
### of the '761, '858, '234, '631, '159, and '444 Patents

13.     Charter restates and incorporates by reference its allegations in paragraphs 1-12 of its Counterclaims.

Answer:  Rembrandt and Remstream repeat and re-allege their responses to Paragraphs 1 through 12 and incorporate them herein by reference.

14.     The '761, '858, '234, '631, '159, and '444 patents are unenforceable due to the inequitable conduct of one or more named inventors and/or others having substantive involvement in the prosecution of the foregoing patents.

Answer:  Denied.

15.     Individuals subject to the duty of candor under 37 C.F.R. § 1.56 ("Applicants"), including named inventors in the applications referenced below and employees with substantive involvement in the filing and/or prosecution of patent applications for Paradyne entities, engaged in inequitable conduct by engaging in a pattern and practice of withholding or misstating material information with intent to deceive the United States Patent and Trademark Office ("the PTO") in connection with patent prosecution of the '761, '631, '234, '159, '858, and '444 patents, including withholding or misstating material information with the intent to deceive in view of the claim constructions that Rembrandt seeks in this litigation.  On information and belief, a reasonable opportunity for discovery will show that Applicants failed to disclose their own previously issued patents that comprised material prior art, failed to disclose material information regarding their own co-pending applications for patents, failed to disclose prior art that was known to them through the prosecution of their own patents and applications, and failed to disclose their own systems that were on-sale prior to the relevant critical dates.  In addition to nondisclosure, Applicants in the prosecution chain of the '159 and '234 patents provided affirmative misstatements as set forth below.  Accordingly, Applicants engaged in an overall pattern and practice of repeatedly and continuously failing to disclose to the PTO material information of which Applicants were indisputably aware.  The permeation and continuation of this misconduct throughout prosecution of multiple patent applications confirms that Applicants acted with deceptive intent rendering the patents unenforceable.  Further, the doctrine of infectious unenforceability renders related patents unenforceable.

Answer:  Denied.

16.     More specifically, during prosecution of the '761 patent, Applicants engaged in inequitable conduct before the PTO, rendering the '761 patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

Redacted Document – Publicly Filed

(i)       By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application. . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[for example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)      Notwithstanding these clear obligations, during prosecution, Applicants were aware of and failed to disclose, without limitation, co-pending application 08/780,762 ("the '762 application," now the '631 patent, which is commonly asserted in this action along with the '761 patent). The Applicants for the '761 patent failed to identify the '762 application or its claims to the examiner in the prosecution of the '761 patent. The '762 application was never disclosed on any IDS that was submitted in the '761 patent or otherwise made of record in the '761 patent. Information relating to the '762 application and its claims was material to patentability. One or more Applicants were aware of the '762 application. Robert Scott is the sole named inventor on both the '761 and '631 patents. Robert Scott was aware of the co-pendency of his applications. In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '761 patent and were aware of the '762 application. Material information relating to the '762 application was withheld with intent to deceive the PTO as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)     Further, Applicants failed to disclose in prosecution of the '761 patent, the prior art of record from the '762 application, as well as the prior art of record from Application Nos. 08/781,787, now issued as 5,751,796 ("Rapid Startup Protocol For Communication Between a Plurality of Modems"), to Scott and Zuranski, 08/781,067, now issued as 5,796,808 ("System and Method for Automatically Selecting the Mode of Communication between a Plurality of Modems"), to Scott and Lastinger Jr., 08/457,881, now issued as 5,793,809 ("Transparent Technique for Mu-Law Modems to Detect an All-Digital Circuit Connection"), to Holmquist, 08/912,126, now issued as 6,081,556 ("Transparent Technique for Mu-Law Modems to Detect an All-Digital Circuit Connection"), to Holmquist, and 08/978,536, now issued as 5,349,635 ("Half-Duplex or Full-Duplex Automode Operation for use in Data Communications Equipment"), to Scott (the "'761 Co-Pending Applications"). One or more Applicants were aware of the '761 Co-Pending Applications. Two of the '761 Co-Pending Applications include Robert

Redacted Document – Publicly Filed

Scott as a named inventor, and in the case of the '761 and '631 patents, he is the sole named inventor on both. Robert Scott was aware of the co-pendency of his applications. In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '761 patent and were aware of the '761 Co-Pending Applications.

(iv)    The prior art of record from the '761 Co-Pending Applications that Applicants failed to disclose, includes without limitation U.S. Patent Nos. 4,905,282 ("Feature Negotiation Protocol and Dynamically Adjustable Retraining Sequence for a High Speed Half Duplex Modem"), to McGlynn and Nash ("McGlynn"), 5,528,679 ("Automatic Detection of Digital Call Paths in a Telephone System"), to Taarud ("Taarud"), 4,680,773 ("Data Telecommunications System"), to Amundson ("Amundson"), and 4,782,498 ("Modem with Improved Handshaking Capability"), to Copeland, III ("Copeland") (the "'761 Co-Pending Art"). The '761 Co-Pending Art was material to the patentability of the '761 patent. Applicants for the '761 patent failed to identify any of '761 Co-Pending Art to the examiner in the prosecution of the '761 patent. Applicants were aware of the '761 Co-Pending Art. Robert Scott is the same and only named inventor on both the '631 and the '761 patents. Further, McGlynn was cited by the Examiner of the '631 patent in a Detailed Office Action and accompanying Notice of References Cited mailed on 9/12/97. The Applicants attempted to distinguish McGlynn in a First Response with Amendments on October 23, 1997. Notwithstanding the October 23, 1997 response, the PTO issued a Detailed Action rejecting the claims in the '631 patent based upon McGlynn in an office action dated November 18, 1997, while the application for the '761 patent remained co-pending, and Applicants nevertheless failed to disclose McGlynn in prosecution of the '761 patent. Further, Applicants for the '761 patent failed to disclose in prosecuting the '761 patent the office actions and responses from the co-pending '631 patent. In addition, on information and belief, a reasonable opportunity for discovery will show that Paradyne personnel substantively involved in the filing or prosecution of the '761 patent were aware of the '761 Co-Pending Art, as well as U.S. Patent Nos. 5,600,712 ("Enabling Technique for Quickly Establishing High Speed PSTN Connections In Telecommuting Applications"), to Hanson, 5,577,105 ("Telephone Call Routing and Switching Techniques for Data Communications"), to Baum, and 5,127,041 ("System and Method for Interfacing Computers to Diverse Telephone Networks"), to O'Sullivan. The undisclosed information described herein was material to patentability of the '761 patent and was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

Answer:  Denied. By way of further answer, the prosecution history of the '761 patent and the MPEP speak for themselves.

17.     Additional instances of misconduct occurred in prosecution of the '631 patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)    By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application. . . [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[for example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application.''

(ii)    Notwithstanding these clear obligations, during prosecution, Applicants repeatedly failed to disclose information within their knowledge as to co-pending applications of which they were aware, including without limitation co-pending application 08/458,048 (now the '761 patent, which is now commonly asserted here along with the '631 patent), as well as Application Nos. 08/781,787, now issued as U.S. Patent No. 5,751,796 ("Rapid Startup Protocol For Communication Between a Plurality of Modems") to Scott and Zuranski, and 08/780,238, now issued as U.S. Patent No. 5,787,363 ("System and Method for Connect Message Synchronization of Modems in a Cellular Data Gateway"), to Scott and Lastinger Jr. (the "'631 Co-Pending Applications"). Applicants for the '631 patent failed to identify any of these co-pending applications or their claims to the examiner in the prosecution of the '631 patent. These applications are never disclosed on an IDS that was submitted in the '631 patent or otherwise made of record in the '631 patent. One or more Applicants were aware of the '631 Co-Pending Applications during prosecution of the '631 patent. All of the '631 Co-Pending Applications include Robert Scott as a named inventor and two claim priority to the same provisional applications for which priority is claimed by the '631 patent. In the case of the '761 and '631 patents, he is the sole named inventor on both. In addition, on information and belief a reasonable opportunity for discovery will show that Paradyne personnel were substantively involved in the filing or prosecution of the '631 patent and were aware of the '631 Co-Pending Applications. The information relating to the '631 Co-Pending Applications was material to the patentability of the '631 Patent and was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)    Further, Applicants failed to disclose in prosecution of the '631 patent, the prior art of record from the '631 Co-Pending Applications, including without limitation U.S. Patent Nos. 5,550,881 ("Automatic Modulation Mode Selecting Unit and Method for Modems"), to Sridhar and Sheer ("Sridhar"), and 5,528,679 ("Automatic Detection of Digital Call Paths in a Telephone System"), to Taarud ("Taarud") (the "'631 Co-Pending

Art"). The Applicants did not disclose the '631 Co-Pending Art during prosecution of the '631 patent. Applicants were aware of the '631 Co-Pending Art during prosecution of the '631 patent. Robert Scott is the same and only named inventor on both the '631 and the '761 patents. Further, Sridhar was cited by the Examiner of the '761 patent and used for claim rejections in a Detailed Office Action and accompanying Notice of References Cited dated December 26, 1996. The '631 and '761 patent were co-pending on December 26, 1996, and the '631 patent did not issue until December 22, 1998. While the '631 patent remained co-pending, Applicants attempted to distinguish Sridhar in a Response and Amendment transmitted March 31, 1997. Applicants for the '631 patent failed to disclose in prosecuting the '631 patent, the December 26, 1996 office action and the March 31, 1997 response from the co-pending '761 patent or the prior art of record referenced in those communications. In addition, on information and belief a reasonable opportunity for discovery will show that Paradyne personnel substantively involved in the filing or prosecution of the '631 patent were aware of the '631 Co-Pending Art, as well as U.S. Patent Nos. 5,600,712 ("Enabling Technique for Quickly Establishing High Speed PSTN Connections In Telecommuting Applications"), to Hanson, 5,577,105 ("Telephone Call Routing and Switching Techniques for Data Communications"), to Baum, 5,127,041 ("System and Method for Interfacing Computers to Diverse Telephone Networks"), to O'Sullivan, 4,680,773 ("Data Telecommunications System"), to Amundson ("Amundson"), and 4,782,498 ("Modem with Improved Handshaking Capability"), to Copeland, III ("Copeland"). The '631. Co-Pending Art and information described in this paragraph was material to patentability of the '631 patent. The '631 Co-Pending Art and information described in this paragraph was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim. In addition, on information and belief, a reasonable opportunity for discovery will show that Robert Scott was improperly listed as sole inventor of the '631 patent with deceptive intent to defraud the PTO into issuing the patent over the '761 patent.

Answer: Denied. By way of further answer, the prosecution history of the '631 patent and the MPEP speak for themselves.

18.    Additional instances of misconduct occurred in prosecution of the '444 patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)    By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question." The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application. . . ." [T]he applicant has the burden of presenting the examiner

with a complete and accurate record to support the allowance of letters patent." The MPEP provides express examples of material information as to other co-pending applications, stating "[for example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)     On information and belief, a reasonable opportunity for discovery will show that one or more Applicants was aware of U.S. Patent No. 3,978,407 ("East Start-Up Adaptive Equalizer Communication System Using Two Data Transmission Rates"), to Forney and Hart. Applicants failed to disclose this patent to the PTO in prosecution of the '444 patent. This reference was material to patentability of the '444 patent. On information and belief, a reasonable opportunity for discovery will show that Applicants knew of and withheld this reference with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)     In addition, on information and belief a reasonable opportunity for discovery will show that Paradyne offered for sale MVL technology more than one year before applying for the '444 patent, that was material to the '444 patent, but failed to disclose those sales as prior art to the PTO. The withheld information was material to patentability and, on information and belief a reasonable opportunity for discovery will show that this information was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

Answer:  Denied.  By way of further answer, the prosecution history of the '444 patent and the MPEP speak for themselves.


19.     Additional instances of misconduct occurred during the prosecution of the '159 patent, where Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by omitting and misstating material information with intent to deceive including the following acts:

(i)     In prosecution of the '159 patent, the PTO repeatedly rejected pending claims due to prior art, including without limitation references to Lang and Mon.  In response to these and other rejections, Applicants represented that claims required and that they had invented a system that included a "displacement multibit memory address." However, Applicants lacked support for the invention as represented to the PTO. Applicants misstated and omitted this material information with intent to deceive the PTO into issuing the claims.  These material misstatements and omissions were made with intent to deceive, as further confirmed by the pattern and practice of inequitable conduct alleged throughout this Counterclaim.  Further, the '234 patent is a divisional of

the '159 patent, refers back to acts occurring in prosecution of the '159 patent, and is infected by the unenforceability associated with the '159 patent.

(ii)     In addition, on information and belief, a reasonable opportunity for discovery will show that the Applicants offered the invention on-sale or placed it in public use more than one year before the application date, and applicants withheld this information which was material to patentability with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

Answer:  Denied.  By way of further answer, the prosecution history of the '159 patent and the MPEP speak for themselves.

20.     Additional instances of misconduct occurred in prosecution of the '858 patent, Applicants engaged in inequitable conduct before the PTO rendering the patent unenforceable by withholding and failing to disclose material information with intent to deceive including the following acts:

(i)     By way of example, MPEP § 2001.06(b) states that there is "a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question."  The MPEP cites to caselaw providing that "[W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application..."  [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent."  The MPEP provides express examples of material information as to other co-pending applications, stating '[f]or example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications.  Similarly, the prior art references from one application must be made of record in another subsequent application if such prior art references are 'material to patentability' of the subsequent application."

(ii)     Notwithstanding these clear obligations, Applicants failed to disclose in prosecution of the '858 patent, the material prior art of record from Application No. 08/607,912, now issued as U.S. Patent No. 5,754,799 ("System and Method for Bus Contention Resolution"), to Hiles, including without limitation U.S. Patent Nos. 4,608,700 ("Serial Multi-Drop Data Link"), to Kirtley, Sterling, and Williams, and 5,398,243 ("Arbitration Method and Bus for Serial Data Transmission"), to Aguilhon, Doucet, and Karcher (the "'858 Co-Pending Art").  The Applicants did not disclose the '858 Co-Pending Art during prosecution of the '858 patent.  On information and belief, a reasonable opportunity for discovery will show that one or more Applicants was aware of the '858 Co-Pending Art during prosecution of the '858 patent.  This undisclosed

information was material to patentability of the '858 patent. On information and belief, a reasonable opportunity for discovery will show this information was withheld with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

(iii)   In addition, one or more Applicants was aware of U.S. Patent No. 4,797,815 ("Interleaved Synchronous Bus Access Protocol for a Shared Memory Multi-Processor System"), to Moore (the same inventor as the '858), and, on information and belief, a reasonable opportunity for discovery will show one or more Applicants was aware of U.S. Patent Nos. 3,997,896 ("Data Processing System Providing Split Bus Cycle Operation"), to Cassarino, Jr., Bekampis, Conway, and Lemay, 4,181,974 ("System Providing Multiple Outstanding Information Requests"), to Lemay and Curley, and 4,669,056 ("Data Processing System with a Plurality of Processors Accessing a Common Bus to Interleaved Storage"), to Waldecker and Wright. Applicants failed to disclose these patents to the PTO in prosecution of the '858 patent. These references were material to patentability of the '858 patent and on information and belief a reasonable opportunity for discovery will show that Applicants knew of and withheld them with intent to deceive the PTO, as is particularly shown by the continuing pattern and practice of nondisclosure referenced in this Counterclaim.

Answer:  Denied.  By way of further answer, the prosecution history of the '858 patent and the MPEP speak for themselves.

## Count II—Inequitable Conduct Regarding Prosecution of the '627 Patent

21.   Charter restates and incorporates by reference its allegations in paragraphs 1-12 of its Counterclaims.

Answer:  Rembrandt and Remstream repeat and re-allege their responses to paragraphs 1 through 20 and incorporate them herein by reference.

22.   The claims of the '627 patent are unenforceable due to the inequitable conduct of one or more of the named inventors and/or others having substantive involvement in prosecuting the '627 patent application. These individuals include, but are not limited to, William L. Betts, Edward S. Zuranski, Ronald D. Slusky and Gerard A. deBlasi ("'627 Procurement Team").

Answer:  Denied.

Misrepresentation Of Prior Art

23.   On information and belief, the '627 Procurement Team made false material statements to the United States Patent and Trademark Office ("the PTO") with the intent to

deceive the PTO during the prosecution of the patent application which led to the issuance of the '627 patent (Ser. No. 748,594, hereinafter "'627 patent application").

Answer: Denied.

24.   In particular, during the prosecution of the '627 patent application, one of the prosecuting attorneys, Gerard A. deBlasi, represented to the PTO that "[t]he Prior Art, as described in Applicants' patent application, does not teach independently trellis encoding a plurality of streams of trellis bits" and that "[t]he Prior Art clearly does not include a plurality of trellis encoders to independently encode a plurality of streams of trellis bits as in Applicants' invention." (12/24/92 Amendment filed in '627 patent application, at 5, 6).

Answer: Admitted that the prosecution history of the '627 patent speaks for itself. The remaining allegations of Paragraph 24 are denied.

25.   The Prior Art described by the applicants in the '627 patent application included United States Patent No. 4,677,625 (the "'625 patent"). The '625 patent discloses a plurality of trellis encoders to independently encode a plurality of streams of trellis bits, contrary to Mr. deBlasi's statements to the PTO.

Answer: Admitted that the '625 patent is referenced in the '627 patent application. By way of further answer, the prosecution history of the '627 patent application and the '625 patent speak for themselves. By further response, it is denied that Mr. deBlasi made any false or improper statements to the PTO.

26.   Mr. deBlasi's false statements were material because they were made to overcome prior art asserted by the PTO in rejecting pending claims. Consequently, Mr. deBlasi's statements are material.

Answer: Denied. It is specifically further denied that Mr. deBlasi made any false or improper statements to the PTO, or that the statements referred to were material.

27.   On information and belief, Mr. deBlasi made false material statements to the PTO during the prosecution of the '627 patent application.

Answer: Denied.

28.   On information and belief, these false material statements were made with intent to deceive the PTO.

Answer: Denied.

29.    These false material statements constitute a breach of the '627 Procurement Team's duty of candor and good faith owed to the PTO. Consequently, this misconduct bars the enforcement of the '627 patent.

Answer:  Denied.

## Intentional Withholding Of Material Prior Art References

30.    On information and belief, the '627 Procurement Team intentionally withheld material information with the intent to deceive the PTO during the prosecution of the '627 patent application.

Answer:  Denied.

31.    In particular, the '627 Procurement Team failed to disclose United States Patent No. 4,641,327 ("the '327 patent"), United States Patent No. 5,052,000 ("the '000 patent"), United States Patent Application No. 363,793 ("the '793 application"), United States Patent No. 5,056,112 ("the '112 patent"), United States Patent Application No. 457,438 ("the '438 application"), United States Patent No. 5,105,442 ("the '442 patent"), United States Patent Application No. 611,200 ("the '200 application"), United States Patent No. 5,214,656 ("the '656 patent") and United States Patent Application No. 627,156 ("the '156 application") to the PTO.

Answer:  Denied.  By way of further answer, the prosecution history of the '627 patent and the referenced patents and prosecution histories speak for themselves, and it is specifically denied that persons responsible for procurement of the '627 patent "failed to disclose" any matter they were obligated to disclose.

32.    On information and belief, the '627 Procurement Team failed to disclose the '327 patent to the PTO. The '327 patent is entitled "Frame Synchronization in Trellis-Coded Communication Systems," and was issued to Lee-Fang Wei on February 3, 1987.

Answer:  Denied.  By way of further answer, the prosecution history of the '627 patent and the '327 patent speak for themselves, and it is specifically denied that persons responsible for procurement of the patent "failed to disclose" any matter they were obligated to disclose.

33.    On information and belief, one or more members of the '627 Procurement Team were aware of the '327 patent prior to issuance of the '627 patent.

Answer:  Rembrandt and Remstream are without sufficient information to form a belief as to the allegations in Paragraph 33, and therefore deny them.

34.    On information and belief, the '627 Procurement Team withheld the '327 patent with intent to deceive the PTO.

Answer:  Denied.

35.    On information and belief, one or more members of the '627 Procurement Team were aware that the '327 patent contained material information including, but not limited to the following:

(i)    "Another general feature of the invention is an interleaver that changes the original sequence of signal points to a revised sequence for transmission and a deinterleaver that changes the received sequence of signal points in a manner that will restore the original sequence." ('327 Col. 1:51-56; see also 2:18-20.)

(ii)    "The communication system is a trellis-coded modulation system. Each signal point is two-dimensional. The two-dimensional points are grouped into multi-dimensional points." ('327 Col. 1:59-62.)

(iii)    [E]ncoders and grouping device 18 deliver to interleaver 19, N pairs of in-phase and quadrature coordinates in series, one pair in each signaling interval, each pair corresponding to a point in a two-dimensional (2D) signal constellation. Interleaver 19 reorders the coordinate pairs. . ('327 Col. 2:68-3:5.)

Answer:  Denied. By way of further answer, the '327 patent speaks for itself.

36.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '327 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

Answer:  Denied.

37.    On information and belief, the '627 Procurement Team failed to disclose the '000 patent to the PTO. The '000 patent is entitled "Technique for Improving the Operation of Decision Feedback Equalizers in Communications Systems Utilizing Error Correction," and was issued to Jin-Der Wang and Jean-Jacques Werner on September 24, 1991. The '627 Procurement Team also failed to disclose the existence of the '793 application to the PTO. The '793 application was filed on June 9, 1989, and eventually issued as the '000 patent.

Answer:    Denied.  By way of further answer, the prosecution history of the '627 patent speaks for itself, and it is specifically denied that persons responsible for procurement of the patent "failed to disclose" any matter they were obligated to disclose. By further response, the '000 patent and '793 application speak for themselves.

38.    On information and belief, one or more members of the '627 Procurement Team were aware of the '793 application and the '000 patent prior to issuance of the '627 patent.

Answer:  Rembrandt and Remstream are without sufficient information to form a belief as to the allegations in Paragraph 38, and therefore deny them.

39.    On information and belief, the '627 Procurement Team withheld the '793 application and the '000 patent with intent to deceive the PTO.

Answer:  Denied.

40.    On information and belief, one or more members of the '627 Procurement Team were aware that the '793 application and the '000 patent contained material information including, but not limited to the following:

(i)    "The use of plural coders provide interleaving of the transmitted symbols and, accordingly, each decoder is operative upon every Mth symbol, where M is the number of encoders or decoders.  If M is properly chosen, the probability of noise impairing the recovery of two successive symbols by any decoder is reduced." ('000 Col. 2:20-24.)

(ii)    "Illustratively, encoders 206-i may each be a convolutional encoder of the type that is used in a standard trellis encoder. Switch 207 takes the outputs of encoders 206-i, preferably in a cyclic fashion, and feeds them to symbol mapping apparatus 208 which generates two-dimensional symbols . . . ." ('000 Col. 4:36-42; see also 8:1-4.)

(iii)    "[W]hile the present invention has been described in reference to particular two-dimensional signal constellations, the invention is also applicable to other two-dimensional signal constellations.  Indeed, the present invention is applicable to signal constellations having other than two dimensions." ('000 Col. 7:60-65.)

Answer:  Denied.  By way of further answer, the '793 application and the '000 patent speak for themselves.

41.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '793 application and/or the '000 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

Answer:  Denied.

42.    On information and belief, the '627 Procurement Team failed to disclose the '112 patent to the PTO.  The '112 patent is entitled "Interleaving in Coded Modulation for Mobile

Radio," and was issued to Lee-Fang Wei on October 8, 1991. The '627 Procurement Team also failed to disclose the existence of the '438 application to the PTO. The '438 application was filed on December 27, 1989, and eventually issued as the '112 patent.

Answer: Denied. By way of further answer, the prosecution history of the '627 patent speaks for itself, and it is specifically denied that persons responsible for procurement of the '627 patent "failed to disclose" any matter that they were obligated to disclose. By further response, the '112 patent and '438 application speak for themselves.

43.    On information and belief, one or more members of the '627 Procurement Team were aware of the '438 application and the '112 patent prior to issuance of the '627 patent.

Answer: Rembrandt and Remstream are without sufficient information to form a belief as to the allegations in Paragraph 43, and therefore deny them.

44.    On information and belief, the '627 Procurement Team withheld the '438 application and the '112 patent with intent to deceive the PTO.

Answer: . Denied.

45.    On information and belief, one or more members of the '627 Procurement Team were aware that the '438 application and the '112 patent contained material information including, but not limited to the following:

(i)    "Interleavers used in fading channel applications can be matched to a particular trellis or block code being used. . . . Matching both the interleaver and the code increases the separation between interdependent signal points and provides an improvement in error performance." ('112 Abstract.)

(ii)    . "As an illustration, assume that N is equal to four (an eight-dimensional code) so that four interdependent signal points would be produced for each codeword every four signalling intervals." ('112 Col. 4:39-43.)

(iii)    "In accordance with the invention, FIG. 14 illustrates the operation of the interleaver on the illustrative trellis code (with two-fold time diversity between successive signal points) of FIG. 10." ('112 Col. 10:14-17.)

Answer: Denied. By way of further answer, the '438 application and the '112 patent speak for themselves.

46.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '438 application and/or the '112 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

Answer:  Denied.

47.    On information and belief, the '627 Procurement Team failed to disclose the '442 patent to the PTO. The '442 patent is entitled "Coded Modulation with Unequal Error Protection," and was issued to Lee-Fang Wei on April 14, 1992. The '627 Procurement Team also failed to disclose the existence of the '200 application to the PTO. The '200 application was filed on November 7, 1990, and eventually issued as the '442 patent.

Answer:  Denied.  By way of further answer, the prosecution history of the '627 patent speaks for itself, and it is specifically denied that persons responsible for procurement of the '627 patent "failed to disclose" any matter that they were obligated to disclose.  By further response, the '442 patent and '200 application speak for themselves.

48.    On information and belief, one or more members of the '627 Procurement Team were aware of the '200 application and the '442 patent prior to issuance of the '627 patent.

Answer:  Rembrandt and Remstream are without sufficient information to form a belief as to the allegations in Paragraph 48, and therefore deny them.

49.    On information and belief, the '627 Procurement Team withheld the '200 application and the '442 patent with intent to deceive the PTO.

Answer:  Denied.

50.    On information and belief, one or more members of the '627 Procurement Team were aware that the '200 application and the '442 patent contained material information including, but not limited to the following:

(i)    "In accordance with the invention, as described more fully hereinbelow, the respective groups of bits on leads 112 and 113 are extended to channel encoders-- illustratively trellis encoders -- 114 and 115 which generate, for each symbol interval, respective expanded groups of the expanded r and p bits on leads 121 and 122, where r>m and p>k." ('442 Cot. 4:30-36; see also 9:3-4; 12:33-36.)

(ii)    "Decoding in the case where multi-dimensional symbols are used--such as the four-dimensional examples described below--is carried out in a similar manner, as will be appreciated by those skilled in the art." ('442 Cot. 8:27-30; see also 8:49-9:11.)

      (iii)   "A further protection against impulse noise for the most important bits in coded modulation schemes based on constellations of the type of FIG. 8 can be achieved by rearranging the bits that are output by channel encoder 114 so that bits that are generated in proximity to one another by the encoder are separated from one another as much as possible, given that the system delay constraints are met. To this end, channel encoder 114 may include a bit interleaver, which performs such rearrangement, as shown in FIG. 15." ('442 Col. 9:40-49.)

Answer:    Denied. By way of further answer, the '200 application and the '442 patent speak for themselves.

51.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '200 application and/or the '442 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

Answer: Denied.

52.    On information and belief, the '627 Procurement Team failed to disclose the '656 patent to the PTO. The '656 patent is entitled "Multiplexed Coded Modulation With Unequal Error Protection," and was issued to Hong Y. Chung, Jin-Der Wang and Lee-Fang Wei on May 25, 1993. The '627 Procurement Team also failed to disclose the existence of the '156 application to the PTO. The '156 application was filed on December 13, 1990, and eventually issued as the '656 patent.

Answer:    Denied. By way of further answer, the prosecution history of the '627 patent speaks for itself, and it is specifically denied that persons responsible for procurement of the '627 patent "failed to disclose" any matter that they were obligated to disclose. By further response, the '656 patent and the '156 application speak for themselves.

53.    On information and belief, one or more members of the '627 Procurement Team were aware of the '156 application and the '656 patent prior to issuance of the '627 patent.

Answer:    Rembrandt and Remstream are without sufficient information to form a belief as to the allegations in Paragraph 53, and therefore deny them.

54.    On information and belief, the '627 Procurement Team withheld the '156 application and the '656 patent with intent to deceive the PTO.

Answer: Denied.

55.    On information and belief, one or more members of the '627 Procurement Team were aware that the '156 application and the '656 patent contained material information including, but not limited to the following:

(i)    "Specifically, and in accordance with the present invention, unequal error protection is provided for a signal comprised of a plurality of classes of information by a) separately coding each one of the plurality of classes of information using a different coded modulation scheme and b) multiplexing the plurality of coded outputs for transmission." ('656 Col. 2: 10-17.)

(ii)    "Each class of information is then separately coded by a different, and conventional, coded modulation scheme, e.g., a 4D 8-state trellis code and a uniformly-spaced QAM signal constellation." ('656 Col. 2:21-24; see also 5:55-61; 6:26-52.)

(iii)    "Also, the coded modulation scheme for each class of information can be enhanced using interleaving techniques, or more complex coded modulation schemes, to protect against other forms of noise, e.g., to protect against 'colored' noise." ('656 Col. 7:26-30.)

Answer:  Denied.  By way of further answer, the' 156 application and the '656 patent speak for themselves.

56.    Because, on information and belief, one or more members of the '627 Procurement Team intentionally withheld the '156 application and/or the '656 patent with the intent to deceive the PTO, the '627 patent is unenforceable.

Answer:  Denied.

57.    On information and belief, one or more members of the '627 Procurement Team made false material statements to the PTO and withheld several material patents and/or patent applications from the PTO during the prosecution of the '627 patent. This behavior demonstrates a pattern of bad faith and intent to deceive the PTO.  Consequently, for the reasons stated above, the '627 Procurement Team breached their duty of candor and good faith owed to the PTO and this breach bars the enforcement of the '627 patent.

Answer:  Denied.

## State Law Claims
### Creation of the ATSC Standard

58.    The American Television Systems Committee ("ATSC") is a private standard setting organization ("SSO") organized according to the policies of the American National Standards Institute.  Following a multi-year competitive bidding process for the technology that

would become the standard for terrestrial digital television broadcasting, the ATSC published the AISC A-53 Digital Television Standard ("ATSC standard") on or about September 16, 1995.

Answer: Admitted that the ATSC published the ATSC standard on or about September 16, 1995. The remaining allegations of Paragraph 58 are denied as stated.

59.    As a condition for participating in the ATSC's standard development, American Telephone and Telegraph Company ("AT&T")—the original owner of the '627 patent during the ATSC standard setting process—was required to agree, and did agree, to abide by the ATSC Patent Policy that required all ATSC participants to license any proprietary technology essential for ATSC compliance either without compensation or on fair, reasonable, and nondiscriminatory ("FRAND") terms. On or about January 12, 1995, AT&T promised that it would license its patents, to the extent they are essential to implementation of the ATSC standard, under reasonable terms and conditions on a non-discriminatory, non-exclusive basis.

Answer: Admitted that on or about January 12, 1995, AT&T IPM wrote a letter, which is a writing that speaks for itself. The remaining allegations of Paragraph 59 are denied.

60.    Besides the technology that Rembrandt currently alleges infringes the '627 patent, at all relevant times multiple other alternative and then-competing technologies were available to the ATSC for incorporation into the standard. Had the ATSC known that any ATSC signatory or its successor would repudiate its FRAND obligations and assert that the '627 patent covers all or part of the standard, the ATSC would have adopted one of the then-competing technologies.

Answer: Denied.

61.    On or about December 24, 1996, the Federal Communication Commission ("FCC") adopted the ATSC standard as the mandatory standard for terrestrial digital television broadcasting in the United States. In adopting the ATSC standard, the FCC explicitly conditioned its adoption on all ATSC participants, including AT&T, agreeing to license essential proprietary technology on FRAND terms.

Answer: Admitted that on or about December 24, 1996, the Federal Communication Commission adopted the ATSC standard. The alleged legal obligations associated with the standard are a matter of law to which no response is required. The remaining allegations of Paragraph 61 are denied.

62.    If the FCC had known that an ATSC signatory or its successor would repudiate its FRAND obligations, and would assert that its patent(s) were essential to the ATSC standard, then the FCC would have adopted one of the competing standards.

Answer: Denied.

63.    Both ATSC and the FCC relied on AT&T's and others' FRAND commitments in adopting the ATSC standard not only as a voluntary industry standard, but also a government mandated standard.  As the only technology accepted by the FCC for broadcasting terrestrial digital television in the United States, Charter and its content providers must implement and follow the standard by at least no later than the upcoming deadline set by Congress for transition to a digital television format.  Charter has already invested a significant amount of time, energy and money into implementing the ATSC standard.

Answer:  The first sentence is denied.  The allegations in the second sentence are a matter of law to which no response is required.  Rembrandt and Remstream lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 63, and therefore deny them.

64.    Congress has established February 17, 2009 as the deadline for the final transition from an analog to a digital system for terrestrial broadcast television in accordance with the ATSC standard.  Charter will be required to comply with the ATSC standard if they wish to provide their subscribers with any content from terrestrial broadcast television at all in the United States.

Answer:  The allegations in the first sentence are a matter of law to which no response is required.  Rembrandt and Remstream lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 64, and therefore deny them.

## Rembrandt's Repudiation of its FRAND Commitment to ATSC

65.    AT&T owned the '627 patent at the time the ATSC promulgated the ATSC standard, and before the FCC adopted that standard as a government-mandated standard.  After the FCC adopted the ATSC standard, in or around December 2004, Rembrandt acquired the '627 patent from Paradyne Networks, Inc. ("Paradyne"), a former subsidiary or affiliate of AT&T, successor-in-interest to AT&T with respect to the rights and obligations associated with the '627 patent, and now a wholly owned subsidiary of Zhone Technologies ("Zhone").  Paradyne obtained its ownership rights to the '627 patent from AT&T.  AT&T and its successors-in-interest to the '627 patent were and are bound by the FRAND licensing commitment that AT&T made to the ATSC.  As a successor-in-interest to the '627 patent, Rembrandt also is bound by that FRAND licensing commitment to the extent that the patent covers technologies necessary to implement or comply with the ATSC standard.

Answer:  Admitted that AT&T was the original owner of the '627 patent.  The remaining allegations of Paragraph 65 are denied.

66.    Rembrandt claims that the '627 patent is "essential" to the ATSC standard.  But Rembrandt has disavowed, reneged on, and repudiated the FRAND licensing commitment that its predecessors-in-interest made to ATSC and by which its predecessors-in-interest were bound.

Answer:  Admitted that the '627 patent is "essential" to the implementation of the ATSC standard.  The remaining allegations of Paragraph 66 are denied.

67.    AT&T, as a predecessor-in-interest to the '627 patent, never claimed that the '627 patent was essential to the ATSC standard.  And through its acts and omissions, AT&T implicitly denied the '627 patent applied to the AISC standard.

Answer:  Rembrandt and Remstream lack knowledge or information sufficient to form a belief as to the allegations in the first sentence of this Paragraph 67, and therefore deny them.  The allegations in the second sentence of Paragraph 67 are denied.

68.    Rembrandt sued Charter and other MSOs without first providing any prior notice of the '627 patent and without offering any license, let alone a license on FRAND terms.  After Rembrandt sued Charter and other MSOs, Rembrandt demanded exorbitant royalties from Charter and others that far exceeded any royalty based on FRAND.  These demands directly harm Charter and the other MSOs and threaten the benefits that inure to all those who use the ATSC standard.

Answer:  Denied.

69.    After acquiring the '627 patent, Rembrandt intentionally repudiated any FRAND commitment with respect to the allegedly essential '627 patent.

Answer:  Denied.

70.    Rembrandt acquired the '627 patent with the specific intent to repudiate, in bad faith, its FRAND obligations and to obtain exorbitant royalties far in excess of FRAND.

Answer:  Denied.

71.    Rembrandt has expressly denied having any FRAND obligations. For example, upon information and belief, it denied owing any such obligation to Harris Corporation, a manufacturer of digital transmission devices, in a complaint it filed in Delaware state court in 2007.

Answer:  Admitted that Rembrandt sued Harris Corporation in Delaware state court and that Rembrandt's complaint in that action speaks for itself and that Rembrandt has no "FRAND" obligations with respect to the '627 patent.  The remaining allegations of Paragraph 71 are denied.

72.     Rembrandt seeks non-FRAND term royalties from Charter, who must according to Rembrandt's allegations pay an exorbitant royalty far in excess of FRAND for practicing the mandated ATSC standard, or cease receiving terrestrial digital broadcast television signals in the United States.

Answer: Denied.

73.     Rembrandt's acquisition of the '627 patent has now subjected Charter to Rembrandt's patent infringement suit, whereas AT&T could not and would not have asserted such suit. Because AT&T implicitly denied application of the '627 patent to the ATSC standard, and because they could not charge greater than FRAND terms in any event, Rembrandt has harmed Charter in a way its predecessors could not and would not have done.

Answer: Denied.

## Creation of the DOCSIS Specification

74.     Beginning in the mid-1990s, work began to develop a technical specification for the delivery of high-speed data over cable television networks. In 1997, the first version of Data Over Cable Services Interface Specifications (DOCSIS) was released by CableLabs.

Answer:   Rembrandt and Remstream lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 74, and therefore deny them.

75.     The goal in the development of DOCSIS was to specify interface requirements so that cable operators and their subscribers would be able to purchase affordable, interchangeable, highly functional cable modems and other equipment from multiple suppliers. To ensure that customers who purchased cable modems would receive products that were fully compatible with the DOCSIS standard, CableLabs established a certification program to identify DOCSIS-compliant manufacturers. Certified equipment could then be used in cable systems supporting DOCSIS, and cable operators could then ensure that the equipment used on their network is DOCSIS certified.

Answer:   Rembrandt and Remstream lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 75, and therefore deny them.

76.     On information and belief, both during and after the DOCSIS standardization process, and prior to filing lawsuits against Charter and other MSOs, neither Rembrandt nor its Paradyne predecessors-in-interest informed CableLabs or cable equipment vendors that they had intellectual property they believed read on or covered the DOCSIS standard.

Answer:  This allegation is unintelligible, and is therefore denied.  For example, the time period corresponding to "both during and after the DOCSIS standardization process, and prior to filing lawsuits against . . ." is not comprehensible.  By way of further answer, there is no DOCSIS "standard" or DOCSIS "standardization" process.  DOCSIS is a specification, rather than a standard.

77.    To facilitate efficient licensing of patented technology essential to implement the original DOCSIS specification and subsequent versions, CableLabs developed a patent pool for such intellectual property.  CableLabs announced the DOCSIS patent pool in July 1998.  Companies contributing technology essential to the DOCSIS standardization effort signed an agreement, entitled, "Data Over Cable Service Interface Specifications License Agreement."

Answer:  Rembrandt and Remstream lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 77, and therefore deny them.

78.    DOCSIS patent pool members contribute a non-exclusive, royalty-free license to any intellectual property rights they have that are essential to comply with the DOCSIS specifications.  In exchange for this grant to the patent pool, DOCSIS pool members receive non-exclusive, royalty-free licenses to the patent pool intellectual property to the extent it is essential to comply with the DOCSIS specification.

Answer:  Rembrandt and Remstream lack knowledge or information sufficient to form a belief as to the allegations in Paragraph 78, and therefore deny them.

79.    Rembrandt and Remstream contend that they have not signed, nor are bound by, the DOCSIS License Agreement.

Answer:  Admitted.

Rembrandt's Breach of the DOCSIS Licensing Agreement



Redacted Document – Publicly Filed



Redacted Document – Publicly Filed



89.    Remstream—either alone or through partnerships with ▮▮▮▮▮ and others—lacks the capacity to meet U.S. demand for DOCSIS-compliant cable modems. Rembrandt's efforts to establish its entity Remstream as the sole supplier of cable modems is not being done for any legitimate business purposes but rather to conjure up an advantage in litigation.

Answer:  Denied.

Redacted Document – Publicly Filed

90.    Upon information and belief, Rembrandt has also reached an agreement with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a cable systems provider, to further its scheme of attempting to further its litigation aims, not any legitimate business purpose. On information and belief, this scheme is intended to support Rembrandt's false claim that it is a practicing entity that has suffered damages as a purported competitor in the cable systems market.

Answer:  Denied.

91.    An actual case or controversy exists between the Comcast Counter-Counterclaimants (sic) and Rembrandt as to the infringement, validity, and enforceability of Rembrandt's asserted patents.

Answer:  Admitted.

**Count III— Breach of Contract and Specific Performance re ATSC**

92.    Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

Answer:  Rembrandt and Remstream repeat and re-allege their responses to paragraphs 1 through 91 and incorporate them herein by reference.

93.    As set forth above, Rembrandt took title to the '627 Patent subject to AT&T's FRAND commitment, and is therefore required to license it in good faith and to grant FRAND license terms to any user of the ATSC standard, including Charter and its equipment suppliers.

Answer:  Denied.

94.    Alternatively, Charter is an intended third-party beneficiary of AT&T's contract with the ATSC in that the ATSC and those who participated in the ATSC standard setting process (including AT&T) intended all manufacturers of ATSC-compliant equipment to have available to them FRAND licensing terms, which would inure to the benefit of purchasers of such ATSC-compliant equipment, including MSOs such as Charter. Charter has standing to enforce AT&T's promise to grant FRAND licenses against AT&T's successor-in-interest, Rembrandt.

Answer:  Denied.

95.    Rembrandt has breached its obligations by refusing to offer a license in good faith and by failing to license on FRAND terms.

Answer:  Denied.

96.     As a result of Rembrandt's breaches, Charter has been irreparably injured in its business or property through the loss of customers and potential customers, by the loss of goodwill and product image, by the prospective damage to their business to the extent it relies upon the ATSC standard, and by the continuing threat of patent infringement litigation.

Answer:  Denied.

97.     As a result of Charter's injuries, Charter seeks specific performance of Rembrandt's contractual obligations to offer licenses in good faith and on FRAND terms.

Answer:  Admitted that Charter seeks specific performance but denied that it is entitled to any requested relief.  The remaining allegations of Paragraph 97 are denied.

98.     Charter has no adequate remedy at law.

Answer:  Denied.

99.     In addition to an order requiring Rembrandt to specifically perform its contractual obligations, Charter also seeks damages for the injuries they have incurred and continue to incur, in an amount to be proven at trial.

Answer:  Admitted that Charter seeks specific performance and damages but denied that it is entitled to any relief whatsoever.

**Count IV — Declaratory Judgment of Contractual Rights and Liabilities re ATSC**

100.     Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

Answer:  Rembrandt and Remstream repeat and re-allege their responses to paragraphs 1 through 99 and incorporate them herein by reference.

101.     An actual controversy exists between Charter and Rembrandt regarding Charter's right to license the '627 Patent on FRAND terms.

Answer:  Admitted that an actual controversy exists between Charter and Rembrandt, but denied as stated with regard to "FRAND."

102.    Charter is entitled to a declaratory judgment that: (i) Charter is entitled to license the '627 Patent on FRAND terms; (ii) Rembrandt's refusal to provide FRAND licenses, despite its obligation to do so, is a breach of contract; (iii) Charter is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and are entitled to enforce those obligations and to recover damages due to said breach of contract; and/or (iv) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology covered by the '627 patent, if essential to the ATSC standard as Rembrandt contends, on FRAND terms.

Answer: Denied.

## Count V — Breach of Contract and Specific Performance re DOCSIS

103.    Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

Answer: Rembrandt and Remstream repeat and re-allege their responses to paragraphs 1 through 102 and incorporate them herein by reference.

104.    Charter is an intended third-party beneficiary of the DOCSIS License Agreement entered into by various signatories, including ██████████████████████ Those who participated in the DOCSIS standard-setting process, and in particular the signatories to the DOCSIS License Agreement, intended all manufacturers and providers of DOCSIS-compliant equipment and services to have available to them such royalty-free licenses to patent claims deemed essential for compliance with DOCSIS, subject to the terms of the DOCSIS License Agreement, which would inure to the benefit of purchasers and operators of such DOCSIS-compliant equipment, including MSOs such as Charter. Charter has standing to enforce each DOCSIS License Agreement's signatory's promise to grant royalty-free licenses under the DOCSIS License Agreement.

Answer: The first and last sentences are legal conclusions to which no response is required. The remaining allegations of Paragraph 104 are denied.

105.    As set forth above, ████████ signed and was bound by the terms of the DOCSIS License Agreement. Under those terms, ████████ and any of its affiliates agreed to grant a nontransferable, worldwide, nonexclusive, and royalty-free license to any of its patent claims deemed essential for DOCSIS compliance to CableLabs, which in turn sublicensed such rights to all other signatories to the DOCSIS License Agreement. ████████████████████ ████████

Answer: Admitted that ████████ is a party to a certain DOCSIS License Agreement, which is a writing that speaks for itself. The alleged terms of such DOCSIS License Agreement

are a matter of law to which no response is required. The remaining allegations of Paragraph 105 are denied.

106. As alleged above, Rembrandt assisted ███████████ in obtaining CableLabs certification for modems that Rembrandt intended to resell. Rembrandt did so for the specific purpose of partnering with ███████████████████████████████████ under the DOCSIS License Agreement while attempting to avoid its corresponding obligation to grant a royalty free license under its own patents. Rembrandt engaged in this scheme to portray itself misleadingly as a true practicing entity in the cable modem business, solely for the purposes of seeking lost profits and/or injunctive relief from Charter, among others.

Answer: Denied.

107. Rembrandt has, or had a relationship, both business and legal, with ███████████ such that they effectively acted as, partners, joint venturers, alter egos of each other, and/or agent and principal. Alternatively, Rembrandt adopted, confirmed and ratified ███████████ entering into the DOCSIS License Agreement when it entered into its business relationship with ███████████

Answer: Denied.

108. As a result, Rembrandt has been and continues to be bound by ███████████ obligations under the DOCSIS License Agreement. Rembrandt has breached its obligations by refusing to offer in good faith a royalty-free license, as provided for under the DOCSIS License Agreement, to the patents it alleges are essential for DOCSIS compliance while simultaneously assuming ███████████ rights under the DOCSIS License Agreement to royalty-free licenses to others' patents essential for compliance with the standard for purposes of portraying itself as a business competitor.

Answer: Denied.

109. As a result of Rembrandt's breaches, Charter has been irreparably injured or threatened with irreparable injury.

Answer: Denied.

110. As a result of Charter's injuries, Charter seeks specific performance of Rembrandt's contractual obligations to offer royalty-free licenses in good faith under the DOCSIS License Agreement.

Answer:   Admitted that Charter seeks specific performance of Rembrandt's purported contractual obligations but denied that Charter is entitled to any relief whatsoever.

111.    Charter has no adequate remedy at law.

Answer:  Denied.

112.    In addition to an order requiring Rembrandt to specifically perform its contractual obligations, Charter also seeks damages for the injuries is has incurred and continues to incur, in an amount to be proven at trial.

Answer:  Admitted that Charter seeks specific performance and damages but denied that Charter is entitled to any relief whatsoever.

### Count VI— Declaratory Judgment of Contractual Rights and Liabilities re DOCSIS

113.    Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

Answer:  Rembrandt and Remstream repeat and re-allege their responses to paragraphs 1 through 112 and incorporate them herein by reference.

114.    An actual controversy exists between Charter and Rembrandt regarding the Charter's right to obtain royalty-free licenses to patents Rembrandt asserts are essential for compliance with DOCSIS under the DOCSIS License Agreement.

Answer:  Admitted.

115.    For the reasons set forth above, Charter is entitled to a declaratory judgment that:

(i)       Charter is entitled to a royalty-free licenses to patent claims deemed essential for compliance with DOCSIS under the DOCSIS License Agreement; (ii) Rembrandt's refusal to provide royalty-free licenses, despite its obligation to do so, is a breach of contract; (iii) Charter is a third-party beneficiary that has been damaged by Rembrandt's failure to comply with its contractual obligations and is entitled to enforce those obligations and to recover damages due to said breach of contract; (iv) Charter's customers have a right to use the technology licensed pursuant to the DOCSIS License Agreement by virtue of their relationship with Charter; and/or (v) the claims of various patents allegedly owned by Rembrandt are unenforceable because Rembrandt has repudiated its obligation to and failed to license the technology, which as Rembrandt contends, is essential for compliance with the DOCSIS standard.

Redacted Document – Publicly Filed

Answer:  Denied.

## Count VII— Unfair Business Practices, Cal. Bus. & Prof. Code § 17200 re ATSC

116.    Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

Answer:  Rembrandt and Remstream repeat and re-allege their responses to paragraphs 1 through 116 and incorporate them herein by reference.

117.    As alleged more fully above, Rembrandt has engaged in unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code § 17200.  These practices have occurred, at least in part, in California, and/or have affected California residents and consumers, or threaten to do so.

Answer:  Denied.

118.    Rembrandt has engaged in unfair business practices by, among other things, refusing to abide by its obligations as successor in interest to AT&T's commitment to offer FRAND licensing terms to any intellectual property that is asserted to be essential to the practice of the ATSC standard.

Answer:  Denied.

119.    Rembrandt has engaged in unlawful business practices by, among other things, failing to abide by the Dec. 24, 1996 FCC Fourth Report and Order that the ATSC format was adopted conditioned upon the participants' agreement to license any technology asserted to be relevant on FRAND terms.

Answer:  Denied.

120.    Charter has suffered actual injury, and is threatened with further actual injury unless Rembrandt is enjoined, as a result of the unfair, deceptive and unlawful business practices of Rembrandt described above.

Answer:  Denied.

### Count VIII— Unfair Business Practices, Cal. Bus. & Prof. Code §17200 re DOCSIS

121.    Charter repeats and realleges all of the allegations of all of the paragraphs above as if set forth fully herein.

Answer:  Rembrandt and Remstream repeat and re-allege their responses to paragraphs 1 through 120 and incorporate them herein by reference.

122.    As alleged more fully above, Rembrandt has engaged in unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code § 17200.  These practices have occurred, at least in part, in California, and/or have affected California residents and consumers, or threaten to do so.

Answer:  Denied.

123.    Several of Rembrandt's illegal, unfair, and fraudulent acts have harmed and threaten to further harm California customers, consumers, and competition within California, including by increasing the prices California consumers pay for cable modems or decreasing the supply of cable modems, or threatening the same.

Answer:  Denied.

124.    Rembrandt has engaged in unfair business practices by, among other things, refusing to abide by its obligations under the DOCSIS License Agreement to offer royalty-free licenses any intellectual property that is asserted to be essential to the practice of the DOCSIS standard, while at the same time purporting to be a bona fide participant in the business of providing cable modems licensed under the DOCSIS License Agreement.

Answer:  Denied.

125.    Rembrandt has engaged in unlawful business practices by, among other things, failing to abide by its obligation to license any technology asserted to be essential to compliance with the DOCSIS standard.

Answer:  Denied.

126.    Rembrandt has engaged in deceptive business practices by representing, or threatening to represent, itself as a purported bona fide cable modem provider when in fact its involvement in the cable modem business is for the purpose of generating evidence for this litigation.  Rembrandt has also engaged in deceptive business practices by representing, or threatening to represent, itself as a purported bona fide cable modem provider when in fact the

true participant in the cable modem business is ███████, its business partner, joint venturer and/or agent.

    <u>Answer</u>:  Denied.

    127.    Charter has suffered actual injury, and is threatened with further actual injury unless Rembrandt is enjoined, as a result of the unfair, deceptive and unlawful business practices of Rembrandt described above.

    <u>Answer</u>:  Denied.

## <u>AFFIRMATIVE DEFENSES</u>

### <u>First Affirmative Defense</u>

Charter Counter-Defendants' Additional Counterclaims fail to state a claim upon which relief may be granted.

### <u>Second Affirmative Defense</u>

Charter Counter-Defendants' Additional Counterclaims are barred, in whole or in part, by the doctrine of estoppel.

### <u>Third Affirmative Defense</u>

Charter Counter-Defendants' Additional Counterclaims are barred, in whole or in part, by the doctrine of waiver.

### <u>Fourth Affirmative Defense</u>

Charter Counter-Defendants' Additional Counterclaims are barred, in whole or in part, by applicable limitations doctrines, including the statute of limitations.

### <u>Fifth Affirmative Defense</u>

Charter Counter-Defendants' Additional Counterclaims are based on a purported agreement to agree, which is unenforceable under applicable law.

### <u>Sixth Affirmative Defense</u>

Charter Counter-Defendants' Additional Counterclaims are based upon a purported agreement with open essential terms, which cannot be supplied under applicable law.

Redacted Document – Publicly Filed

### Seventh Affirmative Defense

To the extent there was an enforceable promise, it was solely a promise to negotiate; there was no intention to permit any third party or a court to impose licensing terms.

### Eighth Affirmative Defense

Charter Counter-Defendants' Additional Counterclaims are barred by the doctrine of laches.

### Ninth Affirmative Defense

Charter Counter-Defendants' Additional Counterclaims fail as a matter of law based on a lack of contractual privity between Rembrandt and Charter Counter-Defendants involving any alleged contractually binding obligation entered into by AT&T and/or AT&T IPM.

### Tenth Affirmative Defense

Charter Counter-Defendants' Additional Counterclaims fail as a matter of law because Charter Counter-Defendants materially breached and/or repudiated any express or implied contract, thereby excusing Rembrandt from any alleged obligation that it might otherwise have had.

### Eleventh Affirmative Defense

Charter Counter-Defendants are not entitled to the relief requested as a matter of law.

### Twelfth Affirmative Defense

Charter Counter-Defendants' Additional Counterclaims fail, in whole or in part, because Charter Counter-Defendants failed to fulfill conditions precedent to any obligation to offer a license to it.

### Thirteenth Affirmative Defense

Charter Counter-Defendants' Additional Counterclaims fail as a matter of law because neither Rembrandt nor Remstream are a signatory to, and are not bound by, the CableLabs' Data Over Cable Service Interface Specifications License Agreement.

### Fourteenth Affirmative Defense

Charter Counter-Defendants' Additional Counterclaims fail as a matter of law because CableLabs is a necessary party and has not been joined.

Redacted Document – Publicly Filed

### Fifteenth Affirmative Defense

Charter Counter-Defendants' Additional Counterclaims fail as a matter of law because the Charter Counter-Defendants' lack standing to assert such Additional Counterclaims.

### Sixteenth Affirmative Defense

Rembrandt and Remstream reserve the right to assert additional and/or different affirmative defenses as discovery progresses, and hereby reserve the right to amend its reply to Charter Counter-Defendants' Additional Counterclaims in support of any such defenses.

### PRAYER FOR RELIEF

WHEREFORE, Rembrandt and Remstream respectfully request: (i) that judgment be entered in their favor, and against Counter-Defendants, on Counter-Defendants' Additional Counterclaims, and that Counter-Defendants not be awarded any relief in connection therewith; and (ii) that Rembrandt and Remstream be awarded all the relief sought in the Prayer for Relief of their Counterclaim, which is incorporated herein by reference.

Dated: May 22, 2008                    CONNOLLY BOVE LODGE & HUTZ LLP


By:    */s/ Collins J. Seitz, Jr.*
Collins J. Seitz, Jr. (#2237)
Francis DiGiovanni (#3189)
James D. Heisman (#2746)
Kristen Healey Cramer (#4512)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
(302) 658-9141
cseitz@cblh.com
fdigiovanni@cblh.com
jheisman@cblh.com
kcramer@cblh.com

*Attorneys for Rembrandt Technologies, LP and*
*Rembrandt Technologies, LLC d/b/a Remstream*

612883

37

Redacted Document – Publicly Filed

## CERTIFICATE OF SERVICE

I, Collins J. Seitz, Jr., hereby certify that on the 22nd day of May, 2008, a true

copy of the foregoing document was electronically filed with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following and the document is

available for viewing and downloading from CM/ECF:

### BY E-MAIL

| | |
|---|---|
| Jack B. Blumenfeld<br>Karen Jacobs Louden<br>Rodger D. Smith II<br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, DE 19899<br>jblumenfeld@mnat.com<br>klouden@mnat.com<br>rsmith@mnat.com | John W. Shaw<br>Young, Conaway, Stargatt & Taylor<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>P.O. Box 391<br>Wilmington, DE 19899-0391<br>jshaw@ycst.com |
| Richard K. Herrmann<br>Mary B. Matterer<br>Amy Arnott Quinlan<br>Morris James LLP<br>500 Delaware Avenue, Suite 1500<br>Wilmington, DE 19801-1494<br>rherrmann@morrisjames.com | Richard D. Kirk<br>Scott G. Wilcox<br>Stephen B. Brauerman<br>Bayard, PA<br>222 Delaware Avenue, Suite 900<br>P.O. Box 25130<br>Wilmington, DE 19899<br>rkirk@bayardlaw.com<br>swilcox@bayardlaw.com<br>sbrauerman@bayardlaw.com |

Redacted Document – Publicly Filed

| | |
|---|---|
| Fredrick L. Cottrell, III<br>Kelly E. Farnan<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>cottrell@rlf.com<br>farnan@rlf.com | Peter J. Toren<br>Lawrence B. Goodwin<br>Monica V. Bhattacharyya<br>Stefan R. Stoyanov<br>Kasowitz, Benson, Torres & Friedman LLP<br>1633 Broadway<br>New York, NY 10019<br>ptoren@kasowitz.com<br>lgoodwin@kasowitz.com<br>mbhattacharyya@kasowitz.com<br>sstoyanov@kasowitz.com |
| Josh A. Krevitt<br>Charles J. Bourdreau<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue, 47th Floor<br>New York, New York 10166-0193<br>jkrevitt@gibsondunn.com<br>cboudreau@gibsondunn.com | David Segal<br>Gibson, Dunn & Crutcher LLP<br>3161 Michelson Drive<br>Irvina, California 92612-4412<br>dsegal@gibsondunn.com |
| Amanda J. Tessar<br>Gibson, Dunn & Crutcher LLP<br>1801 California Street, Suite 4200<br>Denver, CO 80202-2642<br>atessar@gibsondunn.com | David S. Benyacar<br>Daniel L. Reisner<br>Kaye Scholer LLP<br>425 Park Avenue<br>New York, New York 10022<br>dbenyacar@kayescholer.com<br>dreisner@kayescholer.com |
| Matthew D. Powers<br>Edward R. Reines<br>Weil Gotshal & Manges LLP<br>201 Redwood Shores Parkway<br>Redwood Shores, CA 94065<br>matthew.powers@weil.com<br>edward.reines@weil.com | Robert A. Van Nest<br>Brian L. Ferrall<br>Daralyn J. Durie<br>Leo L. Lam<br>Matthew M. Werdegar<br>KEKER & VAN NEST LLP<br>710 Sansome Street<br>San Francisco, CA 94111<br>rvannest@kvn.com<br>bferrall@kvn.com<br>ddurie@kvn.com<br>llam@kvn.com<br>mwerdegar@kvn.com |

Redacted Document – Publicly Filed

| | |
|---|---|
| John Desmarais<br>Kirkland & Ellis LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, New York 10022<br>jdesmarais@kirkland.com | Eric R. Lamison<br>Kirkland & Ellis LLP<br>555 California Street, Ste. 2700<br>San Francisco, CA 94104<br>elamison@kirkland.com |
| Mitchell Stockwell<br>Kilpatrick & Stockton LLP<br>110 Peachtree Street, N.E.<br>Suite 2800<br>Atlanta, GA 30309<br>MStockwell@KilpatrickStockton.com | Bradford P. Lyerla<br>Kevin D. Hogg<br>Charles E. Juister<br>Marshall, Gerstein & Borun LLP<br>6300 Sears Tower<br>233 South Wacker Drive<br>Chicago, IL 60606-6357<br>blyerla@marshallip.com<br>khogg@marshallip.com<br>cjuister@marshallip.com |
| Richard Brown<br>Day Pitney LLP<br>200 Campus Drive<br>Florham Park, NJ 07932<br>rbrown@daypitney.com | Gerald Levy<br>Day Pitney LLP<br>7 Times Square<br>New York, NY 10036<br>glevy@daypitney.com |
| Jonathan Tropp<br>Day Pitney LLP<br>One Canterbury Green<br>201 Broad Street<br>Stamford, CT 06901 | |

By:  /s/ Collins J. Seitz, Jr.
       Collins J. Seitz, Jr. (#2237)
       cseitz@cblh.com

## CERTIFICATE OF SERVICE

I, Collins J. Seitz, Jr., hereby certify that on the 30th day of May, 2008, a true copy of the foregoing document was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following and the document is available for viewing and downloading from CM/ECF:

## BY E-MAIL

| | |
|---|---|
| Jack B. Blumenfeld<br>Karen Jacobs Louden<br>Rodger D. Smith II<br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, DE 19899<br>jblumenfeld@mnat.com<br>klouden@mnat.com<br>rsmith@mnat.com | John W. Shaw<br>Young, Conaway, Stargatt & Taylor<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>P.O. Box 391<br>Wilmington, DE 19899-0391<br>jshaw@ycst.com |
| Richard K. Herrmann<br>Mary B. Matterer<br>Amy Arnott Quinlan<br>Morris James LLP<br>500 Delaware Avenue, Suite 1500<br>Wilmington, DE 19801-1494<br>rherrmann@morrisjames.com | Richard D. Kirk<br>Scott G. Wilcox<br>Stephen B. Brauerman<br>Bayard, PA<br>222 Delaware Avenue, Suite 900<br>P.O. Box 25130<br>Wilmington, DE 19899<br>rkirk@bayardlaw.com<br>swilcox@bayardlaw.com<br>sbrauerman@bayardlaw.com |

| | |
|---|---|
| Fredrick L. Cottrell, III<br>Kelly E. Farnan<br>Richards, Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>cottrell@rlf.com<br>farnan@rlf.com | Peter J. Toren<br>Lawrence B. Goodwin<br>Monica V. Bhattacharyya<br>Stefan R. Stoyanov<br>Kasowitz, Benson, Torres & Friedman<br>LLP<br>1633 Broadway<br>New York, NY 10019<br>ptoren@kasowitz.com<br>lgoodwin@kasowitz.com<br>mbhattacharyya@kasowitz.com<br>sstoyanov@kasowitz.com |
| Josh A. Krevitt<br>Charles J. Bourdreau<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue, 47th Floor<br>New York, New York 10166-0193<br>jkrevitt@gibsondunn.com<br>cboudreau@gibsondunn.com | David Segal<br>Gibson, Dunn & Crutcher LLP<br>3161 Michelson Drive<br>Irvina, California 92612-4412<br>dsegal@gibsondunn.com |
| Amanda J. Tessar<br>Gibson, Dunn & Crutcher LLP<br>1801 California Street, Suite 4200<br>Denver, CO 80202-2642<br>atessar@gibsondunn.com | David S. Benyacar<br>Daniel L. Reisner<br>Kaye Scholer LLP<br>425 Park Avenue<br>New York, New York 10022<br>dbenyacar@kayescholer.com<br>dreisner@kayescholer.com |
| Matthew D. Powers<br>Edward R. Reines<br>Weil Gotshal & Manges LLP<br>201 Redwood Shores Parkway<br>Redwood Shores, CA 94065<br>matthew.powers@weil.com<br>edward.reines@weil.com | Robert A. Van Nest<br>Brian L. Ferrall<br>Daralyn J. Durie<br>Leo L. Lam<br>Matthew M. Werdegar<br>KEKER & VAN NEST LLP<br>710 Sansome Street<br>San Francisco, CA 94111<br>rvannest@kvn.com<br>bferrall@kvn.com<br>ddurie@kvn.com<br>llam@kvn.com<br>mwerdegar@kvn.com |

| | |
|---|---|
| John Desmarais<br>Kirkland & Ellis LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, New York 10022<br>jdesmarais@kirkland.com | Eric R. Lamison<br>Kirkland & Ellis LLP<br>555 California Street, Ste. 2700<br>San Francisco, CA 94104<br>elamison@kirkland.com |
| Mitchell Stockwell<br>Kilpatrick & Stockton LLP<br>110 Peachtree Street, N.E.<br>Suite 2800<br>Atlanta, GA 30309<br>MStockwell@KilpatrickStockton.com | Bradford P. Lyerla<br>Kevin D. Hogg<br>Charles E. Juister<br>Marshall, Gerstein & Borun LLP<br>6300 Sears Tower<br>233 South Wacker Drive<br>Chicago, IL 60606-6357<br>blyerla@marshallip.com<br>khogg@marshallip.com<br>cjuister@marshallip.com |
| Richard Brown<br>Day Pitney LLP<br>200 Campus Drive<br>Florham Park, NJ 07932<br>rbrown@daypitney.com | Gerald Levy<br>Day Pitney LLP<br>7 Times Square<br>New York, NY 10036<br>glevy@daypitney.com |
| Jonathan Tropp<br>Day Pitney LLP<br>One Canterbury Green<br>201 Broad Street<br>Stamford, CT 06901 | |

By:    */s/ Collins J. Seitz, Jr.*
       Collins J. Seitz, Jr. (#2237)
       cseitz@cblh.com