IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) MDL Docket No. 07-md-1848-GMS-LPS |
| REMBRANDT TECHNOLOGIES, LP | ) |
| PATENT LITIGATION | ) **REDACTED –** |
| | ) **PUBLIC VERSION** |

**ALL OTHER PARTIES' OPENING BRIEF IN SUPPORT OF THEIR MOTION
FOR A DETERMINATION THAT THIS IS AN EXCEPTIONAL CASE AND
AN AWARD OF ATTORNEYS' AND EXPERTS' FEES AND COSTS**

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Jeffrey T. Castellano (#4837)
YOUNG CONAWAY STARGATT & TAYLOR LLP
1000 West Street
Wilmington, DE 19801
(302) 571-6600
jingersoll@ycst.com
jshaw@ycst.com
jcastellano@ycst.com

Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
Rodger D. Smith II (#3778)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street, P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
klouden@mnat.com
rsmith@mnat.com

Co-Liaison Counsel for All Parties Other Than Rembrandt

John M. Desmarais, P.C.
Steven C. Cherny
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

David S. Benyacar
KAYE SCHOLER LLP
425 Park Avenue
New York, NY  10022

Eric R. Lamison
Benjamin R. Ostapuk
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104

Co-Lead Counsel on the Eight Patents

Dated:  November 16, 2009

# TABLE OF CONTENTS

**Page**

I.      NATURE AND STAGE OF PROCEEDINGS ..................................................................1

II.     SUMMARY OF ARGUMENT AND STATEMENT OF FACTS ....................................4

III.    ARGUMENT.................................................................................................................5

      A.      Rembrandt's Improper Compensation Agreements with Key Fact
            Witnesses ...........................................................................................................5

      B.      Spoliation Warrants A Finding Of Exceptionality Under § 285............................8

           1.      Rembrandt had a duty to preserve Paradyne documents it
                controlled ..................................................................................................9

           2.      Rembrandt breached its duty to preserve documents it
                controlled ................................................................................................10

      C.      Rembrandt Wrongfully Asserted Fraudulently-Revived Patents ..........................14

      D.      Rembrandt Sought Objectively Baseless Remedies to Extract Royalties .............16

      E.      The Court Should Award AOPs Their Fees And Costs..........................................18

IV.    CONCLUSION..............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beckman Instr., Inc. v. LKB Produkter AB,*
    892 F.2d 1547, 1552 (Fed. Cir. 1989)........................................................................... 18

*Brasseler, U.S.A. I, L.P.  v. Stryker Sales Corp.,*
    267 F.3d 1370 (Fed. Cir. 2001)........................................................................... 5, 13

*Bristol-Meyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,*
    No. 95 CIV.8833, 2002 WL 1733681 (S.D.N.Y. July 26, 2002) .................................. 9, 18

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991)........................................................................... 5

*Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,*
    350 F.3d 1327 (Fed. Cir. 2003)........................................................................... 15

*Gerling Int' Ins. Co. v. Comm'n of Internal Revenue,*
    839 F.2d 131 (3rd Cir. 1988)........................................................................... 9

*Golden Trade, S.r.L. v. Lee Apparel Co.,*
    143 F.R.D. 514 (S.D.N.Y. 1992)........................................................................... 9

*In re Maldague,*
    10 USPQ2d 1477 (Comm'r Pat. 1988)........................................................................... 15

*Knoll Pharm. Co. v. Teva Pharm. USA,*
    No. 01 C 1646, 2004 WL 2966964 (N.D. Ill. Nov. 22, 2004)........................................ 9

*Medtronic Navigation, Inc. v. Brainlab Medizinische Computersystems GmbH,*
    2008 WL 410413 (D. Colo., Feb. 12, 2008)........................................................................... 18

*Mercy Catholic Medical Center v. Thompson,*
    380 F.3d 142 (3d Cir. 2004)........................................................................... 8

*Micron Tech., Inc. v. Rambus Inc.,*
    255 F.R.D. (D. Del. 2009) ........................................................................... 8

*Monsanto Co. v. Bayer Bioscience N.V.,*
    514 F.3d 1229 (Fed. Cir. 2008)........................................................................... 5

*Nilssen v. Osram Sylvania, Inc.,*
    528 F.3d 1352 (Fed. Cir. 2008)........................................................................... 16

**Page(s)**

*Sensonics, Inc. v. Aerosonic Corp.*,
   81 F.3d 1566 (Fed. Cir. 1996)..................................................................... 9

*Takeda Chem. Indus., Ltd. v. Mylan Lab., Inc.*,
   549 F.3d 1381 (Fed. Cir. 2008)............................................................. 5, 18

*Taurus IP, LLC v. Daimler Chrysler Corp.*,
   559 F. Supp. 2d 947 (W.D. Wis. 2008) ........................................................ 8

*U.S. v. Blaszak*,
   349 F.3d 881 (6th Cir. 2003) ....................................................................... 5

**Statutes**

18 U.S.C. § 201(c)(3).......................................................................................... 5

35 U.S.C. § 41(c)(1).......................................................................................... 14

37 C.F.R. § 1.378(a).......................................................................................... 14

**Other Authorities**

ABA Model R. Prof. Conduct 3.4(b) ................................................................... 6

Del. Prof. Cond. R. 3.4(b) ................................................................................... 5

Del. State Bar Ass'n Comm On Prof. Ethics,
   Opinion 2003-3 (Aug. 14, 2003)................................................................... 6

MPEP § 711.03 .................................................................................................. 15

## I.   NATURE AND STAGE OF PROCEEDINGS

Rembrandt's Eight Patent litigation against virtually the entire U.S. cable industry is about to end.  After more than four years of litigation featuring massive document spoliation by Rembrandt, the fraudulent revival of patents for inclusion in this litigation and other extraordinary misconduct, Rembrandt has now covenanted not to sue All Other Parties to the Eight Patents cases ("AOPs") on all Eight Patents.  Nonetheless, Rembrandt's meritless actions consumed vast judicial resources and imposed enormous costs on AOPs.  Therefore, AOPs to the Eight Patents cases now ask the Court to declare this case exceptional and to award AOPs the fees and costs they incurred defending Rembrandt's litigation misconduct and baseless claims.[1]

This matter dates back to 2004, when Rembrandt -- a "non-practicing entity" created solely to acquire and litigate patents -- teamed with Paradyne to sue the cable industry for allegedly infringing Paradyne's patents.  In December 2004,



. (Ex. 1.)  Their 2004 Agreement stated that they were



" (*Id.* at §§ 2.4, 2.7, 9.2.)  As their witnesses previously have testified,

" (Ex. 2 at ¶ 11; Ex. 3 at ¶ 13).

As                                              , Rembrandt sued Comcast in September 2005 in the Eastern District of Texas for infringement of four U.S. patents (the '819, '858, '631 and '627 patents).  In June 2006, Rembrandt then sued Time Warner Cable, Charter,

---

[1]   The Adelphia entities file their own motion for fees given their unique bankruptcy posture.

Cox, and Cablevision on those same patents in the Eastern District of Texas. That same month, Rembrandt acquired more Paradyne patents from Paradyne's parent company, Zhone Technologies, Inc. ("Zhone"), which had acquired Paradyne in July 2005. Then, between September and November 2006, Rembrandt initiated a second wave of industry-wide litigation over Paradyne patents. It sued Time Warner Cable, Comcast, Charter and Cox in the Eastern District of Texas for alleged infringement of five U.S. Patents (the '159, '234, '444, '761 and '903 patents), it sued Adelphia in New York bankruptcy court on four of those patents, and it sued Cablevision on four patents in Delaware. In sum, from September 2005 to November 2006, Rembrandt filed eight lawsuits against the cable industry, in Texas, New York and Delaware. Attachment A provides a litigation timeline.

On June 20, 2007, the Judicial Panel on Multidistrict Litigation consolidated these cases before this Court. Shortly thereafter, on November 21, 2007, the equipment vendors who supply cable equipment at the center of Rembrandt's allegations sued Rembrandt in this Court, seeking a declaration that they and their customers do not infringe any valid patents. On December 12, 2007, all parties appeared for a scheduling conference where the Court set the schedule.

The Court held a *Markman* hearing in August 2008, spending two days on the Eight Patents and a third day on the '627 patent. Because Rembrandt insisted on asserting eighty-nine claims from the Eight Patents, the Court was asked to construe many terms. The Court issued its *Markman* Order on the Eight Patents on November 19, 2008. (D.I. 458.) On January 6, 2009, Rembrandt advised AOPs that it would not assert infringement of the '631, '858 or '819 patents. Two months later, on March 6, 2009, Rembrandt said it would not assert infringement of the '903 patent. Two months later, on May 14, 2009, Rembrandt said it was no longer asserting the

'234 patent. Rembrandt, however, failed to propose to AOPs any covenant not to sue on those five patents, instead seeking stipulations to keep its assertions alive through appeal.

The parties engaged in massive fact discovery on the Eight Patents through May 2009, in response to Rembrandt's demands. AOPs produced more than *15 million* pages of documents. Rembrandt requested, and the Court granted, up to *650 hours* of depositions per side. Rembrandt took more than *seventy-five* depositions, including *thirty-five* of the MSOs, *thirty* of the Equipment Vendors, *six* of third party CableLabs, and *five* of chipset suppliers, among others. Rembrandt provided reports from *five* different experts, requiring AOPs to provide substantial expert reports. AOPs also had to take substantial discovery to expose facts showing (as Rembrandt knew or should have known) that Paradyne patents were invalid and unenforceable. AOPs deposed several inventors, former Paradyne personnel, and Rembrandt personnel to discover on-sale bars and other facts that Rembrandt failed to disclose to AOPs in response to interrogatories.

Discovery that AOPs took also revealed a disturbing pattern of Rembrandt co-opting key fact witnesses by giving them contingent interests in these actions and massive, yet selective, destruction of documents that would have established that the remaining asserted patents were invalid. On July 8, 2009, the Court granted AOPs permission to move for summary judgment of invalidity on two of the then remaining three patents and permission to seek sanctions for assertion of all patents based on Rembrandt's litigation misconduct. (D.I. 833.) Just weeks after the Court issued that Order, on July 21, 2009, Rembrandt first covenanted not to sue AOPs on the Eight Patents and on July 31 moved to dismiss its Eight Patents cases. (D.I. 843.) Rembrandt contends, contrary to the import of the chain of events, that the Court's July ruling had no impact on its decision finally to give up and end these extraordinarily expensive actions.

3

This is not credible.  In any event, that still wasn't the end of the road for Rembrandt.

Inexplicably, Rembrandt *refused* to include in the scope of its covenant the very standards it

repeatedly had accused of infringement, requiring AOPs to oppose Rembrandt's motion to

dismiss and file summary judgment motions in compliance with the schedule.[2]  The Court

subsequently ordered Rembrandt to supplement the covenant to include DOCSIS as a condition

of dismissal.  (D.I. 880.)  The Court's Order also acknowledged that AOPs could move for fees

and expenses.  (D.I. 880 at 2.)  AOPs now file that motion.

## II.    SUMMARY OF ARGUMENT AND STATEMENT OF FACTS

Rembrandt, a well-funded company *created for the purpose of filing and litigating*

*patent lawsuits*, only granted a covenant not to sue when AOPs were on the verge of exposing its

litigation misconduct and proving the patents unenforceable and invalid for reasons Rembrandt

knew or should have known all along.   Rembrandt's extensive and prolonged pattern of

litigation misconduct make this case exceptional.

- Rembrandt gave three key fact witnesses contingent interests in the outcome of this litigation and ███████████████████.  Giving such inducements to fact witnesses is expressly prohibited by applicable statutes and ethical rules.

- As detailed in AOPs' Motion for Sanctions Based On Spoliation (D.I. 873-74), Rembrandt allowed thousands boxes of highly relevant documents within its control to be destroyed during this litigation.  Destroyed documents included Paradyne's sales records relevant to on-sale bar defenses, which Rembrandt opposed by claiming that AOPs lacked the very documents it had spoliated.  And fact witnesses on Rembrandt's payroll participated in the spoliation.

---

[2]    Rembrandt refused to include DOCSIS in its covenant not to sue.  Thus, AOPs had to oppose Rembrandt's motion to dismiss.  And the Court's Scheduling Order remained, and AOPs' summary judgment motions were due August 5, 2009.  On August 4, AOPs proposed a stipulation to defer their motions until after the Court ruled on dismissal.  (D.I. 845.)  On August 6, the Court denied the stipulation and ordered that "AOPs shall file their permitted motions for summary judgment--which should have been filed on August 5, 2009--by close of business on Wednesday, August 12, 2009."  AOPs complied and met the deadline. Rembrandt's refusal to extend an appropriate covenant prolonged these proceedings and comprised another example of exceptional conduct.

- Rembrandt sued on patents it knew Paradyne had procured through inequitable conduct. Rembrandt knew Paradyne had intentionally abandoned the '858 and '819 patents because Paradyne thought those patents were worthless and allowed them to expire. When Paradyne decided to sell those patents, it defrauded the Patent Office and claimed the abandonment was "unintentional" in order to revive them.

- Rembrandt sought remedies that were objectively baseless and in subjective bad faith in order to try to extract unreasonable licensing royalties. Rembrandt created a sham entity called Remstream to sell some modems made by a third party that were re-branded with Rembrandt's name. Rembrandt perpetuated this sham to give the appearance that it was a practicing entity in an attempt to evade the impact of *eBay Inc. v. Mercantile Exchange, LLC*, 547 U.S. 388 (2006) and to threaten the cable industry with a baseless injunction demand.

In sum, Rembrandt engaged in a pattern of misconduct making this case exceptional.

## III.   ARGUMENT

Under 35 U.S.C. § 285, the Court may find this case exceptional upon a showing of "inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement. Litigation misconduct and unprofessional behavior are relevant to the award of attorneys fees, and may suffice, by themselves, to make a case exceptional." *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001) (citation omitted). The Court may award expert fees pursuant to its inherent authority to do so. *See Takeda Chem. Indus., Ltd. v. Mylan Lab., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) (affirming inherent power to award expert fees due to fraud, abuse of the judicial process, or bad faith). Rembrandt's litigation misconduct and inequitable conduct establish this case is exceptional, and support an award of fees and costs.

### A.   Rembrandt's Improper Compensation Agreements with Key Fact Witnesses

Rembrandt broke the rules that prohibit a party from giving fact witnesses contingent interests in the outcome of litigation or excessive compensation. *See* 18 U.S.C. § 201(c)(3) & (d); Del. Prof. Cond. R. 3.4(b) (attorney shall not "offer an inducement to a witness that is prohibited by law"); Del. State Bar Ass'n Comm On Prof. Ethics, Opinion 2003-3 at 6-7, 9-11

(Aug. 14, 2003) (payments to fact witnesses cannot be contingent on outcome of case and must be "reasonable"); *U.S. v. Blaszak*, 349 F.3d 881, 883 (6th Cir. 2003) (affirming violations of witness payment statute due to excessive compensation of fact witness).  The rationale for such prohibitions is that "[f]air competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like."  Comment 1 to ABA Model R. Prof. Conduct 3.4(b).

Here, Rembrandt did exactly what the rules prohibit   Rembrandt unlawfully guaranteed three important fact witnesses 3-5% contingent interests in the litigation outcome and ████████ ████████████ (Ex. 4 at 21; Ex. 5; Ex. 6 at 17:24 - 21:22; Ex. 7 at 46:1-25.)  The witnesses Rembrandt unlawfully compensated were (1) Gordon Bremer; (2) Scott Horstemeyer; and (3) Patrick Murphy.  These witness were ███████████████████████████████, ████████████████████████.  Further, at least some of these compensated fact witnesses participated in the very destruction and concealment of vital evidence that the rules were intended to prevent..  Attachment B lists these witnesses and the cast of characters referenced by AOPs' motion.

Gordon Bremer was a key fact witness.  He directed technology at Paradyne for nearly 30 years including the development and maintenance of Paradyne's entire patent portfolio.  (Ex. 8; Ex. 6 at 39:25 - 42:3, 122:5 - 123:20; Ex. 9 at 177:25-178:22.)  Bremer also ran the Accucom (Comsphere) modem development program that led to many of the asserted patents and AOPs on-sale bar defenses.  (Ex 10.)  Bremer witnessed and participated in key events involving Paradyne's patents-in-suit, including on-sale bar activity that was the subject of AOPs' permitted motion for summary judgment on the '159 patent (*see* D.I. 809, 821, 847-48), inequitable patent prosecution such as fraudulent revival of the '819 and '858 patents, and numerous licensing and

pre-filing enforcement activities. Scott Horstemeyer, Paradyne's longtime prosecution counsel and a member of its internal patent review board, prosecuted most of the patents-in-suit. (*See, e.g.*, Ex. 9 at 176:3-19, 120:12-16, 343:7-9, 378:16-19, 380:17-20; Ex. 6 at 123:13-25.) Horstemeyer witnessed many of the same key facts as Bremer, and was at the center of the scheme to fraudulently revive Paradyne's abandoned patents and sell them to Rembrandt. (*See, e.g.*, Ex. 9 at 184:6-185:21.) Patrick Murphy was Paradyne's CFO at the relevant time. Mr. Murphy also participated in prosecution, licensing and pre-enforcement activities relating to the patents-in-suit, including his pivotal role in Paradyne's fraudulent patent revival scheme. (*See, e.g.*, Ex. 9 at 184:6 - 185:21; Ex. 11 at 82:14-19; Ex. 6 at 324:1-19.)

Unlawfully compensating these fact witnesses biased them and gave them an incentive to assist Rembrandt in concealing and destroying evidence. There is no doubt they fully understood that Rembrandt was paying them to support Rembrandt ***regardless of the facts***. For example, Mr. Bremer ███████████████████████████ ████████████████████████████████████████ (*See Ex. 12* ("███████████████" "██████████████████ ██████████████████████████████████████ ██████████████████████████████ ██████").[3] Once Bremer obtained his contingent interest from Rembrandt, there was no way he would testify in "██████" of AOPs -- ***no matter how the record developed***. In fact, during this litigation, Bremer helped make sure the record would never develop in a way that would affect his ability to recover the money Rembrandt had promised him, by overseeing and assisting in destroying Paradyne documents relevant to on-sale bars. (Ex. 13; Ex. 6 at 174:11 - 178:24.)

---

[3]  Bremer confirmed in deposition that ████████████████ ████████████████████████. (Ex. 6 at 412:1 - 414:9, 416:4-13.)

Rembrandt's contingent fee inducements and ███████████████ to fact witnesses are, in and of themselves, misconduct that render these proceedings exceptional. *See, e.g., Taurus IP, LLC v. Daimler Chrysler Corp.*, 559 F. Supp. 2d 947, 957, 967-68 (W.D. Wis. 2008) (finding exceptional case where witness tampering occurred).

### B.      Spoliation Warrants A Finding Of Exceptionality Under § 285

Rembrandt's conduct also is exceptional because, even as it invoked the power of the courts to attempt to extract an enormous judgment against AOPs, it was also approving the surreptitious destruction of documents within its control that would defeat its demands for such a recovery.  It allowed critically important Paradyne documents within its control to be destroyed *during this litigation*.  These documents had been preserved for decades.  But amazingly, starting just as litigation commenced, they were destroyed.  This was not, however, a one-time event.  The destruction continued over a span of several years of this litigation despite numerous requests and subpoenas for the documents.  Attachment C provides a Spoliation Timeline.[4]

Spoliation occurs where a party "'intentionally or negligently breached its duty to preserve potentially discoverable evidence'...." *Micron Tech., Inc. v. Rambus Inc.*, 255 F.R.D. 135, 148 (D. Del. 2009).  The duty arises "when litigation is pending or imminent, or there is a reasonable belief that litigation is foreseeable," and extends to documents a party "knows or reasonably should know is relevant to the future litigation." *Id.*  It includes documents a party "has the legal right to or ability to obtain" and thus controls. *See Mercy Catholic Medical Center v. Thompson,* 380 F.3d 142, 160 (3rd Cir. 2004) (citing *Gerling Int' Ins. Co. v. Comm'n of Internal Revenue*, 839 F.2d 131, 140 (3rd Cir. 1988)).  In cases involving patent enforcement contracts, courts construe contracts providing for assistance and access to documents as

---

[4]    AOPs detailed Rembrandt's spoliation in their motion for sanctions filed with leave of Court. (D.I. 873-74.)  Because Rembrandt dismissed its claims, AOPs' motion was not decided.

providing "control" for discovery.  *See, e.g., Knoll Pharm. Co. v. Teva Pharm. USA*, No. 01 C

1646, 2004 WL 2966964, at *1-2 (N.D. Ill. Nov. 22, 2004) (control found where "both parties

agreed to cooperate fully with each other"); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D.

514, 525 (S.D.N.Y. 1992) (control found where agreement required other entity to give "all

reasonably requested assistance and information necessary to proceed with [a] suit for

infringement.").   Spoliation alone can show exceptionality under § 285.  *See Sensonics, Inc. v.

Aerosonic Corp.*, 81 F.3d 1566, 1575 (Fed. Cir. 1996) (remanding for district court to address

destroyed documents under § 285 as a basis for exceptional case because "it is the judicial duty

to refuse to condone [such] behavior" given a party's "uncompromising duty to preserve relevant

records"); *Bristol-Meyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, No. 95 CIV.8833,

2002 WL 1733681, *10, 14 (S.D.N.Y. July 26, 2002) (awarding attorneys' and experts' fees due

to inference of document destruction).

### 1.    Rembrandt had a duty to preserve Paradyne documents it controlled

Rembrandt had a duty to preserve potentially relevant Paradyne documents since 2004,

when "███████████████████████████████████████████████████████"

and Rembrandt obtained the rights to and control over Paradyne's documents.  (Ex. 2 at ¶ 7.)

When Rembrandt bought these patents from Paradyne, it knew Paradyne had relevant documents

-- Rembrandt ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████  (Ex. 14 at

REMP0119940; Ex. 7 at 55:6-58:25.)

Rembrandt's and Paradyne's sworn testimony and litigation conduct confirm that

Rembrandt controlled these Paradyne documents.  Witnesses for each testified in a related

9



Delaware State Court matter that they "████████████████████████"

where ████████████████████████████████████

████████████████████████████████████████. (Ex.

2 at ¶¶ 7-11; Ex. 3 at ¶¶ 8-13.)  Their ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████" (Ex.

1 at §§ 2.4, 2.7, 9.2 & Zhone-MDL 13539-48); Ex. 2 at ¶ 7; Ex. 3 at ¶ 8; Ex. 15 at 195:13-

201:10; Ex. 16 at 50:23-51:19; Ex. 7 at 97:7-101:6.)  ███████████and Rembrandt's

control of Paradyne documents, when AOPs subpoenaed documents from Paradyne or its parent

company Zhone, five times, *Rembrandt's* counsel responded to each subpoena.  (Exs. 17-21.)  In

fact, through August 2008, Rembrandt made *all* Paradyne document productions.  They also

continuously shared the same litigation counsel.  They were a single "██████████" in virtually

every way imaginable from 2004 to today.  (Ex. 7 at 96:21-100:25.)

## 2.    Rembrandt breached its duty to preserve documents it controlled

Notwithstanding Rembrandt's control of the Paradyne documents, its obligation to retain

them and the fact that most of its senior executives were attorneys (Ex. 22) who understood that

obligation, Rembrandt allowed thousands of boxes of these documents to be destroyed -- though

not until it first made sure to set aside documents thought to be favorable to it (so-called

"██████████████████").  (Exs. 23-24.)  All of Rembrandt's and Paradyne's 30(b)(6)

designees and attorneys admit that Rembrandt *never* asked Paradyne to retain other highly

relevant categories of documents such as prior sales documents, contracts, purchase orders, and

product documents.  (Ex. 25 at 23:5-17, 25:7-21; Ex. 15 at 159:21-161:13, 163:1-16; Ex. 16 at

422:24 - 423:25; Ex. 7 at 50:14-17; 61:16-20; Ex. 26 at 12:20-15:5.)  Indeed, Rembrandt tacitly

approved destruction of those documents by failing to object to their destruction after Paradyne

specifically told Rembrandt's counsel in 2006 that it would "likely destroy" and did not want to "retain or store any documents pertaining to the patents or applications." (Ex. 26 at 16:8-22; Ex. 27; Ex. 28 at REMP 0133295.)  Between December 2005 and May 2008, Rembrandt allowed Paradyne to shred *3,250* boxes of archived documents without first reviewing them for relevance or responsiveness to outstanding discovery requests, and without first even alerting AOPs to their existence. (*See* Ex. 25 at 27:14-23; 39:17 - 40:1, 42:9-46:4, 46:9-47:23, 48:5-54:25, 56:19-57:16, 57:23-58:12, 58:21-59:7, 59:13-24, 60:3-62:11, 75:8-78:5, 79:13-80:7, 100:1-17.)  Not only was litigation pending throughout this entire shredding campaign, AOPs had repeatedly requested these documents in discovery from Rembrandt, and had subpoenaed Paradyne or its parent, Zhone, for these records on five different occasions. (Exs. 17-21.)  It was not until *May 2008*, after almost three years of litigation and shredding of thousands of boxes of documents, that Paradyne was first asked to stop the shredding. (Ex. 25 at 25:7-21.)

Rembrandt did not simply approve of the document destruction, it actually gave incentives that induced an important Paradyne fact witness, Gordon Bremer, to preserve only so-called "███████████████████" helpful to Rembrandt's positions and to destroy any other documents by giving him a contingent interest in this litigation and ████████.  Mr. Bremer had responsibility, *inter alia*, for the development and maintenance of Paradyne's entire patent portfolio.  When Rembrandt bought Paradyne's patents, Bremer saw this as his opportunity to cash in.  He obtained from Rembrandt █████████████████████████████ and a 3-5% contingent interest in recoveries from patent litigation, including this litigation. (Exs. 4-5; Ex. 6 at 17:24-21:9; Ex. 7 at 46:1-25, 82:19-84:18.)  While under contract with Rembrandt and with litigation pending, Mr. Bremer recalled from Paradyne's storage warehouse only those "████████████████████" that would be helpful to the assertions (charging

his costs of retrieval as a *"litigation cost[]"*) and then oversaw destruction of many remaining Paradyne documents from the very same storage warehouse that he knew housed potentially relevant documents.   (Ex. 25 at 106:19-108:22; Ex. 29 at ZHONE-MDL 47685; Ex. 13; Ex. 6 at 174:11-178:24.)

Rembrandt's use of paid fact witnesses to destroy relevant documents extended beyond the warehouse.  AOPs discovered that another Paradyne fact witness being paid by Rembrandt, Joe Chapman (a named inventor on the '444 patent), called a former Paradyne employee, Mr. O'Horo, at Rembrandt's request, and told him to destroy his documents (which evidenced invalidating pre-critical date public uses and on-sale bars) before his deposition. (Ex. 30 at 27:16-28:19.)  Mr. Chapman's call followed several of Mr. Bremer's calls to Mr. O'Horo.  (*Id.*)

While concealing for years the existence of Paradyne stored documents and their ongoing spoliation, Rembrandt took steps to avoid responsibility for this spoliation and its discovery obligations.  In 2007, after Bremer had retrieved what he and Rembrandt thought to be supportive '███████████████' and while the remaining documents were being destroyed, Rembrandt attempted to relinquish its control over Paradyne's documents by amending its 2004 contract with Paradyne to waive its rights to access Paradyne documents. (Ex. 31, "███████████'███████████████████; Ex. 32 at 68:9-69:24.)  Rembrandt then disingenuously and repeatedly argued that it could not respond to AOPs' discovery requests because it supposedly no longer had access to Paradyne information. (Ex. 33; Ex. 34 at 3-5; Ex. 35 at 13; Ex. 36 at 8.)  ***Notably,*** Rembrandt repeatedly misrepresented to this Court in a hearing on AOPs' request for Paradyne product and sales information relevant to crucial on-sale bar and patent marking issues that Rembrandt "has never had a contractual agreement that gave it access to the products of Paradyne", that "Rembrandt doesn't have access

to all the Paradyne materials regarding their product" and that those "are documents that

Rembrandt has never had access to." (D.I. 560, Ex. 37 at 24:11-15, 33:19-20.)  These

representations to the Court were simply contrary to the facts and the documents.  (Ex. 7 at 70:4-

25; Ex. 3 at ¶¶ 8-13; Ex. 2 at ¶¶ 7-11; Ex. 1 at §§ 2.4, 2.7, 9.2.) [5]

Rembrandt has never denied that massive destruction of relevant documents occurred or

that their destruction severely prejudiced AOPs.  Quite the opposite.  When AOPs requested (and

received) permission from the Court to move for summary judgment that the asserted '159 patent

is invalid due to on-sale bars, Rembrandt argued that AOPs supposedly lacked documents that

the prior sales occurred (D.I. 813 at 2), even though Rembrandt *knew* that those Paradyne sales

records were among the very documents destroyed.   Attachment D to this brief lists several

other examples where Rembrandt relied upon the lack of Paradyne information it had allowed or

---

[5]   In addition to systematically spoliating evidence of on-sale bars, Rembrandt deliberately
ignored remaining evidence that Paradyne's '159 and '234 patents were invalid and
unenforceable due to on-sale bars.  Rembrandt's interrogatory responses self-servingly state
that ████████████████████████████████████████████, and that "████████
███████████████████████████████████" ████.
(Ex. 35 at 8.)  Yet Rembrandt had all inventors and Bremer on its litigation payroll and
access to Paradyne documents.  *AOPs* eventually found through discovery that Paradyne had
engaged in many invalidating, pre-critical date sales activities with respect to Accucom
modems covered by the '159/'234 patents, including with Italtel, Jabil, 3M and Goodyear.
(*See, e.g.*, Ex. 38 at 45:7 - 46:4, 57:14 - 63:4, 63:14 - 64:12, 66:1 - 69:24; 71:9 - 72:16; 83:25
- 86:19, 86:25 - 92:4; 125:5 - 126:5; 131:18 - 132:11; 182:15 - 184:15; 192:10-20; Ex. 61 at ¶
7 (███████████████████████████████████████████); Ex. 62 at
REMP 44490 (████████████████████████████████████
██████████████"); Ex. 63 at p.2; Ex. 64-68 (███████████████████); Ex. 69-
71 (█████████████████████████████); Ex. 72-74 (█████████
█████████████████████████); Ex. 6 at 103:24 - 108:22, 83:20 - 84:1, 98:15 - 99:4.)
Paradyne inequitably failed to tell the Patent Office about *any* of this during prosecution.  In
turn, Rembrandt also tried to avoid these on-sale bars through spoliation and its baseless
claim that it lacked access to Paradyne's information about products and sales.  This
inequitable conduct and litigation misconduct make this case exceptional.  *See Brasseler*, 267
F.3d at 1385 (exceptional case for "failing to inquire when…on notice of certain factual
issues which may have been material to the prosecution of the patent application…[because]
a potential on-sale bar problem existed.")

caused to avoid providing key information in discovery. Critically important destroyed documents included Paradyne customer and supplier contracts, purchase orders, patent files, licensing files, and engineering files. These were highly relevant to AOPs' on-sale bar, best mode, inequitable conduct and marking defenses, among others. Attachment E is an exemplary list of destroyed documents and their relevance (as evidenced by Paradyne document storage sheets that described its stored materials and testimony of Paradyne's records custodian), amply demonstrating the prejudice to AOPs from Rembrandt's spoliation campaign. [6]

Rembrandt's massive spoliation of thousands of boxes of highly relevant documents is litigation misconduct of the highest order. The Court should award AOPs their fees and costs.

### C.     Rembrandt Wrongfully Asserted Fraudulently-Revived Patents

Rembrandt sued on the '819 and '858 patents even though those patents were unenforceable because Paradyne had fraudulently revived them. As Rembrandt knew, three Paradyne fact witnesses on Rembrandt's payroll (Bremer, Murphy and Horstemeyer) had colluded in a scheme to revive and ███████████████████████████ ██████████ for failure to pay maintenance fees. A patentee can only revive patents that expire for non-payment of periodic maintenance fees if the patentee can honestly certify to the PTO that the entire delay in paying fees was "unintentional." *See* 35 U.S.C. § 41(c)(1) (PTO may accept maintenance fees made within two years after the six-month grace period "if the delay is shown…to have been unintentional"); 37 C.F.R. § 1.378(a) (same). A failure to pay fees when due *cannot* be "unintentional" where a patentee changes its mind after previously deciding not to pay the fees when due. *See In re Maldague*, 10 USPQ2d 1477, 1478 (Comm'r Pat. 1988)

---

[6]   AOPs submit herewith as Exhibit 39 a CD that contains electronic copies of (1) Paradyne's contemporaneous storage records for its offsite storage describing contents of boxes that were destroyed; and (2) destruction lists and certificates of destruction.

("intentional act is not rendered unintentional when an applicant reviewing the same facts changes his mind"); MPEP § 711.03(c)(3) at p. 700-192 (specifically explaining that "[w]here the applicant deliberately permits an application to become abandoned (*e.g.*, due to a conclusion . . . . that the invention lacks sufficient commercial value . . . the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as 'unintentional'"); *see also, e.g., Ferguson Beauregard/Logic Controls v. Mega Sys.*, LLC, 350 F.3d 1327, 1343-44 (Fed. Cir. 2003) (confirming "relatively easy" case of inequitable conduct from fraudulent "unintentional" revival petition, but inequitable conducted was not pleaded in the litigation).

Rembrandt has long known that Paradyne and Horstemeyer fraudulently revived the '819 and '858 patents.  Documents Rembrandt eventually produced to AOPs



. The '858 and '819 patents did not lapse unintentionally, but rather were specifically " ███████████████ " as " ███████████████ " (*See* Ex. 40; Ex. 41 at ZHONE-MDL-0025636, 25639; Ex. 6 at 122:17-123:25, 125:3-127:6, 130:12-131:13; Ex. 9 at 194:6-15, 147:20-148:7; Ex. 42-43; Ex. 44 at ZHONE 192-200; Ex. 75.) ███████████ ███████████████████████████ specifically knowing that when making a " ███ ███████████ " to " ███████████ " the " ███████████ ███████████ " (Ex. 45; Ex. 41 at ZHONE-MDL-0025636, 25639; Ex. 9 at 218:13-21.) Paradyne and Horstemeyer expected to receive, and did receive, notices from the PTO that the '858 and '819 patents had expired for failure to pay the maintenance fees.   (Exs. 46-47.)

15

Yet, long *after* they had received expiration notices and deliberately abandoned the '858 and '819 patents, ███████████████████████████████████. In so doing, they decided that ███████████████████████████████. Bremer wrote to Murphy that, ██████████████████████ "██████████████████ ████████████████████" (*See* Ex. 48; Ex. 6 at 147:20 - 148:7, 170:17 - 171:7, 131:2-15.) ████████████████████████████████████████ ████████ (Ex. 43; Ex. 6 at 147:20 - 148:7; Ex. 9 at 184:6 - 185:21, 218:13-21), and in turn fraudulently petitioned to revive the '858 and '819 patents (among others) by falsely stating to the PTO that *"the delay in payment of the maintenance fee of this patent has been unintentional."* (Ex. 49 at p.3, ¶ 8; Ex. 50; Ex. 51 at p.3, ¶ 8; Ex. 52.)

Unfortunately the Court and AOPs have been burdened for years while Rembrandt tried to extract '██████' from the '██████' it purchased from Paradyne.  Rembrandt knew about this scheme -- ██████████████████████████████. (Ex. 7 at 106:14 - 109:4; Ex. 53.)  In fact, Rembrandt ███████████████████████ ████████████████████ (*See, e.g.*, Ex. 54 at ZHONE-MDL 13587 ("██████ ████████████████████████████████████████).)

Despite all this, Rembrandt sued the whole cable industry on these unenforceable patents and paid-off the fact witnesses who had committed this fraud.  The fraud makes this case exceptional, as does Rembrandt's litigation misconduct in asserting the patents.  *See, e.g., Nilssen v. Osram Sylvania, Inc.*, 528 F.3d 1352, 1356, 1359 (Fed. Cir. 2008) (affirming exceptional case due to inequitable conduct, litigation misconduct, and frivoulessness of suit).

### D.      Rembrandt Sought Objectively Baseless Remedies to Extract Royalties

Rembrandt also made this case exceptional by demanding objectively baseless remedies in bad faith.  To try to extract high royalties in licensing demands, Rembrandt brandished the

threat of an injunction before AOPs, which together constitute virtually the whole cable TV industry. The problem was, of course, that as a non-practicing entity, Rembrandt would not be entitled to an injunction under the Supreme Court's *eBay v. MercExchange* decision.

So, on January 16, 2008, years into its litigation campaign, Rembrandt amended its pleadings to add a newly created Rembrandt affiliate, "Rembrandt Technologies, LLC d/b/a Remstream," as a co-plaintiff. (D.I. 47) Remstream was a wholly-owned, sham Rembrandt affiliate set-up to buy cable modems from a third-party manufacturer and to affix a Rembrandt logo to these modems. The purpose of this scheme, as Rembrandt's principal Mr. Schneck admitted to the general counsel of a company to which he proposed to sell re-branded modems, was to give the appearance that Rembrandt was actually a practicing entity suffering competitive injury in order to avoid the Supreme Court's *eBay* decision. (Ex. 55; Ex. 56 at 16:4 - 19:1; 20:1 - 24:10; 27:1-19; 31:1 - 32:25; 38:21 - 39:16; 40:23 - 41:13; 43:3-13; 15:2-21.) The Supreme Court's decision had made it a practical impossibility for a nonpracticing entity ("NPE") like Rembrandt to obtain an injunction. Rembrandt had in fact opposed that outcome in *amicus* briefing to the Supreme Court in which Rembrandt admitted it was a NPE. (Ex. 57.) Rembrandt nevertheless wanted to threaten AOPs with an injunction, so it set up a Remstream affiliate to try to portray itself as a practicing entity. (Ex. 55; Ex. 56. at 16:4 - 19:1; 20:1 - 24:10; 27:1-19; 31:1 - 32:25; 38:21 - 39:16; 40:23 - 41:13; 43:3-13.) This was all a sham, and Rembrandt's own experts explained in their reports that Rembrandt ████████████████████████████ ███████████████████████████ (Ex. 58 at ¶ 69; Ex. 59 at ¶ 19; Ex. 60.) The result of Rembrandt's misconduct unfair pressure on AOPs to try to extract unreasonable licensing fees. Unfair economic pressure is the kind of bad faith conduct that justifies an award of fees and sanctions. *See Medtronic Navigation, Inc. v. Brainlab Medizinische Computersystems GmbH,*

2008 WL 410413, at *5 (D. Colo., Feb. 12, 2008) (exceptional case found where matter filed not to protect the patented technology, but to exert market pressure on defendant).[7]

### E.      The Court Should Award AOPs Their Fees And Costs

Rembrandt's litigation misconduct and inequitable conduct make this case exceptional. The Court should therefore award AOPs their attorneys' fees and expenses. *See Takeda, supra*, 549 F.3d at 1390-91 (affirming $16.8 million in attorney fees, expenses and expert fees); *Bristol-Meyers Squibb*, 2002 WL 1733681 at *16 (awarding over $32 million for attorney fees, expert fees and expenses); *Mathis v. Spears*, 857 F.2d 749, 757 (Fed. Cir. 1988) (interpreting attorneys fees under 35 U.S.C. § 285 to  include expenses incurred "in the preparation for and performance of legal services related to the suit") (quoting *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983)).  This award should include monies expended in relation to AOPs' antitrust and unfair competition claims because those claims were "intertwined" with patent issues. *See Beckman Instr., Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1552 n.2 (Fed. Cir. 1989) (affirming attorneys' fees award for antitrust counterclaim "intertwined" with patent claims).  Indeed, Rembrandt itself argued that those claims were intertwined with infringement in connection with Rembrandt's argument that its covenant not to sue "mooted" those claims.  (D.I. 843 at 6-7.)  Pursuant to its inherent authority, the Court should also award AOPs their expert fees and costs. *See Takeda*, 549 F.3d at 1391 (affirming award of expert fees due to litigation misconduct).  Patent cases like this one require substantial expert involvement, as Rembrandt well knew.  Rembrandt itself relied on two technical experts, two damages experts and a standards expert for reports.

---

[7]    Rembrandt also demanded pre-suit damages where it could not possibly meet its burden of proof because of patent marking failures.

Pursuant to Fed. R. Civ. P. Rule 54(d), and as agreed with Rembrandt, AOPs provide as Attachment F a "fair estimate" of "the amount sought" for the fees and expenses incurred for representation of each AOP.[8]  As the Advisory Committee Notes to the 1993 Amendments to Rule 54 state, "[t]he rule does not require that the motion be supported at the time of filing with the evidentiary materials bearing on the fees," but that those materials must be submitted "in due course. . . as the Court may direct in light of the circumstances of the case."  AOPs respectfully request that the Court direct that "the evidentiary materials bearing on the fees" be submitted a reasonable time after the Court makes its exceptionality determination to award AOPs their fees and costs.  At that time, AOPs will show that the underlying hours, rates and expenditures are reasonable in light of the scope of the litigation Rembrandt brought here.  Through more than eight law suits spanning four years and several venues, Rembrandt threatened to enjoin the entire cable industry from providing cable modems and high speed Internet services, and argued that

██████████████████████████████████████████████████████

████████████████  Rembrandt reported to potential investors in its patent assertion fund, that

██████████████████████████████████████████████████████

(Ex. 14 at REMP 119939, ¶ 6(b); Ex. 7 at 24:18 - 25:6.)  In addition, if the Court wishes for AOPs to propose findings of fact and conclusions of law for this exceptional case (as required by Fed. R. Civ. P. 54(d)(2)(C) and 52(a)), AOPs also request a schedule to provide them.

---

[8]   In addition to the Eight Patents, some cable operators were sued on a ninth patent, U.S. Patent No. 5,243,627. Pursuant to the Court's Order of April 23, 2009, final judgment in favor of the cable operators will be entered on the '627 patent after the Court rules on pending summary judgment motions. (*See* D.I. 634 Attachment 1, ¶ 5). Therefore, the cable operators' estimates includes fees and costs incurred with respect to the '627 patent.

## IV.    CONCLUSION

AOPs respectfully request that the Court (i) find this case exceptional; (ii) find that AOPs are entitled to their attorneys fees and expenses pursuant to 35 U.S.C. § 285; (iii) find that AOPs are entitled to their expert fees and expenses pursuant to the Court's inherent power; and (iv) set a schedule for AOPs to submit evidentiary materials bearing on their fees and costs.

/s/ *John W. Shaw*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Jeffrey T. Castellano (#4837)
1000 West Street
Wilmington, DE 19801
(302) 571-6600
jingersoll@ycst.com
jshaw@ycst.com
jcastellano@ycst.com

*Co-Liaison Counsel for All Parties Other Than Rembrandt*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
Rodger D. Smith II (#3778)
1201 N. Market Street, P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
klouden@mnat.com
rsmith@mnat.com

*Co-Liaison Counsel for All Parties Other Than Rembrandt*

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey T. Castellano, Esquire, hereby certify that on November 23, 2009, I caused to be electronically filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Collins J. Seitz, Jr., Esquire
> Francis DiGiovanni, Esquire
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building – 8th Floor
> 1007 N. Orange Street
> Wilmington, DE  19801
> cseitz@cblh.com
> fdigiovanni@cblh.com

I further certify that on November 23, 2009, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel of record.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Jeffrey T. Castellano*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Jeffrey T. Castellano (No. 4837)
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
jcastellano@ycst.com