# United States Court of Appeals
# for the Federal Circuit

_____

## IN RE: REMBRANDT TECHNOLOGIES LP PATENT LITIGATION

-------------------------------------------------------------------

**REMBRANDT TECHNOLOGIES, LP, REMBRANDT TECHNOLOGIES, LLC, DBA REMSTREAM,**
*Plaintiffs-Appellants*

v.

**COMCAST OF FLORIDA/PENNSYLVANIA, LP, ADELPHIA CONSOLIDATION LLC, MOTOROLA, INC., CISCO SYSTEMS, INC., COMCAST OF PENNSYLVANIA II, LP, CENTURY-TCI CALIFORNIA COMMUNICATIONS, LP, CENTURY-TCI HOLDINGS, LLC, PARNASSOS COMMUNICATIONS, LP, CSC HOLDINGS, INC., TIME WARNER CABLE LLC, TIME WARNER CABLE ENTERPRISES LLC, COXCOM, INC., SCIENTIFIC-ATLANTA, INC., THOMSON, INC., NETGEAR, INC., CHARTER COMMUNICATIONS OPERATING LLC, CCO HOLDINGS LLC, ADELPHIA COMMUNICATIONS CORPORATION, PARNASSOS HOLDINGS, LLC, COMCAST CABLE COMMUNICATIONS, LLC, COMCAST CORPORATION, CABLEVISION SYSTEMS CORPORATION, AMBIT MICROSYSTEMS, INC.,**
*Defendants-Appellees*

**CENTURY-TCI DISTRIBUTION COMPANY, LLC, WESTERN NY CABLEVISION, LP, SHARP CORPORATION, SHARP ELECTRONICS CORP, CBS CORPORATION, NBC UNIVERSAL INC,**

2        IN RE REMBRANDT TECHS., LP PATENT LITIG.

**CENTURY-TCI CALIFORNIA, LP, PARNASSOS DISTRIBUTION COMPANY I, LLC, PARNASSOS DISTRIBUTION COMPANY II, LLC, PARNASSOS, LP, ABC, INC, COMCAST CABLE COMMUNICATIONS HOLDINGS, INC, COMCAST OF PLANO, LP, FOX BROADCASTING COMPANY, FOX ENTERTAINMENT GROUP, INC.**
*Defendants*

————————————

2017-1784

————————————

Appeal from the United States District Court for the District of Delaware in Nos. 1:06-cv-00635-GMS, 1:06-cv-00721-GMS, 1:06-cv-00727-GMS, 1:06-cv-00729-GMS, 1:06-cv-00730-GMS, 1:06-cv-00731-GMS, 1:07-cv-00396-GMS, 1:07-cv-00397-GMS, 1:07-cv-00398-GMS, 1:07-cv-00399-GMS, 1:07-cv-00400-GMS, 1:07-cv-00401-GMS, 1:07-cv-00402-GMS, 1:07-cv-00403-GMS, 1:07-cv-00404-GMS, 1:07-cv-00752-GMS, 1:07-md-01848-GMS, Judge Gregory M. Sleet.

————————————

Decided:  July 27, 2018
SEALED OPINION ISSUED: July 27, 2018
PUBLIC OPINION ISSUED: August 15, 2018*

————————————

THOMAS GOLDSTEIN, Goldstein & Russell, P.C., Bethesda, MD, argued for plaintiffs-appellants.  Also represented by TEJINDER SINGH.

————————————

\* This opinion was originally filed under seal and has been unsealed in full.

JOHN C. O'QUINN, Kirkland & Ellis LLP, Washington, DC, argued for all defendants-appellees. Defendants-appellees Motorola, Inc., Cisco Systems, Inc., Scientific-Atlanta, Inc., Thomson, Inc., Ambit Microsystems, Inc., NETGEAR, Inc. also represented by AARON NIELSON, JASON M. WILCOX; STEVEN CHERNY, New York, NY.

BRIAN LEE FERRALL, Keker, Van Nest & Peters LLP, San Francisco, CA, for defendants-appellees Comcast of Florida/Pennsylvania, LP, Comcast of Pennsylvania II, LP, Century-TCI California Communications, LP, Century-TCI Holdings, LLC, Parnassos Communications, LP, Parnassos Holdings, LLC, Comcast Cable Communications, LLC, Comcast Corporation. Also represented by LEO L. LAM.

BENJAMIN HERSHKOWITZ, Gibson, Dunn & Crutcher LLP, New York, NY, for defendants-appellees CSC Holdings, Inc., Cablevision Systems Corporation. Also represented by JOSH KREVITT, ROBERT SCOTT ROE.

THOMAS LEE DUSTON, Marshall, Gerstein & Borun LLP, Chicago, IL, for defendants-appellees Time Warner Cable, LLC, Time Warner Cable Enterprises LLC, Charter Communications Operating LLC, CCO Holdings LLC. Also represented by JULIANNE M. HARTZELL, KEVIN DAVID HOGG.

MICHAEL CRAIG HARWOOD, Kasowitz Benson Torres LLP, New York, NY, for defendants-appellees Adelphia Communications Corporation, Adelphia Consolidation LLC.

MITCHELL G. STOCKWELL, Kilpatrick Townsend & Stockton LLP, Atlanta, GA, for defendant-appellee Cox-Com, Inc. Also represented by RICHARD W. GOLDSTUCKER.

———————————

Before O'MALLEY, MAYER, and REYNA, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

This appeal derives from a multitude of patent infringement actions that plaintiffs-appellants Rembrandt Technologies, LLC and Rembrandt Technologies, L.P. (collectively, "Rembrandt") filed in the mid-2000s against dozens of cable companies, cable equipment manufacturers, and broadcast networks. The cases were consolidated in the District of Delaware. After several years of litigation, the district court entered final judgment against Rembrandt as to all claims.

Many of the defendants (collectively, "Appellees") thereafter filed a motion requesting attorney fees under 35 U.S.C. § 285. Nearly four years after the litigation ended, the district court issued a brief order granting that motion and declaring the case exceptional. *In re Rembrandt Techs., LP Patent Litig.*, No. 1:07-md-01848-GMS (D. Del. Aug. 20, 2015), ECF No. 951 ("*Exceptional Case Order*"). The court then granted the bulk of Appellees' requests for fees, including nearly all of the attorney fees Appellees incurred in the litigation. *In re Rembrandt Techs., LP Patent Litig.*, No. 1:07-md-01848-GMS (D. Del. Aug. 24, 2016), ECF No. 1013 ("*First Fees Order*"). In total, the court awarded Appellees more than $51 million in fees. *In re Rembrandt Techs., LP Patent Litig.*, No. 1:07-md-01848-GMS (D. Del. Mar. 2, 2017), ECF No. 1044 ("*Second Fees Order*").

Rembrandt appeals both the district court's exceptional-case determination and its fee award. We conclude that the district court did not abuse its discretion in deeming this case exceptional, but that the court erred by failing to analyze fully the connection between the fees awarded and Rembrandt's misconduct. We thus affirm the district court's exceptional-case determination, vacate the district court's fee award, and remand for further proceedings.

# I. BACKGROUND

## A. The Patents in Suit

The underlying litigation involves nine patents belonging to Rembrandt. Eight of them address cable modem technology—U.S. Patent Nos. 4,937,819 ("the '819 patent"), 5,008,903 ("the '903 patent"), 5,710,761 ("the '761 patent"), 5,719,858 ("the '858 patent"), 5,778,234 ("the '234 patent"), 5,852,631 ("the '631 patent"), 6,131,159 ("the '159 patent"), and 6,950,444 ("the '444 patent"). The ninth patent, U.S. Patent No. 5,243,627 ("the '627 patent"), involves over-the-air signals. Although the patented technology is not directly relevant here, the history of the patents and the documents associated with the technology bears heavily on the issues on appeal.

### 1. Rembrandt and Paradyne

Before Rembrandt obtained the patents at issue, they belonged to Paradyne Networks, Inc. ("Paradyne"), a former AT&T subsidiary that developed, manufactured, and distributed network access products. Three former Paradyne employees are relevant to this appeal: Gordon Bremer, the former director of Paradyne's technology department who managed its patent portfolio; Scott Horstemeyer, Paradyne's outside patent prosecution counsel; and Patrick Murphy, Paradyne's Chief Financial Officer.

In 2002, Paradyne decided that the expected value of the '819 and '858 patents did not justify paying their maintenance fees, and it therefore let the patents lapse. Horstemeyer and Bremer later testified that Paradyne incorrectly believed it could thereafter make belated payments of the maintenance fees to revive the patents if it so desired. The '819 and '858 patents lapsed in June and February 2002, respectively.

Following some third-party interest in acquiring the Paradyne patents, Bremer, Horstemeyer, and Murphy decided to petition the United States Patent and Trademark Office ("PTO") to revive the '819 and '858 patents. In connection with that request, they represented that "the delay in payment of the maintenance fee of this patent was unintentional." J.A. 141; *see* J.A. 150. Horstemeyer testified in these proceedings that he felt he could truthfully say that the failure to pay fees had been unintentional because of Paradyne's misunderstanding about the conditions for revival. Horstemeyer explained, however, that he did not offer this explanation to the PTO at the time because he did not want to deviate from the PTO form. The PTO granted the revival petitions.

In September 2004, Paradyne contacted Rembrandt to propose a joint "patent assertion team" to "exploit[] the Paradyne patents"—including the ones that Paradyne had revived. Appellees' Br. 8. In December 2004, Paradyne and Rembrandt executed a patent sale agreement that assigned six of the asserted patents (as well as several others not at issue here) to Rembrandt. The agreement also gave Rembrandt the right to access and copy relevant Paradyne documents. The companies amended their agreement in February 2005, adding the '819 patent to the portfolio of patents assigned to Rembrandt. Rembrandt's in-house counsel, John Meli, asked Paradyne in March 2005 to "save any material that relates to patents you sold to us or plan to sell to us, including product data that embodies the patented inventions." J.A. 203.

## 2. Rembrandt and Zhone

Paradyne was acquired in September 2005 by Zhone Technologies ("Zhone"), an equipment manufacturer. Thereafter, Zhone cut much of Paradyne's workforce and footprint.

Zhone also began to destroy Paradyne's documents, most of which were housed in a storage facility separate from Paradyne's offices. Zhone's general counsel, Paul Castor, testified that the purpose of the document destruction was to cut storage costs, that boxes of documents were destroyed based on their dates (and not their contents), and that Zhone staff had no time to review their contents before destroying them. Zhone discarded approximately 3,200 boxes of documents in total, 90% of them between September 2005 and April 2006. The destroyed documents related to conception and reduction to practice of the patents at issue; potentially invalidating sales and offers to sell; public uses of prior art products; royalty agreements and licensing; standardization of the relevant technology; and patent prosecution.

There is no direct evidence that anyone at Rembrandt was aware of the document destruction, but Meli—then Rembrandt's in-house counsel—repeatedly visited Paradyne's offices to review and copy documents around the time of the sale to Zhone. Meli and other Rembrandt witnesses later testified that Rembrandt did not send Paradyne or Zhone a formal document retention notice until at least 2007. Several Zhone employees could recall no such requests from Rembrandt before 2008.

On February 14, 2006, Rembrandt signed a consulting agreement with Attic IP ("Attic"), a consulting firm that Bremer, Murphy, and Horstemeyer had formed. The consultants agreed to provide Rembrandt "[a]ssistance with patent portfolio analysis and ongoing patent assertion programs." J.A. 240. In exchange, Rembrandt would pay Attic an annual flat fee, in addition to a small percentage of licensing or litigation royalties if Rembrandt subsequently acquired any patents from Zhone. The agreement would not take effect until such an acquisition occurred.

Weeks after Bremer signed this agreement—but before Rembrandt had acquired any patents from Zhone, so that Bremer still had no stake in licensing or litigation royalties—Zhone's general counsel, Castor, asked Bremer to review 30 boxes of documents.  Bremer wrote back to Castor that the documents "generally contain[ed] sales/marketing strategies, plans, reports, etc.," not "'legal' documents."  J.A. 256.  Bremer asked whether Castor wanted him to provide other details and whether the boxes should "remain in storage or be destroyed."  *Id.*  Castor simply wrote back "destroy."  *Id.*  Bremer did not object.

A few months later, on June 9, 2006, Rembrandt entered into a patent sale agreement with Zhone, acquiring more than 100 patents, including two of the patents in suit (the '444 and '903 patents).  Like the sale agreement with Paradyne, the agreement provided that Zhone would give Rembrandt access to documents relating to the assigned patents.

On June 12, 2006, Rembrandt learned that Zhone was planning to discard warehoused documents, including those relevant to the patents Rembrandt had purchased from Paradyne.  Rembrandt urged Zhone not to destroy documents relevant to the patents it had purchased and began to work out an arrangement to preserve them.  Castor told Rembrandt that it was "welcome to have" files relating to the purchased patents but that, if Rembrandt was not interested in them, Zhone would "likely destroy [them] in accordance with [its] records policy."  Appellants' Br. 40.  Rembrandt told Zhone to send Rembrandt the relevant files.

In August 2006, Rembrandt arranged for the Attic consultants to take custody of the Zhone documents (termed the "Documents of Common Interest"), including patent disclosure and prosecution files, patent mainte-

nance files, inventor files, license agreement and acquisition files, technical files, and patent marketing files.

## B. The Present Litigation

This brings us to the present litigation. In September 2005, Rembrandt sued Comcast in the Eastern District of Texas, asserting infringement of six patents it had acquired from Paradyne. *Rembrandt Techs., LP v. Comcast Corp.*, No. 2:05-CV-00443-TJW (E.D. Tex.). Rembrandt then sued several other cable providers in the same district in June 2006. *Rembrandt Techs., LP v. Time Warner Cable, Inc.*, Nos. 2:06-cv-224 (TJW-CE), 2:06-cv-369 (TJW-CE) (E.D. Tex.); *Rembrandt Techs., LP v. Charter Commc'ns, Inc.*, Nos. 2:06-cv-223 (TJW-CE), 2:06-cv-507 (TJW-CE) (E.D. Tex.).

After Rembrandt acquired more patents from Zhone, it filed a second wave of litigation in November 2006. Rembrandt added five patents, including two from Zhone, to its pending suits. At that time, the Attic consultants—Bremer, Murphy, and Horstemeyer—gained a stake in the outcome of Rembrandt's litigation. Rembrandt additionally asserted four of those patents against Adelphia Communications Corp. ("Adelphia") in Adelphia's ongoing bankruptcy proceedings before the Bankruptcy Court for the Southern District of New York. *Rembrandt Techs., LP v. Adelphia Commc'ns Corp.*, Bky. Adv. No. 1:06-1739-reg (Bankr. S.D.N.Y.). Rembrandt also sued several broadcast networks in the District of Delaware. *E.g.*, *Rembrandt Techs., LP v. CBS Corp.*, No. 1:06-cv-00727-GMS (D. Del.).

The Judicial Panel on Multidistrict Litigation consolidated all of Rembrandt's pending suits before Judge Sleet in the District of Delaware. *In re Rembrandt Techs., LP, Patent Litig.*, 493 F. Supp. 2d 1367 (J.P.M.L. 2007). Soon thereafter, several cable modem equipment manufacturers—most of which are among the Appellees here—filed suit against Rembrandt in the District of Delaware seek-

ing a declaratory judgment that their products did not infringe any valid patents. *Motorola, Inc. v. Rembrandt Techs., LP*, No. 1:07-cv-00752-GMS (D. Del.). The declaratory judgment action was consolidated into the multidistrict litigation as well.

### 1. Litigation on the Merits

After a *Markman* hearing in August 2008, the district court issued claim construction orders on the nine patents, all of which were adverse to Rembrandt. *See In re Rembrandt Techs., LP Patent Litig.*, No. 1:07-md-01848-GMS, 2008 WL 5773604 (D. Del. Nov. 19, 2008); *In re Rembrandt Techs., LP Patent Litig.*, No. 1:07-md-01848-GMS, 2008 WL 5773627 (D. Del. Nov. 7, 2008). On January 6, 2009, Rembrandt advised the parties that, in light of the claim construction order, it would not pursue its infringement claims on three of the patents in suit—the '631, '819, and '858 patents—unless the district court's claim construction was reversed on appeal. And, after further discovery, Rembrandt offered to drop the '903 and '234 patents from the litigation in March and May 2009, respectively.

On July 31, 2009, after the parties executed a mutual covenant not to sue, Rembrandt moved to dismiss its claims on eight of the patents, and the defendants moved to dismiss their associated invalidity counterclaims. The district court granted the motion and dismissed the claims and counterclaims. On the remaining '627 patent, Rembrandt stipulated to summary judgment of noninfringement subject to its appeal of the district court's claim construction decisions. The district court granted the motion on July 8, 2011. We affirmed the district court's claim construction in 2012. *In re Rembrandt Techs., LP*, 496 F. App'x 36 (Fed. Cir. 2012).

Until Rembrandt dismissed its claims, the parties engaged in considerable fact discovery. Appellees produced more than 15 million pages of documents, Rembrandt

took 75 depositions, and Appellees took 35 depositions of
their own.  Rembrandt also provided eight reports from
five experts, and Appellees responded with eleven reports
from seven experts.  Rembrandt incurred $20 million in
fees from 2006 to 2008 alone.

Appellees also subpoenaed documents from Paradyne
and Zhone.  Although Rembrandt's attorneys responded
to these subpoenas, Rembrandt never searched the ware-
house where it claimed Paradyne's boxes were stored, nor
acknowledged any document destruction until after April
2008.  Rembrandt instead claimed that it could not ascer-
tain information relevant to the on-sale bar, and it denied
on several occasions that it had access to or control over
Paradyne product documentation.  Rembrandt also as-
serted in interrogatory responses and in its opposition to
summary judgment that there was no evidence of prior
sales, without mentioning that relevant documents poten-
tially reflecting such sales might have been destroyed.

2.  Fee Motions

Through discovery, Appellees ultimately learned
about the abandonment and revival of the '819 and '858
patents, the three Attic consultants' contingent interests
in the litigation, and Zhone's destruction of documents.
On July 8, 2009—after Rembrandt had dropped its in-
fringement case as to five of the patents, but before the
covenant not to sue had been finalized—the district court
granted Appellees permission to file a motion for sanc-
tions as a motion in limine.  Two weeks later, the parties
entered into the covenant not to sue on all patents other
than the '627 patent.

On November 16, 2009, Appellees moved for a deter-
mination that the case was exceptional under 35 U.S.C.
§ 285 and for an award of attorney fees.  The parties
adverse to Rembrandt—which the parties defined as "All
Other Parties," or "AOPs"—argued that the case was
exceptional because Rembrandt (1) asserted two patents

that Paradyne had revived improperly; (2) allowed Zhone to spoliate evidence; (3) improperly gave the Attic consultants an interest contingent on the litigation outcome; and (4) threatened AOPs with a baseless injunction demand.   Adelphia additionally argued in a separate motion that Rembrandt (1) had failed to comply with the marking requirement of 35 U.S.C. § 287, (2) possessed evidence that the on-sale bar invalidated two of the asserted patents, and (3) engaged in bad-faith conduct before the Bankruptcy Court for the Southern District of New York.[1]

On July 13, 2011, the district court struck the fee motions as premature in light of the still-live dispute with regard to the '627 patent.   But, after we affirmed the district court's ruling on the '627 patent in 2012, the district court ordered that the fees motions would be deemed re-filed as of September 7, 2011.   More than a year later, the court returned the sealed record to the parties without ruling on the motion.

Soon after the Supreme Court decided *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), AOPs submitted a notice of supplemental authority to the district court citing that case.   Rembrandt responded by arguing that AOPs had abandoned their motion because the case had been closed for two-and-a-half years and because the pertinent briefs and support-

---

[1]    Rembrandt now claims that Adelphia was not one of the AOPs.  Appellants' Br. 15 n.6.  But, as the district court later noted, the parties submitted a joint status report early in the litigation defining the term AOPs to include "all parties adverse to Rembrandt, whether they are defendants or declaratory relief claimants."   *In re Rembrandt Techs., LP Patent Litig.*, No. 1:07-md-01848, at 1 n.1 (D. Del. Dec. 6, 2012), ECF No. 937.  That definition encompasses Adelphia.

ing documentation had been returned to AOP's counsel, who had accepted them without objection. Rembrandt also contended that a ruling on the motions would cause great prejudice to Rembrandt because the briefings and supporting documents were stale. Rembrandt further argued that the case was not exceptional under the *Octane Fitness* standard.

On August 20, 2015, the district court issued a four-page order ruling on the motions, which by then had been pending for nearly four years. *Exceptional Case Order*, at 1–4. The district court attributed the delay in issuing the order to its "own administrative carelessness." *Id.* at 2 n.3.

The court determined that the case was "indeed exceptional" for three reasons. *Id.* at 3 n.4. First, the court found that "the evidence shows that Rembrandt improperly compensated its fact witnesses, in violation of ethical rules of conduct." *Id.* (citing Model Rules of Prof'l Conduct R. 3.4(b) and cmt. 3 (Am. Bar Ass'n 2015)). Second, the court was "convinced that Rembrandt engaged in (or failed to prevent) widespread document spoliation over a number of years." *Id.* The court acknowledged Rembrandt's argument that "it did not directly destroy any documents and that it lacked control over those who did actually commit the spoliation," but the court nonetheless was "persuaded by a preponderance of the evidence that Rembrandt did have control and did anticipate forthcoming litigation such that it had a duty to preserve or instruct others to retain certain documents." *Id.* The court concluded that "AOPs' inability to conduct full discovery was prejudicial." *Id.* Finally, the court found that "Rembrandt should have known that the 'revived patents' were unenforceable." *Id.*

Based on these findings, the court determined "that the evidence amply supports a finding that this case is exceptional." *Id.* The court dismissed what it called

Rembrandt's "attempt[] to wipe its hands of all wrongdoing, pointing the finger at third parties," because "Rembrandt must take responsibility for its own massive litigation." *Id.* The court concluded that, although things might have been different "[i]f it had only been a single issue, . . . the 'totality of the circumstances'—the wrongful inducements, the spoliation, and the assertion of fraudulently revived patents—supports AOPs' characterization of this case as 'exceptional.'" *Id.* (quoting *Octane Fitness*, 134 S. Ct. at 1756). The court thereafter denied Rembrandt's motion for reargument. *In re Rembrandt Techs., LP Patent Litig.*, No. 1:07-md-01848 (D. Del. Aug. 2, 2016), ECF No. 1011 ("*Reargument Order*").

In view of its exceptional case finding, the court ordered AOPs to submit documentation regarding their attorney fees, which they promptly did.

### 3. Fee Awards

On August 24, 2016, the district court granted AOPs' requested fees in part. *First Fees Order*, at 1. The court found that AOPs had "provided extensive documentation to enable an evaluation of reasonableness" of their requested fees and that the submitted hourly rates, based in part on the American Intellectual Property Law Association's economic survey, were reasonable because the case was "complex multi-district litigation." *Id.* at 1 n.2. The court also found that "[t]his was a challenging case calling for substantial time and expertise." *Id.* Although the court did not analyze separately whether the hours expended were reasonable, it found that the lodestar amount was reasonable. *Id.*

The court excluded, however, several categories of fees, including expert fees, fees related to Adelphia's bankruptcy, fees for time spent on secretarial or clerical work, and prejudgment interest. *Id.* at 2. The court ordered AOPs "to calculate costs and fees and submit an

updated total of expenses incurred for approval within 14 days." *Id.* at 3.

On March 2, 2017, after considering AOPs' revised proposed order regarding expenses and Rembrandt's objections to that total, the district court issued an order awarding fees. *Second Fees Order*, at 1. Although "Rembrandt did not have leave to file" any objections, the court addressed and rejected each relevant objection "out of an abundance of caution to Rembrandt's substantive rights." *Id.* at 1 n.1. As relevant here, the court permitted fees related to the '627 patent, noting that AOPs' opening brief "provided detailed calculations of attorneys' fees and costs in connection with the '627 patent." *Id.* at 2 n.1. The court also awarded "fees and costs related to the Adelphia Bankruptcy," because the court's denial of fees related to the bankruptcy did "not preclude an award of fees incurred defending the causes of action that Rembrandt brought in the bankruptcy court that were ultimately consolidated in [this] multi-district litigation." *Id.* The court therefore found "that it [was] reasonable to award Adelphia expenses relating to the Rembrandt litigation while it was pending in the Bankruptcy Court for the Southern District of New York." *Id.*

The district court ultimately ordered Rembrandt to pay more than $51 million in fees to all Appellees, including Adelphia. *Id.* at 2–3. Rembrandt appealed. We have jurisdiction under 28 U.S.C. §§ 1295(a)(1) and 1338(a).

## II. DISCUSSION

### A. The Exceptional-Case Determination

The district court determined that this was an exceptional case. Specifically, the court found that Rembrandt: (1) wrongfully gave fact witnesses payments contingent on the outcome of the litigation; (2) engaged in, or failed to prevent, widespread document spoliation by Zhone; and (3) should have known that the revived patents were

unenforceable.  Rembrandt argues that all three of the district court's misconduct findings were erroneous; that the district court did not follow the proper procedures in making these findings; and that the claimed misconduct, taken together, does not render the entire multi-district litigation exceptional.

We review an exceptional case determination for abuse of discretion. *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 482 (Fed. Cir. 2016) (citing *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1749 (2014)).  "To meet the abuse-of-discretion standard, the moving party must show that the district court has made 'a clear error of judgment in weighing relevant factors or in basing its decision on an error of law or on clearly erroneous factual findings.'" *Bayer CropScience AG v. Dow AgroSciences LLC*, 851 F.3d 1302, 1306 (Fed. Cir. 2017) (quoting *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 150 F.3d 1374, 1377 (Fed. Cir. 1998)).

Rembrandt raises strong arguments with respect to the district court's factual findings.  The district court's remarkably terse orders shed little light on its justifications for its decisions on these fact-intensive issues.  But abuse of discretion is a deferential standard.  On the record before us, we cannot say that any of the district court's findings was based "on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Highmark*, 134 S. Ct. at 1748 n.2 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).  And, as explained below, the district court did not abuse its discretion, procedurally or substantively, in determining that this pattern of misconduct rendered the case "exceptional" within the meaning of § 285.

### 1. The District Court's Finding that the Witness Payments Were Improper Is Not Clearly Erroneous

Rembrandt first disputes the district court's decision that "the fee structure for Rembrandt's fact witnesses was unreasonable and improperly linked to the outcome of the case, giving rise to a considerable risk of tainted testimony." *Exceptional Case Order*, at 3 n.4. Rembrandt contends that it never expected the Attic consultants to become fact witnesses, that the agreement did not prejudice Appellees, and that the agreements were permissible under our precedent.

After filing suit based on the Paradyne patents, Rembrandt hired three former Paradyne employees in February 2006 to provide "[a]ssistance with . . . *ongoing* patent assertion programs." J.A. 240 (emphasis added). Although the agreement did not immediately give the consultants an interest in the outcome of the ongoing litigation, it clearly contemplated future "assertion programs." It expressly granted the consultants a stake in any litigation involving the Zhone patents, once acquired. Rembrandt bought patents from Zhone in June 2006 and asserted them later that year. The district court reasonably could have found that, when Rembrandt signed the consulting agreement, it was likely that the consultants would play a role in litigation.

It also was foreseeable, at the very least, that the consultants would become fact witnesses in that litigation, given their roles within Paradyne. Meli—Rembrandt's former in-house counsel—acknowledged as much in his deposition. Whether Rembrandt identified the consultants as witnesses is beside the point. As Appellees correctly point out, all three witnesses *did* in fact testify about their knowledge of facts relevant to the merits of the lawsuit. Bremer testified about his involvement in patenting and licensing, the decision to abandon patents (which was related to Appellees' inequitable conduct

defense), the development process that led to the patented technology, and potentially invalidating sales of products that may have practiced the asserted patents.  And Horstemeyer testified that he prosecuted most of the asserted patents, that he participated in the patent review board at Paradyne that decided whether to proceed with patent applications, and that he helped decide whether to abandon patents.  Murphy was not involved as directly, but he was Paradyne's CFO during the relevant period and also participated in the patent review board.

It is true, as Rembrandt notes, that the district court never found that any witnesses gave false testimony.  But the issue that the district court correctly identified was not that witnesses lied, but that the contingent fee arrangement gave them incentives to lie.  For exactly this reason, the Delaware State Bar Association has advised lawyers not to pay, offer to pay, or acquiesce in payments to witnesses contingent on the outcome of the case.  Del. State Bar Ass'n Comm. on Prof'l Ethics, Opinion 1994-1 at 2–3, *available at* http://media.dsba.org/ethics/pdfs/1994-1.pdf.

Rembrandt may be right that Bremer had simply forgotten key details about sales associated with a twenty-year-old project.  But his contingent interest in the litigation outcome gave him a strong incentive not to remember those sales, and it renders Appellees' claim of tainted testimony at least plausible.  And, though Bremer had a similarly innocent explanation for his tacit approval of Castor's decision to destroy sales documents, Bremer's potential stake in the case may well have led the district court to see his acquiescence in a different light.  It was reasonable for the district court to find "that the fee structure for Rembrandt's fact witnesses was unreasonable and improperly linked to the outcome of the case, giving rise to a considerable risk of tainted testimony." *Exceptional Case Order*, at 3 n.4.

Rembrandt contends that the district court's decision conflicts with our holding in *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998). In that case, the patent infringement defendant, U.S. Surgical Corp., obtained a retroactive license for the asserted patent from a third party, Young Jae Choi, who claimed to be an omitted co-inventor. *Id.* at 1459. The license agreement explicitly required Choi to testify in the lawsuit in exchange for a fixed initial payment and an additional payment if U.S. Surgical prevailed in the suit. *Id.* at 1459, 1465. We found that the district court did not abuse its discretion by admitting Choi's testimony, "subject to cross-examination that might expose Choi's bias." *Id.* at 1465.

In several respects, the agreement in *Ethicon* raises more ethical concerns than the one here. The testimony that U.S. Surgical secured from Choi was known to be case-dispositive, but when Rembrandt hired the Attic consultants, all Rembrandt could have known is that their testimony would likely be relevant to certain defenses. And the *Ethicon* agreement conditioned the bulk of the payment on U.S. Surgical's prevailing in the litigation, which provided a much stronger incentive to the inventor than a percentage of any licensing or litigation proceeds.

But, as Appellees note, the agreement in *Ethicon* involved the *assignment* of patent rights. In allowing the assignor to testify, we noted that "[a] patent license agreement that binds the inventor to participate in subsequent litigation is very common," because it "simply assures the licensee that it will be able to defend the property in which it has purchased an interest." *Id.* Rembrandt also cites several district court decisions permitting contingent payment arrangements, but each of those opinions relies on the fact that the payments were "made in connection with an assignment or license of patent rights." *ESN, LLC v. Cisco Sys., Inc.*, 685 F. Supp.

2d 631, 646 (E.D. Tex. 2009); *see Rembrandt Gaming Techs., LP v. Boyd Gaming Corp.*, No. 2:12-cv-00775-MMD-GWF, slip op. at 3 (D. Nev. Mar. 31, 2017) (observing that "the Agreement involves assignment of the Patent, not an agreement to pay fact witnesses to testify, and the witnesses identified included the inventor"). Rembrandt identifies no comparable agreements to the one here, however, where the contingent interest was given to likely witnesses *only* for their help with a licensing or litigation campaign.

In short, *Ethicon* did not upend the longstanding ethical rule in Delaware and other jurisdictions that fact witnesses to a lawsuit should not be paid contingent on the outcome of the suit.  It is instead best read as an exception to that rule that applies only when the contingent payment accompanies the assignment or license of patent rights.  As we said in *Ethicon*, it makes sense for a licensee or assignee to give the licensor or assignor an incentive "to defend the property in which [the former] has purchased an interest." 135 F.3d at 1465.  And these contingent interests make sense for sellers as well—they ensure that, if the patented technology unexpectedly gains value, the licensor or assignor can reap some portion of the windfall.  The agreement between Rembrandt and Attic, on the other hand, was fundamentally different from the sale of a right in a patent, and it does not implicate these policy rationales.  The district court's decision does not call these "very common" agreements into question, *id.*, as Rembrandt suggests, and its finding that the witness payments were improper is not clearly erroneous.

### 2. The District Court's Document Spoliation Finding Is Not Clearly Erroneous

Rembrandt also disputes the district court's conclusion "that Rembrandt engaged in (or failed to prevent) widespread document spoliation, over a number of years." *Exceptional Case Order*, at 3 n.4.  This court reviews the

district court's spoliation decision under the law of the regional circuit. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1345 (Fed. Cir. 2011). In the Third Circuit, "[s]poliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (citing *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)).

Rembrandt does not dispute that Zhone destroyed thousands of boxes of documents starting in January 2006. Rembrandt also does not dispute that, by that time, litigation already had begun or was reasonably foreseeable, meaning that Rembrandt had a duty to preserve relevant evidence. *Id.*; *see Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) ("The duty to preserve evidence begins when litigation is 'pending or reasonably foreseeable.'" (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001))). And Rembrandt does not meaningfully dispute that, even if most of these documents had no bearing on the case, at least some of the destroyed documents were relevant. Rembrandt argues only that it had no control over the documents destroyed and that the district court committed clear error in finding that "spoliation occurred, under facts that support bad faith" on the part of Rembrandt. *Reargument Order*, at 2 n.1.

"[A] district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Octane Fitness*, 134 S. Ct. at 1756–57. "Even if [Rembrandt's] litigation conduct was not quite sanctionable," therefore, the district court could "reasonably determine[] that the case was exceptional." *Lumen View*, 811 F.3d at 483. But

the district court specifically found, as part of its exceptional-case determination, that Rembrandt spoliated evidence.  The relevant question, therefore, can be framed as whether the district court based that conclusion on "clearly erroneous factual findings."  *Bayer CropScience*, 851 F.3d at 1306 (quoting *Mentor Graphics*, 150 F.3d at 1377).

The first aspect of that inquiry is whether "the evidence was in [Rembrandt's] control."  *Bull*, 665 F.3d at 73.  Rembrandt points out that Paradyne and then Zhone always maintained physical possession of the documents while they were being destroyed.  In signing the patent sale agreements, however, Paradyne and Zhone legally obligated themselves to give Rembrandt access to all documents related to the assigned patents.  Rembrandt did not just obtain this right; it exercised the right by asking Bremer to collect the Documents of Common Interest.[2]  As noted above, Rembrandt attorneys issued discovery responses and made all document productions on behalf of Paradyne and Zhone until September 2008.  The district court reasonably could infer that Rembrandt, not Paradyne or Zhone, actually had control over the documents that Zhone destroyed.

Next, under Third Circuit law, "a finding of bad faith is pivotal to a spoliation determination."  *Bull*, 665 F.3d at 79.  Spoliation cannot occur, moreover, "where the destruction was a matter of routine with no fraudulent intent."  *Brewer*, 72 F.3d at 334 (quoting 29 Am. Jur. 2d Evidence § 177).  Rembrandt emphasizes that Zhone only destroyed the documents to clear warehouse space and

---

[2]    Appellees' assertion that these documents comprised only those that were helpful to Rembrandt, Appellees' Br. 50–51, finds no support in the record.  Bremer's offer to collect these documents on Rembrandt's behalf does help establish Rembrandt's control, however.

did not even look at their contents. Indeed, nothing in the record suggests that Zhone acted with fraudulent intent.

But the issue is not Zhone's bad faith; it is Rembrandt's. Rembrandt instructed Paradyne in March 2005 to preserve material related to the patents sold and asked Zhone for access to or copies of all relevant materials in January 2006. Rembrandt also obtained boilerplate contractual assurances from Paradyne that Paradyne would provide "all material information within its possession . . . regarding the assigned patents." J.A. 155, § 3.1.3; Appellants' Br. 61. And only in June 2006, after Zhone had destroyed the bulk of the Paradyne documents, did Bremer tell Rembrandt about the document destruction.

Two facts in the record suggest, however, that Rembrandt knew that document destruction was a significant risk. First, Meli visited the former Paradyne facility in Florida shortly after the Zhone acquisition, and he reported that "every cubicle is gone, there's nobody in it, [and] papers are strewn all over the place." J.A. 2419–20, 72:14–73:11; Appellees' Br. 11. He testified that he "really [did] believe it was shut down" and "being dismantled." J.A. 2419, 72:22–25; J.A. 2422, 75:11–22; Appellees' Br. 10, 14, 50. By that time, litigation already was ongoing, and Meli should have known that some of the documents "strewn all over the place" might be relevant to that litigation. And second, Bremer—who by then was on the Rembrandt payroll—participated in the document destruction well before June 2006. He reviewed dozens of boxes for potential disposal in March 2006, some of which were sales documents, and he allowed Zhone to order them to be destroyed. Bremer was not a lawyer, but he had run a patent program for 30 years and later admitted that he knew that sales documents could be relevant to the on-sale bar. He testified that he did not preserve the documents simply because he had not been instructed to

do so.  Bremer also admitted that he never asked for other warehoused documents to be preserved.

Even after it knew about the risk of document destruction, Rembrandt did not issue a formal document retention notice until May 2008.  Rembrandt points to its January 2006 letter, in which it sought "access to, and copies of, all documents that may be related to the patents in suit," including but not limited to "any documents relating to the products that embody any invention claimed in the patents in suit (both technical and financial documents)."  J.A. 229–30.  That request did imply that Zhone should hand over those documents instead of destroying them.  But subsequent testimony from Rembrandt's own in-house attorneys suggests that even they did not consider the 2006 letter a document-retention notice.  Given the significant risk of document destruction, Rembrandt could have at least issued a litigation hold.[3]

---

[3]    Appellees cite several out-of-circuit district court cases for the proposition that "[a] litigation hold is not, alone, sufficient; instead compliance must be monitored." *Bagley v. Yale Univ.*, 318 F.R.D. 234, 239 (D. Conn. 2016) (quoting *Mastr Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, 295 F.R.D. 77, 85 (S.D.N.Y. 2013)); *see Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1147 (N.D. Cal. 2012) (finding that "Samsung had a duty to verify whether its employees were actually complying with the detailed instructions Samsung claims it communicated to them").  Appellees do not elaborate on how well these cases represent Third Circuit law.  The *Apple* decision, in fact, explicitly mentions that "bad faith is not the required mental state for the relief Apple seeks," 881 F. Supp. 2d at 1147, indicating that the Ninth Circuit employs a lower standard for spoliation.

Rembrandt relies heavily on *St. Clair Intellectual Property Consultants, Inc. v. Toshiba Corp.*, No. CV 09-354-LPS, 2014 WL 4253259 (D. Del. Aug. 27, 2014), to support its assertion that its conduct did not rise to the level of bad faith. In *St. Clair*, the district court found no bad faith where thousands of pounds of documents were destroyed by the former owners of patents that the plaintiff was asserting. *Id.* at *4. With respect to some documents, the *St. Clair* court found that the defendant had "not shown *any* intent to suppress evidence; to the contrary, the record suggests that a benign explanation is more plausible." *Id.* And for others, the court was "not persuaded that [the plaintiff's and a former patent owner's] destruction of the boxes of information was due to anything worse than 'inadvertence, negligence, inexplicable foolishness, or part of the normal activities of business or daily living.'" *Id.* at *5 (quoting *Bozic v. City of Wash.*, 912 F. Supp. 2d 257, 270 (W.D. Pa. 2012)). The court observed that the plaintiff's attorneys were "unaware of the destruction of evidence," and that the plaintiff "believed all the contents of the boxes had been copied." *Id.*

The facts here are different than those at issue in *St. Clair*. The plaintiff in *St. Clair* was unaware of the document destruction and believed all relevant information had been copied. Here, as discussed above, Rembrandt had reason to believe that document destruction was possible, and it certainly knew that relevant information remained in the possession of Zhone. The district court reasonably could have found Rembrandt's claim of ignorance to be implausible.

Given all of the above, the district court reasonably could find "that Rembrandt did have control and did anticipate forthcoming litigation such that it had a duty to preserve or instruct others to retain certain documents." *Exceptional Case Order*, at 3 n.4. As the district court explained later, there was "sufficient evidence to support bad faith spoliation in the existing record."

*Reargument Order*, at 2 n.1.  Although some of Appellees' more conspiratorial allegations go too far, the district court had a reasonable basis to conclude that Rembrandt stood idly by while Zhone destroyed documents.  And, some of those documents were not just relevant, but directly helpful to Appellees' invalidity defenses.  The district court correctly noted, and Rembrandt does not dispute, that "AOPs' inability to conduct full discovery of relevant documents was prejudicial."  *Exceptional Case Order*, at 3 n.4.  On balance, we conclude that the district court's finding of spoliation was not clearly erroneous.

### 3.  The District Court's Inequitable Conduct Finding Is Not Erroneous

Rembrandt next challenges the district court's finding that "Rembrandt should have known that the 'revived patents' were unenforceable."  *Exceptional Case Order*, at 3 n.4.  Rembrandt argues that the district court erred both in finding that the patents were unenforceable due to inequitable conduct and that the inequitable conduct was chargeable to Rembrandt.

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc).  "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO."  *Id.* at 1287.  "[P]revailing on a claim of inequitable conduct often makes a case 'exceptional'" under § 285.  *Id.* at 1289 (citing *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001)).

A threshold question here is the evidentiary standard that governs inequitable conduct determinations in the § 285 context.  When a party raises inequitable conduct as a defense to patent infringement, "[t]he accused infringer must prove both elements—intent and materiality—by

clear and convincing evidence." *Id.* at 1287 (citing *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008)).  But the Supreme Court held in *Octane Fitness* that patent litigants need only establish their entitlement to fees under § 285 by a preponderance of the evidence.  134 S. Ct. at 1758.  Appellees therefore suggest that the clear and convincing standard should not apply here.  Appellees' Br. 63–64.

The district court did not specify which evidentiary standard it applied.  Other district courts that have considered the question have reached different conclusions.  *See Evonik Degussa GmbH v. Materia, Inc.*, 305 F. Supp. 3d 563, 569–71 (D. Del. 2018) (collecting cases and noting disagreement before concluding that the clear and convincing evidence standard applied).  We need not resolve that thorny issue, however, because the district court did not abuse its discretion under either evidentiary standard.

The first question is whether Paradyne's statement that the delay in payment was "unintentional" was material to patentability.  We have noted our reluctance to avoid impinging on the PTO's discretion by opining "[o]n matters unrelated to the substantive criteria of patentability."  *Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1243 (Fed. Cir. 2013).  But where the PTO's procedural rules are unambiguous, deciding what it would have done in a particular circumstance does not require us to second-guess the agency.

The PTO has issued clear guidance on the precise issue we face here:  whether a patent may be revived if the holder failed to pay maintenance fees in the belief that the invention had no commercial value.  The governing regulation provides that "[t]he Director may accept the payment of any maintenance fee due on a patent after expiration of the patent if, upon petition, the delay in payment of the maintenance fee is shown to the satisfac-

tion of the Director to have been unintentional." 37 C.F.R. § 1.378(a) (2013). In the Federal Register notice that the PTO published when it introduced this language, the PTO explained what it meant by "unintentional":

> *Where the applicant deliberately permits an application to become abandoned* (e.g., *due to a conclusion that* the claims are unpatentable, that a rejection in an Office action cannot be overcome, or that *the invention lacks sufficient commercial value to justify continued prosecution*), the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as "unintentional" within the meaning of § 1.137(b). . . . An intentional delay resulting from a deliberate course of action chosen by the applicant is not affected by: (1) The correctness of the applicant's (or applicant's representative's) decision to abandon the application or not to seek or persist in seeking revival of the application; (2) the correctness or propriety of a rejection, or other objection, requirement, or decision by the Office; or (3) the discovery of new information or evidence, or other change in circumstances subsequent to the abandonment or decision not to seek or persist in seeking revival.

Changes to Patent Practice and Procedure, 62 Fed. Reg. 53,132, 53,158–59 (Oct. 10, 1997) (to be codified at 37 C.F.R. pt. 1) (emphases added); *see* Manual of Patent Examining Procedure § 711.03(c)(3)(II)(C) (9th ed. 2015) (noting that an applicant's decision to abandon an application for lack of "sufficient commercial value to justify continued prosecution" is "a deliberately chosen course of action, and the resulting delay cannot be considered as 'unintentional'"). This definition of "unintentional" in relation to abandoned applications applies with equal

force to issued patents.  *See In re Patent No. 5,181,974*, 2007 WL 4974450, at *3–4 (Comm'r Pat. Aug. 17, 2007).

It is clear, therefore, that the PTO would not have revived the patents if it had known that Paradyne consciously allowed them to expire.   In other words, the statement was material to patentability—or at least continued enforceability.[4]   The district court's finding to that effect is not clearly erroneous.

Paradyne's alleged mistake of fact is no defense.   It may be true that Paradyne's employees genuinely believed that a patent could be revived for years even after the six-month grace period for payment.   But their decision not to make the payment still was intentional.

The question of deceptive intent is more complex. Rembrandt cites our holding in *Therasense* that a finding of deceptive intent is inappropriate "when there are multiple reasonable inferences that may be drawn."  649 F.3d at 1290–91.  *Network Signatures* similarly explains that the patentee's action cannot "constitute[] material misrepresentation with intent to deceive" unless "intent to deceive the PTO [is] the single most reasonable inference able to be drawn from the evidence."   731 F.3d at

---

[4]   In setting forth its test for materiality, *Therasense* contemplated statements made to the PTO during initial prosecution of a patent.   649 F.3d at 1291–95.   But statements critical to the "survival of the patent"—even though they do not, strictly speaking, bear on patentability—also can be material within the meaning of *Therasense.  See Ulead Sys., Inc. v. Lex Comput. & Mgmt. Corp.*, 351 F.3d 1139, 1146 (Fed. Cir. 2003) (finding that a "false declaration of small entity status" in an effort to reduce the required maintenance fees satisfied the materiality prong of the inequitable conduct test).

1242 (quoting *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 519 (Fed. Cir. 2012)).[5]

Rembrandt's explanation for Paradyne's conduct makes some sense. In a memo from Bremer to Horstemeyer on November 24, 2003, Bremer acknowledged that the PTO would not allow the revival of a patent unless the failure to pay maintenance fees was "unavoidable" or "unintentional." J.A. 138. Bremer told Horstemeyer that he felt that the abandonment was "unintentional" under the meaning of the PTO form because "we would NOT have abandoned [certain patents] if we understood that reviving was not possible." *Id.* Bremer testified that it was Paradyne's "understanding at the time of abandonment that a patent could be revived within 24 months of the USPTO official abandonment date." J.A. 144. Horstemeyer also testified that he "thought [it] to be a true statement" that the delay in payment was unintentional. J.A. 1162, 195:13–20. He claimed that the failure to pay maintenance fees was due to "a misunderstanding about . . . when the deadline actually was," and that he was "instructed not to make that payment" because of the misunderstanding. J.A. 1174, 207:3–13.

As Appellees point out, however, that explanation is difficult to square with Bremer's acknowledgment in another document that "[f]ailure to pay [maintenance] fees results in loss of patent rights." J.A. 3880. And Bremer testified that Horstemeyer was involved in the

---

[5]     We note that the high bar in these cases is rooted in the clear and convincing evidence standard. If Appellees need only prove inequitable conduct in this context by the preponderance of the evidence—which, again, we do not decide today—the standard upon which the district court could have premised its findings of fact would be less exacting.

patent review board meetings where Paradyne decided which patents to abandon.  Horstemeyer knew, in other words, exactly why Paradyne decided to abandon the '819 and '858 patents—namely, because it believed that they were not worth the fee.  Rembrandt's explanation is also difficult to square with documents indicating that it was Bremer's surprise that a third party might have interest in the abandoned patents that prompted their revival.

The district court could fairly conclude from this evidence that the claim of mistake was a post hoc rationalization.  The district court also could have decided the same about Paradyne's explanation for why it told the PTO that the abandonment was "unintentional."  In making these factual findings, the district court also considered the misconduct discussed above, in which Bremer and Horstemeyer also were involved.  *See Exceptional Case Order*, at 3 n.4 ("[T]he fact witnesses—discussed above—were the very same Paradyne employees who engaged in the inequitable conduct."); *see also Reargument Order*, at 2 n.1 ("The court has been furnished with sufficient evidence to conclude that revival of the patents in this case fit into a pattern of misconduct, and therefore deception was the most reasonable inference.").  Although the other misconduct occurred much later, the district court was entitled to weigh it when assessing the key players' trustworthiness and the likelihood that they had deceptive intent.  For these reasons, the district court's finding of inequitable conduct by Paradyne was not erroneous.

Our decision in *Network Signatures* is not to the contrary.  In *Network Signatures*, the Navy allowed a patent to expire, in accordance with standard policy, because there was no commercial interest in the invention.  731 F.3d at 1240–41.  Two weeks after the final payment date, someone contacted the Navy to inquire about licensing the patent.  *Id.* at 1241.  The Navy immediately filed a petition for delayed payment using the PTO's standard

form, which contained a preprinted statement that the delay in payment of the maintenance fee was unintentional. *Id.* The PTO accepted the delayed payment and revived the patent. *Id.* In a subsequent lawsuit involving the patent, the defendant argued that this constituted inequitable conduct, and the district court granted summary judgment of inequitable conduct, even as it found that none of the Navy's statements in litigation were particularly egregious. *Id.* at 1241–42. We reversed the decision, holding that the Navy's "compliance with the standard PTO procedure for delayed payment, using the PTO form for delayed payment, does not provide clear and convincing evidence of withholding of material information with the intent to deceive the Director." *Id.* at 1243.

Here, however, the district court found that the same people who deceived the PTO were involved in a variety of other misconduct. In light of the latter findings, the district court reasonably could have decided that "intent to deceive the PTO [was] the single most reasonable inference able to be drawn from the evidence." *Network Signatures*, 731 F.3d at 1242 (quoting *Rosuvastatin*, 703 F.3d at 519). "[I]t is not the function of a court of appeals to override district court judgments on close issues, where credibility findings have been made." *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1231–32 (Fed. Cir. 2007).

The only remaining question is whether the district court properly concluded that "Rembrandt had sufficient knowledge to learn of the fraud." *Exceptional Case Order*, at 3 n.4. That, too, is an issue of fact, for which the district court is owed deference. Although the district court did not elaborate on this finding, Appellees identify sufficient evidence to support it. Appellees cite, in particular, a spreadsheet that Bremer sent Meli in August 2006 about the patents in which the third party had expressed interest. The row in that spreadsheet about the '858 patent indicated that it had been abandoned. Although

Rembrandt dismisses the likelihood that it could have gleaned information about the improper revival from this spreadsheet, the spreadsheet was not large—it contained only 30 patents—and among them were patents that Rembrandt already had asserted in this case and to which Rembrandt would have paid close attention.  The district court reasonably could have found that Rembrandt knew that the '858 patent had been abandoned and chose not to investigate how it had been revived.

Appellees also cite other documents that were available to Rembrandt in which Paradyne employees discussed their plan to revive the patents.  Rembrandt had access to these documents under the patent sale agreement.  Although the '819 patent was not listed in the spreadsheet, the fact that at least one patent had been revived in this way, in combination with the other documents accessible to Rembrandt, could give rise to the inference that Rembrandt knew about, or could have learned about, the improper revival of both the '819 and '858 patents.

Rembrandt argues that the district court's implicit application of the "should have known" standard imposes too high a burden on Rembrandt and conflicts with our guidance in *Therasense*.  *See* 649 F.3d at 1290 ("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy [the] intent requirement.").  But Appellees are right that Rembrandt conflates the inequitable conduct and exceptional case inquiries.  The first question—the one governed by *Therasense*—is whether *Paradyne* committed inequitable conduct.  The second question—to which *Therasense* does not apply—is whether Paradyne's conduct renders *Rembrandt's* case exceptional.  Rembrandt's reliance on *Therasense* in the latter context is misplaced.

### 4. The District Court Followed the Proper Procedures in Making Its Exceptional-Case Determination

It is undisputed that Rembrandt did not request an evidentiary hearing at any point before the district court made its exceptional-case determination. The district court sat on the motion for years, and it even returned the sealed exhibits to the parties, but it never resolved the motion. Five years after the motion was filed, and three years after the motion was re-filed after judgment was entered on the '627 patent, Appellees submitted supplemental authority citing *Octane Fitness*, and Rembrandt responded. Although Rembrandt argued that Appellees had abandoned the motion and that ruling on the stale record would be prejudicial, Rembrandt did not request an evidentiary hearing. Rembrandt was never entitled to assume that the motions would be denied or simply ignored. Indeed, Rembrandt apparently did not make such an assumption; its filings show that it contemplated at least the possibility of a ruling on the motions. Rembrandt waived its procedural objection to the lack of an evidentiary hearing.

The district court also was not required to afford Rembrandt an evidentiary hearing in this case. Rembrandt is right that "[t]he imposition of monetary sanctions by a court implicates fundamental notions of due process and thus requires 'fair notice and an opportunity for a hearing on the record.'" *Rogal v. Am. Broad. Cos.*, 74 F.3d 40, 44 (3d Cir. 1996) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)). But, as the Third Circuit recognized in *Rogal*, the concept of an "opportunity to be heard at a meaningful time and in a meaningful manner . . . is flexible, calling for procedural protection as dictated by the particular circumstance." *Id.* (quoting *Kahn v. United States*, 753 F.2d 1208, 1218 (3d Cir. 1985)). The *Rogal* court explained that a district court, "in the sound exercise of its discretion," must determine whether the resolution of a sanction charge "requires

further proceedings, including the need for an evidentiary hearing." *Id.* (quoting *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1359 (3d Cir. 1990)).

Although the *Rogal* court found the district court's failure to hold an evidentiary hearing constituted an abuse of discretion in that case, it emphasized that its "holding [was] a narrow one and depend[ed] heavily on the specific nature" of the misconduct in question. *Id.* at 45. The Third Circuit remanded for the district court to hold the hearing, in particular, because the witness whose testimony the district court found sanctionable "did not have the same incentive at trial to try to clear up all of the apparent contradictions and inconsistencies in his testimony or to try to show his good faith as he would have had at an evidentiary hearing on the question of sanctions." *Id.* That is not the case here. As Appellees point out, the relevant witnesses had an opportunity to explain their actions at their depositions, and they had every incentive to do so; in fact, all of them were on Rembrandt's payroll by that time. The district court was not required to give them a second bite at the apple at an evidentiary hearing.

The lack of an evidentiary hearing also does not alter the standard we use to review the district court's factual findings. We give deference to those findings "in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The district court here certainly understood the litigation better than we can on appeal. Although it remains incumbent on "the district court to provide a concise but clear explanation of its reasons for the fee award," *id.*, our role is to compare that explanation against the record on appeal, not to conduct a de novo analysis of the record.

And, finally, the district court did not need to consider each MDL case separately in making an exceptional-case determination, except to the extent it was required to establish a causal link for fees. "Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities," *Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 904 (2015), but MDL courts "have wide discretion" to manage their dockets to avoid "potential burdens on defendants and the court," *In re Asbestos Prods. Liab. Litig. (No. VI)*, 718 F.3d 236, 246–47 (3d Cir. 2013) (quoting *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 340 (5th Cir. 2000)). The district court exercised that discretion in considering all of the cases together in making its exceptional-case determinations, and the district court implicitly found that *each* case was exceptional. Section 285 does not compel a different process.

### 5. The District Court Did Not Abuse Its Discretion in Determining that the Case Is Exceptional Under § 285

*Octane Fitness* gives district courts broad discretion in the exceptional-case determination. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1756. "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* Relevant considerations may include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

Under that generous standard, the district court's determination was not an abuse of discretion. The district court found that Rembrandt's conduct, and Paradyne's

conduct that was attributable to Rembrandt, showed that Rembrandt litigated the case in an "unreasonable manner." *Exceptional Case Order*, at 2 n.4 (quoting *Octane Fitness*, 134 S. Ct. at 1756). The court found, in particular, that "the 'totality of the circumstances'—the wrongful inducements, the spoliation, and the assertion of fraudulently revived patents—supports AOPs' characterization of this case as 'exceptional'—it 'stands out.'" *Id.* at 3 n.4 (quoting *Octane Fitness*, 134 S. Ct. at 1756). To overturn this finding, we must find that the district court made "a clear error of judgment in weighing relevant factors or in basing its decision on an error of law or on clearly erroneous factual findings." *Bayer CropScience*, 851 F.3d at 1306 (quoting *Mentor Graphics*, 150 F.3d at 1377). Because we find no clear error in the district court's factual findings or any error in the legal standard it employed, there is no basis for us to hold that the district court abused its discretion in determining that the case is exceptional.

## B. The District Court's Fee Award

Rembrandt also takes issue with the district court's award of $51 million in attorney fees. Rembrandt raises no specific objections to Appellees' tabulations of the hours they expended; nor does Rembrandt contend that Appellees should have calculated fees using a lower hourly rate. Rembrandt instead argues that the fee award is excessive and unreasonable because the district court failed to establish a causal connection between the claimed misconduct and the fees awarded. We agree.

"The determination of reasonable attorney fees is also 'a matter that is committed to the sound discretion' of a district court judge." *Lumen View*, 811 F.3d at 483 (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010)). "We therefore also review the calculation of an attorney fee award under § 285 for an abuse of discretion." *Id.*

After determining that this case was exceptional, the district court asked Appellees to submit documentation detailing their fee requests and a proposed order awarding those fees. Appellees did so, accompanied by briefing on why Rembrandt's pervasive misconduct justified an award of all fees and costs incurred in the litigation. The proposed order also included, in footnotes, an award of the fees Appellees incurred in defending against Rembrandt's assertion of the '627 patent.

The district court granted almost all of those fee requests, excluding only expert fees, fees relating to Adelphia's bankruptcy, fees for secretarial and clerical work, and prejudgment interest. But the court did not explain why an award of almost all fees was warranted or whether it had accepted AOPs' argument about pervasive misconduct. *First Fees Order*, at 1–3. The district court's order said nothing about the '627 patent. It did, however, order AOPs to submit an updated fee request. *Id.* at 3. AOPs submitted that request and a new proposed order, explaining that the original proposed order "did not correctly tabulate the fee amounts requested in the declarations submitted" because it "omitted" fees from Cablevision, Cox, and Adelphia. J.A. 3268.

Over Rembrandt's objections, the district court granted Appellees' request. *Second Fees Order*, at 1–3. The district court accepted AOPs' explanation that the increased amount was the result of a tabulation error. *Id.* at 2 n.1. The district court found that AOPs had satisfied the procedural requirements for seeking fees related to the '627 patent, and it awarded those fees without further explanation. *Id.* And the district court "conclude[d] that it is reasonable to award Adelphia expenses relating to the Rembrandt litigation while it was pending in the Bankruptcy Court for the Southern District of New York." *Id.* It then ordered Rembrandt to pay the full amount of fees and costs Appellees requested. *Id.* at 2–3.

Appellees do not dispute that attorney fees under § 285 are compensatory, not punitive. *Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983). In such a "statutory sanction regime[]," a "fee award may go no further than to redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 & n.5 (2017) (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994)). Deterrence "is not an appropriate consideration in determining the *amount* of a reasonable attorney fee." *Lumen View*, 811 F.3d at 484–85. It follows, as we have held, that "the amount of the award must bear some relation to the extent of the misconduct." *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1106 (Fed. Cir. 2003). We have explained that "[a] finding of exceptionality based on litigation misconduct[] . . . usually does not support a full award of attorneys' fees." *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1316 (Fed. Cir. 2012), *vacated on other grounds*, 134 S. Ct. 1744 (2014).

To be sure, an award of fees under § 285 is not governed by the same exacting standards as a sanction under the Federal Rules of Civil Procedure. Rule 37(b), for example, provides that a party failing to comply with a court order must "pay the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(b)(2)(c). Section 285, on the other hand, says only that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. As the Supreme Court recognized in *Goodyear*, an award of all of a party's fees, "from either the start or some midpoint of a suit," may be justified in some "exceptional cases." 137 S. Ct. at 1187. But, critically, the amount of the award must bear some relation to the extent of the misconduct. *Rambus*, 318 F.3d at 1106. The district

court must explain that relationship, at least to the extent practicable.

Appellees cite our decision in *Monolithic Power Systems, Inc. v. O2 Micro International Ltd.*, 726 F.3d 1359 (Fed. Cir. 2013), where we upheld a full award of attorney fees against a party whose "extensive misconduct was enough to comprise an abusive pattern or a vexatious strategy that was pervasive enough to infect the entire litigation." *Id.* at 1369 (internal quotation marks omitted). Under the circumstances there, we held "that [the party's] rampant misconduct so severely affected every stage of the litigation that a full award of attorney fees was proper." *Id.*

But the district court here never made such a finding. It said only that the inducements to witnesses "g[ave] rise to a considerable risk of tainted testimony, that the destruction of documents "was prejudicial" to AOPs because it prevented them from conducting "full discovery of relevant documents," and that "Rembrandt should have known that the 'revived patents'"—two of the nine in the litigation—"were unenforceable." *Exceptional Case Order*, at 3 n.4.[6] Although the district court also said that "Rembrandt must take responsibility for its own massive litigation," *id.*, none of the district court's language implies that it thought the specific instances of misconduct above bore the kind of relation to the overall litigation contemplated by *Goodyear* or *Rambus*.

_____

[6]   Appellees claim that the district court found that "Rembrandt denied Appellees the opportunity 'to conduct full discovery' and 'prejudic[ed]' them at every turn." Appellees' Br. 66 (alteration in original) (quoting *Exceptional Case Order*, at 3 n.4). Appellees read too much into the district court's decision.

In fact, several of the district court's findings suggest otherwise. The district court rejected Adelphia's claim that Rembrandt had sued in bad faith and that its legal positions were unreasonable. *Id.* at 3 n.5. And, in one of its subsequent orders, the court found that expert fees were not warranted because they can be awarded only when a "party acted in bad faith, vexatiously, wantonly, [or] for oppressive reasons," and that "such a finding is not warranted in this case." *First Fees Order*, at 2 n.3. The district court similarly found "that there has not been the kind of bad faith through litigation that warrants prejudgment interest on the amount of fees awarded." *Id.* at 2 n.6.

Appellees also imply that the fee award was appropriate because the destroyed documents and the inducements to witnesses affected every issue in the suit. Appellees point to their own itemization of the documents destroyed and their relevance to the case. Rembrandt, on the other hand, submitted a declaration accompanied by extensive documentation explaining all of the aspects of the case that the misconduct did *not* affect. Rembrandt notes, moreover, that the improperly revived patents were not asserted against Adelphia, that the on-sale bar defense was only relevant to two patents, and that the '627 patent was on a separate track and had no overlap with the issues involving the other patents.

The district court, by and large, did not even attempt to assess which issues the claimed misconduct affected. It specifically addressed the fees Appellees incurred relating to the '627 patent, which Appellees had listed separately in their proposed orders. *Second Fees Order*, at 2 n.1. But the district court did not establish a causal connection between the misconduct and those fees, and it did not offer any other reason for its fee award. *Id.* And, even though the district court explained why it awarded the attorney fees that Adelphia incurred defending against Rembrandt in bankruptcy court, it again failed to connect

the misconduct with Adelphia's fees. Nowhere did the district court address the requisite "causal connection" it was required to find between the misconduct and the fees it awarded. *Goodyear*, 137 S. Ct. at 1187.

In the run-of-the-mill patent infringement case involving a few patents and a couple of defendants, a finding of pervasive misbehavior or inequitable conduct that affects all of the patents in suit may justify an award of all of the fees incurred. But this massive case featured nine patents and dozens of defendants, and the claimed misconduct affected only some patents asserted against some defendants. Even if Rembrandt's misconduct, taken as a whole, rendered the case exceptional, the district court was required to establish at least some "causal connection" between the misconduct and the fee award. *Id.* What the district court did here—award all fees with no explanation whatsoever of such a causal connection— was not enough.

The most appropriate course, therefore, is to remand for the district court to determine in the first instance how much of the claimed fees Rembrandt should pay. This does not require a tedious, line-by-line investigation of the hours Appellees expended. As the Supreme Court recently explained in *Goodyear*, "'[t]he essential goal' in shifting fees' is 'to do rough justice, not to achieve auditing perfection.'" *Id.* (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)). "The court may decide, for example, that all (or a set percentage) of a particular category of expenses— say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct." *Id.* "And such judgments, in light of the trial court's 'superior understanding of the litigation,' are entitled to substantial deference on appeal." *Id.* (quoting *Hensley*, 461 U.S. at 437).

We therefore vacate the district court's fee award and remand for the district court to conduct the appropriate analysis in the first instance.

IN RE REMBRANDT TECHS., LP PATENT LITIG.                43

### III. CONCLUSION

We affirm the district court's determination that this case is exceptional under § 285.  We vacate, however, its award of attorney fees and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**

### COSTS

No costs.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### NOTICE OF ENTRY OF
### JUDGMENT ACCOMPANIED BY OPINION

## OPINION FILED AND JUDGMENT ENTERED: 07/27/2018

The attached opinion announcing the judgment of the court in your case was filed and judgment was entered on the date indicated above. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing en banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

No costs were taxed in this appeal.

Regarding exhibits and visual aids: Your attention is directed Fed. R. App. P. 34(g) which states that the clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them. (The clerk deems a reasonable time to be 15 days from the date the final mandate is issued.)

FOR THE COURT

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

cc: Steven Cherny
Thomas Lee Duston
Brian Lee Ferrall
Thomas Goldstein
Richard W. Goldstucker
Julianne M. Hartzell
Michael Craig Harwood
Benjamin Hershkowitz
Kevin David Hogg
Josh Krevitt
Leo L. Lam
Aaron Nielson
John C. O'Quinn
Robert Scott Roe
Tejinder Singh
Mitchell G. Stockwell
Jason M. Wilcox

17-1784 - Rembrandt Technologies, LP v. Comcast of Florida
United States District Court for the District of Delaware, Case No. 1:07-md-01848-GMS, 1:06-cv-00635-GMS, 1:06-cv-00721-GMS, 1:06-cv-00729-GMS, 1:06-cv-00727-GMS, 1:06-cv-00730-GMS, 1:06-cv-00731-GMS, 1:07-cv-00399-GMS, 1:07-cv-00403-GMS, 1:07-cv-00401-GMS, 1:07-cv-00404-GMS, 1:07-cv-00402-GMS, 1:07-cv-00400-GMS, 1:07-cv-00398-GMS, 1:07-cv-00396-GMS, 1:07-cv-00397-GMS, 1:07-cv-00752-GMS

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

717 MADISON PLACE, N.W.
WASHINGTON, D.C.  20439

PETER R. MARKSTEINER                                                        202-275-8000
    CLERK OF COURT

## Information Sheet

## Petitions for Rehearing and Petitions for Hearing and Rehearing En Banc

### 1.  When is a petition for rehearing appropriate?

The Federal Circuit grants few petitions for rehearing each year.  These petitions for rehearing are rarely successful because they typically fail to articulate sufficient grounds upon which to grant them.  Of note, petitions for rehearing should not be used to reargue issues previously presented that were not accepted by the merits panel during initial consideration of the appeal.  This is especially so when the court has entered a judgment of affirmance without opinion under Fed. Cir. R. 36.  Such dispositions are entered if the court determines the judgment of the trial court is based on findings that are not clearly erroneous, the evidence supporting the jury verdict is sufficient, the record supports the trial court's ruling, the decision of the administrative agency warrants affirmance under the appropriate standard of review, or the judgment or decision is without an error of law.

### 2.  When is a petition for hearing/rehearing en banc appropriate?

En banc consideration is rare.  Each three-judge merits panel is charged with deciding individual appeals under existing Federal Circuit law as established in precedential opinions.   Because each merits panel may enter precedential opinions, a party seeking en banc consideration must typically show that either the merits panel has (1) failed to follow existing decisions of the U.S. Supreme Court or Federal Circuit precedent or (2) followed Federal Circuit precedent that the petitioning party now seeks to have overruled by the court en banc.  Federal Circuit Internal Operating Procedure #13 identifies several reasons when the Federal Circuit may opt to hear a matter en banc.

### 3.  Is it necessary to file either of these petitions before filing a petition for a writ certiorari in the U.S. Supreme Court?

No.  A petition for a writ of certiorari may be filed once the court has issued a final judgment in a case.

---

**For additional information and filing requirements, please refer to Fed. Cir. R. 40 (Petitions for Rehearing) and Fed. Cir. R. 35 (Petitions for Hearing or Rehearing En Banc).**

---

*Revised May 10, 2018*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
### 717 MADISON PLACE, N.W.
### WASHINGTON, D.C.  20439

PETER R. MARKSTEINER                                                    202-275-8000
CLERK OF COURT

## Information Sheet

## Filing a Petition for a Writ of Certiorari

There is no automatic right of appeal to the Supreme Court of the United States from judgments of the Federal Circuit.  Instead, a party must file a petition for a writ of certiorari which the Supreme Court will grant only when there are compelling reasons. *See* Supreme Court Rule 10.

**Time.** The petition must be filed in the Supreme Court of the United States within 90 days of the entry of judgment in this Court or within 90 days of the denial of a timely petition for rehearing. The judgment is entered on the day the Federal Circuit issues a final decision in your case. The time does not run from the issuance of the mandate.  *See* Supreme Court Rule 13.

**Fees.** Either the $300 docketing fee or a motion for leave to proceed in forma pauperis with an affidavit in support thereof must accompany the petition. *See* Supreme Court Rules 38 and 39.

**Authorized Filer.** The petition must be filed by a member of the bar of the Supreme Court of the United States or by the petitioner as a self-represented individual.

**Format of a Petition.** The Supreme Court Rules are very specific about the content and formatting of petitions.  *See* Supreme Court Rules 14, 33, 34.  Additional information is available at https://www.supremecourt.gov/filingandrules/rules_guidance.aspx.

**Number of Copies.** Forty copies of a petition must be filed unless the petitioner is proceeding in forma pauperis, in which case an original and ten copies of both the petition for writ of certiorari and the motion for leave to proceed in forma pauperis must be filed. *See* Supreme Court Rule 12.

**Filing.** Petitions are filed in paper at *Clerk, Supreme Court of the United States, 1 First Street, NE, Washington, DC 20543.*

Effective November 13, 2017, electronic filing is also required for filings submitted by parties represented by counsel. *See* Supreme Court Rule 29.7.  **Additional information about electronic filing at the Supreme Court is available at** https://www.supremecourt.gov/filingandrules/electronicfiling.aspx.

No documents are filed at the Federal Circuit and the Federal Circuit provides no information to the Supreme Court unless the Supreme Court asks for the information.

*Revised May 10, 2018*